FILED
SEP 17 1990
JAMES F. DAVEY, Clerk

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America,

v.

Criminal No. 89-0162

Rayful Edmond, III, <u>et al.</u>

MEMORANDUM OPINION OF CHARLES R. RICHEY
UNITED STATES DISTRICT JUDGE

The Court has just completed sentencing eighteen defendants on Count Two of the forty-three count Superseding Indictment ("Indictment") in the above-captioned case which charges conspiracy to distribute or to possess with the intent to distribute more than five kilograms of a mixture or substance containing a detectable amount of cocaine or more than fifty grams of a mixture or substance containing a detectable amount of cocaine base in violation of 21 U.S.C. § 846.[1] At their sentencing hearings, most,

---

[1] The Court severed the Indictment in this case, which involves twenty-nine defendants and forty-three counts, into four separate trials. Other than the nine defendants who pled guilty, all of the defendants were convicted of conspiracy in the first two trials. The Court set aside the conspiracy conviction of one of the defendants in the second trial on the ground of insufficiency of evidence. In addition to the nine defendants named in the Indictment who pled guilty, the Court sentenced five other defendants (three cooperated with the government) who pled guilty to 21 U.S.C § 846 or 18 U.S.C. § 371 because of their participation in the conspiracy charged in Count Two.
    The eighteen defendants who have been sentenced for conspiracy are Rayful Edmond, III, Melvin D. Butler, James Antonio Jones, Jerry R. Millington, Tony Lewis, Willie G. Childress, Keith E. Cooper, Columbus Daniels, Rachelle Edmond, Robert M. Hardy, Bernice Hillman McCraw, David W. McCraw, John Monford, Armaretta B. Perry, Constance D. Perry, Melvin E. Stewart, Jeffrey L. Thompson, and Raynice Thompson. The defendant Emanuel Sutton remains to be sentenced on October 5, 1990.

2

if not all, of these eighteen defendants raised three identical objections to their Presentence Investigation Reports prepared by the Probation Office. The first objection is the Probation Office's computation of their base offense level based on fifty or more kilograms of cocaine when the jury convicted them of a conspiracy to distribute or to possess with the intent to distribute five or more kilograms of cocaine. The second objection, which was initially made by the defendant Rayful Edmond, III and was subsequently adopted by many of his co-defendants, is that the object of the conspiracy of which they stand convicted was engaging in a continuing criminal enterprise ("CCE") rather than the distribution or the possession with the intent to distribute cocaine. The third objection is to the Probation Office's assessment of a two-level enhancement to each defendant's base offense level pursuant to § 2D1.1(b)(1) of the Sentencing Guidelines for the possession of guns during the conspiracy.

Upon careful consideration of the legal memoranda filed by the defendants and the government prior to sentencing, the arguments advanced by each defendant and the government at the sentencing hearings, the applicable provisions of the Sentencing Guidelines, and the case law construing them, the Court adopted the Probation Office's recommendation that each defendant be given a base offense level of 36 and a two-level enhancement for guns and rejects the argument that engaging in a continuing criminal enterprise is the object of the conspiracy of which the defendants stand convicted. At each defendant's sentencing hearing, the Court announced from

the bench the portions of the record and the legal authority upon which it relied in assigning each defendant a base offense level of 36 and a two-level enhancement for guns. This opinion memorializes those oral findings of fact and conclusions of law.

I.   <u>Appropriate Drug Quantity for Determining Base Offense Level</u>

Defendants' reliance upon the jury's verdict and the quantity of cocaine specified in the count of the Indictment charging conspiracy in arriving at the appropriate base offense level is misplaced. In fact, some district courts have been reversed for calculating the base offense level, as the defendants urge, solely on the basis of the quantity of cocaine specified in the Indictment and supported by the jury's verdict. <u>See</u>, <u>e.g.</u>, <u>United States v. Schaper</u>, 903 F.2d 891, 897 (2d Cir. 1990) (holding that district court erred in accepting defense counsel's argument that quantity of cocaine for purposes of sentencing should be confined to amounts seized and charged); <u>United States v. Moreno</u>, 899 F.2d 465, 473 (6th Cir. 1990) (holding that "district court is not bound by the jury's verdict . . . despite the jury's finding as to the quantity of drugs involved in the conspiracy or scheme" and that "[t]he district court committed error . . . by considering itself bound at sentencing by the jury's findings").

