

September 16, 2019

The Honorable Judge Emmet G. Sullivan
District Judge
E. Barrett Prettyman United States Courthouse
333 Constitution Ave NW
Washington, DC 20001

Re:  *United States v. Rayful Edmond*, Cr 89-162-01
     Sentencing Memorandum

Dear Judge Sullivan:

   After providing unprecedented assistance to the government for over twenty-four years, Rayful Edmond III will appear before the Court on October 16, 2019 asking this Court to reduce his sentence to twenty-six years incarceration. Mr. Edmond's request is based, in part, on the only government official to have participated in Mr. Edmond's cooperation from the beginning, Assistant United States Attorney ("AUSA")  John Dominguez. Since many of the details surrounding Mr. Edmond's cooperation are not documented, AUSA Dominguez is the only person with a full working knowledge of the intricacies of this matter. His analysis of Mr. Edmond's cooperation is distinct. In 2015, AUSA Dominguez indicated to Mr. Edmond that the appropriate sentence in light of his cooperation is a sentence of time-served. Time-served in 2015 would have been twenty-six years incarceration. Twenty-six years was appropriate in 2015. Twenty-six years remains appropriate in 2019. The extent of Mr. Edmond's cooperation has not changed over the last four years. The only changed circumstance is that the USAO has chosen to ignore AUSA Dominguez's 2015 recommendation, notwithstanding the unique position from which he based his insight.

**I.  Mr. Edmond will present evidence showing he provided unparalleled levels of cooperation in convicting more than one hundred individuals and investigating innumerable federal inmates**

A small portion of Mr. Edmond's cooperation is public knowledge. The overwhelming majority of the documentation regarding Mr. Edmond's cooperation remains in custody and control of the government. However, Mr. Edmond expects that the government will concede that he began cooperating in 1994[1]. Within days of the debriefing Mr. Edmond, government officials recognized that his cooperation would constitute the intelligence coup of the decade – perhaps of the century. The government officials were correct.

Once Mr. Edmond began cooperating, it was clear that the government did not have the resources to prosecute all of the persons against whom he provided inculpatory information. Indeed, Mr. Edmond provided information for wiretap affidavits leading to the conviction of over one hundred defendants. The number of wiretap affidavits based, in part, on Mr. Edmond is so voluminous the government cannot determine an exact count. Since August 2018, undersigned counsel has requested that the government provide the defense with the exact number. The government has represented to counsel that it began searching the Washington Field Office of the Federal Bureau of Investigation for this information. To date, the USAO has been unsuccessful in locating the exact number of wiretap affidavits where Mr. Edmond

---

[1] Significantly, prior to June 2, 1998, Mr. Edmond assigned all contractual rights to a sentencing reduction to his mother, Constance Perry. The government indicates Constance Perry's sentence of 293 months was reduced to time-served as a result of Mr. Edmond's cooperation. Dkt. Entry 214 at 3. This assertion is incomplete, and therefore inaccurate. Ms. Perry's 293-month sentence had already been reduced in 1996 to 168 months after the United States Court of Appeals for the District of Columbia Circuit ordered her to be resentenced in case number 1:89-cr-00162-JGP-24. In other words, Ms. Perry's 168-month (fourteen-year) sentence was reduced to time-served after she had already served nearly nine years. This discrepancy is material in that it significantly reduces the benefit Ms. Perry received as a result of Mr. Edmond's cooperation. Ms. Perry received a twenty-eight-month reduction for Mr. Edmond's cooperation. This reduction is disproportionately small compared to the weight of Mr. Edmond's assistance.

After Ms. Perry was sentenced, Mr. Edmond continued formally cooperating for at least sixteen years after Ms. Perry was resentenced.

provided information leading to an arrest and/or conviction. However, at this juncture, the government concedes that Mr. Edmond's cooperation regarding wiretap affidavits – alone – led to the conviction of more than one hundred defendants.

In addition to untold wiretap-based convictions, Mr. Edmond cooperated with the Office of the Inspector General. Mr. Edmond expects to present evidence that this facet of his cooperation led to substantial changes in the Bureau of Prison's phone and visitation policies.