The penalty for a § 846 conspiracy is calculated pursuant to § 2D1.1 of the Sentencing Guidelines. "Under § 2D1.1, sentencing for violation of § 846 is largely determined by the quantity of

4

drugs involved and the type of narcotic as outlined in § 2D1.1(c). Under § 2D1.1(c), the judge is required to make a finding of the approximate amount of drugs involved in order to apply the Guidelines." United States v. Reynolds, 900 F.2d 1000, 1003 (7th Cir. 1990). The district court's factual finding as to the quantity of drugs, which may be reversed only if clearly erroneous, see United States v. Buggs, 904 F.2d 1070, 1077 (7th Cir. 1990); United States v. Davis, 902 F.2d 860, 861 (11th Cir. 1990); United States v. Rivera, 898 F.2d 442, 445 (5th Cir. 1990), must be supported by a preponderance of the evidence, see Schaper, 903 F.2d at 898-99; Moreno, 899 F.2d at 472-73; United States v. Powell, 886 F.2d 81, 85 (4th Cir. 1989), cert. denied, 110 S. Ct. 1144 (1990).

The Guidelines make it clear that a court making a finding as to the quantity of drugs involved is not bound by the quantity of drugs for which a defendant was indicted or convicted, United States v. Wayne, 903 F.2d 1188, 1197 (8th Cir. 1990); Rivera, 898 F.2d at 445, or the amounts seized, Schaper, 903 F.2d at 897, or even the quantity a defendant actually handled, United States v. Drew, 894 F.2d 965, 972 (8th Cir.), cert. denied, 110 S. Ct. 1830 (1990). Instead, the Guidelines provide that "a sentencing court must consider a defendant's involvement with quantities of narcotics not charged in the count(s) of conviction when such conduct was undertaken in the same course of conduct as the offense of conviction." Schaper, 903 F.2d at 897-88 (citing U.S.S.G. §

1B1.3(a)(2) (Jan. 15, 1988));[2] see also United States v. Alston, 895 F.2d 1362, 1369-72 (11th Cir. 1990) (upholding sentence where "the district court determined the base level for the amount of cocaine involved in the scheme and not merely the four ounces charged in the count to which [the defendant] had entered his plea"). Accordingly, in arriving at the appropriate base offense level, the Court's task is to make a finding by a preponderance of the evidence as to the quantity of cocaine involved in the conspiracy of which the defendants were convicted. See Drew, 894 F.2d at 972 (holding that Guidelines provide for calculation of defendant's base offense level based on the 341 grams involved in the conspiracy rather than the 66.1 grams he sold himself).

Based upon testimony at the first two trials, the Court reaches the inescapable conclusion that the conspiracy involved more than fifty kilograms of cocaine.[3] Without combing through the

---

[2] The applicable Guideline, § 1B1.3(a)(2) provides that "all such acts or omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction" are "relevant to determining the applicable guideline range." The Commentary to that Guideline explains that "types and quantities of drugs not specified in the count of conviction are to be included in determining the offense level if they are part of the same course of conduct or part of the same scheme or plan as the count of conviction." U.S.S.G. § 1B1.3(a)(2), Application Note 5 (Jan. 15, 1988) (emphasis added).