Mr. Edmond expects to present evidence regarding two public trials where he testified on behalf of the government, thereby placing his life in danger. In another trial, the defendant pled guilty upon learning that Mr. Edmond would testify on behalf of the government. Even more, Mr. Edmond expects to present evidence that he assisted the Metropolitan Police Department regarding several "cold case" homicides.

Mr. Edmond's cooperation formally ended in approximately 2014. The following year, AUSA Dominguez informally, but in writing, time-served was the appropriate sentence for Mr. Edmond's formal cooperation. Unofficially, Mr. Edmond provided information to the USAO until 2018, when he filed the underlying Motion to Compel. Document 201.

**II.     This Court should take into account the procedural posture of this case when determining whether the government is relying on the extent of Mr. Edmond's cooperation when recommending a forty-year sentence**

Notably, the USAO did not voluntarily file a Rule 35 in this case after he stopped formally cooperating in 2014. After Mr. Edmond filed the underlying Motion to Compel in August 2018, it inexplicably took the government until September 2019 to increase their formal recommendation to forty years. This increase from 26 years (i.e., time-served in 2015) to 40 years begs the question as to what prompted change.  A hearing on this matter should illuminate

the fact that there is no justification related to the extent of Mr. Edmond's cooperation. It has not taken the government four years to evaluate Mr. Edmond's cooperation. His cooperation is as exceptional today as it was when AUSA Dominguez indicated time-served was an appropriate sentence in 2015.

Regardless of how the government justifies the increased formal recommendation, a forty-year sentence would constitute an unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct.

### III. This Court should follow the government's original indication that time-served is the appropriate sentence Mr. Edmond because violent leaders of vast criminal enterprises of received substantially less sentences

In determining an appropriate sentence, a sentencing judge must be aware of "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C.A. § 3553 (a)(6). This Court has the authority to analyze the sentence of other cooperating defendants in fashioning the appropriate sentence in this case.

A comparison of Mr. Edmond to Salvatore "Sammy the Bull" Gravano is instructive in analyzing similarly situated defendants. Both are leaders of criminal enterprises that provided substantial assistance to the government. However, Mr. Gravano led a more widespread organization for a longer period of time while personally participating in an astonishing number of murders. Still, the government recommended a sentence considerably less than forty years in Mr. Gravano's case.

Mr. Edmond was the leader of a four-year enterprise spanning from 1985 until April 1989. Mr. Gravano operated for thirteen years by the time he was indicted in United States v.

John Gotti, et al, 1:90-cr-01051-ILG-3. Moreover, Mr. Gravano operated within a vastly larger and more entrenched enterprise, the Gambino family. The Gambino family has been reported to be an organized crime family operating across the United States (based out of New York City) since, at least, 1921. Mr. Gravano was a leader ("underboss") of this long-standing enterprise.

Mr. Gravano was charged with thirteen counts of racketeering, murder, illegal gambling, loansharking, and obstruction of justice. Notably, Mr. Gravano was initially charged with three murders. Once he made the decision to cooperate with the United States government in 1991, he admitted to *sixteen additional murders*. During his career with the Gambino organized crime family, he admitted to, *inter alia*, 19 murders, extortion, robberies, burglaries, and assaults[2] before United States District Judge Leo Glasser. On or about September 26, 1994, Judge Glasser, in accordance with the government's recommendation, sentenced Mr. Gravano to five years.

Both Mr. Edmond and Mr. Gravano's cases have garnered extensive media coverage. However, in contrast to Mr. Gravano, there is no meritorious argument that Mr. Edmond participated in – or ordered – any violent crime against a person. Indeed, the government all but concedes as much. See Dkt. Entry 224 at 4 ("Thus, as the Redacted Superseding Indictment, the closing-argument transcript, and the defendant's Presentence Report confirm, at the 1989 trial the government did not adduce evidence of any violent crimes"). There was no evidence to support such an allegation because, unlike Mr. Gravano, Mr. Edmond never participated as a principal or aider and abettor in a murder. Accordingly, sentencing Mr. Edmond to 40 years would constitute an unwarranted sentencing disparity between him and Mr. Gravano despite the

---

[2] Formally, Mr. Gravano pled guilty to one count of violating the RICO Act.

fact that both were high-profile leaders of criminal enterprises that provided invaluable assistance to the government.