[3] "The November 1989 revisions of the Sentencing Guidelines modified the drug quantity table to designate higher offense levels for categories corresponding to amounts of cocaine in excess of fifty kilograms, see U.S.S.G. § 2D1.1(c) (Nov. 1, 1989) (drug quantity table), but those guidelines are applicable only to offenses committed after November 1, 1989." Schaper, 903 F.2d at 896 n.4 (citing United States v. Guerrero, 863 F.2d 245, 250 (2d Cir. 1988)). The conspiracy of which the defendants were convicted terminated on or about April 16, 1989. Accordingly, the Court must look to the drug quantity table in the January 15, 1988 version of

6

testimony of the witnesses at the first two trials or the exhibits received in evidence, the Court can immediately identify several instances of witnesses testifying credibly about quantities of cocaine in excess of fifty kilograms. Much of the cocaine distributed during the course of the conspiracy came from the defendant Melvin Butler's connections in California. Typically, Rayful Edmond, III would send couriers to California to deliver money to Melvin Butler for the purchase of cocaine; a short time thereafter, Butler would send couriers to the Washington, D.C. area with the cocaine. Various members of the conspiracy would pick up the cocaine from Butler's couriers at one of the hotels near National Airport. For instance, at both trials, James Minor testified that he and David McCraw picked up fifty kilograms of cocaine from a gentleman from California at the Day's Inn Hotel in Crystal City, Virginia in August, 1988.[4] Royal Brooks also picked up substantial quantities of cocaine from various hotels in Crystal City. On one occasion, he picked up as much as 77 kilograms of cocaine; on another occasion, he picked up 58 kilograms of cocaine.

After a member of the conspiracy picked up the cocaine in Crystal City, it was stored in one of many locations; one such

---

the Guidelines in determining the appropriate base offense level.

[4] Although Minor was unable to identify the person from whom he and David McCraw received the cocaine, other evidence adduced during the second trial demonstrated that this person was the defendant Willie G. Childress. It should also be noted that Minor testified during the second trial that David McCraw had told him that he had gone to the Day's Inn alone the week before to pick up another fifty kilograms of cocaine; the Court does not recall whether Minor so testified during the first trial.

location was the apartment of Royal Brooks. At trial, Royal Brooks testified that at any one time he stored anywhere from 89 to 93 kilograms of cocaine at his apartment under a platform bed. Almost immediately after Brooks' arrest, the defendant Columbus Daniels removed approximately 90 kilograms of cocaine from Brooks' apartment at Rayful Edmond, III's direction.

Alta Rae Zanville testified about breaking down kilograms of cocaine into smaller amounts and packaging it for sale. For a nine-month period, the defendants David and Bernice McCraw went to Zanville's apartment to bag cocaine with her three times a week; each time they packaged one to two kilograms of cocaine. This means that Zanville and the McCraws packaged somewhere between 108 and 216 kilograms of cocaine over a nine-month period. After the nine-month period in which she packaged cocaine with the McCraws, Zanville packaged cocaine with Jeffrey and Raynice Thompson for a period of three months. Zanville packaged approximately 36 kilograms of cocaine with the Thompsons during this three-month period because she packaged approximately one kilogram with them three times a week.

Based on the trial testimony of Minor, Brooks, and Zanville, the Court cannot avoid the conclusion that the government has established that the conspiracy of which the defendants stand convicted involved more than fifty kilograms of cocaine. Moreover, the Court finds that each of these defendants knew or should have reasonably foreseen that fifty or more kilograms of cocaine were distributed during the course of the conspiracy. Accordingly, the

8

Court assigns each defendant a base offense level of 36.

II. Object of the Conspiracy

The defendant Rayful Edmond, III argues that the Probation Office and the government have incorrectly calculated his adjusted offense level for his conspiracy conviction by referring to the wrong object of the conspiracy.[5] While the Probation Office and the government argue that the defendant Edmond was convicted of conspiracy to distribute or to possess with the intent to distribute more than five kilograms of cocaine or more than fifty grams of cocaine base, the defendant Edmond argues that the object of the conspiracy was engaging in a CCE. In either case, the base offense level would be 36. Compare U.S.S.G. § 2D1.5 (CCE) with U.S.S.G. § 2D1.1(a)(3) (distribution of or possession of with the intent to distribute fifty or more kilograms of cocaine). However, if the object of the conspiracy were distribution of or possession of with the intent to distribute cocaine, the sentencing court could arrive at a significantly higher adjusted offense level by applying enhancements for role in the offense or possession of a firearm, see U.S.S.G. §§ 3B1.1, 2D1.1(b), whereas the application notes to the CCE Guideline provision do not contemplate these enhancements, see § 2D1.5.