Similarly, Alberto "Alpo" Martinez was arrested in Washington DC on or about November 7, 1991. Mr. Martinez was the leader of a drug enterprise operating, at a minimum, between New York and Northern Virginia. He was arraigned in the District of Columbia in United States v. Alberto Martinez et al., 1:91-mj-00962-AK-1 the same day he was arrested. Ultimately, he was charged with conspiracy to commit murder, various drug charges, and 14 counts of murder. Mr. Martinez shipped hundreds of kilograms of cocaine into Washington, D.C. and paid Michael Perry (a hitman operating in the District of Columbia) to kill Michael Salters on July 17, 1990. Upon information and belief, Mr. Martinez admitted to approximately ten homicides while cooperating with the USAO. Nevertheless, upon information and belief, the government recommended a thirty-five-year sentence for Mr. Martinez, the leader of a drug enterprise that admitted to killing ten people. Conversely, the government admits there has been no evidenced adduced that Mr. Edmond participated in any homicides. While there is a commonality between Mr. Edmond and Mr. Martinez – they were both leaders of drug enterprises – the difference in culpability is meaningful. Mr. Edmond, unlike Mr. Martinez – did not increase his culpability by shooting and killing people. Unquestionably, Mr. Edmond should not receive a higher sentence than "Alpo" Martinez.[3]

---

[3] Mr. Edmond would be remiss if he did not note that the government is asking that he receive a higher sentence than convicted terrorist, Najibullah Zazi. Mr. Zazi pled guilty to conspiracy to use weapons of mass destruction and conspiracy to commit murder in a foreign country in case number CR-09663 in the United States District Court For The Eastern District of New York. Mr. Zazi plotted to execute suicide bombings on the New York City subway system. After the government arrested Mr. Zazi, he cooperated and provided substantial assistance. Accordingly, prosecutors recommended that he receive a ten-year sentence. Judge Raymond Dearie sentenced Mr. Zazi to ten years. It is flabbergasting that the government recommends Mr. Edmond receive thirty years more incarceration than an admitted terrorist. Potentially, with Mr. Zazi's case, the government hopes to encourage more cooperators to come forward with evidence of terrorist plots. Sending a message that cooperating with the government is advantageous should be a government priority in Mr. Edmond's case. However, the government's current

## IV. Conclusion

Mr. Edmond expects that the October 16 hearing will prove that his cooperation was unparalleled. The government should concede as much. While the government may choose to rely on a simple recitation of the [impressive] statistics surrounding Mr. Edmond's twenty-four years of cooperation, Mr. Edmond will ask this Court to hear testimony in order to appreciate the extent thereof. At the end of the hearing, an impalpable question will remain: why is the USAO ignoring the only government official that has been involved in Mr. Edmond's cooperation from its commencement, AUSA John Dominguez. By ignoring the only prosecutor involved with Mr. Edmond's cooperation from the beginning, the government demonstrates that its recommendation is based on reasons unrelated to the extent of Mr. Edmond's cooperation. Twenty-six years was an appropriate sentence in 2015. Twenty-six years[4] remains the appropriate sentence today.

[Signature on next page]

---

recommendation sends the opposite message to would-be cooperators regarding narcotics investigations in the District of Columbia. A forty-year sentence for Mr. Edmond would send a message to the community that a drug dealer is less deserving of leniency than an admitted terrorist.

[4] The difference between a twenty-six year sentence and a time-served sentence is meaningful. Should this Court sentence Mr. Edmond to twenty-six years, he has already served more than thirty years. The "extra" four years should not credited against the instant case within the meaning of 18 U.S.C. § 3585(b)(2). Accordingly, Mr. Edmond would have a colorable argument that he began serving his Pennsylvania sentence four years ago in case number 4:96-203 in the Middle District of Pennsylvania. Essentially, Mr. Edmond's sentencing request seeks to put him in the position in which he would have been had the government filed a timely Rule 35 in 2015 when the AUSA Dominguez informed him that time-served was appropriate.

Respectfully submitted,

DOWNS COLLINS, P.A.

_____
Jason G. Downs, Esq.
20 S. Charles Street, Suite 901
Baltimore, Maryland 21201
Office: (410) 462-4529
Fax:    (410) 995-7200
Jason@downscollins.com
*Counsel for Mr. Edmond*