In making this argument, the defendant ignores common sense and the law of CCE and conspiracy and distorts the manner in which

---

[5] The Sentencing Guidelines do not assign the offense of conspiracy a separate base offense level, but U.S.S.G. § 2D1.4 requires the sentencing court to apply the base offense level assigned to the offense which is the object of the conspiracy.

the government prosecuted this case. The Indictment charged the defendant Edmond with, <u>inter alia</u>, CCE and in a separate count with conspiracy to distribute or to possess with the intent to distribute cocaine or cocaine base, and neither the government's manner of trying this case nor the jury's verdict of guilty on both counts were inconsistent with this Indictment. Furthermore, it was clear that the conspiracy of which the defendant Edmond was convicted was one of the "continuing series" of narcotics-related predicate offenses required by the CCE statute, 21 U.S.C. § 848(b), and therefore was an element of the offense of CCE, <u>see</u> Court's Jury Instructions at 35. This exposes the hopelessly circular nature of the defendant Edmond's argument that would have CCE be the object of a conspiracy which in turn is an element of CCE. Thus, a conspiracy with CCE as its object in effect would be a "conspiracy to conspire," which would not be an offense under even the most expansive view of conspiracy law.

In view of the foregoing, it is understandable that the defendant Edmond has not pointed to a single case in which a defendant was charged with or convicted of "conspiracy to commit CCE" to counteract the deluge of cases in which defendants have been convicted of <u>both</u> CCE and conspiracy, <u>see</u>, <u>e.g.</u>, <u>Garrett v. United States</u>, 471 U.S. 773, 776 (1985) (CCE and conspiracy to import and to possess with intent to distribute narcotics); <u>Jeffers v. United States</u>, 432 U.S. 137, 141 (1977) (CCE and conspiracy to possess with intent to distribute narcotics); <u>United States v. Casamento</u>, 887 F.2d 1141, 1157-59 (2d Cir. 1989) (CCE and

10

conspiracy to import and distribute narcotics), <u>cert. denied</u>, 110 S. Ct. 1138 (1990).  Accordingly, in determining the defendant Edmond's adjusted offense level for his conspiracy conviction, the Court will look to the object of the conspiracy, namely distribution of or possession of with the intent to distribute more than five kilograms of cocaine or more than fifty grams of cocaine base.[6]

   III. <u>Two-Level Enhancement for the Possession of Firearms During the Conspiracy</u>

   Section 2D1.1(b)(1) of the Guidelines directs sentencing courts to enhance the base offense level of a defendant convicted of certain narcotics-related offenses, such as a § 846 conspiracy, by two levels if "a firearm or other dangerous weapon was possessed during commission of the offense."  Relying upon the analysis of the decision by the United States Court of Appeals for this Circuit in <u>United States v. Burke</u>, 888 F.2d 862 (D.C. Cir. 1989), many defendants have argued that they should not receive a two-level increase for the possession of firearms because they lacked the requisite <u>scienter</u>.

   In <u>Burke</u>, police officers at Union Station searched the defendant's tote bag and found heroin and a gun inside.  The defendant then pled guilty to a drug charge in exchange for dismissal of a gun charge.  When he was sentenced, the defendant

---

   [6] Although some of the defendant Edmond's co-defendants have "adopted" his overly creative "CCE as object of the conspiracy" argument, this argument is totally inapplicable to the other defendants who were not even charged with CCE.

received a two-level enhancement for the possession of a firearm during the commission of a drug offense. The Court of Appeals held that the sentencing judge erred in imposing this two-level enhancement because it did not make a finding that the defendant "<u>knowingly</u> possessed the gun found in his tote bag." <u>Id.</u> at 865 (emphasis in original).

The analysis in <u>Burke</u>, <u>a non-conspiracy case</u>, is not transferable to a conspiracy case such as this one because "a defendant involved in a conspiracy, regardless of whether he [or she] has possessed a firearm, can be punished as a principal based on the rule of vicarious liability of coconspirators." <u>United States v. Long</u>, 905 F.2d 1572, 1577 n.8 (D.C. Cir. 1990). The rule of vicarious liability, also known as the <u>Pinkerton</u> theory, makes a coconspirator liable for all substantive offenses committed by his or her coconspirators in furtherance of the conspiracy. <u>Pinkerton v. United States</u>, 328 U.S. 640, 646-48 (1946).

Section 1B1.3(a)(1) of the Guidelines and the accompanying commentary embody the principle of vicarious liability.

> [C]onduct that is relevant to determining the applicable guideline range [consists of] all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense.

U.S.S.G. § 1B1.3(a)(1). The commentary interpreting this provision explains that "[i]f the conviction is for conspiracy, it includes conduct in furtherance of the conspiracy that <u>was known to or was</u>

12

reasonably foreseeable by the defendant." U.S.S.G. § 1B1.3(a)(1), Application Note 1 (emphasis added);[7] see also United States v. Garcia, No. 89-10332, 1990 WESTLAW 106221 at 2 (9th Cir. July 31, 1990) (to be reported at 909 F.2d 1346) (holding that sentencing court, before giving the defendant a two-level enhancement for possession of a firearm, must determine: (1) whether a coconspirator possessed a firearm during the conspiracy and (2) whether the defendant reasonably could have foreseen the coconspirator's possession of the firearm); United States v. Willis, 899 F.2d 873, 874 (9th Cir. 1990) (holding that reasonable foreseeability is standard for determining whether a coconspirator is liable for another coconspirator's possession of a firearm); cf. United States v. Otero, 890 F.2d 366, 367 (11th Cir. 1989) (per curiam) (upholding enhancement for firearms possession even though defendant claimed he was unaware of coconspirator's possession of a firearm).

Guns and ammunition played an integral role in the conspiracy of which the defendants stand convicted. At trial, several officers of the Metropolitan Police Department testified about pistols, revolvers, rifles, machine guns, and assorted ammunition

---

[7] It should be noted that the Pinkerton theory differs from the concept of vicarious liability embodied in § 1B1.3(a)(1) of the Guidelines in that reasonable foreseeability is not required under the Pinkerton theory. See Devitt & Blackmar, Federal Jury Practice and Instructions, § 27.17, at 43 (1977) (to hold a coconspirator vicariously liable under the Pinkerton theory, the government must prove "[f]irst that the offense defined in the substantive count was committed pursuant to the conspiracy, and [s]econd that the particular defendant was a member of the conspiracy at the time the substantive offense was committed").

which were found alongside cocaine and packaging materials in the various stash houses out of which the members of the conspiracy operated. In addition, a gun and cocaine were seized from the alley between Morton and Orleans Place, N.E. out of which members of the conspiracy transacted cocaine sales.[8]  Because of the proximity of the weapons and ammunition to the cocaine distributed during the course of the conspiracy, it is more likely than not that members of the conspiracy knowingly possessed them during the conspiracy. See United States v. Restrepo, 884 F.2d 1294, 1296 (9th Cir. 1989) (holding that sentencing court reasonably inferred that defendant possessed weapon during commission of the offense when the weapon was found hidden in the same room in which the defendant kept equipment used for the distribution of drugs); United States v. Jones, 875 F.2d 674, 676 (8th Cir. 1989) (member of conspiracy possessed guns because "they were located in close proximity to the drugs [he] was in the business of distributing").

In addition to the guns and ammunition found in the stash houses and the alley, the defendant John Monford reached for an operable 9 mm semi-automatic pistol located in a nightstand in his bedroom at 407 M Street, N.E., the conspiracy's headquarters, when officers were executing a search warrant for the premises on

---

[8] Although the alley constitutes a public space to which all members of the public have access, the Court finds that it is more likely than not that the gun found in the alley had been knowingly possessed by a member of the conspiracy. In a wiretapped conversation between the defendant Jerry Millington and an unknown male (Government's Exhibit 398A), the unknown male asks Millington whether the Uzi seized from the alley had anything on it. Millington responds to the unknown male by saying "[n]ah."

14

February 5, 1988. Earlier that day, the defendant Melvin Stewart sold one ounce of cocaine to an undercover officer from 407 M Street. The presence of the gun at the conspiracy's headquarters out of which transactions were negotiated and in which cocaine and money were stored strongly supports a finding that this pistol was knowingly possessed by a coconspirator during the conspiracy. See United States v. Durrive, 902 F.2d 1221, 1231-32 (7th Cir. 1990) ("While the temporal and spatial dimensions of a conspiracy are often difficult to delineate, the presence of the gun in the conspirator's headquarters several hours before a buyer was to appear and the day after negotiations for a buy took place strongly support a finding that Durrive possessed the weapon during the life of the conspiracy.").

The possession of guns by various conspirators during the course of the conspiracy was reasonably foreseeable to each of the eighteen conspirators who have been sentenced on the conspiracy count. Guns were a topic of conversation amongst some conspirators as demonstrated by several conversations which were recorded pursuant to a court-authorized wiretap. See, e.g., Government's Exhibit 357A (Armaretta Perry telling John Monford "[t]he FBI is watching my house for the nigger who had them pistols around here"); Government's Exhibit 358A (Armaretta Perry telling Bernice Hillman McCraw that Melvin Stewart had a gun with him, and the only thing he was going to do with the gun was shoot himself because he was so inept); Government's Exhibit 393A (conversation between John Monford and an unknown male in which Monford refers to guns

as "guzans" so anyone listening in on the conversation would have a hard time understanding its substance); Government's Exhibit 398A (Jerry Millington and an unknown male discussing a gun and drugs that law enforcement officers seized from the alley between Morton and Orleans Place).

Moreover, the large quantity of cocaine purchased, bagged, and sold during the life of the conspiracy made it reasonably foreseeable to each defendant that one or more of his or her coconspirators would possess a gun to protect the cocaine and the resulting profits. See United States v. Garcia, No. 89-01332, 1990 WESTLAW 106221 at 3 (9th Cir. July 31, 1990) (to be reported at 909 F.2d 1346) (where defendant did not have actual knowledge of coconspirator's possession of a gun, court held that "[i]n light of the large amounts [of cocaine (17 kilograms)] involved in this case, [the coconspirator's] possession of the gun was reasonably foreseeable"); United States v. Aguilera-Zapata, 901 F.2d 1209, 1215-16 (5th Cir. 1990) (holding that a sentencing court "may ordinarily infer that a defendant should have foreseen a co-defendant's possession of a dangerous weapon such as a firearm, if the government demonstrates that another participant knowingly possessed the weapon while he and the defendant committed the offense by jointly engaging in concerted criminal activity involving a quantity of narcotics sufficient to support an inference of intent to distribute"); United States v. Ramos, 861 F.2d 228, 231 n.3 (9th Cir. 1988) ("trafficking in narcotics is very often related to the carrying and use of firearms"); United

States v. Gironda, 758 F.2d 1201, 1213 (7th Cir.) ("'It cannot be denied that the possession of firearms at a narcotics transaction increases the probability of the transaction's success and, thus, is an act in furtherance of the conspiracy.'" (quoting United States v. Grant, 448 F. Supp. 781, 782 (W.D. Pa. 1978)), cert. denied, 474 U.S. 1004 (1985); United States v. Alvarez, 755 F.2d 830, 849 (11th Cir.) ("We have previously acknowledged the 'nexus' between weapons and drugs, and we have also recognized that weapons have become 'tools of the trade' for those involved in the distribution of illicit drugs." (quoting United States v. Montes-Cardenas, 746 F.2d 771, 776 (11th Cir. 1984)), cert. denied, 474 F.2d 905 (1985).

For the foregoing reasons, the Court adopted the Probation Office's recommendation that each defendant be given a base offense level of 36 and that the base offense level of each defendant be enhanced by two levels pursuant to §2D1.1(b)(1) of the Sentencing Guidelines for the possession of guns during the conspiracy.

September ___17th___, 1990

CHARLES R. RICHEY
UNITED STATES DISTRICT JUDGE