UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA          :
                                  :
          Plaintiff,              :   Criminal Action
                                  :   No. 89-162
v.                                :
                                  :
RAYFUL EDMOND,                    :   October 16, 2019
                                  :   10:00 a.m.
                                  :
                                  :
          Defendant.              :   Washington, D.C.
                                  :
...........................       :


TRANSCRIPT OF MOTION HEARING PROCEEDINGS
BEFORE THE HONORABLE EMMET G. SULLIVAN,
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

  For the United States:     **John Crabb, Jr., Assistant U.S.**
                             **Attorney**
                             U.S. ATTORNEY'S OFFICE
                             Judiciary Center Building
                             555 Fourth Street, NW
                             Room 11-844
                             Washington, DC 20530
                             (202) 252-1794
                             Email: John.D.Crabb@usdoj.gov

                             **David Goodhand, Assistant U.S.**
                             **Attorney**
                             U.S. ATTORNEY'S OFFICE
                             Judiciary Center Building
                             555 Fourth Street, NW
                             Washington, DC 20530

  For the Defendant:         **Jason Gregory Downs, Esq.**
                             DOWNS COLLINS PA
                             20 South Charles Street
                             Suite 901
                             Baltimore, MD 21201
                             (410) 462-4529
                             Fax: (410) 995-7200
                             Email: Jason@downscollins.com

Appearances:  Cont.

For the Probation          **Kelly Kraemer-Soares, Probation**
Department:                **Officer**


Court Reporter:            **Scott L. Wallace, RDR, CRR**
                           Official Court Reporter
                           Room 6503, U.S. Courthouse
                           Washington, D.C. 20001
                           202.354.3196
                           scottlyn01@aol.com

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1          **<u>MORNING SESSION, OCTOBER 16, 2019</u>**

2    (10:28 a.m.)

3          THE COURTROOM CLERK:  Your Honor, this is Criminal Case

4    89-162, *United States of America versus Rayful Edmond*.

5          Will parties please come forward to this lectern and

6    identify yourselves for the record.

7          MR. CRABB:  Good morning, Your Honor.  John Crabb and

8    David Goodhand for the United States.

9          THE COURT:  Good morning, Counsel.

10          MR. DOWNS:  And good morning again, Your Honor.  Jason

11    Downs for Rayful Edmond.  Mr. Edmond's present and before the

12    Court.

13          THE COURT:  Right.  Mr. Edmond, how are you this morning?

14          THE DEFENDANT:  I'm good, Your Honor.  How are you?

15          THE COURT:  I'm fine.  Thanks.

16          All right.  Sorry for the delay.  There were some few

17    technical issues that we had to address and resolve.  Let me just

18    make a few comments.  Since 1984 I've been honored to serve on

19    three courts.  I began my judicial career as an associate judge

20    in the Superior Court of the District of Columbia.  I then served

21    as an associate judge of the D.C. Court of Appeals.  I joined

22    this Court in 1994.  And during my time on those courts, I've

23    decided a number of significant and high profile cases.  None of

24    those cases compare to the present one.  Rendering a decision in

25    this case will be one of the most difficult and challenging

1  decisions of my judicial career.

2      Pending before the Court is the government's motion to

3  reduce Mr. Edmond's sentence, pursuant to Federal Rule of

4  Criminal Procedure 35(b)(2)(C).  The government recommends that

5  the Court reduce Mr. Edmond's previously imposed sentence of life

6  to 480 months, or 40 years, of imprisonment.  Mr. Edmond

7  recommends that the Court reduce his sentence to time served.

8  Mr. Edmond has served approximately 30 years on this court's

9  sentence to date.

10      On May 21st of this year the Court scheduled an

11  evidentiary hearing for today.  The Court understands that

12  Mr. Edmond intends to call certain witnesses today, and that the

13  government does not intend to call any witnesses.

14      After the evidentiary hearing the government's motion will

15  be ripe for the Court's adjudication.  In all likelihood, the

16  Court will probably take this matter under advisement, in all

17  likelihood.

18      The Court would like to first express its sincere

19  appreciation to the outstanding work of the following individuals

20  and entities.  An event like this doesn't happen without a lot of

21  planning.  First, United States Sentencing Commission's Office of

22  Research and Data, especially -- the Court is especially grateful

23  to United States Marshal Service, who -- that office has worked

24  very diligently to address any potential issues, and the Court,

25  as always, is deeply appreciative of our United States Marshal

1    and his deputies and associates.  The United States Probation

2    Office, and especially Ms. Kelly Kraemer-Soares.  The Office of

3    the Attorney General for the District of Columbia, and its

4    Attorney General Karl Racine and his deputies.  U.S. Attorney's

5    Office and Mr. Edmond's counsel and the Court's been in contact

6    with them to deal with logistical issues.

7        The Court also gives special attention and thanks to the

8    parties on the Court's Clerk's Office staff and the court

9    reporter for going deep into the archives, especially for that

10   effort.  There were a number of papers we couldn't locate, but

11   one dedicated employee of the Clerk's Office took it upon himself

12   to search for files and he found them.  He was very successful,

13   and I'm deeply appreciative for that.

14       I want to talk about the relevant background.  In 1990 a

15   federal jury in the District of Columbia found Mr. Edmond guilty

16   of the following crimes:  One, engaging in a continuing criminal

17   enterprise in violation of the federal code; two, conspiracy to

18   distribute and possess with an intent to distribute more than

19   5 kilograms of cocaine and more than 50 grams of cocaine base in

20   violation of the federal code; unlawfully employing a person

21   under 18 years of age, again, in violation of the federal code;

22   interstate travel in aid of racketeering in violation of federal

23   code; and unlawful use of the communication facilities in

24   violation of the federal code.

25       Counts 14, 15, 16, 18, 1, Count 5 of the indictment and

1    Count 2.  That conviction was affirmed by the circuit court in

2    the case of *United States versus Edmond*, 52 F.3d 1080, a decision

3    issued in 1995.

4        On September 17, 1990, Judge Charles Richey, a former

5    colleague, imposed sentences of mandatory life without parole on

6    Count 1; life without parole on Counts 2 and 5; 60 months on

7    Count 11; 48 months on Counts 14, 15, 16 and 18.  Judge Richey

8    ordered the sentences to run concurrently with each count.

9    Mr. Edmond was required to pay a special assessment of $400.

10   Judge Richey imposed the following terms of supervised release:

11   Eight years on Count 5; four years on Count 2; and three years on

12   Counts 11, 14, 15, 16 and 18 to run concurrently.

13       Now, according to the presentence report that was revised

14   on August the 27th, 1990, Mr. Edmond had three pending counts of

15   first degree murder while armed, and one count of using and

16   carrying a firearm in connection with a drug trafficking offense.

17       Judge Richey severed those offenses from the conspiracy

18   and drug-related charges.  The government did not adduce any

19   evidence of any violent crimes at the 1989 trial, and significant

20   that the parties agree that those alleged crimes were dismissed

21   and never pursued against Mr. Edmond.

22       On January 3rd, 1991Judge Richey entered an order

23   dismissing without prejudice Count 21 of the indictment charging

24   Mr. Edmond with homicide.  On April the 28th, 1995, the Court of

25   Appeals for the D.C. Circuit vacated Count 2.  Mr. Edmond's

1    conspiracy conviction under 21 U.S. Code Section 846, in light of

2    the parties' agreement, the D.C. Circuit's decision to not impact

3    Mr. Edmond's sentences as to Counts 1, 5, 11, 14, 15, 16 and 18.

4        In 1996 Mr. Edmond pled guilty to conspiracy to possess

5    with the intent to distribute more than 5 kilograms of cocaine in

6    violation of the federal code in the United States District Court

7    for the Middle District of Pennsylvania, having run a large-scale

8    narcotics distribution operation from prison.

9        On July 24th, 1997, Judge Malcolm Muir -- that's

10   M-U-I-R -- of the Middle District of Pennsylvania sentenced

11   Mr. Edmond to 30 years of imprisonment with a term of 30 years of

12   supervised release.  Now, it's significant that because Mr. --

13   because Judge Muir did not order Mr. Edmond's sentence to run

14   currently with his previously imposed sentence with this Court,

15   Mr. Edmond's sentence in the Middle District of Pennsylvania runs

16   consecutively to his sentence in the District of Columbia,

17   pursuant to 18 U.S. Code 3584(a), which provides, and I quote,

18   multiple terms of imprisonment imposed at different times run

19   consecutively unless the Court orders that the terms are to run

20   concurrently, end quote.

21       The parties also agree that Mr. Edmond's Pennsylvania

22   sentence will begin upon the completion of his sentence in this

23   Court.

24       Now, the government has confirmed that the United States

25   Attorney's Office in the Middle District of Pennsylvania has not

1   reached a decision on whether to file a Rule 35 motion in that

2   case.  The government stated that if this Court reduces

3   Mr. Edmond's sentence in this case, the U.S. Attorney for the

4   Middle District of Pennsylvania would entertain any arguments

5   from defense counsel with respect to whether the filing of said

6   motion would serve the interest of justice.

7        Now, I'm going to focus on the views of the community,

8   which is very important to the Court.

9        Previously the Court stated -- strike that.

10       As the government has stated, quote, Mr. Edmond stands

11  convicted of having run one of our city's largest and most

12  destructive narcotics distribution operations, end quote.

13       Quote, And after having been convicted of that, he went on

14  to run...

15       (Brief pause in proceedings.)

16       And after having been convicted of that, he went on to run

17  a large-scale narcotics distribution operation from prison in

18  Pennsylvania.  Against this backdrop the Court appointed the

19  Attorney General as amicus -- as amicus curiae in this case.

20       This appointment was appropriate because there was --

21  there were no statutorily-defined crime victims in the case, and

22  that's something that the Court -- that issue -- that issue is

23  one that the Court wrestled with early on.  How does the Court,

24  if at all, determine or ascertain the views of the community?

25  Because as the Court previously stated, Mr. Edmond had been

1    convicted of running one of the city's largest and most

2    destructive narcotics distribution, so the Court felt very

3    strongly about trying to figure out a way to ascertain the views

4    of the community.  And it just seemed appropriate that the Court

5    would enlist the aid of the elected Attorney General for the

6    people of the District of Columbia to attempt to ascertain what

7    the views of the community were.

8         Neither party disputes that the Court may consider all of

9    the factors set forth under 18 U.S. Code Section 3553 to the

10   extent that they are relevant in deciding the Rule 35 motion.

11   Relevant to the Court here is, quote, the nature and circumstance

12   of the offense and the history and characteristics of the

13   defendant.  And, moreover, another relevant factor is the need

14   for the sentence, quote, to protect the public from further

15   crimes of the defendant, end quote.

16        Given the significant impact of Mr. Edmond's crimes on the

17   residents of the District of Columbia, the Court requested the

18   Attorney General to file a friend of the Court brief regarding

19   the views of the community concerning whether to reduce

20   Mr. Edmond's sentence or not.  The Attorney General submitted his

21   amicus brief with an appendix on August the 30th of this year.

22   According to the amicus brief, 510 individuals offered their

23   opinions on Mr. Edmond's potential sentence reduction.  Based on

24   that sample, 50.4 percent of the people who commented supported a

25   sentence reduction, and 49.6 percent opposed it.  And there was

1    no statistically significant difference in the results.  Neither

2    the government nor Mr. Edmond has challenged the Attorney

3    General's amicus brief.

4         At this time, the Court invites representatives from the

5    Office of the Attorney General for the District of Columbia to

6    the lectern to speak about their methodology, the data and the

7    results of their efforts to ascertain the views of the community.

8         In that regard, the Court will recognize the deputy -- the

9    Chief Deputy Attorney General, Ms. Natalie Ludaway.  Good

10   morning.  How are you?

11        MS. LUDAWAY:  Good morning, Your Honor.  First, let me say

12   on behalf of Attorney General Racine, who is in the courtroom,

13   thank you for giving the Office of Attorney General the

14   responsibility and opportunity to assist the Court and give

15   District of Columbia residents a voice in, as you have said, one

16   of the most important proceedings.

17        As you know, this case marks the first time that the

18   office has been asked by a federal court to represent the

19   community's views in an adult criminal matter in which it does

20   not have prosecutorial authority.

21        Too often, Your Honor, the District's lack of control over

22   our adult criminal system means that our residents lack a voice

23   in decisions that profoundly impact the community.  This time,

24   you are giving the residents an opportunity to be heard.  Your

25   Honor mentioned we did submit amicus brief, and it summarizes the

1    input and the methodology.  What I'd like to do here is tell you

2    the process that we used and also give a very high-level summary

3    of our findings.

4         THE COURT:  You know, too often I think everyone overlooks

5    that these courts are the people's courts, and the judges who

6    serve in these courts just have the privilege and honor of

7    attempting to administer justice.  So I think it's very

8    appropriate to give the people an opportunity to speak in the

9    system of justice that was created by the people.

10        MS. LUDAWAY:  Thank you.  And, Your Honor, we were last in

11   front of you on May the 21st, and at that time we set out

12   essentially what our plan would be to engage the community.  You

13   issued a minute order on May 24th giving us, the office a role,

14   and thereafter we immediately set in motion a plan to engage the

15   community.

16        At that time we began the process of gathering the views

17   of the community regarding the potential sentence reduction for

18   Defendant Rayful Edmond.  OAG worked during the summer to educate

19   the public and inform the public of the opportunity to express

20   their views.  And from -- for our office, I would really like to

21   commend our communications team and our community engagement team

22   for the work that they did to actively engage and publicize what

23   was going on.

24        First we created a Website, rayfuledmondfeedback.com.  We

25   also created a portal for people to be able to share their views.

And we tried to keep it simple so that people would be invited to
respond. The questions were whether residents thought the Court
should reduce Mr. Edmond's sentence. If so, whether they thought
Mr. Edmond should be allowed to return to the District. We asked
for the place of residence, specifically ward. And the portal
officially opened on May the 31st. I would like to note that we
invited people to have the opportunity to leave their name, but
also we gave them the option of being John or Jane Doe.

Second, we established an e-mail address, telephone number
and street address for postal mail. So for those people who
weren't inclined to use the Internet, they could simply write a
letter and send it to us, and many people did.

Third, we convened three public forums across the city
where community members could come and voice their views in
person.

We had one event, June 13th at the counsel chambers, which
is actually 441 Fourth Street, Metro accessible. Second, on a
Saturday, we had an event in Ward 8 at Martha's table. Third,
again on a Saturday, we had an event at the Frank Reeves Center,
the municipal building in Ward 2, again, Metro accessible and
highly trafficked.

And fourth, we held two focus groups, and we handpicked
those who would come to the focus groups looking at leaders in
the community, the clergy, so that we could hear their views.

And hopefully, as the Court may have seen, to publicize,

1    to explain the Court's order and to make sure that the public

2    knew of this opportunity, we issued a press release, which

3    garnered local and national attention.  There was a lot of

4    national coverage on the fact that this was being done by Your

5    Honor.  Online, radio and television coverage, blog posts, social

6    media, community letters and we posted it on list serves, so it

7    was widely sent out.

8         OAG's experience working with the community around public

9    safety issues informs Attorney General Racine of broad and varied

10   approach, and we are used to getting that community input.

11        Now, I'd like to go through the findings and high level.

12   As outlined in our brief, we received a total of 510 current and

13   former District residents voiced their views.  If you look at the

14   appendix to the brief, we have a summary, and we also included

15   the actual documents from the residents.  And you'll see that

16   residents were impassioned, residents were thoughtful.  It was

17   clear that residents took a significant amount of time to have

18   their views held.  Some residents actually did research to

19   support their views.

20        And in summary --

21        THE COURT:  I read the comments.  It's clear that people

22   were speaking from the heart.

23        MS. LUDAWAY:  Yes.

24        THE COURT:  No question about that.

25        MS. LUDAWAY:  Yes, Your Honor.  And of those 510 people,

1     239 people supported sentence reduction, 243 opposed the sentence

2     reduction, and 28 did not state an opinion.  What was clear is

3     that the community's opinion is almost equally divided.  And some

4     gave credit to Mr. Edmond's cooperation --

5           THE COURT:  I can't say I'm surprised at that.  I

6     anticipated that.

7           MS. LUDAWAY:  Yeah, it was interesting --

8           THE COURT:  Right.

9           MS. LUDAWAY:  -- that some thought that Mr. Edmond's

10    cooperation with the federal government merited leniency, others

11    viewed the cooperation as insignificant.  Some commentators

12    believed that Mr. Edmond was uniquely responsible for the crack

13    epidemic in the District; whereas, the other side, some people

14    viewed Mr. Edmond as a victim, and Mr. Edmond as a victim of

15    racial disparities that plaque the criminal justice system.  Some

16    believed that he had served enough time; others said that it

17    still wasn't long enough.

18        Whether citing the potential impact on -- some looked at

19    the impact on District youth, their religious briefs, their views

20    in the community, so it was a widespread.

21        The views and stories of community members shed light on

22    the effect that Mr. Edmond has had and might have in the future.

23    Community members also raised thoughtful questions about how

24    Mr. Edmond -- and people asked that they thought it would be

25    relevant to know what Mr. Edmond did while he was in jail, and

1  whether or not he would contribute to the community if he were

2  released and other factors.

3      Your Honor did not request that the Attorney General take

4  a position, and we have not taken a position.  Rather, we have

5  done our best to present the community's views.  And, again,

6  the -- it is an honor and a pleasure to have been able to serve

7  this Court.  Thank you.

8      THE COURT:  If you'd like to articulate an opinion now,

9  that would be fine.

10      MS. LUDAWAY:  That is why we have an elected Attorney

11  General.  I will take my seat now.  Thank you, Your Honor.

12      THE COURT:  Thank you very much.

13      Mr. Racine, thank you very much.

14      MR. RACINE:  Thank you, Your Honor.

15      THE COURT:  On September the 10th the Court submitted a

16  request to the U.S. Sentencing Commission's Office of Research

17  and Data to provide relevant data and analysis regarding

18  Mr. Edmond's resentencing, and I posted the letter that was

19  received by the Court for Mr. Glenn Schmitt, director of the

20  Office of Research and Data.  And the commission's letter makes

21  clear that the courts have reached different outcomes in deciding

22  Rule 35(b) motions.

23      On September the 27th, the Court filed the commission's

24  letter on the public docket, and the Court directed the parties

25  to provide, among other things, any responses to the relevant

1    data and analysis in the commission's letter.  The government did

2    not object to the data or analysis.  Mr. Edmond objected to the

3    allegation in the letter that he was, quote, held responsible for

4    several murders, end quote.

5          On October 30th, two thousand -- and at some point I'll

6    ask the parties to address that.  I think -- I'll just ask the

7    parties to address that last issue.

8          On October 3rd of this year, the Court contacted the U.S.

9    probation officer regarding the information in the commission's

10   letter.  The Court requested that the probation officer submit a

11   supplemental report regarding the terms of supervised release

12   under the sentencing guidelines calculation.

13         And on October the 11th of this year, the probation

14   officer submitted a memorandum to the Court that's filed at ECF

15   Number 265, and the Court directed the parties to be prepared to

16   discuss the memorandum, pursuant to the Court's minute order of

17   October 11th.

18         The Court would like to hear from the Court's probation

19   officer, Ms. Kelly Kraemer-Soares, and I'm going to invite you to

20   the lectern.  Good morning.

21         THE PROBATION OFFICER:  Good morning, Your Honor.

22         THE COURT:  How are you this morning?

23         THE PROBATION OFFICER:  Fine.  Thank you.

24         THE COURT:  Okay.  Would you like to summarize your

25   representations to the Court?

1      THE PROBATION OFFICER:  Yes, Your Honor.  After reviewing

2  the materials regarding Mr. Edmond's convictions in this case, I

3  understand that Count 2 was ultimately removed or vacated back in

4  1995; therefore, we're left with Counts 1, 5, 11, 14, 15, 16 and

5  18.  Essentially the guidelines remained the same.  Count 1, as

6  you mentioned, under 5(g) kind of drives it as the life sentence

7  per statute.  Recalculating, though, the guidelines using the

8  2018 manual, since we are no longer using Count 2, I've

9  recalculated it.  It does start with a two level less based on

10  the drug amount, so we started with an offense level of 34.

11  Because a firearm or dangerous weapon was possessed during the

12  conspiracy, we added two levels to that.  We also added four

13  levels for Mr. Edmond being a leader or organizer.  We did not

14  include the two-level adjustment for obstruction of justice.  If

15  Your Honor were inclined to put that back in, clearly that would

16  impact this; however, we came up with a total offense level of 40

17  for the remaining counts, not Count 1.  So we have Count 1, life,

18  and then if Your Honor were to want to know what it was for the

19  level 40, it'd be 292 to 365 months for the remaining counts

20  under the guidelines.

21      THE COURT:  And that would be what -- that would be your

22  office's recommendation today if the Court were to sentence anew

23  today, correct?

24      THE PROBATION OFFICER:  Yes, Your Honor.

25      THE COURT:  Right.

1    THE PROBATION OFFICER:  Because it takes out the Count 2,

2  which had previously been vacated back in 1995, so we had to

3  rework the guidelines, Your Honor, using the current guidelines

4  which are more -- which are -- sorry, I just lost the word.

5    THE COURT:  I appreciate that.  And that was -- and the

6  Court was concerned about that, and the Court was thinking, just

7  what would the Court be struggling with today if the Court had

8  the responsibility of sentencing Mr. Edmond anew today based upon

9  changes in the law, changes in guidelines, changes in comments to

10  the guidelines et cetera, et cetera.

11    THE PROBATION OFFICER:  Correct, Your Honor.

12    THE COURT:  So you've given me a realtime view as to what

13  at least your recommendation would be to the Court.

14    THE PROBATION OFFICER:  Correct, Your Honor, based on the

15  counts, not Count 1.  Count 1 is the one that's controlled by the

16  statute, Your Honor.

17    THE COURT:  Right, right.

18    THE PROBATION OFFICER:  And as it relates to supervised

19  release, the document that I submitted, it only addresses the

20  statutory penalties relating to supervised release, and it's

21  actually without the benefit of a 3553(e).

22    THE COURT:  Right.

23    THE PROBATION OFFICER:  So Count 1 would be five years

24  maximum; Count 5 would be at least ten years; Count 11 is three

25  years; Counts 14, 15, 16 and 18 would be the one-year term.

1     However, if Your Honor were inclined to go below, based on

2   what we have today, two to five years would be for Count 1 and

3   Count 5 under the guidelines because they're Class A felonies.

4   Count 11 is one to three years, and the remaining counts on the

5   misdemeanors would be one year under the guideline now that

6   you're no longer bound by the mandatory minimums.

7         THE COURT:  Right.  All right.  Thank you very much.

8         THE PROBATION OFFICER:  Sure.

9         THE COURT:  Thank you for all of your hardworking on this.

10         THE PROBATION OFFICER:  Thanks.

11         THE COURT:  I'm going to hear -- the Court's going to hear

12   from the government and defense counsel regarding the probation

13   officer's representations.  And first I just want to inquire

14   whether there are objections, any objections to what

15   Ms. Kraemer-Soares has just said.

16         Mr. Crabb?

17         MR. CRABB:  Your Honor, no objections from the government.

18         THE COURT:  All right.  Thank you.

19         Mr. Downs?

20         MR. DOWNS:  No, Your Honor, there are no objections to the

21   guideline calculations.

22         THE COURT:  All right.  Thank you.

23         All right.  So the Court's -- the Court understands that

24   the government will not offer any witnesses.

25         Is that correct or has that changed?

1    MR. CRABB:  Your Honor, that has not changed, but just to

2  clarify, there are several law enforcement representatives here

3  that the defense has asked to address the Court, but the

4  government doesn't intend to actually present any evidence to the

5  Court.

6    THE COURT:  All right.  Okay.

7    And, Mr. Downs, you have how many witnesses?

8    MR. DOWNS:  I anticipate six -- excuse me, Your Honor.

9    THE COURT:  Sure.

10    MR. DOWNS:  I anticipate three law enforcement officers

11  and three civilians, Your Honor, and Mr. Edmond as well, so seven

12  total.

13    THE COURT:  All right.

14    MR. DOWNS:  And preliminarily -- may I make a preliminary

15  comment?

16    THE COURT:  Sure.

17    MR. DOWNS:  Earlier the Court indicated that Mr. Edmond is

18  requesting that the Court impose a sentence of time served.  A

19  small distinction is that in Document Number 264 we actually

20  requested that this Court sentence Mr. Edmond to 15 years.

21    THE COURT:  As soon as I said that I started thinking

22  about that document.  I was going to correct that.  But, no,

23  you're absolutely correct, your current request is a sentence of

24  15 years.

25    MR. DOWNS:  Thank you, Your Honor.

1   THE COURT:  All right.  And, Mr. Edmond, you understand

2 that you're under no obligation to say anything at all?  You

3 understand that?

4   THE DEFENDANT:  Yes, sir.

5   THE COURT:  All right.  Okay.  And it's your decision to

6 testify then?

7   THE DEFENDANT:  Yes, sir.

8   THE COURT:  All right.  That's fine.

9   The Court also deemed it appropriate for Mr. Edmond to

10 attend today's hearing, even though his presence is not required

11 under the Constitution or Federal Rule of Criminal Procedure

12 43(b)(4).  The first hearing was by way of remote screen, but we

13 gave it a lot of thought, and we thought it was appropriate to

14 afford him his day in court.

15   The Court may schedule a subsequent hearing to announce

16 its decision or may not, and I'll hear from the parties later on

17 the issue of whether Mr. Edmond may appear at that hearing by way

18 of video conference.  I mean, there are a couple of options

19 available.  The Court could issue a decision.  I assume I'm going

20 to write on this issue.  I think there's no doubt about that.

21 You know, although I could change my mind during the course of

22 this hearing, I think it's reasonable to assume the Court's going

23 to write on this very significant issue.

24   The Court also notes that the government has reserved its

25 right to object to one or more of the potential defense

1    witnesses, and that's pursuant to -- actually, that was a sealed

2    report, but I think it's appropriate to mention that.

3          But will there be objections?  You know who the witnesses

4    will be.  Will there be objections, Counsel?  And if so, maybe

5    the Court needs to deal with those objections at the bench,

6    because the witnesses have not been previously identified for a

7    host of reasons.

8          MR. CRABB:  Can we approach, Your Honor?

9          THE COURT:  Sure.  And we're going to provide Mr. Edmond

10   with some ear phones so he can hear our discussion.

11         (Following sidebar discussion had on the record:)

12         THE COURT:  Let me just make sure your client can hear.

13         MR. DOWNS:  Yes, Your Honor.

14         THE COURT:  I just want to make sure you can hear me.

15         THE DEFENDANT:  Yeah, I can.

16         THE COURT:  All right.  Counsel.

17         MR. CRABB:  Your Honor, I want to make sure I'm following.

18   Is the court referring to our objection to questions of

19   Mr. Dominguez about his view as to what the sentence should be?

20         THE COURT:  I'm not sure because I'm just quoting.

21         MR. CRABB:  Okay.

22         THE COURT:  The government observes the right to object to

23   one or more of the defense's potential witnesses.  That may be

24   Dominguez.  I'm not sure.

25         MR. CRABB:  Then I think it was a lack of clarity on my

1  part.  I apologize.  If that's primarily all, I guess, in theory

2  some of the law enforcement witnesses, we might object to the

3  scope of what they're presenting and whether it's relevant or not

4  when we don't object to them testifying in general.

5        THE COURT:  All right.  Mr. Dominguez is going to be

6  called, right?

7        MR. DOWNS:  Yes, Your Honor.

8        THE COURT:  Okay.

9        MR. DOWNS:  And, Your Honor, very briefly.

10        THE COURT:  Let me just -- this is new equipment and we

11  have to get this on.  We can't turn this thing on.

12        (Brief pause in proceedings.)

13        THE COURT:  Okay.

14        MR. DOWNS:  Thank you, Your Honor.  My partner is handling

15  another federal hearing at the moment via telephone in the United

16  States District Court of Mississippi.  I suspect that it'll end

17  around 11:30 a.m.  If the Court would allow her to join me at

18  counsel table because she's been involved in the case and I may

19  need her assistance later in the hearing, and I would ask the

20  Court --

21        THE COURT:  She's going to be here?

22        MR. DOWNS:  She will be here as soon as that hearing ends,

23  and I would ask for leave for her to join us later.

24        THE COURT:  Yeah sure.

25        MR. DOWNS:  Thank you, Your Honor.

 1     THE COURT:  She's in Mississippi now?

 2     MR. DOWNS:  She's on a call for a motions hearing in

 3  Mississippi.

 4     THE COURT:  Okay.

 5     MR. CRABB:  Yes, Your Honor.  With respect to

 6  Mr. Dominguez, when the time comes, could we address the Court

 7  and get a proffer as to the parameters to his testimony and then

 8  lodge any objections we feel are appropriate?

 9     THE COURT:  Sure.

10     MR. CRABB:  Thank you.

11     THE COURT:  I should do that now.

12     MR. CRABB:  Okay.

13     THE COURT:  Do you have anything else you want to put on

14  the record at this point?

15     MR. CRABB:  On this issue?

16     THE COURT:  On any issue.

17     MR. CRABB:  Nothing that's arisen so far this morning.

18     THE COURT:  Maybe I should get just a brief opening from

19  the government.  The government filed this motion, just so the

20  public understands what's going on.

21     MR. CRABB:  Okay.  Well, if I can have an opportunity to

22  address the Court later, depending on how things develop?

23     THE COURT:  Sure, absolutely.

24     MR. CRABB:  Thank you.

25     (Sidebar discussion concluded.)

```
1          THE COURT:  All right.  Thank you, Counsel.

2          The government's filed a motion pursuant to Rule 35, and,

3   indeed, under our rules now currently, only the government under

4   Rule 35 can file a motion to reduce a sentence.  Congress changed

5   that some years ago, and that's just a fact.

6          So I'll hear from government counsel about your motion,

7   and maybe the reasons for it.

8          MR. CRABB:  Thank you, Your Honor.  As the Court's pointed

9   out, the government has filed a motion pursuant to Federal Rules

10  of Criminal Procedure 35 to reduce Mr. Edmond's sentence, which

11  was previously imposed in this Court.

12         The basis for that motion is the fact that after being

13  sentenced, Mr. Edmond has cooperated with the government and

14  provided substantial assistance in the investigation and

15  prosecution of others.  And based on that action from

16  Mr. Edmonds --

17         THE COURT:  Is that distinguished from the cooperation

18  that was provided in the Middle District of Pennsylvania?

19         MR. CRABB:  Yes, Your Honor.  If I may go back a step to

20  explain the procedural posture here, which is somewhat

21  complicated?

22         THE COURT:  Sure.

23         MR. CRABB:  As the Court's alluded to -- and I apologize,

24  I don't mean to be redundant -- Mr. Edmond was first charged here

25  in the District of Columbia in 1989 for large-scale drug
```

1    trafficking; went to trial in that case and was convicted, as the

2    Court has already set forth, several offenses, perhaps most

3    importantly, Count 1, the continuing criminal enterprise offense

4    which carries a mandatory life sentence.

5        Having been convicted of Count 1 and the other offenses,

6    Mr. Edmond was placed in the federal penitentiary and eventually

7    found himself in Lewisburg, Pennsylvania where he was serving his

8    time in the early 1990s.

9        Later the government learned that while in prison in

10   Lewisburg, Mr. Edmond was conducting a drug trafficking

11   enterprise that rivaled what he had been doing previously while

12   at liberty here in D.C.  In brief, he became acquainted with

13   certain Colombians involved in the drug trade and was negotiating

14   deals directly from Colombians to some of Mr. Edmond's former

15   drug contacts here in the District of Columbia and negotiating

16   large multi-kilogram cocaine deals.

17       When that was discovered, Mr. Edmond was approached by law

18   enforcement, and at that point he agreed to cooperate.  And I

19   think this gets to the Court's point.  That cooperation --

20   there's a written plea agreement, which I believe has been

21   submitted to the Court.  And Mr. Edmond agreed to cooperate and

22   helped us ferret out what was going on in Lewisburg, and perhaps

23   other prisons, some drug trafficking and make reforms; but

24   specifically, that cooperation was dedicated to Mr. Edmond's

25   mother who was incarcerated at the time in conjunction with the

1 earlier D.C. case.  So that was accounted for, the cooperation

2 Mr. Edmond provided to the government, with respect to the drug

3 trafficking in the prison in Lewisburg.

4       Subsequent to that Mr. Edmond continued to cooperate with

5 the government, and that we believe is what's at issue before the

6 Court now and in the coming days, to evaluate the value and the

7 scope of that cooperation and as to what, if any, sentence

8 reduction that merits.  As the Court's noted, we believe it

9 merits reducing a mandatory life sentence to 40 years.

10       Does that address the Court's question about the different

11 cooperations?

12       THE COURT:  Yes.

13       MR. CRABB:  As I've said, we've asked that Mr. Edmond's

14 sentence be reduced, and as I understand from what the Court

15 said, we'll have an opportunity to address the Court later as

16 certain things developed.  But to state generally and to

17 summarize Mr. Edmond's cooperation that he provided to the

18 government after the drug dealing in the federal penitentiary was

19 addressed, falls primarily into four categories.

20       Mr. Edmond was ready, willing and able to testify in

21 several significant drug trafficking cases in the District of

22 Columbia and in a Federal District in North Carolina.  One of

23 those cases, I'm sure the Court's familiar with, it was the Kevin

24 Gray trial, one of the larger, more violent groups ever

25 prosecuted here in Washington.  Mr. Edmond testified in that case

1    for the better part of a week.

2         In two other large-scale narcotic trafficking cases

3    Mr. Edmond was prepared to testify, but those cases ended without

4    trial, so his testimony was not necessary, but again, he was

5    ready, willing and able to testify.

6         In addition to that, the next component of Mr. Edmond's

7    testimony was assisting federal and local authorities here in the

8    District of Columbia with a number of narcotics investigations.

9    And generally I think we could explain to the Court what

10   Mr. Edmond did there, although by this time he had been in jail

11   for some time, but he had a lot of historical information.  And

12   he gave information that was not -- the information he gave

13   wasn't the only information that was used, but it was important

14   information that allowed the government to receive several orders

15   to tap telephones here in the District of Columbia used by

16   narcotics traffickers.  And as we set forth in a filing last week

17   with the Court, that led to a number of indictments and a number

18   of defendants being prosecuted.

19        But I'd like to be clear, what Mr. Edmond's role there was

20   one of several sources leading to the wiretap being authorized by

21   the Court, which then led to an investigation and prosecution.

22   In this category of cases, Mr. Edmond did not actually testify at

23   trial.  He was providing more background information, but I don't

24   want to give the Court the wrong impression.  That was very

25   important and crucial information to those prosecutions.

1    The third category of Mr. Edmond's cooperation was helping

2    with so-called cold case homicides, homicides that were long --

3    had languished for some time and had not been resolved.  And,

4    again, when Mr. Edmond was providing this cooperation, he had

5    been incarcerated for some time, so I'd like to explain to the

6    Court.  These are not situations where Mr. Edmond actually was a

7    witness to a homicide or had firsthand information or even

8    admissible evidence about homicides.  These are not situations

9    where Mr. Edmond testified, like the three situations I mention

10   earlier.

11   Instead, it's based on Mr. Edmond's knowledge of this

12   community and involvement in this community and the fact that,

13   based on his prior life, he knew many people in this community

14   who were engaged in violence.  He provided background information

15   to help guide investigations.  To explain it more concretely,

16   giving information about who might be an enemy with another

17   person so investigators knew where to focus the investigation.

18   Or, perhaps equally as important, to let investigators know that

19   certain people got along and didn't have a problem so certain

20   suspects could be eliminated.

21   So I think it's fair to sum up what Mr. Edmond did there

22   was assist law enforcement in focusing investigations and making

23   sure that scarce resources were used as best as they could to

24   solve some of these cold case homicides.

25   The fourth component of Mr. Edmond's cooperation, which is

at issue today, harkens back to what happened in the penitentiary

in Lewisburg but is slightly different from the actual law

enforcement, the investigation of that situation and prosecution

of others.  And what Mr. Edmond did to help the government in

addition to the actual prosecution of drug dealers in Lewisburg,

who he had previously dealt with, was to provide a lot of

information to the government, and in particular to the Office of

the Inspector General the Department of Justice about the federal

penitentiary system, about some of the problems, problems with

telephones, other problems, which allowed organizations and

situations like this to develop and thrive in the prisons.  And

due to Mr. Edmond's efforts in that regard, it was important

helping the government come up with very important prison reforms

to try to avoid those types of situations happening in the

future.

So to recap, Mr. Edmond provided primarily four categories

of cooperation:  He had firsthand knowledge about three important

cases where he was ready, willing and able to testify; he

provided background information, which helped start narcotics

investigations through obtaining wiretap authorizations and

moving forward with the investigation; he provided background

information, which helped focus investigations in cold case

homicides; and he provided a lot of information to the Office of

the Inspector General of the Department of Justice to help with

prison reforms.

1    So it's based on that body of work that we ask that the
2  Court reduce Mr. Edmond's sentence.
3      If I could add briefly, to echo what the Court has said,
4  when the Court considers this, we asked the Court to consider the
5  backdrop of this case -- and I believe the Court's already quoted
6  some of our papers -- that in considering what Mr. Edmond did to
7  cooperate, which was important and wide and deep.  But we also
8  ask the Court to consider the gravity of Mr. Edmond's crimes,
9  that he conducted the largest, most destructive drug organization
10  that this city's ever seen.  It's hard to calculate the harm that
11  he visited upon this community.  And then a after having done
12  that, went to prison and conducted a drug network, which was at
13  least as big, and rivaled what he had done here on the streets.
14      So we ask the Court to balance those two in determining
15  what reduction would be appropriate.
16      Unless the Court has further questions, I'd ask to reserve
17  the rest of my time to address issues which may arise today or as
18  we go forward.
19      THE COURT:  Sure.  Let me just say one thing.  I don't
20  think anyone should reach any conclusions with respect to how the
21  Court's inclined to rule on these issues, just because of the
22  nature of the questions the Court asks.  I ask a lot of
23  questions, and I ask questions because I don't know the answers.
24  So don't read anything into, well, he's inclined to go this way
25  or he's inclined to do something else, because you're probably

1    wrong.

2         MR. CRABB:  It's always a dangerous practice.

3         THE COURT:  I know, right?  So I just wanted to say that

4    because I want to ask you a question and I don't know the answer

5    to it.

6         Hypothetically, if the Court were to sentence Mr. Edmond

7    to time served or 15 years or some lesser sentence than what he's

8    serving now, could the Court impose a lifetime period of

9    supervised release?

10        And the second part of that question would be:  If the

11   Court could, would it be lawful for the Court to ban Mr. Edmond

12   from returning to the District of Columbia, period?

13        MR. CRABB:  Your Honor, may I preface my response to these

14   questions saying that I believe we need to look into those

15   further.  Starting at the end, we don't believe the Court can ban

16   someone from the District of Columbia or banish them.

17        THE COURT:  I think that's probably correct, right, but I

18   just need to get the government's position on that.

19        MR. CRABB:  With respect to lifetime supervised release,

20   I'd ask an opportunity to look into that more fully.  And I

21   apologize, I believe there's a third part of the question I've

22   forgotten.

23        THE COURT:  So have I.  So the question was whether or not

24   the Court could impose lifetime supervision and ban.  I don't

25   think there was a third part.

```
 1          MR. CRABB:  Oh, then there wasn't a third part.
 2          THE COURT:  I don't think.  Scott, was there a third part?
 3   I don't think there was.
 4          MR. CRABB:  That's why I forgot it.
 5          THE COURT:  Right.
 6          MR. CRABB:  Could -- with respect to this, could we
 7   briefly approach the bench again?
 8          THE COURT:  Sure.  Sure.  And, Ms. Kraemer-Soares, I'm
 9   going to ask you that same question about supervision as well.
10          (Following sidebar discussion had on the record:)
11          THE COURT:  I think that's correct, but I just wanted you
12   to...
13          MR. CRABB:  I just want to flag one issue for the Court to
14   consider.  As the Court knows, Mr. Edmond is currently in the
15   Witness Protection Program in prison.
16          THE COURT:  I don't plan to mention that at all.  I mean,
17   should that be on the public record?
18          MR. CRABB:  Okay.  I would hope not.  That's why I asked
19   to approach, but I just wanted to flag that there's a lot of if's
20   in what I have to say, but if Mr. Edmond gets released at some
21   point, and if Mr. Edmond is interested in continuing Witness
22   Protection, I think that could have something to do with where he
23   resides.  And, also -- I'm sorry, I don't know off the top of my
24   head, but there might also be some logistical issues with
25   supervised release if you're in Witness Protection, so I just
```

1  wanted to, without raising it in the public, flag that potential

2  issue for the Court that we might have to work through if we move

3  in that direction.

4       THE COURT:  Right, right.  I don't plan to mention the

5  Witness Protection.

6       MR. DOWNS:  I would not mention it, Your Honor.  I would

7  ask -- and I would ask to make an argument about the

8  circumstances of his confinement, and I will probably make the

9  argument at the bench because of the circumstances.  They're more

10 restrictive than they would be for someone else.  But with the

11 Court's permission, I'll make that argument at the bench.

12      THE COURT:  At what point?

13      MR. DOWNS:  If the Court were to allow us to make argument

14 at the very end of this hearing, I would ask then.

15      THE COURT:  Okay.

16      MR. DOWNS:  Thank you.

17      THE COURT:  You're talking about --

18      MR. DOWNS:  The appropriate -- when the Court is

19 determining the appropriate sentence.  I would ask the Court to

20 consider the fact that he has been confined under conditions that

21 are significantly more restrictive than other inmates.

22      THE COURT:  You mentioned that in your last pleading.

23      MR. DOWNS:  Yes, Your Honor.

24      THE COURT:  I'll give you a reminder.  The burden's on

25 you.

1      MR. DOWNS:  Yeah, I will remind the Court.  Thank you,

2  Your Honor.

3      THE COURT:  Thank you.

4      (Sidebar discussion concluded.)

5      THE COURT:  Ms. Kraemer-Soares.  Just with respect to

6  supervision, are there limits to the Court's authority to impose

7  a specific term of supervision?

8      THE PROBATION OFFICER:  I have -- I have thought about

9  that, Your Honor.  The statute simply states at least ten years.

10  If it --

11      THE COURT:  At least ten years?

12      THE PROBATION OFFICER:  -- opens up to a longer term, I --

13      THE COURT:  Does the statute say at least ten years?

14      THE PROBATION OFFICER:  Yes, at least ten years.

15      THE COURT:  All right.

16      THE PROBATION OFFICER:  And then it doesn't cap it, the

17  guidelines do.  I -- in all the years I've --

18      THE COURT:  But the guidelines are just that, guidelines.

19      THE PROBATION OFFICER:  They say two to five years, right.

20      THE COURT:  Right.

21      THE PROBATION OFFICER:  Two to five years would be for the

22  Class A felony.  In all the years I've been doing this, I've

23  never seen anybody sentenced to, you know, a lifetime term, other

24  than sex offenses.  Those are different.  So, Your Honor, I -- I

25  am not 100 percent sure at this point.

1    THE COURT:  All right.

2    THE PROBATION OFFICER:  I've done a little bit of

3  research, and I can't find -- I think there was a nominal

4  revocation sentence where I think the judge went to a three-year

5  term, which was about a year over what it was recommended by the

6  statute or something, but it wasn't a larger term.

7    THE COURT:  All right.  Thank you.

8    All right.  And just for the benefit of the public, there

9  will be some arguments made at the bench just because they should

10 be outside the earshot of the public, and those -- I will just

11 say very generally that the arguments made are related to

12 security, and that's the reason why they'll be made at the bench

13 and not on the public record, and those arguments will be at the

14 end of this hearing.

15    Mr. Downs, why don't you give me the benefit of your

16 opening statement.

17    MR. DOWNS:  Yes.  Thank you, Your Honor.

18    THE COURT:  Sure.  Good morning.

19    MR. DOWNS:  Good morning again, Your Honor.  Your Honor,

20 to encourage the citizens of the District of Columbia to

21 cooperate with the government, thereby promoting respect for the

22 law, we are -- we're requesting that this Court impose a sentence

23 that is commensurate with Mr. Edmond's length of cooperation, the

24 breadth of his cooperation, and the scope of his cooperation.  I

25 would ask the Court to take into consideration all three of those

1   factors.

2       To aid the Court in its determination, we're asking that

3   this Court consider the testimony of several law enforcement

4   officers, all of which are here on their own dime on their own

5   time.  None of them have been subpoenaed, none of them have been

6   compelled to show up here in court today.  They're all in court

7   today because it is the right thing to do.

8       THE COURT:  And are all of those witnesses present in the

9   courtroom now?

10      MR. DOWNS:  They are.

11      THE COURT:  All right.  And no one has invoked the rule on

12  witnesses, correct?

13      MR. DOWNS:  I have not, Your Honor.

14      MR. CRABB:  We're not asking for that.

15      THE COURT:  All right.  All right.  I just want the record

16  clear.  All right.

17      MR. DOWNS:  Thank you, Your Honor.  And the names of those

18  witnesses the Court is likely aware, but we've got Mr. Steven

19  Benjamin, Rick Watkins and Barbara Watkins, all of which have

20  shown up in court today to detail to the Court the extensive

21  cooperation that Mr. Edmond provided since July 20th of 1994.

22      The cooperation was so extensive that when he began

23  providing information, it was impossible for law enforcement

24  officers to follow up on every single piece of information he

25  gave in time to give his mother the benefit of that cooperation.

1    So while Mr. Edmond began cooperating in 1994, the law

2    enforcement officers will inform this Court that it was

3    impossible for them to wrap up that investigation by 1998 when

4    Constance Perry was resentenced, Your Honor.  So the

5    investigation continued for several years.  Ultimately Mr. Edmond

6    cooperated for 24 years, as the Court is aware.

7    Now, while the law enforcement officers are not going to

8    be able to give this Court the specific statistics related to

9    Mr. Edmond's cooperation, this Court -- I don't think there is

10    going to be any dispute as to the fact that Mr. Edmond's

11    cooperation led to at least 111 indictments against 340

12    defendants over the course of his cooperation, Your Honor.

13    And we're not only talking about drug investigations.

14    There was -- there were other aspects of the investigation -- his

15    cooperation as well.  That cooperation was with regard to cold

16    case homicides here in the District of Columbia that directly

17    impacts the citizens of the District of Columbia.  Mr. Edmond

18    will talk to you about how he testified at the Kevin Gray trial.

19    I also spoke to the prosecutor that prosecuted the Kevin Gray

20    trial.  She is currently in London at the moment, but she asked

21    me to tell the Court that Mr. Edmond's cooperation was material,

22    and that it was very thorough, and that she considered him a

23    critical witness in that case, and she would have been here if

24    she were not in London at the moment.  But I don't think there's

25    any dispute as to the fact that his cooperation in the Kevin Gray

1  trial was extensive.  He testified for almost a week in that case
2  as the government concedes.

3       He was also prepared to testify at several hearings as the
4  government concedes, Your Honor.  And in addition to those law
5  enforcement officers, there's another law enforcement officer in
6  the room as well who happens to be an Assistant United States
7  Attorney, and that's Assistant United States attorney John
8  Dominguez.  Mr. Dominguez's position is unique in this case, in
9  that he has been the one person that has communicated with
10 Mr. Edmond since the very beginning of this cooperation.

11      So while the government will concede that there are four
12 facets to his -- to Mr. Edmond's cooperation, there's one person
13 that knows every single facet, and that is AUSA John Dominguez.
14 And what Mr. Dominguez wrote about Mr. Edmond's cooperation,
15 there will be no dispute that Mr. Dominguez wrote that
16 Mr. Edmond's cooperation will be the coup of the intelligence
17 coup of the decade, perhaps, of the century.  And interestingly
18 enough, the government will now tell the Court that that is
19 hyperbole and it's not actually accurate, but I will ask the
20 Court to deem it accurate because the one person in this
21 courtroom that has been there from the beginning would be John
22 Dominguez.

23      In addition to the law enforcement officers, we're going
24 to ask that this court listen to members of the community,
25 because members of the community will tell this Court that while

1   Mr. Edmond was incarcerated, he helped citizens of the District

2   of Columbia specifically by brokering a truce between two

3   neighborhoods that were, frankly, shooting and killing each other

4   for months leading up to this meeting.

5       There's going to be testimony that the meeting occurred at

6   a church here in the District of Columbia, that the young men

7   were encouraged to come to the church in order specifically to

8   hear from Mr. Edmond, that Mr. Edmond called into the church and

9   spoke to these young people and encouraged them to stop the

10  killing, and that the community activists in that particular

11  neighborhood will tell this Court that the killing stopped

12  between those two particular crews, those two sets of young men.

13      THE COURT:  Could your client system the killing now?

14      MR. DOWNS:  There will be further testimony that members

15  of the community now are asking that he come -- if he were able

16  to come home to an undisclosed location, that he repeat that

17  behavior, that he speak to young men in the community.  There are

18  other community members here right now prepared to testify that

19  there are members of the clergy, that they work with at-risk

20  youth on a consistent basis, that the at-risk youth are

21  particularly susceptible to hearing from Mr. Edmond, as opposed

22  to myself or the Court or anyone else because of who Mr. Edmond

23  is, because of his stature.  And if he were given the

24  opportunity, Mr. Edmond will tell this Court that he would repeat

25  that behavior, but right now he cannot.  He cannot speak to young

1    people.  The reason he cannot is -- he just cannot at this

2    moment, Your Honor, as the Court is aware for a reason that we

3    discussed at the bench.

4        But I would ask this Court after hearing all of the

5    evidence in this case, to consider that Mr. Edmond's cooperation

6    was above average.  And while his cooperation was above average,

7    we're not going to ask that this Court give him an above average

8    reduction.  We're going to ask that this Court give him the

9    average reduction for a defendant that was convicted of a CCE

10   offense, a continuing criminal enterprise offense, with the exact

11   same adjusted offense level.

12       That average sentence is 15 years, and we're going to ask

13   that this Court -- 15.4 to be specific, so we're going to ask

14   that this Court give him the average sentence, despite the fact

15   that he provided above average cooperation.

16       And I'm happy to answer any questions the Court has at

17   this point, or I'm happy to call witnesses.

18       THE COURT:  Now, the cooperation you referred to, Counsel,

19   is separate and apart and distinguishable from the cooperation in

20   the Pennsylvania --

21       MR. DOWNS:  We are not going to --

22       THE COURT:  -- District?

23       MR. DOWNS:  Correct, Your Honor.  We are going to be very

24   intentional about avoiding discussing cooperation specifically

25   geared towards Pennsylvania because we don't know if we're going

1    to have to make a separate argument to Pennsylvania.  So we're

2    going to be very intentional about trying to avoid mentioning

3    that cooperation.

4         THE COURT:  And as a result -- and just correct me if I'm

5    wrong.  As a result of Mr. Edmond's cooperation in that case, the

6    other Pennsylvania case, that the benefit derived from that

7    inured to the benefit of his mother; is that correct?  Her

8    release as a result of that cooperate in the Pennsylvania case?

9         MR. DOWNS:  Well, her sentence was reduced by 28 months as

10   a result of the cooperation that Mr. Edmond provided between 1994

11   and 1998, so I don't want to give this Court the impression that

12   she received any significant -- it was a reduction, and I guess

13   any day out of prison is significant, but it was 28 months.  It

14   was not a very long -- it wasn't a very long reduction, Your

15   Honor.  But, yes, that reduction was related to a four-year

16   timeframe.  But the witnesses will tell the Court that it's very

17   difficult to parse out what happened before 1998 because the

18   investigations from that information continued after 1998.  And,

19   in fact, some of those defendants became cooperators themselves,

20   and so it's going to be very difficult to parse -- to say this is

21   a specific definitive date where the cooperation must stop,

22   because we can't go back and say, well, the investigation stopped

23   on that particular day as well, which is why we're going to ask

24   this Court to consider Mr. Edmond's cooperation, starting with

25   July 20th, 1994, which is the very first day he began

1    cooperating.

2          THE COURT:  Right.  All right.

3          All right.  So we've all been talking for about an hour or

4    so.  We started a little bit late.  Does anyone need to take a

5    recess before we start with the witnesses?  And let me just say

6    that this hearing may be continued until tomorrow if we're unable

7    to finish today.  We'll try to finish today, but if not, we have

8    set aside time tomorrow as well and even Friday if necessary.

9          There will be some recesses during the course of this

10   proceeding today and maybe tomorrow, and we're going to kind of

11   vary what we normally do.  Mr. Edmond will leave the courtroom

12   first, and after Mr. Edmond leaves, I'm just going to ask

13   everyone to remain seated until the Court leaves, the Court

14   staff.

15         So that's about all I have to say, but if there's a need

16   to take a recess now, we'll probably take testimony until 1:00,

17   we'll break for lunch then.  It's always hard to see what time it

18   is because of the glare on that clock, but it appears to be 11:30

19   or so, but is there a need to take a recess now?

20         And, Mr. Edmond, I extend that courtesy to you as well.

21   If there's a need to take a recess now, we'll do it now, as

22   opposed to 15 minutes from now.

23         THE DEFENDANT:  I'm okay.

24         MR. DOWNS:  Thank you, Your Honor.

25         THE COURT:  Anyone else?  Yes?

1    MS. LUDAWAY:  Your Honor, we would ask to be excused

2  during the proceeding.

3    THE COURT:  You know what, I just -- can you come forward

4  to the microphone, because the court reporter can't hear you from

5  where you're seated.

6    MS. LUDAWAY:  One moment.

7    THE COURT:  Actually, you know what --

8    MR. DOWNS:  Should I stay --

9    THE COURT:  Yeah.  I'm going to save you -- I noticed

10  you -- no, I'm going to save you from walking up here.  No, don't

11  do that.  I heard you clearly.  You'd like --

12    MR. DOWNS:  The request is for the Attorney General's

13  Office to be excused.

14    THE COURT:  You know I'm not going to impose a hardship on

15  you.  Sorry.

16    MS. LUDAWAY:  No, that's fine.  May the Office of the

17  Attorney General be excused from staying throughout?

18    THE COURT:  Well, especially since I made you walk up

19  here, of course you can.  All right.  Thank you.  I'm sorry.  I

20  hope you have a good day.

21    Mr. Racine, thank you and your staff as always.  Thank

22  you, everyone.

23    All right, Mr. Crabb, anyone need to take a recess?

24    MR. CRABB:  Your Honor, we defer to the Court.  We're

25  ready to proceed or recess.

1          THE COURT:  Let me just huddle with my staff.

2          (Brief pause in proceedings.)

3          THE COURT:  So we'll start the testimony and continue to

4    take testimony until 1:00.  All right?

5          MR. DOWNS:  Yes, Your Honor.

6          THE COURT:  All right, Counsel, you can call your first

7    witness.

8          MR. DOWNS:  Thank you.  May it please the Court.  We would

9    call agent -- or Former Agent Steve Benjamin, Your Honor.

10               (STEVEN, DEFENDANT'S WITNESS, SWORN)

11         THE COURT:  Good morning, sir.

12         THE WITNESS:  Morning.

13         THE COURT:  How are you?

14         THE WITNESS:  Good to meet you.

15         THE COURT:  Okay.

16         MR. DOWNS:  May I begin, Your Honor?

17         THE COURT:  Yes.

18               DIRECT EXAMINATION OF STEVEN BENJAMIN

19   BY MR. DOWNS:

20   Q.    Good morning again, Mr. Benjamin.

21   A.    Good morning.

22   Q.    Mr. Benjamin, could you tell us a little bit about your

23   law enforcement background?

24   A.    I joined the FBI in 1976.  I went to agent's class in

25   1980, became an FBI special agent, was assigned to late '80 --

1  late 1980 assigned to the Washington Field Office and served at

2  the Washington Field Office 14 years on the C6, the drug squad.

3  And in 1998 I took a promotion at the headquarters, three years

4  of headquarters, and then back to the field as a senior

5  supervisor special agent in the Albany Division at Binghamton,

6  New York and retired in January of 1994 at the Albany Division.

7  **Q.**     Did your career at law enforcement require you or lead

8  you to work with people that were cooperating with the

9  government?

10  **A.**     Yes.  Many times.

11  **Q.**     Did your career in law enforcement lead you to Rayful

12  Edmond?

13  **A.**     Yes, it does.

14  **Q.**     When did you begin -- when is the first time you met

15  Mr. Edmond in person?

16  **A.**     The first time I met Mr. Edmond was at the -- at a small

17  motel that we had -- under a rouse, taking him out of the

18  federal penitentiary, at the end of our wiretap investigation

19  that had gone on for about two years, to talk to Mr. Edmond and

20  see what his options might be, whether he'd like to cooperate or

21  not, and it was July 20th, 1994.

22  **Q.**     Before bringing Mr. Edmond to this hotel, this motel, did

23  you warn him that you were going to bring him to the motel?

24  **A.**     No.  No.

25  **Q.**     Did you have any law enforcement warn him that he was

1   going to be brought to a hotel?

2   **A.**     No.  He was -- I believe, if my recollection was correct,

3   it was under a health -- taken out for medical reasons,

4   something the prison arranges, you know, occasionally, so -- but

5   he wasn't taken to a hospital.  He was taken to see us.

6   **Q.**     And when Mr. Edmond arrived, can you describe his

7   demeanor?  Was he combative with you?  Or describe his demeanor

8   when he arrived.

9   **A.**     Surprisingly calm.  It was an -- one of my extraordinary

10  moments in law enforcement, in my career, I'll just say that.

11  He was extraordinarily calm.  He sat in a chair, and we simply

12  explained to him who we were, why he was there, and laid out the

13  case that we had on him regarding the wiretaps, introduction of

14  an undercover officer doing inside the prison numerous

15  investigative techniques.  It was myself, Detective Rick

16  Watkins, and Detective William Nealis with the Metropolitan

17  Police Department, who is since deceased.  And we basically laid

18  out to him our case and said here's, you know, what it is, what

19  we've got, what we're going to do, and you have a choice to

20  make.  And it was an extraordinary conversation.

21  **Q.**     Why do you -- why do you classify it as an "extraordinary

22  conversation"?  What about it was extraordinary?

23  **A.**     Because our -- we'd been listening to him on the phone

24  for two years, the prison phones, and the perception was that he

25  would not cooperate, that he was a stand-up in the criminal

1   world kind of guy, and it was no chance that he would decide to

2   cooperate.

3   **Q.**   How did he respond?

4   **A.**   Well, Detective Nealis started talking to him about the

5   impact he'd had on the community as a drug dealer, his drug

6   enterprise, laid it out for him in a very straightforward manner

7   as to the damage that he had done, the murders that had been

8   going on, the gang violence that had been going on throughout

9   the city.  And a big part of the beginning of that was his rise

10  as a person who was able to bring drugs in and almost flood the

11  city with it.

12  **Q.**   And did he agree to cooperate at that point?

13  **A.**   He did.  And, surprising -- the reason why I say it was

14  extraordinary -- he broke down and started crying.  I mean, I

15  was -- I think all of us were stunned with it.  And his

16  rationale was that "I thought I was trying to do right.  I

17  thought I was trying to lift people up with the money."  And

18  some people were, but just as many, if not more, were not.  And

19  I --

20       THE COURT:  Can I stop you for just one second?

21       THE WITNESS:  Sure.

22       THE COURT:  This is going -- this is nonjury, so I have

23  the luxury of stopping a witness, and I just have a question.  I

24  don't want to get too far down the -- too far into this

25  proceeding without asking this question.

1          There's been a lot of references to murders attributed to

2     Mr. Edmond.  I just want to clear the air.  He was never

3     convicted of any murder offenses, correct?

4          MR. DOWNS:  He was never convicted of any murder offense,

5     but I think even more importantly is that there was no evidence

6     adduced connecting Mr. Edmond to a murder.  And so it's not only

7     that there was a lack of a conviction, there was a lack of

8     evidence as well.

9          THE COURT:  Did the sentencing judge take any evidence of

10    murders attributed to -- or by Mr. Edmond in consideration at the

11    time of sentencing?

12         MR. DOWNS:  I don't believe so.  I think one of the

13    questions that we're going to -- John Dominguez is here and he

14    was at the sentencing.  If anyone is the best person to answer

15    the question it's, frankly, John Dominguez.  My understanding

16    is -- I've read the transcript -- I don't believe -- I believe

17    the answer's no.

18         MR. CRABB:  Your Honor, I'll answer for the United States.

19    That was not presented at sentencing.

20         THE COURT:  All right.  And the government's not making

21    that argument today that the Court should take into

22    consideration --

23         MR. CRABB:  No, Your Honor.  We've attempted to make clear

24    throughout our papers that, regardless of the violence that was

25    related to the drug enterprise, there's no direct evidence of

1  Mr. Edmond being implicated in the acts of violence.

2  THE COURT:  All right.  All right.  Thank you very much.

3  I'm sorry.  Do you recall that last question?

4  THE WITNESS:  Yeah.  I was talking about his --

5  Mr. Edmond's response.

6  **A.**  And like I said, he broke down.  And then he said

7  something to the effect of, "I didn't know how to get out of

8  this.  I got started, and I didn't know how to stop it."  And he

9  said, "I'm ready to stop it."  And it was -- like I said, it was

10  a surprise to all of us.

11  And I know the AUSA in the case, John Dominguez, was back

12  in D.C. fully expecting and ready for a press release that he

13  had been arrested again.  And I called John and said, "He wants

14  to cooperate."  So everything in the world changed.  We didn't

15  know how he would -- you know, the press was already knocking on

16  the doors -- but Rayful at that point, I remember he just

17  slumped and said, "Maybe I can do good now," something to the

18  words to that effect, so that's where we started from there.

19  BY MR. DOWNS:

20  **Q.**  As he was telling you how difficult it was to get out of

21  the drug game, did he explain to you how difficult it was while

22  behind bars?  Did he tell you about that?

23  **A.**  Yes.  We talked about that, and we specifically then

24  started talking about what is it he could do, because we didn't

25  really have an inclination he'd actually go back inside prison.

1    Lewisburg was the highest secure prison east of the Mississippi,

2    an extraordinarily dangerous situation, but he said, "No, I can

3    go back.  On my personality, my background, I can go back, and

4    I'm willing to go back in."

5         And it took about six months for us to get a plan

6    together and get it approved at the highest levels at the

7    Department of Justice and actually get him back in.  And that

8    was the other -- from my experience as a law enforcement

9    officer, to have somebody willing to go back into a federal

10   penitentiary, a secure penitentiary like Lewisburg, to cooperate

11   with us from inside against major cartel Colombian drug dealers

12   that were in there, it was extraordinary.

13   Q.    Let me stop you there.  Can I stop you for a brief

14   second --

15   A.    Yes.

16   Q.    -- because let me unpack that.  That's a lot of

17   information.

18   A.    Yeah, I'm sorry.

19   Q.    No, fair enough.  You mentioned that it took about six

20   months to get him back in there.

21         What do you mean by that?

22   A.    I believe so, somewhere -- back into Lewisburg, I'm

23   sorry.

24   Q.    Where was Mr. Edmond -- well, was his movement free at

25   that point?

1   **A.**    No.  He was placed in segregation or lockdown, solitary

2   confinement, by the Bureau of Prisons for disciplinary matters

3   regarding use of the phones, I believe, it was under at that

4   time.  And during that time we were negotiating with the U.S.

5   Attorney's Office and FBI headquarters and the Department of

6   Justice and the Bureau of Prisons and Lewisburg penitentiary to

7   formulate a plan that everybody would be comfortable with to

8   give Mr. Edmond an opportunity to cooperate with us, and us to

9   continue our -- multiple investigations of major drug dealers.

10   **Q.**    What was your risk assessment to Mr. Edmond at the time

11   for him to go back into Lewisburg penitentiary as a cooperator?

12   What was your risk assessment?

13   **A.**    As the investigators on the case, our risk -- our

14   assessment was it was very high and it was very, very dangerous.

15   It was really on Mr. Edmond -- um, what's the word I want?  It

16   was his ability to convince us that he could do it.  And we

17   finally said, "Okay, we will try, and if something happens, it's

18   on you, but it's on us, too." So it was a major effort, and we

19   finally got the okay at the highest levels of justice and the

20   Bureau of Prisons, and we had to arrange ways for him to

21   communicate with us, and, you know.

22   **Q.**    And so without going into the specifics, while he was in

23   Lewisburg, did he cooperate while in Lewisburg penitentiary?

24   **A.**    From that point on once he -- yes.  Yes, for the next

25   almost two years, I think.  I don't remember the exact dates,

1    but yeah.

2    **Q.**    How often did you interact with Mr. Edmond during that

3    timeframe?

4    **A.**    Myself or my cold case agent, Jimmy Caudle, or Detective

5    Watkins, Ray would call and check in, I will say, at least once

6    a week, if not two or three times.  And we had a specific number

7    that he could call, and we had emergency arrangements that he

8    could call any time 24/7 if he felt he was in jeopardy.  And we

9    had Lewisburg penitentiary working with us to immediately

10   extract him if we got a call, no matter when it was, if he felt

11   he was in jeopardy.  So we had very elaborate plans to protect

12   him if need be.

13   **Q.**    And during the timeframe where you interacted with

14   Mr. Edmond two or three times a week, did you have an

15   opportunity to assess the utility of the information he provided

16   to law enforcement?

17   **A.**    Yes.  It was a -- it was very evident from the start that

18   he had made a decision and was sincere about it, and at no time

19   wavered, no matter how difficult it was, the subjects we were up

20   against.  Not as -- and not only not wavered, but somehow --

21   which is extraordinary to me -- kept a joyful attitude under the

22   circumstances to go forward with it.  And I really do believe he

23   was trying to make an effort to right all the wrongs that he

24   did, as substantial as they are.

25   **Q.**    And as he was trying to right the wrongs that he did, did

1  he provide you with any information that you found to be false?

2  **A.**    No, not -- not a single incident did we come across

3  anything that was contradictory.  He told us a lot of

4  information we did know.  He made clear for us information that

5  we thought we knew and wasn't correct, but -- and I had many

6  cooperators during my career, and sooner or later there was

7  something that they didn't want to tell us about, but that was

8  not the case with Mr. Edmond.  Once he made the decision, he had

9  made the decision.

10  **Q.**    In the course of your career dealing with cooperators,

11  where would you --

12      THE COURT:  Can I ask you a question?  You said you've had

13  many cooperators during your career and sooner or later there's

14  something they didn't want to tell us about, so how many --

15      THE WITNESS:  Something they didn't want to tell us about

16  or something -- yeah, something they told us untruthful about

17  because they were trying to protect somebody.

18      THE COURT:  Right, right.  So going back just very

19  generally, how many cooperators do you think you've dealt with in

20  your career?

21      THE WITNESS:  Oh, my.  Well, working drug cases for 14

22  years, boy, Your Honor, it's got to be in the hundreds.

23      THE COURT:  Just ballpark.

24      THE WITNESS:  It's got to be in the hundreds.

25      THE COURT:  In the hundreds?

1          THE WITNESS:  Yeah.  Oh, yeah, yeah.

2          THE COURT:  So he was exceptional then in that regard?

3          THE WITNESS:  Exceptional in every way, yeah.  And it got

4   to the point where it wasn't even a concern.  You know, he was --

5   I'll say this in kind of a weird way, it'll sound weird, but part

6   of the team, basically.  I mean, he was all in, no matter what we

7   asked -- asked him to do, you know, he was willing to do.

8   BY MR. DOWNS:

9   Q.     What types of things did you ask Mr. Edmond to do while

10  you were communicating with him two or three times a week?

11  A.     Make phone calls to subjects on the outside, and all

12  these calls were recorded.  We would -- he would call in, and we

13  would --

14         MR. CRABB:  Your Honor, if I may address the Court?

15         THE COURT:  Let me just read this.

16         Sure.  You want to come to the bench or not?

17         MR. CRABB:  Just briefly.

18         THE COURT:  Sure.

19         MR. CRABB:  Your Honor, this is the part of the

20  cooperation which the defense said it wasn't going to get into.

21  What's being described now are the covert activities that

22  Mr. Edmond did while in prison.  That's the case he pled guilty

23  to in the Middle District of Pennsylvania and was sentenced to 30

24  years and dedicated the cooperation to his mother.  Our position

25  is that this is not relevant to this proceeding.

1        THE COURT:  All right.

2        MR. DOWNS:  May I be heard, Your Honor?

3        THE COURT:  Sure.

4        MR. DOWNS:  That's actually not the only place we're

5   going.  Mr. Edmond was transcribing phone calls.  He was

6   deciphering phone calls.  Some of that information could not be

7   followed up on between 1990- -- before 1998.

8        THE COURT:  I'll give you some leeway.

9        MR. DOWNS:  Thank you, Your Honor.

10       THE COURT:  Sure.

11  BY MR. DOWNS:

12  **Q.**   What types of things did Mr. Edmond do when you were

13  communicating with him?

14  **A.**   Again, operationally, it was making contact with other

15  subjects of other cases that we had on our squad.

16       THE COURT:  Let me ask you this:  Are you in a position to

17  segregate out his cooperation vis-à-vis this case and the Middle

18  District case?

19       THE WITNESS:  Yes, in the sense that we had subjects,

20  other major Cuban, Colombian, cartel members, subjects doing life

21  terms like Mr. Edmond in the penitentiary at Lewisburg that we

22  also had cases on.  Then we had the D.C. side, which were drug

23  dealers in the D.C. area.

24       THE COURT:  All right.  So then your testimony today then

25  will focus on this case and the D.C. cases, right?

1           THE WITNESS:  Yes.

2           THE COURT:  All right.  It's always interesting from my

3    perspective to be able to talk to law enforcement officers at the

4    time of sentencing, the agents that have worked with someone

5    who's been out in the community cooperating, or sometimes gone

6    out of the country to cooperate.  And I'm always interested in

7    their answer to a question that I ask, and that is:  On a scale

8    of 1 to 10, with 1 being, "Judge, we couldn't find this cat.  You

9    know, I mean, he would stiff us, he wouldn't show up, he wouldn't

10   do this," to a scale up to 10, which was having had this type of

11   cooperation before.

12          I always want to find out an opinion that a law

13   enforcement officer who's been working with someone has about

14   where that person fits on that very informal chart of mine, 1 to

15   10.

16          THE WITNESS:  It's an 11, Your Honor.

17          THE COURT:  11?

18          THE WITNESS:  Yeah.

19          THE COURT:  And I've had that answer a couple of times,

20   it's over 10, and I don't try to lead people to that.  I don't --

21   I don't -- I never say it could be greater than 10, but you

22   volunteered that.

23          THE WITNESS:  Yeah, 11.

24          THE COURT:  And what's your basis for that?

25          THE WITNESS:  Because not only did he -- sorry.  Not only

1    did he cooperate for us, but he also cooperated with another

2    government agency, specifically the Inspector General's Office of

3    the Bureau of Prisons, on fixing the problem with the phone

4    systems.  Because Mr. Edmond was simply one of many that were on

5    the phones at Lewisburg conducting anything from tax fraud to

6    major drug deals.  And they would simply make a collect call,

7    have their person outside forward them to Colombia or wherever,

8    and arrange a drug deal.  And it was pervasive through the

9    system, so not only did Mr. Edmond put himself in jeopardy with

10   possible potential other drug dealers that could find out he was

11   cooperating, but also the Bureau of Prisons.  You know, they were

12   getting very bad publicity for all this going on when it hit, and

13   he still put himself out there to try to fix something that he,

14   too, knew was wrong.

15          THE COURT:  All right.  Sorry to interrupt you, Counsel.

16          MR. DOWNS:  May I have the Court's brief indulgence?

17          THE COURT:  Sure.

18          (Discussion had off the record between attorney and

19   client.)

20   BY MR. DOWNS:

21   Q.    Let me take you back to 1994.  At the time when

22   Mr. Edmond made the decision to cooperate, what, if anything, do

23   you remember from the news that hit the newspapers here in D.C.

24   about Mr. Edmond?

25   A.    I believe there was -- well, it was reported -- and my

1  memory -- it was -- there was a report or a news release that he

2  had been arrested again, so everybody knew that.  I -- it did

3  not leak out that he was cooperating, or else we couldn't have

4  done our operation.  But there definitely was a press release.

5  We had press up in Lewisburg suddenly coming up from D.C. trying

6  to talk to him, and -- yeah, so it was out there that he had

7  been arrested again.  And that was one of the biggest concerns

8  about putting him back out.  We were trying to keep it secret

9  that he had been talked to.  But there was ultimately, I

10  believe -- and Mr. Dominguez can talk to that about the details,

11  but that there was some kind of release that he'd been arrested

12  again.

13  Q.    Thank you.  We'll talk about it later.

14        MR. DOWNS:  Thank you very much for your time.

15        THE WITNESS:  Thank you.

16        THE COURT:  All right.  Any questions, Mr. Crabb?

17        MR. CRABB:  May I have a moment, Your Honor?

18        THE COURT:  Sure.

19        MR. CRABB:  Thank you, Your Honor.

20        THE COURT:  All right.  Thank you, sir.

21        THE WITNESS:  Thank you, Judge.

22        MR. DOWNS:  May I continue, Your Honor?

23        THE COURT:  Sure.

24        MR. DOWNS:  We will call Barbara -- Ms. Barbara Watkins.

25        (BARBARA WATKINS, DEFENDANT'S WITNESS, SWORN)

1    THE COURT:  All right.  Good morning.

2    THE WITNESS:  Good morning.

3          <u>DIRECT EXAMINATION OF BARBARA WATKINS</u>

4  <u>BY MR. DOWNS:</u>

5  **Q.**    Good morning again.  Thank you for your time.

6  **A.**    No problem.

7  **Q.**    Has anybody forced you or compelled you or subpoenaed you

8  to be here?

9  **A.**    No.

10  **Q.**    Why are you here?

11  **A.**    It's the right thing to do.

12  **Q.**    I'm going to take you back to the early '90s.

13          Did you meet Rayful Edmond?

14  **A.**    I met Mr. Edmond, like, mid-'90s, late '90s.

15  **Q.**    All right.  And what were you doing for a living at the

16  time?

17  **A.**    Police officer.

18  **Q.**    All right.  And how did you come to meet Mr. Edmond in

19  your role as a police officer?

20  **A.**    I was detailed to the FBI working with Steve Benjamin,

21  Rick Watkins, and William Nealis.

22  **Q.**    And what was your assignment at the time?

23  **A.**    I was undercover.

24  **Q.**    When you met Mr. Edmond, had he already been begun

25  cooperating at the time?

**A.**    Yes.

**Q.**    What was the nature of your interactions with Mr. Edmond while Mr. Edmond was cooperating?

**A.**    Mr. Edmond supplied information regarding the Kevin Gray case and a few other cases, so I was with the prosecutor that went to interview him.

**Q.**    Understanding that Judge Sullivan knows about the Kevin Gray case, but could you give us all a bit of background just about the magnitude of the Kevin Gray case?

**A.**    Kevin Gray and his crew were responsible for over 30 homicides in the D.C. area.  And Mr. Edmond took the stand for maybe four days, and he gave extensive testimony which resulted in the convictions.

**Q.**    Before Mr. Edmond took the stand in the Kevin Gray case, were you there when Mr. Edmond was being debriefed about the Kevin Gray case?

**A.**    Yes.

**Q.**    Okay.  Can you describe Mr. Edmond's demeanor as he was being debriefed?

**A.**    It was kind of funny because we couldn't keep up with how fast he was giving us the information, so we were trying to write, and he's steadily pouring out the information.  So he was very, very upfront and informative.

**Q.**    How often during your career as a law enforcement officer, how often did you communicate with Mr. Edmond?

1    **A.**    It's hard to say.  I -- we talked to Ray quite a bit

2    during the course of different investigations.

3    **Q.**    Can you put an exact number on how many investigations

4    Mr. Edmond gave you information regarding?

5    **A.**    Me personally?  Maybe four or five different cases.

6    **Q.**    During the course of providing you information on four or

7    five cases personally, did Mr. Edmond ever provide you any

8    information that was false or misleading at all in anyway?

9    **A.**    No.

10   **Q.**    Describe -- you heard Judge Sullivan's question earlier.

11   On a scale of 1 to 10, how -- how productive was Mr. Edmond's

12   cooperation to your investigations?

13   **A.**    He was very productive.  On a scale of 1 to 10, 11.

14   **Q.**    All right.

15        MR. DOWNS:  Court's very brief indulgence, Your Honor.

16        THE COURT:  Sure.

17        MR. DOWNS:  Thank you.

18        Thank you, Your Honor.  If the Court doesn't have any

19   other questions of Ms. Watkins, neither do I.

20        THE COURT:  Mr. Crabb?

21        MR. CRABB:  No questions, Your Honor.  Thank you.

22        THE COURT:  All right.

23        MR. DOWNS:  Thank you for your time.

24        THE WITNESS:  All right.

25        MR. DOWNS:  Your Honor, we call Rick Watkins to the stand.

                    (RICK WATKINS, DEFENDANT'S WITNESS, SWORN)

          THE COURT:  Good morning, sir.

          THE WITNESS:  Good morning, Your Honor.

                    DIRECT EXAMINATION OF RICK WATKINS

BY MR. DOWNS:

**Q.**     Good morning, sir.

**A.**     Good morning.

**Q.**     Could you describe briefly, just briefly, your law

enforcement background?

**A.**     I joined the Metropolitan Police Department in April of

1973, and I retired in October of 2008.

**Q.**     Did anyone force you or compel you to attend today's

court proceedings?

**A.**     No.

**Q.**     Why are you here today?

**A.**     The same reason that was given before, I just felt it was

the right thing to do.

**Q.**     How did you first meet Mr. Edmond?

**A.**     First met Mr. Edmond when he was taken out of Lewisburg

and he was taken to Allenwood under an order by Judge Muir in

the Eastern District of Pennsylvania, and we took him to a hotel

room and we started debriefing him.

          THE COURT:  Why do you say it was -- this is the right

thing to do?

          THE WITNESS:  I feel that everybody should be given the

1  opportunity to have their story heard.  And I think it's only

2  fair that Mr. Edmond's story should be out there and the public

3  should know of his cooperation and the extent of his cooperation,

4  which for the most part has been kept a hidden secret for obvious

5  reasons.

6  BY MR. DOWNS:

7  **Q.**    And do you think now is the appropriate time for

8  Mr. Edmond's story, his cooperation, to be told?

9  **A.**    Yes.

10  **Q.**    Okay.  So let's talk a bit about that cooperation.

11       You said it began in that hotel room back in -- what year

12  was it, if you remember?

13  **A.**    I believe it was July of 1994.

14  **Q.**    Describe Mr. Edmond's demeanor for us when you

15  encountered him in 1994 in that hotel room.

16  **A.**    At first he just came -- we brought him in.  He sat down,

17  and we explained who we were.  We said we had some information

18  to put forth to him, which we did, and detailed a case we had

19  against him.  He listened.  He didn't ask my questions.  And as

20  I believe Mr. Benjamin said, at one point he finally --

21  Mr. Edmond took a -- sat back, took a deep sigh like he had

22  relaxed, and made a comment about, "I'm fine.  This day finally

23  came," and he agreed to cooperate.

24  **Q.**    When he said "This day finally came," do you remember

25  what he told you what was happening to him in prison at

1    Lewisburg at the time?

2    **A.**    Yes.

3    **Q.**    What was happening?

4    **A.**    He was being pressured to maintain his status, as any of

5    the high profile prisoners are in the penitentiary.

6    **Q.**    Describe the -- Lewisburg at the time.  Was it a sort of

7    -- what type of place was it to be, less dangerous, more

8    dangerous, or somewhere in the middle?

9    **A.**    No, it was more dangerous.  It was the highest level

10   security prison on the East Coast at that time.

11   **Q.**    When you say Mr. Edmond was being pressured, what do you

12   understand that to mean?

13   **A.**    Based on the years of working that case and interacting

14   with the Bureau of Prisons personnel at Lewisburg, you had to

15   maintain whatever you came in there from the street for.  If

16   not, you went to the lower order, the lower rung of the ladder

17   amongst all the prisoners and were treated completely

18   differently, so you were pretty much forced into maintaining the

19   same posture you had before you came to prison.

20   **Q.**    And when Mr. Edmond told you "This day finally came,"

21   what did you take that to mean?

22   **A.**    That he wanted out of the game.

23   **Q.**    Did he take the opportunity to get out of the game on

24   that particular day?

25   **A.**    Yes.

1  **Q.**    Did he hesitate?

2  **A.**    Not at all.

3  **Q.**    Okay.  From that day forward, how often did you

4  communicate with Mr. Edmond with regard to cooperation?

5  **A.**    I can't put a number on it.  There was multiple, multiple

6  hours, week, days.  I have no clue.

7  **Q.**    I want to focus your attention on cold case homicides.

8        Did there come a time when Mr. Edmond provided you

9  information with regard to cold case homicides?

10 **A.**    Yes.

11 **Q.**    Tell us how that -- how did that start?

12 **A.**    It started with some of the cases that he related, I

13 recognized as being either defendants or deceased persons, and I

14 contacted cold case homicide and had a liaison with one of the

15 people in cold case homicide.

16       As we developed and continued to interview Ray, certain

17 names or people who were linked together either via their drug

18 connection, their girlfriend, how they were with their position

19 in the community, I could relate that information back to the

20 people in the cold case squad, which would narrow their focus on

21 who they were looking for as defendants in some of their cases.

22 **Q.**    Okay.  So logistically, how would Mr. Edmond get the

23 information to the cold case squad at MPD, at the Metropolitan

24 Police Department?

25 **A.**    Well, some of it was done in person with myself; some of

1    it was done by telephone; and eventually, I believe there was --

2    I don't remember who it was from the FBI who filled in that

3    position to be the coordinator between the cold case squad and

4    Mr. Edmond.

5    **Q.**    Do you know the name Agent Jimmy Caudle?

6    **A.**    Yes.

7    **Q.**    Who's that?

8    **A.**    I believe that was the agent who took that position.

9    Thank you.

10   **Q.**    With regard to the cold case homicides, how useful was

11   that information in sort of developing either suspects or

12   eliminating suspects?  How useful was Mr. Edmond's information?

13   **A.**    I can only say from the individuals I spoke with that

14   were in that unit, it was very helpful.

15   **Q.**    In evaluating -- in all of your interactions with

16   Mr. Edmond, at any point did he ever tell you something that was

17   misleading or false?

18   **A.**    No.

19   **Q.**    Did he -- how would you rate his cooperation on a scale

20   from 1 to 10?

21   **A.**    Again, I'd have to say an 11.

22   **Q.**    And as to his truthfulness, what would you say -- how

23   would you rank his truthfulness or how would you, at this point

24   in his life --

25        THE COURT:  Why do you say 11 as opposed to 10?

```
1        THE WITNESS:  He went above and beyond what any normal

2   cooperator would do.  And in my 35 years in the police

3   department, I had in excess of probably over 200 cooperators, so

4   Mr. Edmond far exceeded anything that any of those other

5   cooperators ever did.  There were individuals that they didn't

6   want to testify against or give information on, or it could have

7   been a family member, it could have even been a police officer,

8   because we locked up a few police officers in my tenure.  So

9   there were cooperators who did not want to give you all the facts

10  that they knew, for whatever reason, for their own protection, or

11  they didn't want people to know they were cooperating.

12       Mr. Edmond wasn't like that.  Anything and everything we

13  asked him to do, he did.  And there were some things that he

14  volunteered to do, based on information he had given us.  And we

15  would maybe be kind of lost on, say, one of the tapes we were

16  reviewing with him, and he could put us in the right direction

17  because we didn't quite understand some of the lingo sometimes.

18       So, yeah, he never -- he never faltered or wavered in any

19  way.

20       THE COURT:  Over the course of your career, did you -- did

21  you learn that the main reason for people wanting to fully

22  cooperate was their reluctance to testify against family members

23  and friends or not?

24       THE WITNESS:  There were -- there were cooperators who did

25  not want to talk about family or close friends, and in
```

1   Mr. Edmond's case that wasn't true.

2         THE COURT:  All right.

3   BY MR. DOWNS:

4   **Q.**     Once you began -- once Mr. Edmond began cooperating in

5   '94, were you able to close out all of the information he gave

6   you between '94 and '98?  Were you able to just investigate it

7   fully and stop as of June 1998?

8   **A.**     No.  There was too much information to stop or to finish

9   by 1988 [sic].

10  **Q.**     So what happened after June of 1998?  Did that

11  information still -- was it still useful or did it just

12  disappear?

13  **A.**     No.  It was still useful, and it was disseminated to the

14  parties who were doing other investigations.

15  **Q.**     Okay.

16        MR. DOWNS:  Court's very brief indulgence.

17        THE COURT:  Sure.

18        MR. DOWNS:  Thank you, Your Honor.  Nothing further.

19        THE COURT:  All right.  Mr. Crabb?

20        MR. CRABB:  Thank you, Your Honor.  No questions.

21        THE COURT:  All right.  Thank you, sir.

22        THE WITNESS:  Thank you, Your Honor.

23        THE COURT:  You may step down.

24        MR. DOWNS:  Your Honor, the defense will call John

25  Dominguez.

```
1          THE COURT:  All right.

2          MR. CRABB:  Your Honor, may we approach at this point?

3          THE COURT:  Sure.

4          (Following sidebar discussion had on the record:)

5          MR. CRABB:  Your Honor, I think this gets to the point

6   that we discussed briefly this morning, and we'd ask for a

7   proffer as to the contours of what the defense intends to elicit

8   from Mr. Dominguez so we can lodge any objections.

9          Thank you, Your Honor.

10          THE COURT:  Should that be on public record?

11          MR. CRABB:  That's fine.

12          THE COURT:  Okay.

13          (Sidebar discussion concluded.)

14          THE COURT:  All right.  And for the record, Mr. Dominguez

15   is currently an Assistant U.S. Attorney in the District of

16   Columbia office; is that correct?

17          MR. CRABB:  Yes, Your Honor, that is.

18          THE COURT:  All right.  And, Counsel, please make a

19   proffer as to the testimony that you'd like to elicit from

20   Mr. Dominguez.

21          MR. DOWNS:  Yes, Your Honor.  I would ask Mr. Dominguez to

22   start detailing Mr. Edmond's cooperation from July 20th of 1994,

23   but specifically on sort of how he evaluated Mr. Edmond's

24   cooperation on cases where Mr. Edmond was scheduled to testify

25   but did not testify because defendants pled.
```

1  There were other defendants that Mr. Edmond testified or

2  provided information against, that themselves became cooperators.

3  I would ask Mr. Dominguez or AUSA Dominguez to describe that as

4  well.

5  I would ask Mr. Dominguez to describe sort of whether he

6  believes Mr. Edmond's cooperation was exceptional, whether the

7  information that he wrote in the draft 35 -- Rule 35 is factually

8  true; in other words, was there anything in there that was not

9  true.  I'm not asking him to give his ultimate opinion today.

10  So to the extent is the concern that I would be asking

11  Mr. Dominguez to opine on the appropriate sentence today, we will

12  not ask him to opine.  We will only ask him to confirm that

13  factually he did not write anything inaccurate in the draft

14  Rule 35 that specifically is attached as Exhibit 2.1 to

15  Document 202.

16  THE COURT:  All right.

17  MR. DOWNS:  And that's it, Your Honor.  Thank you.

18  THE COURT:  All right.  Any objections?

19  MR. CRABB:  Thank you, Your Honor.  We don't object to any

20  of those lines of questioning.

21  THE COURT:  All right.  Thank you.

22  You may proceed, Counsel.

23  (JOHN DOMINGUEZ, DEFENDANT'S WITNESS, SWORN)

24  THE COURT:  Good morning, Counsel.  Good morning.  How are

25  you?

1    THE WITNESS:  Good morning, Your Honor.  It's an

2  uncomfortable position for me.

3    THE COURT:  Why?

4    MR. CRABB:  Why?

5    THE WITNESS:  I'm used to being over there (indicating).

6    DIRECT EXAMINATION OF JOHN DOMINGUEZ

7  BY MR. DOWNS:

8  **Q.**    Tell us why it's uncomfortable for you, Mr. Dominguez.

9  **A.**    I've been an Assistant U.S. Attorney since 1984.  I'm

10  used to asking questions, not answering them, but I'll do my

11  best.

12  **Q.**    Understood, understood.

13    In your career as an Assistant United States Attorney

14  since 1984, have you had the opportunity to work with

15  corroborating witnesses?

16  **A.**    Yes, hundreds of times.

17  **Q.**    Have you had the opportunity to evaluate their testimony

18  or their utility?

19  **A.**    Every single time.

20  **Q.**    I want to direct you to one cooperating witness in

21  particular, Rayful Edmond.

22    How did you come in contact with Mr. Edmond?

23  **A.**    I came in contact with Rayful Edmond first because I

24  prosecuted him.  I was part of the team in 1989 that prosecuted

25  Rayful Edmond.  My role was to do the sentencing for him and all

1    of the defendants in that case, which is this case, Criminal

2    89-162.  And I did all of the violent crime prosecutions along

3    with AUSA Dave Schertler, and all the asset forfeiture and money

4    laundering prosecutions.

5    **Q.**    And after convicting Mr. Edmond in the first trial, were

6    you involved in the investigation of Mr. Edmond while he was in

7    Lewisburg?

8    **A.**    Yes.

9    **Q.**    And as that investigation came to a close and Mr. Edmond

10    was in the hotel room, I want to take you to that moment right

11    there.

12           Were you physically in the hotel room the first time

13    Mr. Edmond came to that hotel room?

14    **A.**    No.

15    **Q.**    Were you expecting Mr. Edmond to cooperate at that time?

16    **A.**    No.

17    **Q.**    All right.  So tell us:  When Mr. Edmond made the

18    decision to cooperator, what was your reaction?

19    **A.**    Okay.  I knew that the -- what the team was going to do,

20    because I -- Steve Roman and I were the Assistant U.S. Attorneys

21    who were prosecuting and investigating crimes committed out of

22    USP Lewisburg involving Rayful Edmond and others.  So we knew

23    that this was going to be a takedown day, so to speak, and we

24    were going to end up arresting someone who was already serving a

25    life sentence in a federal penitentiary.

1    Steve Benjamin asked if he could interview Rayful Edmond,

2  and I said, "Fine.  Do what you will."  I had no expectations

3  that he would ever cooperate.  And so I was in constant

4  communication with the team from here in D.C., and on -- it was

5  July 20th of 1994, and I remember the day because after the

6  interview started, Steve Benjamin called me, and we had a

7  four-hour long telephone conversation.

8  **Q.**    About?

9  **A.**    Rayful Edmond and what had happened when they encountered

10  him and cooperating.  They took him out the USP Lewisburg

11  pursuant to an order, as I recall, by Judge Malcolm Muir, who's

12  passed now, but he was the federal judge in Williamsport, and

13  that covered the area of Lewisburg.  Lewisburg is a federal

14  penitentiary about 28 miles south of Williamsport.

15  **Q.**    And at the time when Mr. Edmond made the decision to

16  cooperate, what information hit the news, if anything, about his

17  cooperation or lack thereof?

18  **A.**    Okay.  This I didn't expect, so I'm roughing it out.

19    My recollection is that it hit the news that he had been

20  rearrested for operating drug trafficking out of USP Lewisburg,

21  not introduction of contraband into an institution, but actually

22  running an operation from inside the prison affecting events

23  outside the prison.

24    When -- after this four-hour long -- roughly, four-hour

25  long conversation with Steve Benjamin, first I was as astounded,

1     then I had to shift gears.  And so I was shifting gears and

2     trying to figure out how to capitalize on this opportunity.  And

3     the best way to do it is to say be covert and give us an

4     opportunity to go to the U.S. Attorney and say what had happened

5     and get his approval.  At the time it was Eric Holder.  And then

6     eventually it went to high levels in the Department of Justice.

7     **Q.**     And when you say it went to high levels of the Department

8     of Justice, what is the "it"?  Is it Mr. Edmond's movement?

9     **A.**     His cooperation was -- this was extremely unusual.  Most

10    of the time if you -- if you're able to gain a cooperator from

11    somebody who's in prison and serving a sentence in prison, all

12    they have to offer is historical information, you know, stuff

13    that happened in the past.  He had both opportunity to do things

14    covertly into the future, as well as provide us information that

15    was historical.

16         My job was to find out a way, if we could capitalize on

17    this opportunity.  I had no expectation that he was going to say

18    what he said to the agents, that he was wanting to cooperate.

19    As it was explained to me, his remarkable phrase was, "What took

20    you so long?"  And the agents were, like, astounded.  "What do

21    you mean what took us so long?"  Edmond had known he was stuck

22    at USP Lewisburg, and he was trapped into dealing drugs for just

23    about any inmate who came by and asked for it.

24    **Q.**     What would happen, to your knowledge, if he refused an

25    inmate's request to supply him drugs at Lewisburg?

**A.**     Well, it took a while for me to figure this out and understand what life was like in USP Lewisburg, but the -- I came to appreciate, with the help of other experts at the BOP and also statements that Edmond had said, that if -- these are such dangerous people at USP Lewisburg.  If you deny one person's overture to help and commit a crime or make a drug connection, then they become your enemy and all of their friends become your enemies.  And if you start that road, if you don't have a strong gang to support you, you aren't going to live past lunch time.  They're very -- they'll shank you.  It is an extremely violent place.  The public does not normally understand what life is like at USP Lewisburg.  I didn't.  So I had to do a lot of research to try to understand what was going on before I could understand what Edmond was saying about his motives and how he wanted to get out of that -- I think, Rick Watkins said "the game."  He means the drug game.  And so I came to appreciate that, and --

**Q.**     What did you -- so did you -- once you understood that life at USP Lewisburg was very dangerous, did you just ask Mr. Edmond to go right back into general population, or did he go somewhere else?

**A.**     No.  Well, no, he went into segregation.  And it turned out after -- so we had a lot of consultation with a fellow named Nelson Aponte, who then was the SIS.  He was the chief police officer at Lewisburg.  The inmates would expect that they would

1  put an inmate who did a infraction, a disciplinary infraction,

2  or committed a crime to be put in segregation.  That turned into

3  an advantage for us, because I needed time to figure this out to

4  try to figure out what information he could give and how he

5  could help us, and then be able to come up with a way of -- that

6  would make sense to my bosses, the U.S. Attorney, and eventually

7  had to go to the high levels in the Department of Justice.

8          So he needed to be -- he was going to be incarcerated and

9  go back to being incarcerated -- remember, he was already

10 serving a life sentence -- and so they put him in segregation.

11 **Q.**    How long did he stay, approximately, if you remember?

12 **A.**    My recollection was he had about six months in solitary,

13 which they call segregation.  But that actually gave us the

14 months we needed to figure out a plan.

15 **Q.**    Did you figure out a plan?

16 **A.**    Yeah.

17 **Q.**    After you figured out the plan, did Mr. Edmond go back to

18 general population?

19 **A.**    Oh, well, yeah, after about six months.

20 **Q.**    Right.

21 **A.**    And we coordinated the plan with him in finding out what

22 would work.  Um, it was -- it was -- it was extremely

23 extraordinary.  I'd never encountered something like this.  You

24 generally do not use a cooperator who's serving a sentence in an

25 institution covertly.  It's just too dangerous.  So it was --

1  **Q.**    Was that explained to Mr. Edmond before he decided to

2  physically go back in the general population?

3  **A.**    What do you mean did -- he explained it to us.  We then

4  verified.

5  **Q.**    Did he actually -- he went back into general population,

6  right?

7  **A.**    Yes.  And he -- so we come up with --

8       THE COURT:  What did he say to you?  You said he explained

9  it to us.  I mean, to the best of your recollection.

10      THE WITNESS:  Well, I had a hard time wrapping my head --

11  my mind around what was going on, and how -- I referred to it as

12  Newtonian physics in the real world that I grew up in don't seem

13  to apply inside the walls of USP Lewisburg.  Cause and effect

14  doesn't -- I understand when you hit a billiard ball here, it

15  bounces another billiard ball here.  When you go inside

16  Lewisburg, trying to predict things like cause and effect, no,

17  you need expertise.  I need a Nelson Aponte, I needed advice from

18  Edmond.  So Edmond explained to us what would work, what's likely

19  to happen, how dangerous this was.  He was willing to do it.

20      We saw an opportunity, but not without great risk.  I

21  mean, look, we're dealing with the leaders of the Medellín

22  Cartel, the leaders on the Cali Cartel.  His roommate was his

23  roommate at prison, Chicky, who was the third largest cocaine

24  producing person in the world.

25  BY MR. DOWNS:

1    Q.    Who's Chicky's mother?  Well, do you remember Chicky's

2    mother?

3    A.    Yeah.

4    Q.    Who was that?

5    A.    It is Velda -- Oh, I had all this long ago.  I knew all

6    these names.  The black widow.

7    Q.    Black widow.

8          What was your --

9    A.    Books and movies about her.

10   Q.    All right.  What was your assessment of Mr. Edmond's risk

11   while he was cooperating while being roommates with the black

12   widow's son?

13         MR. CRABB:  Your Honor, may I address the Court again?

14         THE COURT:  Sure.

15         MR. CRABB:  Again, Your Honor, this is getting into covert

16   operations that Mr. Edmond did, which is the subject of his

17   guilty plea in the Middle District of Pennsylvania.  And this

18   segment of his cooperation, working covertly in the jail, is what

19   he pled guilty to and dedicated that cooperation to his mother.

20   That's not relevant to today's proceedings, this covert activity.

21   It's already been assessed and credited.

22         THE COURT:  I'll give counsel some leeway.

23         Are you in a position to segregate out cooperation via the

24   Pennsylvania case and this case?

25         THE WITNESS:  Yes, and did so, and made an effort to

1    compartmentalize it so that we could determine what

2    prosecutions -- what information he gave and prosecutions

3    resulted before 1998, I think it was, before Judge Penn ruled on

4    our Rule 35(b) motion for Constance D. Perry.  And so you can

5    compartmentalize the information, but it's -- you can't

6    compartmentalize what started and how he made the decision and

7    how we came to believe and be confident that this genuine.

8         And so the kind of information like the agents' already

9    testified, I mean, he was giving us so much information so fast,

10    we couldn't keep up with it.  It was -- we debriefed him Monday

11    through Friday, I think starting in August, all the way through,

12    like, Thanksgiving.  It was like --

13    BY MR. DOWNS:

14    **Q.**    How many hours approximately a day?

15    **A.**    We drove up there on Friday nights.  We would come back

16    on Sunday afternoon.  We'd get in the car and go back up to

17    Lewisburg, and it went on like that for, like, I don't know,

18    three months or something.

19         So we're doing two things:  We're gathering information

20    about crimes that he knows and criminal conduct that's

21    historical; we're also trying to interpret thousands and

22    thousands of wiretap hours.

23         We were on his phone from '92 to, roughly, just before

24    '94.  And a tremendous amount of criminal conduct was going on

25    on the phone.  He was on the phone constantly, talking with

1   people, Baltimore, Colombia, D.C., and a lot of it was social,

2   but a lot of it was criminal.

3       And so, look, this was...

4   **Q.**   Were you able to follow up -- so were you able to follow

5   up on every piece of information he gave you between August and

6   Thanksgiving prior to June of 1998?

7   **A.**   No way.

8   **Q.**   Why not?

9   **A.**   Volume, the volume of information was too great.

10      So we're -- we went after -- we built cases against the

11  cartel leaders in the USP Lewisburg that he had associated with

12  and he was ordering up kilos from Colombia.  Chicky, by the way,

13  his roommate, got paroled while our investigation was going on

14  and got sent back to Colombia.  They're still on the phone.

15  He's calling collect from USP Lewisburg ordering up kilos from

16  Chicky in Colombia to be sent to D.C.  And so we knew that, and

17  that was something we paid attention to.

18      After his arrest, though, when we started -- when he

19  started cooperating, we then went over Fred Aguilera and Nelson

20  Garcia.

21  **Q.**   Who -- and let's stop for a second to make sure the

22  Court -- who were they?  Who are Mr. Garcia and Aguilera?

23  **A.**   Okay.  So they were -- let me get this right.  They

24  were -- so Fred Aguilera was married to Carmen Santacruz

25  Londono, who's a sister of, what, Pablo Escobar something.  Um,

1  anyone ever heard of Pablo Escobar?

2       So, yeah, so these were serious players.  World

3  distributors in cocaine, and we were trying to infiltrate and

4  use his information.

5  **Q.**    So let me stop you there.

6       Did Mr. Edmond decline to provide information about

7  Colombian drug dealers?

8  **A.**    No.

9  **Q.**    Did he decline to provide information that could be

10  deemed very dangerous because it's linked to Pablo Escobar?  Did

11  he say, "You know what, I'm not corroborating on that case"?

12  **A.**    Well, Freddy Aguilera was dangerous enough, so did he --

13  he gave us information on these targets.  He, while in prison,

14  acted covertly to help us set up and catch Freddy Aguilera.  So

15  this is -- if he were -- if he were exposed as a cooperator,

16  what'd I tell you, this is not hyperbole, he wouldn't -- if it's

17  morning and they find out, he isn't going to live past lunch

18  time.  They just shank you.  That's just -- that's -- in those

19  settings, those inmates don't forgive people for cooperating.

20  They'd kill him.

21  **Q.**    And based on your experience, had Mr. Edmond's

22  cooperation been exposed against Colombian drug dealers, what

23  was the risk to Mr. Edmond's family?

24  **A.**    At the time, minimal until it became disclosed that he

25  was a cooperator.  Then my job got way more complicated.

1   **Q.**     How so?

2   **A.**     Well, because you -- one of the things you want to do

3   with a cooperator is, you want to protect them from retaliation.

4   Nobody's going to want a cooperate if they get killed for doing

5   it.  So a lot of times if you -- you can protect a cooperator,

6   but the -- the drug dealers and people you're going after know

7   he's a cooperator, and if they can't get to him directly,

8   they'll get to his family.  And so it became -- boy, that was

9   complicated.  Many of them were still serving sentences from our

10  initial prosecutions, prosecutions that I participated in from

11  1989 to 1990.

12          And so it was a -- it was great fortune that he -- that

13  they didn't suffer any disastrous consequences when his

14  cooperation came out, and he didn't.  Part of it is, the

15  department has extraordinary resources when you're dealing with

16  cases like this, if they decide to use them, and we used them in

17  this particular case.

18  **Q.**     All right.  And after Thanksgiving -- you said you were

19  going every day Monday through Friday between August and

20  Thanksgiving -- did you stop talking and stop communicating with

21  Mr. Edmond after Thanksgiving?

22  **A.**     No.

23  **Q.**     How often would you communicate with him after

24  Thanksgiving of -- this is 1994, correct?

25  **A.**     Yes.  So now he's -- so then it was not a good idea to

1  use the prison phones to call me, as Assistant U.S. Attorney, so

2  we had a undercover apartment in southwest D.C. with a phone

3  that was manned by part of our team, so Edmond could get to a

4  phone and talk to us when he needed to.  That was part of the

5  safety arrangements, but it was part of the communication

6  arrangements.  So my communication with Mr. Edmond at that time

7  was vicarious.

8      Afterwards, when his cooperation became known and he was

9  serving a sentence, my responsibilities changed and I had

10 responsibilities for taking care of his safety, in part, and

11 addressing issues involving threat and risk to his family.  Um,

12 and so that required communications, oh, man, at least once a

13 month, maybe twice a month.  I think he had approved calls,

14 legal calls, for me, and I was put on as a legal call, so I

15 would get -- he could call me twice a month.

16 **Q.**    Okay.

17 **A.**    Things changed, though, as we got closer to this day.

18 **Q.**    Okay.  So I want to talk about Mr. Edmond's trial

19 testimony.

20     Are you familiar with his trial testimony in the Kevin

21 Gray case?

22 **A.**    Yes.

23 **Q.**    Are you familiar with the preparation that went into

24 Mr. Edmond's testimony?

25 **A.**    Yes.

**Q.**     All right.  Tell us about that preparation.

**A.**     Well, it was -- Assistant U.S. Attorney Amy Jeffress, now a partner at Arnold & Porter, and so that was her responsibility, as I recall, to put that together.  So she and her team went to me to communicate with Edmond and make their request based on information they already had about what he knew about who was on trial in the Kevin Gray case.  There were, like, eight defendants in the first round, and so Amy Jeffress became the point person.  So I had a lot of communications with her, and my job was to facilitate her ability to get to him and get answers to the questions and prepare him for testimony.  I did not prepare him for testimony in that case, but I was aware of it every step of the way.  I remember I came back from a conference, the middle of a conference to help facilitate an interview.

**Q.**     What is your understanding of the utility of Mr. Edmond's cooperation with regard to the Kevin Gray case?  Was it useful, un-useful or something else?

**A.**     What was?

**Q.**     Mr. Edmond's testimony in the Kevin Gray case, was it useful, un-useful or something else?

**A.**     No, no, it was useful.  He was on -- and the defense knew it.  He -- I think Amy Jeffress finished her direct in about a day, and they continued to cross-examine him for three more days after that, so I think it was a total of four days.

1    **Q.**    And the North Carolina trial, we referenced that earlier,

2    did Mr. Edmond also testify in a case in North Carolina?

3    **A.**    He was willing to testify in that case.

4    **Q.**    Did he show up to the courthouse, or how -- when you say

5    willing to show -- willing to testify, how do you know he was

6    willing to testify?

7    **A.**    He was produced by the Bureau of Prisons U.S. Marshals as

8    a witness in that case to the Assistant U.S. Attorney who had

9    that case, but it ended up not going to trial, but he was

10    willing to testify.

11    **Q.**    Who's Phyllis Webster?

12    **A.**    Phyllis Webster is the -- an individual that I prosecuted

13    and also turned as a cooperator.

14    **Q.**    What, if anything, does Mr. Edmond have to do with the

15    Phyllis Edmond -- excuse me -- Phyllis Webster prosecution?  Did

16    he provide any information at all?

17    **A.**    Yes.

18    **Q.**    How so?

19    **A.**    Well, he -- we didn't use him as a witness, but we

20    already knew that in the -- say, for example, let's take the

21    example the wiretap affidavit, we knew that he was like, what, I

22    forget, confidential source number 6.  He had sold or flipped a

23    kilo -- excuse me, that's a term of art.  He had sold a kilo to

24    Phyllis Webster, a kilo of cocaine, in, say, 1986, and she got

25    caught and arrested in Prince George's County for it.  So we

1   already knew she had a predisposition, but by 1999 when agents

2   are looking at her role in current drug trafficking, we used

3   information that showed that she already had a predisposition

4   for drug trafficking.  Now we're revisiting current information

5   and building a wiretap investigation against her and her

6   supplier.

7   **Q.**     Was Mr. Edmond's information useful in prosecuting

8   Phyllis Webster?

9   **A.**     Well, I would -- it was useful in terms of getting

10  approval.  For a wiretap and establishing the probable cause you

11  needed to get a wiretap.  But, again, he was CI Number 6, but,

12  that's -- I want to make sure that you understand, we are not

13  making light of the fact that he was confidential informant

14  number 6.  All of the informants and confidential informants

15  play a role in convincing a judge reviewing a wiretap affidavit

16  that they should authorize us to do a wiretap.  So could we have

17  gotten the wiretap without him?  I don't know.  Probably, but --

18        THE COURT:  What was the significance or not of him being

19  number 6 as opposed to number 1?

20        THE WITNESS:  What's -- confidential informant like

21  number 1 would probably be somebody who was next to the target

22  that we are going after, who's actually done drug deals currently

23  with that person.  And so in Phyllis Webster, we had -- excuse

24  me -- we had such a witness.  But, I mean I know that.  It was my

25  particular case, but he -- so let's put this in perspective.  I

1    want to make sure you understand.  We think that it's right to

2    give him credit for helping in so many of these wiretaps, but, as

3    Mr. Crabb has said, he -- Mr. Crabb has characterized his role

4    accurately in the pleadings.  He was helpful but not outcome

5    determinative.  But we still think that that merits consideration

6    for the Court in all of his cooperation.  And so we had maybe 10,

7    12 other such cases I noticed, because I led the -- I managed the

8    OCDETF unit in this office and was the lead prosecutor in OCDETF,

9    which stands for Organized Crime Drug Enforcement Task Force.

10         THE COURT:  Can I stop you for a second.  And I'm sure you

11   and I have probably had -- you've appeared before me over the

12   years.  We've probably had these discussions.  If not, let me

13   give you an idea of discussions I've had with prosecutors and

14   defense attorneys over the years.

15         From my perspective, I view cooperation as providing the

16   government with something that the government would not have

17   ordinarily have information about, making a difference, enabling

18   the government to prosecute a case they would not be able to

19   prosecute, as opposed to corroborating certain information,

20   although corroboration is important as well, correct?

21         THE WITNESS:  It absolutely is --

22         THE COURT:  Sure.

23         THE WITNESS:  -- because if you -- if you have a

24   confidential informant and it's uncorroborated, it's likely that

25   a reviewing neutral magistrate or judge is going to have problems

1  finding probable cause.  But if you have one confidential

2  informant who's corroborated by three or four other independent

3  sources, that presents a much stronger, more compelling

4  evidentiary picture that we're justified in -- and the Court is

5  justified in granting the relief requested in, say, for example,

6  a wiretap affidavit or a search warrant.

7        So corroboration is critical to our success as

8  prosecutors.  No one's going to want to believe an informant or

9  an accomplice alone.  If you don't have other corroboration, why

10  you should believe them.

11        THE COURT:  Right, but you mentioned that his -- and I

12  don't want to misstate it.  I thought you said his cooperation

13  was not outcome determinative; is that right?

14        THE WITNESS:  Yes.

15        THE COURT:  All right.  So then how would you characterize

16  the extent of his cooperation?

17        THE WITNESS:  Corroborative.  He was a -- he

18  corroborated --

19        THE COURT:  All right.

20        THE WITNESS:  -- our hypothesis in our wiretap affidavit,

21  that that is -- that this particular target is, indeed, involved

22  in drug trafficking and merits authorization to do a wiretap

23  investigation.

24        THE COURT:  Okay.

25        THE WITNESS:  Did that answer your question, Your Honor?

1     THE COURT:  It did, yes.

2  BY MR. DOWNS:

3  Q.     How -- for how many years did Mr. Edmond provide

4  information that was corroborating other confidential informants

5  or other information law enforcement officers had?

6  A.     Well, I don't quite understand the question.  We

7  captured -- obtained a great deal of information, volumes of

8  information, about drug traffickers when we were debriefing him.

9  The information he provided after 1998 or our meetings kept --

10  our meetings ended with him, continued to be of value to the

11  government for a decade after 1998.

12  Q.     Why?

13  A.     Well, because it's like the scenarios I stated.  He

14  provided information that was historical that was corroborative

15  of wiretap stuff.  When he was called in 2002 to testify in the

16  Kevin Gray case, a lot of that was -- it's all historical.  He

17  knew about drug trafficking activities of these people, partly

18  because he participated in it, partly because he knew what they

19  were doing.  That made him valuable as a witness in that

20  prosecution.

21     But you -- we continued to use the information that he

22  had provided in the original debriefings from '94 to '98 long

23  after the written plea agreement was satisfied by the reduction

24  of sentence to his mother, Constance D. Perry.

25     And Rule 35(b), as I understand it, is the mechanism that

1  allows a judge to consider the additional cooperation -- well,

2  that allows a court to consider additional prosecutions that

3  were of substantial assistance to law enforcement that could not

4  be realized prior to his original sentence for a plea agreement.

5  **Q.**    Fair enough.

6         And let me -- to close this chapter out, who's Bill

7  Willis?

8  **A.**    That's a Dump Truck Smitty case.

9  **Q.**    Okay.  Tell us about that.

10 **A.**    That's Amy Jeffress' prosecution.  They used a money

11 launderer -- oh, gosh....

12 **Q.**    Just generally.

13 **A.**    Edmond knows.  It was -- Rayful knows, and it was his --

14 he was involved in money laundering, um, drug trafficking.

15 **Q.**    Generally did Mr. Edmond provide information against Bill

16 Willis and Dump Truck Smitty?

17 **A.**    Yes, but he didn't -- he was willing and able to testify

18 in that case, too -- and I forgot when that was, 2003 I think we

19 arrested him as a -- he'd been a fugitive for ten years, but he

20 ended up pleading guilty, and so Edmond did not have to testify.

21 But the practice of the U.S. Attorney's Office, when it comes to

22 providing assessment for substantial assistance to law

23 enforcement, is that a witness has to be -- either testify or

24 willing to testify.  And so he's not deprived of an opportunity

25 to get a benefit for being willing to cooperate just because

1    somebody decides to plead guilty.

2         Did that help?  Did that understand --

3    **Q.**    Understood.

4    **A.**    Okay.

5    **Q.**    I want to talk to you a bit about the changes to the

6    Bureau of Prisons' visitation policies and phone policies.

7         Are we on the same page?

8    **A.**    Yes.

9    **Q.**    Tell us about how that came to pass.  What information,

10   if any, did Mr. Edmond provide with regard to the Bureau of

11   Prisons' telephones?

12   **A.**    All right.  After -- well, this is one of the most

13   difficult parts of the investigation, changing things within the

14   Department of Justice.  So the Bureau of Prisons.  So his

15   information had reached the public that he was running a drug

16   operation from inside USP Lewisburg, and as you might imagine,

17   the community was outraged, as were many prosecutors, and many

18   people at the Department of Justice.

19        So the IG's office decided they would do an

20   investigation, and they came to me, and I set up appointments

21   and interviews with their team to talk to Rayful Edmond about

22   how he used the phones at that time at USP Lewisburg.

23        Now, remember, at the time the problems we were having

24   is, the Bureau of Prisons, at a place like Lewisburg, are only

25   able to influence inmates by using commissary privileges, phone

1    privileges, and visitation privileges, or withdrawal of them to

2    get them to, like, do simple things, let's go to bed at night,

3    turn out the lights.  Okay?  So that's how they would take this

4    away or grant it.

5         So when inmates like Edmond were abusing the phone

6    privileges and, like, calling collect to Colombia to order up

7    kilos from a prison phone, yeah, this upset me and my colleagues

8    and the Department of Justice.  He agreed to --

9         THE COURT:  And this was not a prison camp, this is a

10   maximum security facility, correct?

11        THE WITNESS:  Exactly, exactly.

12        THE COURT:  What was the level of security at that time,

13   do you recall?

14        THE WITNESS:  Maximum.

15        And so they're all, like, serving life sentences.

16   They're -- most of them there don't have a hope or chance of ever

17   getting out.  It's very difficult without using force and

18   violence to get someone to follow the rules.

19        So when -- when the IG's office found out what this case

20   was about, they wanted to investigate the phone privileges that

21   were being -- visitation as well, that were being allowed to --

22   inmates at maximum security -- and, actually, all the

23   institutions at the Bureau of Prisons.  And so his information

24   was a great force for change.  They interviewed other people as

25   well and put together a really long report, but the benefit of

1    that, as I know, IT -- it's called a inmate telephone system,

2    which is what they now have which doesn't -- inmates are not

3    allowed to make collect phone calls, they're not allowed to make

4    three-way calls, they can only call certain people on approved

5    phone calling lists.  So as far as I know, that was a huge change

6    in the Bureau of Prisons to help them accomplish their mission of

7    incapacitating people who have been removed from society for

8    crimes.

9    BY MR. DOWNS:

10   Q.    And, to your knowledge, without Mr. Edmond's information,

11   was BOP considering making these changes to the telephone

12   privileges without Mr. Edmond's cooperation?

13   A.    I can't -- I don't know if I can answer that

14   hypothetical.  I can just tell you that they spent a lot of time

15   interviewing Rayful Edmond about the vulnerabilities of the

16   phone system, so they -- the current phone system, and Edmond

17   was candid about how easy it was for he and other inmates to

18   abuse the privileges to make criminal phone calls on these

19   phones to, as Edmond says, make collect phone calls to Colombia

20   to order up kilos to be delivered to people in D.C. or

21   Baltimore.

22   Q.    And absent --

23         THE COURT:  But correct me if I'm wrong, though, but the

24   impression that one would get is that BOP was not aware of the

25   vulnerabilities of the phone system until that incident; is that

1  correct or not?

2      THE WITNESS:  I -- I would disagree with that assessment,

3  Your Honor.

4      THE COURT:  Okay.

5      THE WITNESS:  But trying to get change is different than

6  making somebody aware of a problem.

7      THE COURT:  Right.

8      THE WITNESS:  And so he was an instrument of change that I

9  think was for the good, through the IG's office.  And so I don't

10  know, how do you value that, that's substantial assistance, in my

11  mind, to law enforcement, even though no one got prosecuted for

12  that.

13  BY MR. DOWNS:

14  Q.    So I'm going to ask you about -- much has been made about

15  this draft Rule 35, so I'm just going to ask you:  Did you write

16  the draft Rule 35 that we have attached to our motion, Document

17  Number 202?

18  A.    I shared a draft -- a draft Rule 35, one such, which had

19  draft all over it, because he requested it.  He wanted --

20      THE COURT:  When you say "he"?

21      THE WITNESS:  Rayful Edmond.

22      THE COURT:  All right.

23      THE WITNESS:  And he -- because as time went on, he wanted

24  to know if this was ever going to happen, if he was ever going to

25  get a Rule 35(b), and so he asked --

1    THE COURT:  And he was not able to file such a motion

2  under Rule 35(b).

3    THE WITNESS:  No, the government.

4    THE COURT:  Right.

5    THE WITNESS:  And he knew who I was and that I was the key

6  person between communications with him and the rest of law

7  enforcement, and so I agreed to share it with him.  Because what

8  part of it is, whenever you're dealing with cooperators and you

9  get to this stage where you want to give them the benefit of

10  their cooperation, you want to make sure that you've captured

11  everything, and so we went through various discussions and phone

12  calls about all the things that he did, is there anything else

13  that we left out?  And this was a process that went on for about

14  a year back and forth.

15    But in this context he asked to see what one of these

16  things would look like, and I said, "I don't make the decision."

17  He wanted -- he was hoping for a time served -- a reduction of

18  time served, and I said, "I don't make that call, a Departure

19  Committee does it or the U.S. Attorney, or in his case, higher up

20  in the Department of Justice, and he needs to expect that."  And

21  so it was in that context that you got hold of that draft,

22  because he gave it to you, yeah.

23  BY MR. DOWNS:

24  Q.    And did you write anything in that draft that was untrue?

25  A.    No.

1          THE COURT:  You know what, I just don't recall this.

2          Is the draft a part of the record?

3          MR. DOWNS:  It is document -- it is Exhibit 2.1 to

4   Document Number 202.

5          THE COURT:  Okay.

6          MR. DOWNS:  But if the Court needs a copy, I'm happy to

7   find it for you.

8          THE COURT:  No, no, I can find it.

9          MR. DOWNS:  Thanks, Your Honor.

10          THE WITNESS:  But that's not the document we ended up

11   filing.  And we gave --

12          THE COURT:  No, I know.  I know.  I just wanted a copy.

13          THE WITNESS:  And there's more information than what we

14   actually filed than what was in the draft.

15          MR. DOWNS:  All right.

16          THE WITNESS:  So it's an evolutionary process, but it

17   wasn't false.

18          MR. DOWNS:  It wasn't false?

19          THE WITNESS:  It wasn't false.  There were just some more

20   things we could have added, and we did.

21          THE COURT:  And that's a document that you prepared?

22          THE WITNESS:  Yes.

23          THE COURT:  All right.

24   BY MR. DOWNS:

25   Q.    In this evolution, on a scale from 1 to 10, where does

1   Mr. Edmond's cooperation rank?

2   **A.**     He's off the chart.

3         THE COURT:  What do you mean by that?

4         THE WITNESS:  Okay.  I've done hundreds of --

5         THE COURT:  We all have opinions about what that means.

6         What's your opinion?

7         THE WITNESS:  It's extraordinary.  I have nothing in my

8   career as 35 years as a U.S. Assistant Attorney and as the head

9   of the OCDETF program in the office that has been -- that

10  compares with this.  The amount of information and cooperation

11  that he gave was, I don't know, you got to talk about it in

12  superlatives.  And so he provided for us in law enforcement and

13  for the FBI a target list that lasted 10 years for more than ten

14  years.  We knew through his help who were our drug trafficking

15  targets and who to go after.  All we had to do was take a look at

16  what they're doing now and see if they're still involved and then

17  do an investigation of that, which often led to a wiretap.

18       So this is -- I don't know.  That's the way it works.

19  I -- I dealt with a lot of cooperators, hundreds.  He was

20  superlative.  But, look, it's -- I got to tell you honestly, as I

21  told him, his legacy, as he testified on witness stands, you got

22  to consider this.  As a prosecutor I'm not just a one-way street.

23  I care about the community.  And, wow, he made a really -- for a

24  guy with his intellect, he made such a terrible choice to waste

25  his life the way he did.

1    And he left -- I don't think he planned for this, but he

2    left a legacy of death and destruction in his own hometown.  If

3    you go take a look at all the guys he graduated with at Dunbar,

4    how many of them lived through the '90s?  I would bet you the

5    casualty count is greater than the Vietnam War was for someone

6    who graduated from high school in the Vietnam War.  It is

7    death -- I call it death and destruction.  I'm not trying to be

8    hyperbolic about it, but I lived through the '90s as a

9    prosecutor, and I saw the changes in this town, and it was really

10   frightening.  People were -- addiction was terrible, the violence

11   was terrible, and it was open and notorious.

12   BY MR. DOWNS:

13   **Q.**    And did you -- out of the people that you prosecuted with

14   Mr. Edmond, approximately how many have been released?  Is it

15   about 27 that have been released?  Is that your understanding?

16   **A.**    All -- no, we actually -- more than that.  So I think

17   there were 32 or 34, but I think --

18   **Q.**    Let me get to the --

19   **A.**    -- only one is still incarcerated, well, and Edmond.

20   **Q.**    And out of all of them that have been released, do you

21   have any information that any of them have recidivated?

22   **A.**    Okay.  Let's just deal with his family.  I'm focusing on

23   his family, and I think that -- look, I follow statistics, too,

24   and this -- the statistical likelihood of someone released from

25   a long time in a federal penitentiary for recidivism is

1   extremely high.  Okay?  And his family has escaped that

2   statistical pit.  As far as I know -- and I check with them

3   every time we call, twice a month -- they have not gone back

4   into criminal conduct, and that defeats the statistical odds.  I

5   have some ideas as to what might have precipitated that, other

6   than just accident, and so I got to think that Edmond's decision

7   to cooperate put his family at risk as well as him, but at the

8   same time, from the communications I've had with his family,

9   they backed his decision.  They weren't angry at him.  They

10  supported him.

11      And, um, so I think an unintended benefit was, when they

12  all did their time and they did -- they did horrific amounts of

13  time.  They surrendered 20 years of their life for the crimes

14  they committed when Edmond led that drug operation here in D.C.

15  and haven't gone back to crime.  I keep my fingers crossed.

16      MR. DOWNS:  Thank you for your time.

17      THE COURT:  Let me ask you this:  You've been a prosecutor

18  since you've been working with the Department of Justice since

19  1984, correct?

20      THE WITNESS:  Yes, Your Honor.

21      THE COURT:  All right.  So approximately how many

22  cooperators have you had the occasion to interact with over that

23  period of time?

24      THE WITNESS:  Hundreds.  I just -- I just never counted.

25  I mean, who does that?  But, I mean, I was --

1        THE COURT:  Hundreds?

2        THE WITNESS:  Hundreds.

3        THE COURT:  Where would you rank -- where would you rank

4   the level of cooperation that Mr. Edmond provided?

5        THE WITNESS:  His value as a cooperator?

6        THE COURT:  Right.

7        THE WITNESS:  To law enforcement?

8        THE COURT:  Yeah.

9        THE WITNESS:  Off the charts.

10       THE COURT:  Top of the list?

11       THE WITNESS:  Top.

12       THE COURT:  Top of the list?

13       THE WITNESS:  He's the top of my list, but I also know a

14  lot about everybody else's lists, too.

15       THE COURT:  No, no.  I'm just referring to your list,

16  though, because you've interacted with hundred of cooperators

17  over the years, so --

18       THE WITNESS:  Well, yes.

19       THE COURT:  And I don't want to lead you, but you just

20  said he's at the top of that list, right, your list?

21       THE WITNESS:  He's the top of the list.  So he -- so let's

22  take a look at -- I prosecuted Alpo.  I had the opportunity to do

23  that case, Alberto Geddis Martinez, in front of Judge Hogan and

24  Wayne Perry.  Alpo pled guilty to 15 homicides.  The Department

25  of Justice would only let us charge 10.  Okay?  And his value as

1    a cooperator was tremendous.  We were able to solve 15 homicides

2    with his cooperation, and we ended up convicting 48 of his drug

3    trafficking associates when he was a kingpin.  He followed Rayful

4    Edmond.  So Alpo's home now, and has been for a couple of years,

5    and so he --

6        THE COURT:  What was his original sentence?  What was his

7    original sentence?

8        THE WITNESS:  His original sentence, okay, was two of

9    them.  So Judge Ellis in the Eastern District of Virginia, 30

10   years and 15 years consecutive; here, Judge Hogan had given him

11   30 years; and I think there was a --

12       THE COURT:  And that would have been consecutive also, I

13   assume?

14       THE WITNESS:  Yes.

15       THE COURT:  All right.

16       THE WITNESS:  But he was also the beneficiary of

17   substantial assistance.  And these are -- these are tough calls

18   for judges anywhere to make.  I appreciate that.  When you -- you

19   have to weigh the benefit that comes from substantial assistance

20   to law enforcement to get other people held accountable for their

21   crimes, and then you take a look at what they left behind, what

22   were the direct results of their criminal conduct.  I respect

23   your job, Your Honor.  I don't envy it.  It's a tough one.

24       But in characterizing Edmond and his cooperation, it's --

25   I've never seen anything like it.  I've never read anything like

1    it.  He's an unusual -- he's an unusual person.  He has a skill

2    set that -- after spending all these hours with him -- that I've

3    never seen again in another drug dealer.  He's as smart as any

4    Fortune 500 CEO.  He's got a brilliant memory.  He has a

5    personality that can -- that has enough charisma that matches any

6    of our national politicians.  And yet it bothers me he chose to

7    sell drugs and he was profiting off of the destruction of the

8    lives of other people in his community, and it is an unusual mix.

9         But if you've heard his testimony, as he's tried to

10   explain it to jurors in a number of cases, I think there's a ring

11   of truth to it, because -- there's a loud ring of truth to it,

12   but it is -- and me and the agents think that he wasn't just

13   desperate to try to get out of prison.  He made his decisions and

14   followed through it.  That shows a change to me in who he is and

15   his attitude.  He's not the same 24-year old that I was arguing

16   in front of the judge to put him in jail for the rest of his life

17   in 1990, but -- I don't know.

18        Any other questions or anything?

19        THE COURT:  Are you the prosecutor who more closely worked

20   with Mr. Edmond over the years than anyone else?

21        THE WITNESS:  Yes.  That was my responsibility.  It's --

22   it was one that I didn't -- I didn't welcome because it was a

23   tremendous distraction as well, but I was bound and determined to

24   benefit from the decisions that had been made by supervisors,

25   managers, U.S. Attorney, from years ago, and maximize the benefit

1  from it.  And the way we do that as prosecutors is, we try to

2  hold other people accountable for the criminal conduct that they

3  did.  But the price you end up paying under the Sentencing

4  Guidelines and under Rule 35(b) is, you present it to a judge and

5  he gets a shot or the judge gets to make a determination as to

6  what that is worth, if at all, in terms of reducing his sentence.

7       I'm confident that my office, our office, has presented

8  the facts of his cooperation to law enforcement in this hearing

9  that you're hearing today and when you take a look at the whole

10  record.  There's a lot of pleadings but it's there.

11       THE COURT:  All right.  Before -- do you have other

12  questions?

13       MR. DOWNS:  I do not, Your Honor.

14       THE COURT:  Before counsel steps down, you made reference

15  early on to a prosecutor who's not present today -- and I think

16  you said you referred to her gender as a she -- is in England or

17  so?

18       MR. DOWNS:  Amy Jeffress.

19       THE COURT:  I just wanted to make that clear.  And your

20  proffer was that had she been here, she would have said what?

21       MR. DOWNS:  That Mr. Edmond's cooperation in the Kevin

22  Gray trial was material, and -- and I'm not sure if it was

23  critical, there was another adjective that she used, but that his

24  testimony was important, it was truthful, and it was necessary in

25  convicting Mr. Gray and the other co-defendants.  And

1    strategically she called him during a portion of the case where

2    she could maximize Mr. Edmond's utility.  So she deemed him a

3    critical, if not the critical witness.  And she specifically said

4    that she wanted to be here, but she's in London and she just

5    could not rearrange her schedule --

6              THE COURT:  No, that's fine.  That's fine.

7              MR. DOWNS:  -- but she wanted to be here.

8              THE COURT:  All right.  I have a very high regard -- the

9    Court has a very high regard for Ms. Jeffress.  Indeed, I should

10   probably put on the record that I didn't know about her

11   involvement in any of these prosecutions, but the Court very

12   recently appointed her as guardian ad litem in a very complicated

13   high-profile immigration case.  And her name was one of many

14   names of outstanding attorneys submitted to the Court for the

15   Court's consideration, and I'm quite familiar with her

16   background.  I just wanted -- I thought I should put that on the

17   record.  I thought that's who you were referring to, and I just

18   wanted to follow-up on that and make sure it was Ms. Jeffress.

19              All right, Counsel.  Thank you.

20              THE WITNESS:  Thank you, Your Honor.

21              MR. DOWNS:  Your Honor, that concludes the law enforcement

22   officers.  Candidly, the civilian witnesses are going to be

23   short, so I defer to the Court.  I suspect they are -- they are

24   all here, and they have been here for a bit, but I'm happy to

25   take a break if the Court requires.  They will be short.  They

1    will not be as long as law enforcement.

2         THE COURT:  All right.  I mean, it's 1:00.  I'm always

3    mindful about the burdens of the court reporter as well.  I don't

4    want him walking out of here.  So I think I should probably stick

5    to the schedule, unless that's going to create a hardship for any

6    of those witnesses?

7         MR. DOWNS:  May I have a two-minute indulge, Your Honor?

8         THE COURT:  Yeah, sure.

9         MR. DOWNS:  Thank you.

10        (Brief pause in proceedings.)

11        MR. DOWNS:  Thank you, Your Honor.  The civilians, all of

12   them are kindly willing to stay until after lunch, Your Honor.

13        THE COURT:  Great.  All right.  That's fine.  Then I think

14   we should just stand in recess.  I'm going to excuse Mr. Edmond

15   first with his attorney -- well, actually, I'll excuse Mr. Edmond

16   first.  I'm going to ask everyone else to remain seated until the

17   court stands in recess.  All right.

18        (Thereupon, the defendant left the courtroom.)

19        THE COURT:  And we'll start promptly at 2:00.

20        MR. DOWNS:  Yes, Your Honor.

21        THE COURT:  Actually, let's -- it's after 1 now.  Let's

22   just make it 2:15.

23        MR. DOWNS:  Yes, Your Honor.

24        THE COURT:  All right.  Please remain seated.  Thank you.

25        (Thereupon, a luncheon recess was had beginning at

1:03 p.m.)

**AFTERNOON SESSION, OCTOBER 16, 2019**

(2:21 p.m.)

THE COURTROOM CLERK:  Your Honor, resuming Criminal Case 89-162, *United States of America versus Rayful Edmond*.

THE COURT:  All right.  Let me just say a couple of things.  First I want to give this to Mr. Coates.  This is something that just came in over the lunch hour to chambers.  It's a community impact statement.  It's captioned "Community Impact Statement From the 5D Court Watch, Ward 5, Patrol Service Areas 501 Through 507."  It'll be posted.  People can read it.  But essentially the consensus is that, "The organization strongly urges the Court not to reduce the defendant's sentence for the reasons they've articulated."  So I'll give that to Mr. Coates and just ask him to post that.

The other thing is, I want the -- it's clear now to the Court that the Court will issue a written opinion at some point, so I'm going to request that the parties order transcripts.  And it may well be, because there's a fine line between cooperation efforts made with respect to the Pennsylvania case and cooperation efforts with respect to the D.C. case, that the Court will probably benefit from proposed Findings of Facts, either jointly submitted by the parties or separately submitted by the parties.  We can talk about a briefing schedule for that after this hearing.

1     But the Court's going to have to make some Findings of

2  Fact, so the Court should put the burden -- and it's not crystal

3  clear with respect to the distinction right now, so I'm going to

4  put the burden on the attorneys to propose at least Findings of

5  Facts for the Court's consideration.

6     All right.  And your colleague has joined you?

7     MR. DOWNS:  Yes, Your Honor.  Tiffani Collins.

8     MS. COLLINS:  Good afternoon, Your Honor.  Tiffani

9  Collins.

10     THE COURT:  All right.  I'm sorry.  What's your last name?

11     MS. COLLINS:  Collins.

12     THE COURT:  Yes.  Good afternoon, Counsel.  Welcome to the

13  court.

14     Do you have other witnesses you'd like to call?

15     MR. DOWNS:  Your Honor, with the Court's permission, I

16  would ask to recall Agent Benjamin for a very limited purpose --

17     THE COURT:  Sure.

18     MR. DOWNS:  -- about three questions.

19     THE COURT:  That's fine.

20     All right, sir.  I'll just remind you, you're still under

21  oath.  All right?

22     THE WITNESS:  Yes, Your Honor.

23     THE COURT:  Good afternoon.

24     THE WITNESS:  Good afternoon.

25

DIRECT EXAMINATION OF STEVEN BENJAMIN (continued)

BY MR. DOWNS:

**Q.**     All right.  Good afternoon, again, Agent Benjamin.

**A.**     Good afternoon, Counsel.

**Q.**     I want to take you back to that very first conversation that you had with Mr. Edmond.

Can you tell me what you told him about anything you could or could not offer him?

**A.**     Yes.  We had obtained permission to interview him from the U.S. Attorney's Office, a concurrence, I would say; however, we were made -- it was made very clear that we were not in any way to offer him any chance at assistance for his cooperation. And so in our discussion I laid it out very clearly to Mr. Edmond that there was nobody at the U.S. Attorney's Office in Washington, D.C. that was in any -- had any inkling that he'd have any chance of assistance in the future or at any time, but the only thing I could offer him, simply as another human being, is that his cooperation might lead him to be able to sleep at night for the rest of his life, and that was it.

He had, like I said, no -- there was no indication that we could offer him any assistance at all.  And in spite that have he made the decision to cooperate.  And there was no conversation about his mother at that time or anything like that.  That came up later, but -- so.

**Q.**     Okay.  So despite the fact there was no conversation

1    about his mother receiving cooperation, and you told him

2    explicitly that you could not offer him any assistance, did he

3    agree to cooperate that day?

4    **A.**    Yes.  And, in fact, not only could I -- was authorized to

5    offer him -- which I never could do as an agent, it's always

6    from the U.S. Attorney's Office, of course -- but that I

7    communicate to him that the U.S. Attorney's Office was of the

8    position that he would not receive any cooperation through the

9    U.S. Attorney's Office, in light of everything that's happened

10   up to that point.

11        So, but he still made the decision to cooperate, so that

12   is one of the reasons I felt that he was sincere and that it was

13   significant when he made the decision, because it wasn't someone

14   who would say, well, we'll -- you know, routinely, "Well, we'll

15   talk to the prosecutors and see what we can do," but there was

16   none of that kind of communication because it was very clear

17   what the deal was from the beginning.

18        THE COURT:  So was it clear to you then what his

19   motivation was for his willingness to cooperate?

20        THE WITNESS:  I think his motivation was -- my perception

21   at the time was that his motivation was that he was -- realized

22   he was in over his head, and he finally got -- it's like, I

23   got -- I remember when he broke down, my recollection and

24   thinking at that time was, he basically was broke, had no way

25   out, had finally realized the damage he'd done, and this was his

1  opportunity to maybe, maybe possibly change some of that.  That

2  was my thinking at the time.  I remember thinking that.  I think

3  in my communication with Mr. Dominguez when I called him on the

4  phone, I said, "Guess what, he wants to cooperate."  I think that

5  was part of the conversation I had with John was, I think -- he

6  asked me "Why," or "What's he getting out of it?"  And I said, "I

7  don't think he just -- he doesn't want anything out of it.  He's

8  realizing the damage that he's done, and here's his chance to

9  maybe make things right."

10      MR. DOWNS:  I don't have any further questions for this

11  witness.  Thank you, Your Honor.

12      THE COURT:  All right.  Sure.  Thank you.

13      Thank you, sir.

14      THE WITNESS:  Thank you, Your Honor.

15      MR. DOWNS:  With the Court's permission, we would call

16  Tyrone Parker.

17      THE WITNESS:  Good afternoon, Your Honor.

18      THE COURT:  Good afternoon, sir.

19          (TYRONE PARKER, DEFENDANT'S WITNESS, SWORN)

20      THE COURT:  Thank you very much.  Have a seat.

21              DIRECT EXAMINATION OF TYRONE PARKER

22  BY MR. DOWNS:

23  Q.    Good afternoon again, Mr. Parker.

24  A.    Good afternoon.

25  Q.    Mr. Parker, what do you do for a living?

**A.**     I am the executive director of the Alliance of Concerned

Men, a 501C organization that deals with youth violence in the

city and returning citizens.

**Q.**     How -- and how does the Alliance of Concerned Men deal

with youth violence and returning citizens?  What specifically

does the organization do?

**A.**     Usually we mentor or whenever there is a gang war or a

crew war, we'll go in and try to negotiate a successful

conclusion where individuals would permanently put down their

guns to begin a -- to enter into the mainstream of life as a

support system.

**Q.**     How long have you worked with the Alliance of

Concerned --

**A.**     Almost three decades.

**Q.**     How often do you personally interact with at-risk youth

here in the District of Columbia?

**A.**     About six days out of a week.

**Q.**     All right.  I'm going to transition to Mr. Edmond.

        How long have you known Mr. Edmond?

**A.**     I first met Mr. Edmond, it had to have been '97, '98,

around about that time.

**Q.**     And did you meet Mr. Edmond in your role in working as

the executive director of the Alliance of Concerned Men?

**A.**     Yes, I did.

**Q.**     Okay.  And what was the -- what were the circumstances of

1  meeting Mr. Edmond?  What was the purpose?

2  **A.**    Well, we were negotiating a truce over in a place known

3  as Simple City Benning Terrace, which is considered one of the

4  most violent places in the District of Columbia by virtue of the

5  homicides that had occurred in the -- within that period of

6  time.

7  **Q.**    And I suspect Judge Sullivan knows what was happening

8  back in '97, but just generally tell us what was happening in

9  Simple City in 1997 with the youth.

10  **A.**    Well, basically the youth was a reflection of the city in

11  the contents of violence.  They were primarily at war with each

12  other, two communities less than three blocks apart, where you

13  had cousins fighting each other or brothers killing one another

14  in the sense of simply because of where they were living at, and

15  it was considered as a war zone.

16  **Q.**    In that time what did you decide to do with -- because of

17  the violence that was happening in Simple City?

18  **A.**    Well, basically we saw to the point that it did not

19  appear as though anything was coming to a conclusion in regards

20  to eliminating or stopping the violence.  So after a 12-year old

21  kid was killed on his way to school -- they found him two days

22  after he was missing, shot three times in his head, was on the

23  front page of the *Washington Post* -- we decided to go.  We had

24  to do something.  We had to begin to try to stop this

25  hemorrhaging and the loss of lives that was occurring within our

1   city.

2   Q.    And was Rayful Edmond physically with you in the city at

3   that time?

4   A.    No, Rayful wasn't.

5   Q.    How did he get involved?

6   A.    Rayful had got involved through a friend.  He had heard

7   about the work we had done in regards to what was occurring,

8   because we had been doing this work before.  And he offered to

9   help us, you know.  And we knew who he was in regards to his

10  reputation, so we figured that, you know, if we could get him to

11  help as he had offered, it would be a part that would actually

12  help to consolidate what was occurring.

13  Q.    Did you get word to the young people that were shooting

14  and killing each other in -- at Simple City?

15  A.    Yes.  We took them over to Union Temple Church.

16  Q.    How did you get them there?  What did you tell them about

17  what would happen when they arrived at Union Temple?

18  A.    Well, we told them that the community was going to

19  acknowledge them, but just as important, that Rayful Edmond

20  would call in and speak to them and to see if he could support

21  them in regards to what they were doing.

22  Q.    After you told the young people that the community would

23  be there and that Rayful Edmond would call in, did the young

24  people show up?

25  A.    Absolutely.

1    **Q.**    When they showed up, did Rayful Edmond -- did he call in?

2    **A.**    Rayful Edmond called in, and I think he was in Lewisburg

3    at that point in time.  And he told the kids about their

4    behavior and what it would actually get them, the outcome of it.

5    And he went ahead to give his self as an example.  And I think

6    that from that particular conversation, was a essential part in

7    regards to helping to retain what was occurring.  And I think it

8    had a major impact even through the city, because the Alliance

9    of Concerned Men began to negotiate truths all through the city

10   in regard to the violence.  And I think that from that

11   particular conversation, even while it was brief, and who it

12   came from, was so substantial for them to hear it.

13   **Q.**    And where -- physically where were the kids?  Were they

14   sitting on separate sides of the church, or where were they

15   physically?

16   **A.**    No.  We had them all in the church.  It was a designated

17   place for them to be able to sit together.

18   **Q.**    So while all the kids were sitting together in a church

19   listening to Mr. Edmond, could you see -- did it appear to you

20   that they were listening to Mr. Edmond?

21   **A.**    You know, I was looking at them to see the impact of the

22   conversation that he was relating to them, and they were --

23   **Q.**    What did you see?

24   **A.**    I mean, they was focused totally on the voice that was

25   coming from the -- from the speakers, you know.

**Q.**     What happened with the violence in Simple City after

that?

**A.**     Oh, the violence decreased, you know.

**Q.**     How do you know that?  How do you know?

**A.**     How do I know?  Because it was less individuals being

locked up, it was less funerals, it was more individuals that

were beginning to take the mainstream of life, they began to

work, they began to -- the regular things that an ordinarily

healthy community should encounter was beginning to occur.

**Q.**     If given the opportunity, if Mr. Edmond were released to

an undisclosed location, would you give him the opportunity to

do that again?

**A.**     Without a question of a doubt.

**Q.**     Why?

**A.**     Because I think that individuals such as him should be

utilized as public safety tools and instruments to help us to

retain public safety.  And I think that his impact is

extraordinary by virtue of who he is and what he have

accomplished.  Even thought there's a negative side, there's a

positive side, in the sense that the community and the kids that

we're working with.  We've got to begin to create -- we've got

to be able to create unique means of meeting and reaching them,

and he is -- he's gifted.  The brother's blessed.  I've heard

the testimony in here in the contents of what he has done, and I

had the opportunity to see it occurring on the public safety

perspective of it.

**Q.**     Now, Mr. Parker, did I force you to come to court today?

**A.**     No, you didn't.

**Q.**     Why did you come today?

**A.**     Why did I come today?  Because I'm in hopes that whatever occurred, that we would be able to utilize Rayful Edmond's spirit and his ability to help to transform individuals. Whether it'd be teleconferencing or spite or whatever, he is too valuable not to be utilized at this point in time for the greater good of our community.

        MR. DOWNS:  Thank you for your time.

        THE COURT:  Let me ask you something, sir.

        THE WITNESS:  Yes, sir.

        THE COURT:  How are you today?

        THE WITNESS:  I'm very fine.

        THE COURT:  Good.  So you had the occasion to interact with our young people six days a week or so?

        THE WITNESS:  Yes, sir.  Yes, sir.

        THE COURT:  All right.  Is Mr. Edmond known in the community, in today's community?

        THE WITNESS:  You know, I saw where the U.S. Attorney did a survey, and I heard the numbers on it.  What we have done, we basically do a anecdotal survey with the kids between the ages of -- that's in middle school and high school.  And we ask them the question:  If you had the opportunity to talk to a judge or

1  either talk to someone that had been shot 21 times or Rayful

2  Edmonds, who would you prefer?  By a landslide this guy always

3  comes up.  Even at the point that they don't -- they don't even

4  know him, but his reputation is so profound, they performed

5  surgery among kids that are looking for something to hold onto.

6  We cannot afford to lose this brother.  We've already lost him

7  long enough.

8          MR. DOWNS:  May I have the Court's very brief indulgence?

9          THE COURT:  Sure.  Sure.

10         (Brief pause in proceedings.)

11         MR. DOWNS:  Thank you, Your Honor.  Nothing further.

12         THE COURT:  Sure.  Any questions?

13         MR. CRABB:  No, Your Honor.  Thank you.

14         THE COURT:  All right.  Well, if any of them ever want to

15  talk to a judge, I'm available, too.  Okay?

16         (Laughter.)

17         THE COURT:  All right.

18         MR. DOWNS:  With the Court's permission, we would call

19  Reverend Wilson.

20         THE COURT:  All right.

21         (WILLIE WILSON, DEFENDANT'S WITNESS, SWORN)

22         THE COURT:  Good afternoon, sir.

23         THE WITNESS:  Good afternoon.

24         THE COURT:  How are you?

25         THE WITNESS:  Thank you.

<u>DIRECT EXAMINATION OF WILLIE WILSON</u>

<u>BY MR. DOWNS:</u>

**Q.**    Reverend Wilson, it may be apparent by your title, but tell us what you do for a living.

THE COURT REPORTER:  Please have him state his name.

BY MR. DOWNS:

**Q.**    Oh, please state your name.

**A.**    Reverend Willie Wilson, pastor of the Union Temple Baptist Church in Southeast Anacostia, Washington, D.C.

**Q.**    And how long have you been a pastor, a full-time pastor?

**A.**    46 years.  It don't look like it, but 46.

**Q.**    Do you do any work in the community -- aside from being a full-time pastor, any work in the community?

**A.**    I work in the community, the nation and the world.

**Q.**    All right.  And in your community work, do you have an opportunity to interact with youth in the District of Columbia?

**A.**    Most absolutely.  We've been involved.  We have a social action ministry that's very interrelated and involved in the community, and we have many youth programs at the church and in the community.

**Q.**    And in -- and in these youth programs, did you ever have an opportunity to work with Mr. Edmond?

**A.**    Yes, I did.  Indirectly through the testimony that just finished, Mr. Tyrone Parker of the Alliance of Concerned Men, we have worked together on any number of projects dealing with

1    crime in our city and violence in our city.  And when the

2    killing -- an inordinate amount of this killing was going on in

3    Simple City, as he mentioned a moment ago, we talked about what

4    could be done, and through his -- the Alliance contacts, we made

5    arrangements.

6        First we brought in the warring factions in Simple City

7    to Union Temple.  I had a meeting with them.  We had a meeting

8    with them in my office, and I asked them why and what was all

9    the killing about.  The answer was, "It has been going on so

10   long we don't know why now."  So all we needed to say, because,

11   as Mr. Parker stated a moment ago, Rayful Edmond is an iconic

12   individual in this city.  Young people know about him, even

13   those who were not born when he was incarcerated.  So all I had

14   to say to those young men, having made the arrangements for

15   Rayful to call the church at our morning service on a given

16   Sunday morning in 1998, that he did call.  The arrangement was

17   for him to call at 11:15.  He called at 11:15 on the dot.  We

18   had the young men there, and he made the call to stop the

19   killing.

20       I think that, to me, it exemplified his heart as a

21   person.  He didn't have to do it, but he had a purposeful intent

22   to do something to make a difference in the community, and

23   having made that call -- in fact, I just ran into a couple of

24   those young men last week at Washington Hospital Center who are

25   gainfully employed and who are productive citizens in this

city -- in this community.  So he had a -- he made a valuable

contribution to the Washington, D.C. community, which at that

time was not unlike what it is right now with all of the

shootings that are going on in the city.  And he made an

appreciable difference by his simply sounding that call because

of the way in which he is viewed by the young people in this

city.

Q.      What did you give Mr. Edmond to encourage him to speak to

these young people?

A.      I didn't give him anything, but just a --

Q.      You didn't promise him anything?

A.      Just a request.

Q.      And tell us what your request was.

A.      The request was that he would call the church on Sunday

morning.  That particular service started at 11.  That would

have given us a few minutes to open the service, and at 11:15

the young men were there.  Didn't have to pardon them to come.

They were there in full.  And he came through the speaker system

and made that call to stop the violence, and they responded

accordingly.

        A few weeks later we had them to come back to the church.

There were some job training programs being put together by a

Mr. Gilmore, who was in charge of the receivership of the public

housing at Simple City at that time.  Through these good

auspices and other groups, we were able to get gainful

1  employment for many of those young men, and that had a great

2  deal to do with the curtailing of the violence that was going

3  on.

4  **Q.**    And if Mr. Edmond were released to an undisclosed

5  location, would you facilitate him speaking to young people

6  again if given the opportunity?

7  **A.**    Most definitely.  We need to facilitate any and everybody

8  we can that could make a difference in what's going on in this

9  city right now.

10 **Q.**    And what is it about Mr. Edmond's ability to facilitate

11 ending violence that you and I may not have?  What is it about

12 Mr. Edmond?

13 **A.**    Well, what I said a moment ago, he is an iconic figure in

14 the city among all the people, even those that don't understand.

15 I haven't seen the videos, but I've been told that there are

16 videos of him that young people still look at that were made

17 that were produced, and so they know about him.  And I think in

18 concert with others who are doing work out here, myself

19 included, I think that he could, in fact, make a difference.

20 **Q.**    All right.  And although it's 2019 -- so we're 30 years

21 removed of Mr. Edmond being in prison -- what is your -- what is

22 your understanding as to the impact that Mr. Edmond could have,

23 given that you interact with youth on a regular basis?

24 **A.**    The assessment of the situation is that same conditions

25 that prevailed 20 years ago, 30 years ago, still prevail in this

1  city.

2  **Q.**    All right.

3       MR. DOWNS:  Thank you, Your Honor.  I have no further

4  questions of this witness.

5       THE COURT:  Sure.  Why are those -- why do those

6  conditions still prevail?  I mean, I recall when I was in the

7  D.C. Court of Appeals in 1994 I was asked to preside over a

8  judicial conference, and I thought that -- and I had the ability

9  to determine what the theme would be, and it was on juvenile

10  violence because juvenile violence was rampant.

11       THE WITNESS:  Right.

12       THE COURT:  And we had people from all over the country

13  participating in that conference.  And you'd look back on that,

14  and many would say, "What's changed?"  Why are those conditions

15  still the same?

16       THE WITNESS:  Well, for one, the powers that be -- meaning

17  the government and other agencies -- don't have the will to put

18  the kind of necessary resources into the poverty, the lack of

19  education, the lack of jobs.  All of these conditions still

20  remain among the masses of oppressed people, not only here in

21  Washington, D.C., but if you look at what's happening in every

22  major city in this country, it's the same predicament.  And it's

23  because those attending factors have not been addressed, with

24  regard to a lack of education, lack of resources and training,

25  poverty, lack of education, employment.  All those factors play

1    into why things are.

2         We often look at the end result without looking at the

3    cause of those results and, of course, because we have

4    historically, not just in recent years but forever so many years,

5    not addressed those problems as they might be addressed to make a

6    real difference in the life of a great majority of the citizens

7    of the United States of America.

8         THE COURT:  Even though the government that incarcerates

9    more people than any other country in the world, spends upwards

10   of $40,000 per year to incarcerate someone?

11        THE WITNESS:  Yes, and that's part of the problem.

12        THE COURT:  Any other questions?

13        MR. DOWNS:  No, thank you, Your Honor.

14        THE COURT:  Mr. Crabb?

15        MR. CRABB:  No, Your Honor.  Thank you.

16        THE COURT:  Reverend Wilson, it's good to see you.  Thank

17   you.

18        THE WITNESS:  Thank you.

19        THE COURT:  Watch your step.

20        THE WITNESS:  Thank you very much.

21        MR. DOWNS:  And with the Court's permission, we call

22   Pastor Rowe, Thson Rowe.

23             (THSON ROWE, DEFENDANT'S WITNESS, SWORN)

24        THE COURT:  Good afternoon, sir.

25        THE WITNESS:  Good afternoon, Judge.

<u>DIRECT EXAMINATION OF THSON ROWE</u>

<u>BY MR. DOWNS:</u>

**Q.**     Pastor, could you say your name for the record, please?

**A.**     Thson Rowe.

**Q.**     And so, again, it's self-evident from the title, but what do you do for a living?

**A.**     I am the full-time pastor of the Greater Tyson Temple, Faith United Church of the First Born Living -- First Born Church of the Living God.

**Q.**     How long have you served as a pastor?

**A.**     I've served -- I've been pastor now 29 years.

**Q.**     In your role as a pastor, do you have an occasion to interact with youth?

**A.**     Yes, we do.

**Q.**     And do you specifically have an opportunity to interact with at-risk youth?

**A.**     Great.

**Q.**     How often do you interact with at-risk youth, if any?

**A.**     On a weekly basis probably about three to four times a week.

**Q.**     And generally what's your action?  What's the purpose of your interaction with these young people?

**A.**     Mostly in just trying to get them to stay focused or redirect them in a more positive way.  We have a 40 and under monthly gathering at the church, and it's not a church service,

1    it's more or less how we let the young folks express themselves

2    and talk and, you know, about how they really feel, as opposed

3    to listening all the time to the adults.

4    **Q.**      If Mr. Edmond were released to an undisclosed location,

5    would you give him the opportunity to speak with the young

6    people in either your congregation or that come to your church?

7    **A.**      Without a doubt, I would.

8    **Q.**      Why?

9    **A.**      Because being -- and talking to the young folk, and as

10    Reverend Wilson said, his name is great among the city because

11    the kids idolize him.  And it's interesting how the stories are

12    so wrong and so confusing.  For example, one young man told me

13    that Mr. Edmond is out, and -- I grew up with Mr. Edmond -- and

14    that I wouldn't even recognize him because you all, the courts

15    and the government, have gave him plastic surgery, and he could

16    be sitting next to me and I wouldn't even know it.  And we

17    study, trying to tell these young folk, "Y'all don't have it,"

18    you know?  And I think if Mr. Edmond had the opportunity, and if

19    I could open up a door or an avenue to help reach some of these

20    young folks so they can hear it, as we say, quote-unquote, from

21    the horse's mouth, you know, what direction they should go in

22    and get it correct.

23    **Q.**      Given your knowledge of Mr. Edmond and your interaction

24    with young people, what do you believe the effect would be if

25    Mr. Edmond had the opportunity to speak with the young people in

1  your congregation?

2  **A.**    I believe that it would change them greatly.  I really --

3  I'm not saying we would reach them all, but I believe we would

4  save some of them.

5       MR. DOWNS:  Court's very brief indulgence.

6       THE COURT:  Sure.

7       (Discussion had off the record between attorney and

8  client.)

9  BY MR. DOWNS:

10 **Q.**    I neglected to ask:  Why are you here?  Did I force you

11 to come?

12 **A.**    No, you didn't.  No, you did not.

13 **Q.**    Why are you here?

14 **A.**    I'm here because, well, I'm a friend of Mr. Edmond, grew

15 up with Mr. Edmond from the sandbox of J.O. Wilson.  We played

16 football together, and the last few games we did win.  And their

17 crew never really beat us in football, and we're still -- we're

18 family.  Northeast is family.  That corridor is just family.

19 **Q.**    All right.  And what is your impression of him?  What

20 kind of person is he?

21 **A.**    To me, Mr. Edmond is a great guy, is a great guy.

22 **Q.**    All right.  And you are willing to facilitate his

23 discussions with your congregation if he's released?

24 **A.**    Absolutely.

25 **Q.**    What if he's released to an undisclosed location?  Would

1    you facilitate via telephone, Skype, or something else?

2    **A.**     Whatever means that we can.  With any connection that I

3    have with other clergy, we would just pull together all that I

4    can to just try to reach the young folk, because they are our

5    future and we have to do something.

6            MR. DOWNS:  Thank you for your time.

7            THE WITNESS:  Thank you.

8            THE COURT:  What's your basis?  You said Mr. Edmond's a

9    great guy?

10           THE WITNESS:  Um-hmm.

11           THE COURT:  All right.  So what goes into that statement,

12   there, he's a great guy?  For what reason?

13           THE WITNESS:  For the reason -- the fact that -- how

14   that -- his image, as Reverend Willie Wilson said, it can also be

15   used in such a positive way, you know.  I'm a Christian.  I'm a

16   bishop of the church.  And we deal with change of people.  And

17   the God that we serve is able to change.  And as I heard the

18   prosecutor that prosecuted Mr. Edmond, one thing he did say, he

19   said, "The man that I prosecuted is not the same man that's

20   sitting here."  And the God that I serve do change people.  I

21   know that because he changed me.  And if he can change me, he can

22   change him, and I believe God uses us.

23           You want to know God's hands?  Here they are.  You want to

24   know God's feet?  Here they are.  You want to know God's voice?

25   It's us.  We are the people.  The you wanted to here gods voice

1    it's up, us we are the people.  The Apostle Paul had gotten

2    letters from the Sanhedrin court, which is the Supreme Court in

3    the biblical days, but God changed that man's life.  And the

4    rumor was they were scared.  Ananias was told to go meet him, but

5    Ananias was scared because of the rumor, but God said, "Go see

6    him because he's a changed man," and he went and saw him.  And

7    Paul, the very one that prosecuted the church, was also God's

8    spokesman and wrote most of the New Testament.  You can't even

9    preach the New Testament without preaching about Paul.  And he

10   was a changed man, and I believe that Mr. Edmond is a changed

11   individual.

12        THE COURT:  Would you have any concerns about the safety

13   of visitors to your church were he to visit your church?

14        THE WITNESS:  No, sir.  No, sir.

15        THE COURT:  Why not?

16        THE WITNESS:  Why not?

17        THE COURT:  Yes.

18        THE WITNESS:  When you grew up like we have in the

19   streets, there's just -- there's certain fears we just don't

20   fear, because we've been out there.  And when people know that

21   you are honest and you are true, it is what it is, you know.  It

22   is what it is, you know.  And me personally, we can't walk around

23   in fear.  He said, "I didn't give you the spirit of fear."

24        And, you know, they used to call D.C. Duckin' -- I lived

25   in the northeast quarter.  They used to call it Duckin' Dodge

1   City.  And, you know, I was caught between gunfire at least three

2   or four times.  I still walk the streets.  You know, if you want

3   to live in fear, to me you might as well go somewhere and seclude

4   yourself to a hideout.  I don't think that's -- I don't think

5   it's God's will for us to live in fear.

6           THE COURT:  Any other questions?

7           MR. DOWNS:  No.  Thank you, Your Honor.

8           THE COURT:  All right.  Thank you, Pastor.

9           THE WITNESS:  Um-hmm.

10          MR. DOWNS:  Your Honor, with the Court's permission, we

11  call Bishop Steadman.

12           (PATRINA STEADMAN, DEFENDANT'S WITNESS, SWORN)

13          THE COURT:  Good afternoon.

14          THE WITNESS:  Good afternoon, Your Honor.

15              <u>DIRECT EXAMINATION OF PATRINA STEADMAN</u>

16  <u>BY MR. DOWNS:</u>

17  **Q.**     Could you state your name for the record?

18  **A.**     Patrina Steadman.

19  **Q.**     And Bishop Steadman, what do you do for a living?

20  **A.**     I'm pastoring full time.

21  **Q.**     How long have you been pastoring full time, just

22  approximately?

23  **A.**     17 years.

24  **Q.**     I want to ask you about Mr. Edmond.

25          Do you know Rayful Edmond?

1    **A.**    Yes, I do.

2    **Q.**    How do you know Mr. Edmond?

3    **A.**    From elementary to high school, we grew up together.

4    **Q.**    How much time did you spend with Mr. Edmond when you were

5    growing up?

6    **A.**    Oh, every day.  Every day.

7    **Q.**    And over -- as Mr. Edmond was grown and he continued

8    ageing, would you continue speaking with him via telephone, or

9    did you continue some form of communication with him?

10   **A.**    You said after he grew up?

11   **Q.**    After he turned 24 and was arrested in this case, did you

12   continue speaking with him?

13   **A.**    Sure.  Yeah.  We talked on the phone.  We talked via

14   letters.  I wrote him letters.  He wrote me letters.  He called,

15   and I talked with him.

16   **Q.**    You were in court when AUSA Dominguez mentioned that

17   Mr. Edmond is not the same 24-year old as he was back in the

18   early '90s.

19           Is that your impression as well?

20   **A.**    Sure.

21   **Q.**    Why?  What kind of changes have you seen?

22   **A.**    Well, just by talking to him when he was incarcerated,

23   and his conversation was changed.  We talked a lot about the

24   Lord and how he was giving his life to the Lord and how he had a

25   experience with the Lord.  And so the things that we shared, I

1    felt the change.  I felt the sincerity of his heart.

2    **Q.**    What sort of spiritual guidance, if any, did you offer

3    Mr. Edmond while he was incarcerated?

4    **A.**    I always -- I prayed with him over the phone.  I let him

5    know that he was not alone, and in spite of it all, God still

6    loved him, and I did too, and that the Lord will see him through

7    this.  And I also told him that he will not -- he will not be in

8    prison for life.

9    **Q.**    And in your role as a pastor -- I want to pivot to your

10   role -- do you work with youth at all?

11   **A.**    Yes, I do.

12   **Q.**    How often would you say you interact with at-risk youth,

13   specifically?

14   **A.**    Well, I've got a lot of them in my church, yeah, so

15   regular.  I would say -- I would say about three times a week

16   and especially on Saturdays.

17   **Q.**    And what's your understanding as to whether the youth of

18   today of 2019 have any idea as to who Mr. Edmond is?  Do they

19   even know who he is?

20   **A.**    Sure, they do because of the Internet.  A lot of them,

21   they go on the Internet.  They surf the Internet.  They know

22   about him.  They know about him.  They ask me about him.  They

23   even knew that I knew him because they saw -- I was interviewed

24   before.  They came to my church to interview, and so they said

25   to me, "Bishop, we didn't know you knew Rayful.  We saw you, the

1   video when they came to interview you at your church."

2   **Q.**    If given the opportunity, would you facilitate an

3   opportunity for Mr. Edmond to speak with the young people at

4   your church, your congregation?

5   **A.**    Absolutely.

6   **Q.**    Why?

7   **A.**    Because I know him.  He's a passionate-hearted man.  He's

8   a lovable man.  He's not -- he's not a mean-spirited man as

9   society or people wanted to paint that picture.  And I believe

10  out of experience you have something to say, and I believe

11  through his experience he can impact a nation.

12  **Q.**    What type of impact do you believe he would have, given

13  your experience working with young people?

14  **A.**    I think it would be -- he would have a positive impact.

15  It would help deter them from different roads or roadways that

16  they choose to go, or think that -- a lot of them think that

17  they have the answer, or think that they are invincible, and I

18  believe that he can share some of his life experience with them.

19  **Q.**    And, Bishop, did I send you a subpoena, or did I force

20  you to come to court today?

21  **A.**    No.  No, sir.

22  **Q.**    Why are you here testifying on Mr. Edmond's behalf?

23  **A.**    Because I believe that -- I believe in him.  I believe

24  that he has been changed.  I believe that he has served and did

25  his duty of time.  And I believe -- I believe in redemption.  I

1    believe in second chance, third chance, fourth chance.

2    **Q.**    Okay.  And what, if anything, are you hoping that

3    Mr. Edmond does with your congregation if he's released?

4    **A.**    I'm hoping that we get together and we can help and have

5    meeting and talks with the young people and gatherings and help

6    impact them.

7         MR. DOWNS:  I don't have any further questions for this

8    witness, Your Honor.

9         THE COURT:  Sure.  What exact changes have you noticed in

10   Mr. Edmond over the years?  You've been interacting with him

11   primarily over the phone, correct?

12        THE WITNESS:  Yes, sir.  Yes, sir --

13        THE COURT:  Okay.  What have you noticed --

14        THE WITNESS:  -- or by letter.

15        THE COURT:  Or by letter?

16        THE WITNESS:  Um-hmm.

17        THE COURT:  What have you noticed?

18        THE WITNESS:  His talk of how the Lord has dealt with him

19   and how he was Godly sorry about the things that he's done, and

20   if given another opportunity he would never go that route again,

21   so he was -- he was very -- he -- he showed remorse when he was

22   talking to me.

23        THE COURT:  Would you be concerned about the safety of

24   individuals in your church if he were to visit young people

25   there?

1          THE WITNESS:  No, sir.

2          THE COURT:  Why not?

3          THE WITNESS:  No, sir.

4          THE COURT:  Why not?

5          THE WITNESS:  Because, again, as the pastor said before,

6     we're not -- we can't walk around in fear.  If that's the case,

7     then I probably should have shut my door down because I got a lot

8     of people that it -- that's broken or that's been in situations

9     that comes in my church, and we come -- and I still help them.

10    From a prime example, I had three young guys that come in that

11    wanted to stick my church up, you know?  And the only thing I

12    did, I offered them prayer.  I offered them prayer.  I reached

13    two of them.  One of them didn't want to, but I couldn't be in

14    fear.  But the other two, their spirit was broken.  They cried.

15    They asked me to pray for them, and our church did.

16         THE COURT: All right.  Thank you.

17         Mr. Crabb, any questions?

18         MR. CRABB:  No, Your Honor.  Thank you.

19         THE COURT:  All right.  Any other questions you have,

20    Counsel?

21         MR. DOWNS:  No, Your Honor.  Thank you.  Thank you for

22    your time.

23         THE COURT:  All right.  Thank you.

24         MR. DOWNS:  And with that, I would call Rayful Edmond.

25         THE COURT:  All right.

1          (RAYFUL EDMOND, DEFENDANT IN THE CASE, SWORN)

2          THE COURT:  Mr. Edmond, how are you today?

3          THE DEFENDANT:  I'm doing good, Your Honor.  How are you?

4          THE COURT:  You realize you're under no obligation to

5     testify?  You understand that?

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  All right.

8                    DIRECT EXAMINATION OF RAYFUL EDMOND

9     BY MR. DOWNS:

10    **Q.**    All right.  And I know we said it earlier, but could you

11    say your name for the record, please?

12    **A.**    Rayful Edmond, the third.

13         THE COURT:  Why don't you sit back and just pull that

14    microphone.  It'll pick your voice up.

15         THE DEFENDANT:  (Witness complied.)

16         THE COURT:  All right.

17         THE DEFENDANT:  Can I say something to the Court?

18         THE COURT:  Sure.

19         THE DEFENDANT:  I just want to say -- I want to thank you

20    for this opportunity, and I really appreciate it, and I'm humbled

21    by the situation and overwhelmed.  And I'd just like to thank

22    everybody who came in to support me today.

23         THE COURT:  All right.  Sure.

24    BY MR. DOWNS:

25    **Q.**    Mr. Edmond, I'd like to begin with July 20th of 1994.

1    You heard Mr. Dominguez testify that was the first day that you

2    began cooperating.

3          Do you remember that day?

4    **A.**    Yes, sir.

5    **Q.**    I want to talk you through that particular day.

6          Where were you located when you first interacted with any

7    law enforcement officers that day after you left Lewisburg?

8    **A.**    In Allenwood penitentiary.

9    **Q.**    Okay.  Where did they take you?

10   **A.**    They took me to a motel somewhere in Pennsylvania.

11   **Q.**    When you got to the motel, did you have any reason -- did

12   you have any understanding as to the reason why you were there?

13   **A.**    No.

14   **Q.**    What were you told when you arrived?

15   **A.**    When I first got there, they started showing me some

16   pictures of a agent who was, you know, doing some undercover

17   work and who had, you know, got me into an undercover sting.

18   And then they just started having heart to hearts with me

19   because they brought a lot of agents from D.C. that knew me from

20   my first case.  So it was about seven or eight of them there,

21   and they had long talks with me, just telling me about my life

22   and what I should be doing and what I shouldn't be doing.

23   **Q.**    And, in general, what effect did the conversation have on

24   you, the agents that were from D.C. telling you what you should

25   be doing with your life?  How did that impact you?

1    **A.**    Well, it had a big impact because I was already -- I was

2    already thinking that way before they even started talking to me

3    about it, so it just reassured me that the mindset that I had

4    was the right mindset at that time.

5    **Q.**    So I'm going to freeze you right there.

6         You said you were already thinking that way.  What were

7    you already thinking?

8    **A.**    That I didn't want to be involved in selling drugs no

9    more, that I wanted to get out of that business.

10    **Q.**    Why?

11    **A.**    I just knew that it was wrong, and I just didn't feel

12    right.  I just -- I just felt sick about it, you know, because I

13    was hurting people.  I already had hurt my family, so I just

14    wanted to change my life and, you know, do positive things.

15    **Q.**    And where -- some members of your family, where were they

16    at that time?

17    **A.**    They were incarcerated.

18    **Q.**    And you were -- at this time you were assigned to

19    Lewisburg penitentiary; is that correct?

20    **A.**    Yes.

21    **Q.**    Tell us about Lewisburg, what was the environment like

22    there?

23    **A.**    Oh, Lewisburg was -- it was -- it was just like being

24    back in the streets.  It was the exact same way.  It was just --

25    it was a wide open prison.  It's just like you wasn't even in

1    prison.  You know, everything was going on in Lewisburg.

2    **Q.**    What, if any, violence did you see with your own eyes

3    while you were at Lewisburg prior to July 20th, 1994?

4    **A.**    Oh, I seen several people get murdered.

5    **Q.**    How so?  Just in general, what was the -- what was

6    happening there?

7    **A.**    Oh, they got stabbed.

8    **Q.**    How many people, if you can count, asked you to be a

9    connection with regard to drugs or D.C. or anything like that,

10   while you were in Lewisburg before July 20th, 1994?

11   **A.**    I'd say Lewisburg had about -- probably about 17- to

12   1,800 inmates, and I would say probably about half of them.

13   **Q.**    And why did you -- did you -- how did you respond when

14   people asked you to be a connection?

15   **A.**    You know, you try to respond positively so you can keep

16   yourself out of a bunch of conflicts, so I always tried to

17   respond positively.

18   **Q.**    And what do you mean "keep yourself out of a bunch of

19   conflicts"?  What does that mean?

20   **A.**    You know, because if you tell somebody, "No, I don't want

21   to do this, I don't want to do that," they might come at you the

22   wrong way.  They might want to fight you.  They might want to

23   stab you.  You know, so you got to be careful the way how you

24   handle it.

25           THE COURT:  What was your expectation about how you were

1    to conduct yourself while incarcerated?

2         THE DEFENDANT:  Well, you know, when you get to -- well,

3    originally when I was incarcerated, they incarcerated me into an

4    ADX, which is a lockdown facility.  They sent me straight there

5    from court after I was sentenced.  So when I ended up in

6    Lewisburg, it was more like I was happy because I had a little

7    more freedom.  I was able to move around.  I wasn't in my cell 24

8    hours a day.  So at the time when I first got there, my

9    expectation was just in, you know, exercise, workout, enjoy

10   myself and just try to be free and deal with, you know, the

11   situation I was in.

12   BY MR. DOWNS:

13   **Q.**    After you learned that you had freedom, did you learn

14   that with that freedom at Lewisburg came some problems as well?

15   **A.**    Yeah, there came a lot of problems and a lot of

16   headaches, you know, yeah.

17   **Q.**    Okay.  So now let me take you back to that hotel room on

18   July 20th of 1990- --

19        THE COURT:  What sort of problems and headaches?

20        THE DEFENDANT:  Just everybody wanting something from you,

21   wanting you to do something for them.  You know, everybody just,

22   you know, "Ray, Ray."  You know, everybody's calling you, you

23   know, because my case, you know, had so much publicity at the

24   time, so everybody knew who you was, and it was about -- about

25   1,700 inmates, half of them was from D.C. so everybody knew who I

1   was, so everybody's pulling at you from every direction every

2   day.

3   BY MR. DOWNS:

4   **Q.**   And how old were you at the time?

5   **A.**   24.  Probably 25.  When I got there I was 25 because it

6   was 1990, so I was 25 when I got there.

7   **Q.**   So now you're in the hotel room.  You're already, in your

8   words, "thinking this way," so how did you respond when the

9   agents came to you and offered you cooperation?

10  **A.**   Oh, I responded very positive because I was looking for a

11  way out, and I figured if I start cooperating with the

12  government, that would give me a way, I wouldn't have to sell

13  drugs again.

14  **Q.**   Did they promise you anything at that time?

15  **A.**   Nah, they didn't promise me anything.

16  **Q.**   And you were here when Agent Benjamin testified that he

17  told you that they actually couldn't offer you anything.

18       Is that your recollection?

19  **A.**   Yes.

20  **Q.**   What about your mother, did you bring up your mother on

21  this particular day, July 20th, 1994?  Did you even say anything

22  about her?

23  **A.**   No.  They brought it up at a later time.

24  **Q.**   So on this particular day, to be clear, why did you agree

25  to cooperate with the government on day one?

1   **A.**     Because I wanted to put the drug -- my life as being a

2   drug dealer behind me.  I wanted to get out the drug game

3   forever.

4   **Q.**     So was there a plan developed?

5   **A.**     I didn't have a plan.  I didn't know how to get out of

6   it.  I didn't have a plan at the time, but when they came to me,

7   they gave me a plan.  I thought in my mind, I said, "This my way

8   out."  I felt like God had put them in front of me to say, "Hey,

9   this is your chance to get out of it right here."

10  **Q.**     After that night in -- after that night in the hotel

11  room, did you go right back to general population in Lewisburg?

12  **A.**     No.  Well, what they -- what they didn't remember

13  earlier, John didn't remember, Steve or Rick.  What happened

14  was, there was a lawyer named Rudasill.  He ended up telling the

15  paper that I was already cooperating with the government.  At

16  the time I hadn't.

17          THE COURT:  James Rudasill.

18          THE DEFENDANT:  Yeah.  And at the time I was not a

19  government witness, so that almost threw the whole case off,

20  because it was on the front of the paper that I was cooperating

21  with the government, but I hadn't.  We had just made an agreement

22  a few hours after that.  So we were all -- they were all

23  paranoid.  They was panicking, and I was like, "Don't worry.

24  We'll get through it."  And we ended up getting through it.

25  BY MR. DOWNS:

1    **Q.**    So since there was some -- there was media publicity

2    about you cooperating when you hadn't even made the decision to

3    cooperate --

4    **A.**    Right.

5    **Q.**    -- where did you physically go after you left the hotel

6    room?  Where did you physically go?

7    **A.**    Oh, they took me to Allenwood.  They kept me -- I was in

8    Allenwood for three days.  We were there so we could talk

9    because I couldn't go back to Lewisburg.  But it was very

10   dangerous because they pulled me out of the penitentiary, so

11   people want to know where I'm at, where have I gone.  I'm gone

12   for three days.  You shouldn't be moving out of the penitentiary

13   for three days, but I was gone.  So we talked those three days,

14   and I was -- and we was contemplating.  I was telling them,

15   "Y'all got to get me back in there because if you don't, we'll

16   never be able to do what we need to do," so eventually they took

17   me.  They got me back there that Sunday.

18   **Q.**    Did you understand the risk of going back to Lewisburg?

19   **A.**    Yeah.  Yeah, I knew it from jump that, you know, at any

20   time, you know, if anybody would have found out or even just

21   thought that, they would have killed me.

22   **Q.**    And did you think that the guards would be able to stop

23   it if somebody tried to kill you in Lewisburg?

24   **A.**    No, they couldn't.  They couldn't stop it if somebody

25   wanted to kill me.  They just -- they just could have killed me.

1   **Q.**     So where did you -- where did you go?  When you got back

2   to Lewisburg, where did you go?

3   **A.**     They put me in -- they put me back in segregation.

4   **Q.**     Approximately how long were you in segregation?

5   **A.**     Yeah, between five and six months.

6   **Q.**     And after you left segregation, what was your

7   understanding of what you were to do?  What was you,

8   essentially, assignment?

9   **A.**     Well, nobody likes to be in segregation.  You know, it's

10  hard when you're in segregation, so I didn't want to be there.

11  And when we had talked, when I talked with the guys and we had

12  worked it out and I worked out a deal with them, I felt like I

13  should be back in population now, but they just kept going on

14  and on and on, and I was in the hole.  But, you know, I just

15  stayed relaxed and calm, and, you know, I know they were a

16  little paranoid.  They was like, "We're working on it, Ray,

17  we're working on it," but it just kept going on and on, so I

18  thought it never was going to happen.  So I stayed there all

19  that time, and then finally, you know, they pulled some strings

20  and got it done.

21  **Q.**     All right.  So instead of discussing all of the

22  cooperation that you did in Lewisburg, I want to ask you where

23  you went after you left Lewisburg?  Where were you?

24  **A.**     I went to a county jail.

25  **Q.**     And when you got to the county jail, what sort of

1  interaction, if any, did you have with children or at-risk

2  youth?

3  **A.**    I spoke to every children at the county jail every month.

4  The warden would bring in between 20 and 30 kids who were

5  misbehaving in school or in the streets, and he would have me

6  sit down and talk to them.

7  **Q.**    How often did that happen?

8  **A.**    Every month.

9  **Q.**    And what sort of things did you tell the kids that were

10  coming in that were misbehaving in school or getting in trouble?

11  Just generally, what sort of things did you tell them?

12  **A.**    Well, the ones who, you know, that first time coming in

13  front of me, I would always just tell them about my life, you

14  know, how I destroyed my life and my family life with the things

15  that I did, so I would -- I would tell them about that most of

16  the time.

17  **Q.**    What was your goal in speaking to these at-risk youth

18  while you were at the county the jail?

19  **A.**    To help them not end up in prison somewhere.  You know, I

20  would tell them a lot about how bad prison is.  That, you know,

21  is not a place you want to be.

22  **Q.**    I want to talk to you about Simple City.  You heard

23  Mr. Parker and Reverend Wilson talk about Simple City.

24      How did you first get involved in brokering a truce

25  between the kids in Simple City?

**A.** Me and Tyrone Parker's daughter are real close, and she put me on the phone with him.

**Q.** You said she put you on the phone with Mr. Parker?

**A.** Yes.

**Q.** Where were you physically at this time?

**A.** In a county prison.

**Q.** And while you were at the county jail, just generally tell us what you said to the kids that were at the church.

**A.** Oh, I -- same exact thing I told the kids that were visiting the county jail. You know, I told them about my life, you know, how I destroyed it; how, you know, friends of mine lost their life by, you know, me being involved in drugs. And I say, "That's the same thing that will happen to y'all. Y'all are killing each other about nothing." You know, I say, "Y'all need to get your life together and change it. You know, there's a lot that y'all can offer to society. It's a better life out there. Don't end up like me in prison." So that was the main things that I would tell them.

**Q.** Why did you -- why did you agree to speak with the children at Mr. Parker's request? Did he promise you anything?

**A.** No.

**Q.** Why'd you do it?

**A.** That was just always my passion. You know, even my time in the penitentiary, we had a lot of young guys who would come in, who were misguided and lost, and who would look up to me and

1    wanted to be like me.  And I would tell them, "No, I'm not the

2    person you should be like.  You got an opportunity.  I don't

3    have an opportunity.  I'm in jail for life, but you got a

4    opportunity.  You got 10 years.  You got 15 years.  Take

5    advantage of that second opportunity that you have."

6         So it was just something that I always did, that all --

7    even when I was home, you know, like, Ms. Steadman said earlier,

8    it's a -- it's like this image out there about me that's really

9    not true.  You know, I'm like one of the greatest human beings

10   you would know as a human being.  I did make a bad mistake in

11   getting involved in selling drugs, but as far as a human being,

12   I'm one of the best human beings you would ever meet.  I have a

13   great heart and everything, and, you know, I just wanted the

14   Court to know that.

15   Q.    So what about the warden at the county jail?  Did the

16   warden promise you anything to encourage you to talk to the kids

17   other there?

18   A.    Nah.  It was just something that I used to always talk

19   about to the guards and stuff, and they told him about it, that

20   I always speak about it.  And he knew who I was, so he came and

21   asked me would I do it, and I said sure.

22   Q.    After you left the county jail, I don't want you to tell

23   us where you were, but at that point, is it accurate to say that

24   your movement was significantly more restricted after you left

25   the county jail?

1   **A.**     Yes.

2   **Q.**     Since your movement was so restricted, did you have the

3   opportunity to call and do things, like, talk to kids, at-risk

4   youth at church?

5   **A.**     No.

6   **Q.**     Did you have the opportunity to talk to kids in the

7   community since you're movement was so restricted?

8   **A.**     No.

9   **Q.**     Okay.  I want to turn your attention to cold case

10  homicides.

11         Did there come a point where you spoke with law

12  enforcement officers about cold case homicides?

13  **A.**     Yes.

14  **Q.**     What law enforcement officers did you speak with?

15  **A.**     Rick Watkins and Barbara Watkins.

16  **Q.**     And in general, what were you -- what information were

17  you providing?  What were you giving them?

18  **A.**     They -- the department came up with a -- they had a

19  bunch.  They had about 3,000 cold cases, and they wanted to

20  close them.  So they just needed help on who did them, why they

21  killed the person so they could write it up, and then put the

22  cases away as a closed case.

23  **Q.**     During the -- after you left the county jail and your

24  movement is more restricted, up until approximately 2018, how

25  often did you speak with John -- AUSA John Dominguez?

1    **A.**    Always sometimes four times a month, sometimes three, or

2    at least twice a month for -- from that duration of that time.

3    **Q.**    In general -- I'm not asking you for every single

4    conversation, but in general, what were you discussing?

5    **A.**    Mostly we were discussing about, you know, me trying to

6    get a Rule 35(b).

7    **Q.**    Okay.

8          THE COURT:  Excuse me one second.

9          (Brief pause in proceedings.)

10          MR. DOWNS:  May I continue, Your Honor?

11          THE COURT:  Yeah, that's fine.  Yes.

12          MR. DOWNS:  Thank you, Your Honor.

13    BY MR. DOWNS:

14    **Q.**    Mr. Edmond, I want to turn your attention to the Kevin

15    Gray trial.

16          Do you remember testifying in that trial?

17    **A.**    Yes.

18    **Q.**    Where did the trial take place?

19    **A.**    Here in Washington, D.C.

20    **Q.**    What was the -- what were the allegations in that case,

21    and what sort of information did you provide?

22    **A.**    The allegation was:  It was a bunch of murders in that

23    case, a bunch of people got killed, and it was a drug case.

24    **Q.**    How long, if you remember, were you on the stand?

25    **A.**    It was probably about four days.

1   Q.     How much prep work did it take to get on the -- did they

2   just throw you on the stand cold, or how much work did you do

3   before you got on the stand?

4   A.     No.  Amy Jeffress came to visit me on several occasions,

5   and we met and discussed my testimony, and, you know, what I'd

6   be saying and what I'd be testifying to.

7   Q.     And I want to turn your attention to the North Carolina

8   matter.

9         Do you remember we spoke about that earlier?

10   A.     Yes.

11   Q.     Tell us about your involvement in the North Carolina

12   matter.

13   A.     Yeah.  I remember earlier Mr. Dominguez testifying he

14   didn't remember whether or not I testified, but I did testify in

15   that particular case also.

16   Q.     And what was the nature of your testimony in the North

17   Carolina matter?

18   A.     It was a drug case, so I testified about a particular guy

19   that was on trial, about the drugs that he was selling and used

20   to get from us back in those days.

21   Q.     All right.  Bill Willis, who's that?

22   A.     Bill Willis, he was the guy that ran Champagne

23   Productions.

24   Q.     What was your involvement in the Bill Willis prosecution,

25   if any?

**A.**　　I bought a bunch of cars from him when I was free.

**Q.**　　Did you provide information to law enforcement?

**A.**　　Yes.

**Q.**　　Who did you provide information to, if you can remember?

**A.**　　It was a lady.  I don't remember her name, but I did provide information and they brought me to court to testify in that particular case, but he pled guilty once I got to court.

**Q.**　　Okay.  So you were physically in the courthouse at the time?

**A.**　　I was in the car coming into the courthouse, and he...

**Q.**　　Phyllis Webster, who is that?

**A.**　　Another person who was a drug dealer also.

**Q.**　　Is it possible for you to recall the names of every single person against whom you provided information and gave it to the government?

**A.**　　Not every single person, but every person name that I actually gave them, was -- sometimes I give them information and they might come up with other people too, from that particular information.

**Q.**　　Are you able to count the number of times you spoke with Agent Steve Benjamin?

**A.**　　No.  It's more than I could count.

**Q.**　　Are you able to count the number of times that you spoke with Agent Barbara Watkins?

**A.**　　No.  It was many times.

1  **Q.**     Are you able to count the number of times that you spoke

2  with Mr. Watkins, Rick Watkins?

3  **A.**     No.  Many a times.  And I --

4  **Q.**     Jim Caudle is actually not here --

5  **A.**     I still talk to them sometimes now, too.  You know, I

6  still keep a relationship with those guys now too, because we

7  sat together for months putting cases together and talking about

8  life and things like that.  And I -- you know, I wanted to let

9  them know, too, that I really appreciate them having heart to

10  hearts with me a lot of times.  We had big discussions, because,

11  you know, I'm from one side of the fence and they're from

12  another side, but somehow we mutually came together for the

13  common good, and I want to let them know I really appreciate

14  that.

15  **Q.**     What about Marcus Jackson [sic], who's that?

16  **A.**     Marcus Jackson or Marcus Haynes?

17  **Q.**     Marcus Haynes, excuse me.

18  **A.**     Yeah.  Marcus Haynes and Adolph Jackson, they -- those

19  were guys who were involved in the drug operation with me.

20  **Q.**     Did you actually testify at a trial or something else?

21  **A.**     No.  They had a sentencing hearing, and I testified at a

22  sentencing hearing in -- you know, in the District Court.

23  **Q.**     In the District of Columbia?

24  **A.**     Yes.

25  **Q.**     Okay.  So you testified at a sentencing hearing for

1    Marcus Haynes and Adolph Jackson, right?

2    **A.**      Yes.

3            THE COURT:  Now, you testified on behalf of the

4    government?

5            THE DEFENDANT:  Yes.

6            THE COURT:  All right.

7            THE DEFENDANT:  Yes.

8    BY MR. DOWNS:

9    **Q.**      Mr. Edmond, you have seen Document 202, the motion to

10   compel, right?  You've seen that?

11   **A.**      Yes.

12   **Q.**      You've seen the exhibits, right?

13   **A.**      Yes.

14   **Q.**      Notwithstanding that motion, notwithstanding the delay in

15   filing -- if the government asked you for help today, would you

16   help the government?

17   **A.**      Yes.

18   **Q.**      Why?

19   **A.**      It's the right thing to do.

20   **Q.**      All right.  Would you -- you actually have never really

21   spoken directly with Mr. Crabb, but if Mr. Crabb asked you for

22   help, would you even help Mr. Crabb?

23   **A.**      Yes.

24   **Q.**      Why?

25   **A.**      It's the right thing to do.

1   **Q.**     So I don't have any other questions for you, but to be

2   clear, is there anything else you want to tell the Judge?

3   **A.**     Just once again, just, thank the Court.  I appreciate it.

4   And let the Court know that I'm very remorseful, and I'm sorry

5   to be in front of you in this situation.  I'm sorry for

6   everybody that I hurt, everybody that I disappointed, and if I'm

7   ever given an opportunity, you know, I will do the best with it

8   and try to make up for all my wrongs.

9           THE COURT:  Let me ask you this:  Without getting into any

10  detail, you're familiar with the term, "substantial cooperation"?

11          THE DEFENDANT:  Yes.

12          THE COURT:  All right.  Are you able to still provide

13  substantial cooperation to the government, without getting into

14  any detail?

15          THE DEFENDANT:  I would think so, if something came up and

16  they needed me, I think I probably would be able to, just on the

17  knowledge of things that I know, you know, in the street and how

18  the street works.  I think I would be able to if they needed me

19  for something.

20          THE COURT:  Is that something you'd be willing to do if

21  you were released and on supervision?

22          THE DEFENDANT:  Yes.  I would love to -- like all the

23  pastors said and Mr. Parker, I would love to be able to go in the

24  community -- if it couldn't be this community, any community

25  anywhere to help law enforcement or just help kids, just help

1    people change their lives.  That's what I want to do.  That's my

2    passion.  That's what I want to do, because I feel like I'm

3    making up for my wrongs if I'm out there helping other people not

4    fall into the trap that I fell into.

5         THE COURT:  How did you get into doing what you were

6    doing?

7         THE DEFENDANT:  Well, that's a -- that's a tough question,

8    Your Honor, because it's -- you know, I was born into it, if you

9    just want to say that.  I grew up that way as a kid.  It was --

10   you know, I was always around it.  My neighborhood, my family, we

11   all -- it's just something that we did.  We always was involved

12   in selling drugs in some type as a kid as I was growing up, even

13   though, you know, my family and my parents had me going to school

14   and stuff like that.  So I had the opportunity to choose the

15   right way also, and I -- you know, I'm responsible, and I take

16   full responsibility for taking the wrong path, because I had a

17   opportunity to go both ways.  Both ways was provided to me, and I

18   chose the wrong path, so I take full responsibility for that on

19   my own, my own self.

20        THE COURT:  You just impress me.  Having read everything

21   we've read, that I've read about you, I'm just impressed that,

22   had you gone another way, you could have been probably sitting at

23   the apex of a major legitimate distribution firm like Amazon.  I

24   mean, we're talking distribution and the ability to motivate

25   people and to accomplish the objectives.  You have all that.

1          You know that, right?

2          THE DEFENDANT:  Yes, sir, yeah.  And that's something that

3   bothers me when I think about those things all the time, the

4   prior things I could have did.  And, you know, I'm a grandfather

5   now, and, you know, I could have been able to tell my grand -- I

6   got to tell them about, you know, my time in prison, and, you

7   know, all the bad things I did.  You know, I think about that's

8   going to be one on the hardest days of my life, explaining that

9   to them.

10          THE COURT:  They don't know?  Your grandchildren don't

11   know?

12          THE DEFENDANT:  No.  They're only four years old.  They're

13   two little -- two little twin girls.  To me they're still babies,

14   you know, so that's one of the things I think about all --

15          THE COURT:  They grow up fast.

16          THE DEFENDANT:  Oh, yeah.  Like my sons, when I got locked

17   up, they were babies.  They're grown men now with kids, so yeah,

18   time -- time moves fast, yup.

19          THE COURT:  Okay.  What are your plans?  If you're

20   released at some point, what are your plans for the future going

21   forward?

22          THE DEFENDANT:  Like I just explained, just to give back.

23   And it's not about me, you know.  My best days are behind me, you

24   know.  I'm -- you know, how much longer am I going to live?  You

25   know, if I live another 25 years, that'd be a blessing from God,

1  but that's not guaranteed to me.  I'll be 55 in 40 days, so, you

2  know, with the little bit of time that I do have left on this

3  earth, I just want to give back and help people and show people

4  that I can be a productive citizen and help a community thrive

5  and be better, like some of these other people that we just heard

6  in here talk about up here on the stand today.  I'd like to have

7  that opportunity one day to do the things that they're doing.

8  And maybe one day I could be a pastor.  I'm hoping that maybe one

9  day I could pastor a church or something.  I'm really into the

10  Bible and things like that, so anything positive I'm willing to

11  do.

12       THE COURT:  Okay.

13       MR. DOWNS:  Your Honor, I do have one follow-up, if the

14  Court would permit it.

15       THE COURT:  Sure.

16  BY MR. DOWNS:

17  **Q.**    Mr. Edmond, has anyone in your family that got arrested

18  with you, has anyone recidivated?  Anyone gone back to prison?

19  **A.**    No.  That's -- that's been a great thing I've been proud

20  of.  Everybody, I mean, most of them been home over 10, 15

21  years, and nobody's been incarcerated again.  They always been

22  home owners, business owners and, you know, doing the right

23  thing.

24       THE COURT:  Are you concerned about your own safety?

25       THE DEFENDANT:  Not -- Your Honor, I always -- you know,

1    people -- I get asked that question all the time in prison and

2    everywhere.  Everybody always asks me, "Are you ever concerned

3    about your safety?"  And I look at it as I can't be concerned

4    about my safety because I wasn't concerned when I was on the

5    street back then, and it was way -- I could have been killed

6    faster back then than I would be now.  So, you know, you can't

7    live your life in fear.  You know, I feel like God has a plan for

8    my life, and, you know, if it was meant for me to die in the

9    streets, that would have happened, you know, 30-some years ago.

10       MR. DOWNS:  I don't have anything further.  Thank you,

11   Your Honor.

12       THE COURT:  Any questions, Mr. Crabb?

13       MR. CRABB:  No, Your Honor.  Thank you.

14       THE COURT:  All right.  Thank you, sir.  You may rejoin

15   your attorney.

16       THE DEFENDANT:  All right.  Thank you.

17       MR. DOWNS:  Your Honor, we do not have any other witnesses

18   on behalf of the defense.  Thank you.

19       THE COURT:  All right.  Mr. Crabb, any witnesses or

20   anything else you'd like to say at this point?

21       MR. CRABB:  Your Honor, we have no witnesses.  May I ask a

22   question?

23       THE COURT:  Sure.

24       MR. CRABB:  How does the Court intend to proceed from this

25   point towards conclusion?

1      THE COURT:  Back at you.  What's your recommendation for

2  how the Court should proceed?

3      MR. CRABB:  If I understand correctly, the Court's

4  mentioned that it would like a transcript, would like some

5  proposed Findings of Fact, and plans to write something.  In

6  light of that, and also the fact that there's been a great deal

7  of material presented to the Court today, I would ask for the

8  opportunity for the parties to, in addition to the materials the

9  Court's already mentioned, submit a post-hearing brief; and also

10 if the Court thinks it would be helpful, to have another hearing

11 to address whatever's raised in the briefs.  I believe, since the

12 Court asked, that might be more effective than trying to address

13 everything at the spur of the moment at this point.

14     THE COURT:  That's a good suggestion.

15     Counsel?

16     MR. DOWNS:  Thank you, Your Honor.  Your Honor, I

17 certainly would have no objection.  I think it's actually helpful

18 to have post-hearing briefs, but scheduling a further hearing,

19 this hearing has been scheduled for months, Your Honor.  I don't

20 know that we need another evidentiary hearing.

21     Frankly, we could make arguments right now based on all of

22 the material that was presented, because all of us knew what was

23 going to happen -- I'm not saying the Court knew, but the

24 litigants knew what was going to happen before we walked in the

25 court.  So very little of this is a surprise, and I think we

1   should just brief the issues, because I understand the Court's

2   concern about parsing out the different pieces of the

3   cooperation, but scheduling a further hearing, I would object in

4   large part because there's no other evidence to be presented.

5   And if we need to make an oral argument, I think we can make the

6   oral argument right now because we were all hear and we all

7   expected -- the Court was very meticulous about making sure the

8   parties corroborated, spoke about the witnesses that were going

9   to come court today, about the general nature of the testimony,

10   about the exhibits that would be referenced, so there are no

11   surprises.  I think because there are no surprises, I would ask

12   the Court to set a very tight briefing schedule, and when the

13   Court is able to rule, I would ask the Court to issue a ruling,

14   but I would not ask the Court to schedule another hearing.

15        Thank you, Your Honor.

16        THE COURT:  All right.  Suppose -- and I'm going to take a

17   short recess to huddle with my staff, but suppose the Court were

18   to afford the parties an opportunity to make their respective

19   arguments today, with the understanding that there could be a

20   follow-up hearing depending on what emerges from the proposed

21   findings?

22        MR. DOWNS:  Yes, Your Honor.

23        THE COURT:  Mr. Crabb, let me ask you this:  Were you

24   surprised about any testimony that was presented today?

25        MR. CRABB:  No, Your Honor.  I didn't mean to suggest that

1    there was a surprise or a problem --

2          THE COURT:  Right.

3          MR. CRABB:  -- nor did I in any way mean to suggest that

4    there should be another evidentiary hearing.  I only meant to

5    suggest that if we submit post-hearing briefings for the Court,

6    the Court could benefit from any questions or oral argument

7    regarding legal issues that might be raised in those papers.

8          THE COURT:  Right, right.  I'm thinking -- and, again, I'm

9    going to huddle with my staff.  I'm thinking I'd like to have the

10   best of both worlds, to hear from counsel today, give you a

11   reasonable opportunity to file your post-hearing submissions.

12   And I'm not so sure I'm optimistic that the parties can agree on

13   proposed findings.  I don't -- I don't know.

14         Any views about that?

15         MR. CRABB:  I think there will be some common ground, but

16   I'm not sure we'll be able to resolve everything.

17         THE COURT:  All right.  I'm going to afford you the

18   opportunity.  If you can, that's fine.  And maybe the parties can

19   agree on some facts and leave others as proposed facts

20   respectively, and that way you'd have the benefit of both

21   opportunities as well, to submit either a joint submission or an

22   individual submission.

23         But I think I'd like to hear from you today.  We've heard

24   a lot of testimony today.  I'm not sure at a follow-up hearing

25   whether it'll be in open court.  I mean, hearings like this just

1    don't happen by virtue of making a phone call.  There's a lot of

2    planning that goes into the effect, but I thought it was

3    important enough for Mr. Edmond, for his family, for his friends,

4    for those who oppose his request, to be afforded the opportunity

5    to hear the respective arguments in open court, because this is a

6    public proceeding and it certainly involves the public, and the

7    public does have an extreme interest in this proceeding, and

8    that's to put it mildly.

9         But let me huddle with my staff for about ten minutes or

10   so.  And, again, I'm going to excuse Mr. Edmond first.  I'm going

11   to ask everyone to remain seated until the Court leaves, and

12   we're going to proceed at -- I have that other matter, don't I?

13        Will that matter take a long time, Counsel?

14        (Discussion had off the record.)

15        THE COURT:  All right.  Let me handle that before I take a

16   recess.  All right.

17        (Thereupon, a break was had from 3:32 p.m. until

18   4:02 p.m.)

19        THE COURTROOM CLERK:  Your Honor, resuming Criminal Case

20   89-162, *United States of America versus Rayful Edmond*.

21        THE COURT:  All right.  Let me just inquire.

22        Ms. Kraemer-Soares, may I ask you a question at the

23   podium.  You may not be able to answer it, and that's fine.  I

24   don't expect you will be at the podium.  I'm not trying to put

25   that pressure on you, but the government has asked for -- asked

1   the Court to grant its motion to reduce and to resentence

2   Mr. Edmond to 40 years, 480 months.

3         THE PROBATION OFFICER:  Yes, sir.

4         THE COURT:  So the question I would have for the probation

5   officer is:  Pursuant to our -- pursuant to current policies, an

6   individual would serve 85 percent of the time.

7         THE PROBATION OFFICER:  Yes, sir.

8         THE COURT:  All right.  So if the sentence were

9   prospectively 480 months, the question would be:  When would he

10   be eligible for release, recognizing -- I know it's a complicated

11   question, and I don't profess to have the answer.  It's not a

12   trick question at all.  Recognizing that for a period of time

13   while he was incarcerated on this court's original sentence, he

14   was involved in criminal activity, and probably would not for

15   that period of time receive the 15 percent credit; is that right,

16   or not?

17         THE PROBATION OFFICER:  Potentially, Your Honor.

18         THE COURT:  Potentially, right.  So I don't -- I just

19   don't know.  Do you have any --

20         THE PROBATION OFFICER:  Off the top of my head, Your

21   Honor, I don't have an answer to the question.  You bring up a

22   good point about whether or not they're going to consider that an

23   infraction, are they going to take away his, you know, good

24   conduct time --

25         THE COURT:  Right.

1          THE PROBATION OFFICER:  -- or forfeit it.  Um, that would

2     probably have to be something that I would have to call the

3     designation center on to see if I could speaker to one of the --

4          THE COURT:  And I apologize.  We didn't think of this

5     earlier.

6          THE PROBATION OFFICER:  Well, it does make a difference,

7     Your Honor, because clearly you're reducing a sentence.  He's

8     been incarcerated for quite some time, and then I'm sure that --

9     well, it's clearly going to impact his Pennsylvania, because when

10    does that start?  So that's the other issue, too, because, you

11    know, as soon as he can get credit, this under his belt, then

12    he --

13         THE COURT:  Right.

14         THE PROBATION OFFICER:  -- then that can kick in and then

15    that's --

16         THE COURT:  Right.  And, again, I don't want people to

17    read too much into the Court's question, but it's an answer that

18    I'd like to have -- it's a question I'd like to have the answer

19    to.  It doesn't mean that the Court's considering that sentence

20    and that sentence only, but it would be nice to know what the

21    answer is, and I just don't know.

22         THE PROBATION OFFICER:  I can certainly reach out to

23    designation, Your Honor, and see if I can speak to one of the

24    supervisors there.  We have a contact that hopefully she can

25    provide some insight.

1    THE COURT:  All right.  Good.  And I would just ask that

2  once you determine what the answer is, could you just supplement

3  your submissions that you filed in this case?

4    THE PROBATION OFFICER:  Yes, sir.

5    THE COURT:  All right.  And I'll give the parties a chance

6  to respond to that answer.

7    THE PROBATION OFFICER:  Yes, sir.

8    THE COURT:  All right.  Thank you.

9    I think it's appropriate.  The government's a moving party

10  in this case because the government filed the motion, so I think

11  it's appropriate to hear from government counsel first.

12    Maybe you know.  Do you know the answer to that question

13  about when he would be eligible, because I don't think it's just

14  a simple answer of 85 percent of 48 months.  I just don't think

15  it's that simple because of the criminal activity, but I just --

16  I just don't know.

17    MR. CRABB:  I believe the Court's right, and, in

18  particular, the Court's put its finger on the real problem or the

19  real difficulty in calculating this, the fact that Mr. Edmond was

20  involved in criminal activity during his period of incarceration.

21  Unfortunately we hadn't figured or factored that in.

22    In working through these materials, we did have some very

23  general discussions with the Bureau of Prisons, and it's our

24  understanding that Mr. Edmond would be eligible for good time

25  credits as currently calculated after the First Step Act.  So he

1　would -- they would -- through the entire period of his

2　incarceration, he would be eligible for the higher level of good

3　time credits.  But as the Court points out, there's a question of

4　which period would he get those good time credits as currently

5　calculated, and would he be disqualified for some period because

6　of the other criminal activity.  We have not had an opportunity

7　to work through it to that level of detail.

8　　　　　THE COURT:  Right.  And I guess there could be an argument

9　that the sentence imposed by the judge in Pennsylvania superseded

10　any forfeiture for good time credit or something.  I don't know.

11　I just don't know.

12　　　　　MR. CRABB:  I would be guessing, Your Honor.

13　　　　　THE COURT:  Right.

14　　　　　MR. CRABB:  I don't want to speculate.

15　　　　　THE COURT:  All right.  So I don't feel bad.  You didn't

16　think about it either then.

17　　　　　MR. CRABB:  No.  The Court put its finger on an issue

18　which we hadn't factored through.  We had looked at the -- just

19　the more basic question about calculation of good time credits in

20　light of changes --

21　　　　　THE COURT:  Mr. Downs, don't smile.  You didn't think

22　about it either, did you?

23　　　　　MR. DOWNS:  I did not, Your Honor.

24　　　　　THE COURT:  All right.

25　　　　　MR. DOWNS:  I did not.

1      THE COURT:  All right.  But I think I'd like the answer.

2  And, again, don't read too much into it, but it would be nice to

3  know just in the scheme of things, because I'm going to make some

4  findings and try to arrive at the right conclusions for the right

5  reasons, so...

6      All right.  Go right ahead, Counsel.

7      MR. CRABB:  Thank you, Your Honor.  Thank you for this

8  opportunity to address the Court again.  In light of the fact

9  that this issue's been briefed and we've been in court all day

10  with testimony and other material presented to the Court, I

11  intend to be brief but would be prepared to attempt to answer any

12  questions that the Court has.

13      But if I may briefly just state again the government's

14  position.  As the Court knows, we are moving to reduce

15  Mr. Edmond's sentence, pursuant to Rule 35, based on the fact

16  that he's provided substantial assistance to the government more

17  than a year after he was originally sentenced.  And as we've said

18  in our papers several times and it's been said today, we believe

19  that Mr. Edmond's cooperation was substantial and is deserving of

20  a significant decrease in his sentence.

21      The government does not believe, however, that

22  Mr. Edmond's cooperation is extraordinary or unprecedented.

23  That's just not true in this case, Your Honor.

24      I think sometimes these things get conflated.  What

25  Mr. Edmond did in jail in Lewisburg when he went back into a

1   dangerous environment and worked covertly to set up drug dealers,

2   such as Colombians and drug dealers here in D.C., that truly was

3   extraordinary, but that's not before the Court today.

4       What we have before the Court today is much more

5   run-of-the-mill.  We have testimony in two or three cases; we

6   have background information; some cold cases, not actually

7   solving one; we have background information and some wiretaps,

8   not actually testifying; and we have help from the -- helping the

9   Office of the Inspector General with prison reform.

10      I want to be clear, this is substantial.  We believe he

11  should get a substantial reduction in his sentence.  We believe

12  that a reduction from life to 40 years is a huge reduction, but

13  this is not something extraordinary that the Court should

14  consider out of norms when the Court looks at what's actually

15  before --

16      THE COURT:  How do I balance that argument, which is not

17  evidence, with the testimony from Mr. Dominguez who's been doing

18  this for 35 years or so, 35 years, who says it's -- you know, his

19  cooperation was at a level not enjoyed by others for his entire

20  35 years?

21      MR. CRABB:  I'd ask the Court to consider two things

22  there.  I do think that Mr. Dominguez, to a certain extent, is

23  conflating what happened in the prison, which as I said, that was

24  extraordinary.  Going covert in a prison environment and working,

25  especially against the targets that Mr. Edmond was targeting at

1    that point, namely Columbian drug Lords, that is extraordinary.

2    That's not what's before the Court today.

3        Also, Your Honor, sometimes one needs a little bit of

4    perspective and distance from a matter to give a better judgment,

5    and it's the United State's position that it's substantial

6    assistance, but nothing extraordinary or out of the ordinary.

7        THE COURT:  All right.

8        MR. CRABB:  What we ask the Court is:  In light of that

9    cooperation, and noting the extraordinary nature of Mr. Edmond's

10   crimes which have been discussed at some length today, conducting

11   perhaps the largest most destructive drug organization that this

12   city's ever seen, that when you put the cooperation that's before

13   the Court and compare that to the crime that Mr. Edmond was

14   convicted of, as I say, a reduction of a life sentence to 40

15   years is a very substantial reduction.  That's what we'd ask the

16   Court to do.

17       If I could briefly address some of the other issues that

18   have come up before the Court today.

19       As we've set forth previously -- and if I could just for

20   the record be specific -- in our response to the Court's minute

21   order filed back on April 5th of nineteen -- excuse me, 2019, as

22   we set forth on page 7 there, it's the government's position, as

23   the court's have held, that the near universal rule is, that in

24   doing a 35 sentence reduction, the Court should only look to the

25   Rule 3553 factors to reduce the amount of time the government's

1    asking for but not to increase it.

2         So it's the government's position that, based on the

3    majority of circuits that have addressed this issue, these issues

4    that the Court's heard today about how Mr. Edmond has reformed

5    himself, what he could do to help the community, et cetera,

6    aren't relevant, and the Court should not consider them to give a

7    bigger reduction than what the government's asking for.  Those

8    3553 factors could only be considered to give a smaller

9    reduction.

10        As the courts have explained, the reason for that is, a

11   Rule 35 resentencing is not a preliminary resentencing.  We're

12   not starting from scratch.  Mr. Edmond was sentenced.  What the

13   Court should consider today is the cooperation itself.  And as

14   the courts who have adopted these rules say, the 3553 factor

15   should be used by the court to protect the community and reduce

16   the amount of reduction that the government's asking for if the

17   the Court thinks that's not in the best interest of the

18   community.

19        So based on that, we'd ask the Court not to consider those

20   factors, to consider the cooperation that's actually before the

21   Court today, the gravity of Mr. Edmond's crimes, and reduce his

22   life sentence to 40 years.

23        I have nothing further to add unless the Court has

24   questions.

25        THE COURT:  So are you -- is it the government's position

1   that the Court can't consider his testimony that -- and the

2   testimony of others that he's a changed person?

3       MR. CRABB:  Your Honor, yes.  It's our position that that

4   is a 3553 factor, going to the history and characteristics of an

5   individual --

6       THE COURT:  Right.

7       MR. CRABB:  -- which would be appropriate at a original

8   sentencing.  But in a Rule 35, since this is a sentencing from

9   scratch -- I want to be clear, the D.C. Circuit has not ruled on

10  this issue, but the majority view of circuits is, that on a

11  Rule 35 resentencing, the court should only consider the Rule

12  3553 factors, such as somebody being changed, which goes to

13  history and circumstances of an individual, to reduce the amount

14  of reduction the government asked for but not to increase it.

15      THE COURT:  Has any circuit held that?

16      MR. CRABB:  Yes, Your Honor.  Just -- I can do two things.

17  As I said, this is in Document 224, the government filed on

18  page 7.  As we cite, this is the majority rule.  It's called "The

19  Near Universal Rule," but I do want to note it is not -- there's

20  not unanimity.

21      Both the -- two circuits have held the other direction,

22  Your Honor.  And I apologize.  It'll take me a moment to figure

23  out which the two are, but as I said --

24      THE COURT:  Are those enlightened jurisdictions or --

25      MR. CRABB:  I'm sorry, Your Honor?

1    THE COURT:  Are those enlightened jurisdictions?

2    MR. CRABB:  I wouldn't be presumptuous to opine.  I --

3    it's in our brief.  I think it's the 2nd Circuit and the 9th

4    Circuit who have ruled.  The Court can look at 3553 factors for

5    both directions.  And several circuits have held, the majority of

6    circuits have held what I set forth.  And as I say, the D.C.

7    Circuit, as far as we've been able to determine, has not yet

8    addressed this issue.  And I apologize that I -- these cases are

9    cited, as I say, in Document 224, but it'll take me a moment to

10   tell the Court exactly which circuit.

11   THE COURT:  Sure.  No, take your time.

12   MR. CRABB:  Okay.  Thank you.  May I have just a moment?

13   THE COURT:  Sure.

14   (Brief pause in proceedings.)

15   MR. CRABB:  Your Honor, as I say, these are on page 7.

16   And I'll let the Court be the judge on how enlightened these

17   circuits are, but it's our understanding that the circuits that

18   have held that the 3553 factor may only be considered to reduce

19   the amount of reduction are the 5th Circuit in *Lightfoot*, the

20   2nd -- sorry, the 7th Circuit in *Shelby*, the 11th Circuit in

21   *Menella*, the 4th Circuit in *Davis*, the 8th Circuit in *Rubley*, and

22   the 10th Circuit in *Neary*.  And my memory was correct, it's the

23   2nd and 9th Circuits who have held to the contrary, namely that

24   the Court can consider the 3553 factors across the board as it

25   would at an initial sentencing.

1    THE COURT:  Right.  It appears that the 9th Circuit and

2  the 7th Circuit have held that the District Courts may consider

3  all of the Section 3553(a) factors, to the extent that they are

4  relevant in determining the extent of a sentence reduction under

5  Rule 35(b), and that would include the *Webster* decision at 663

6  F.3d 1023, and the *Tadio* decision 663 F.3d at 1048.

7    And there's a two-step process -- inquiry that both the

8  2nd and 9th Circuits have adopted, which is as follows:  The

9  District Court may properly consider the 3553(a) factors in

10  determining the amount of a reduction, and it may use those

11  non-assistance factors to reduce the sentence by an amount

12  greater than, less than, or the same as what the defendant's

13  assistance considered alone would warrant, but the amount of

14  reduction should always be determined in reference to the

15  starting point and by considering the non-assistance factors, in

16  combination with the amount of assistance rendered by the

17  defendant.

18    That sounds pretty enlightened to me, but, you know,

19  we'll -- all right.

20    MR. CRABB:  I don't mean to belabor the point, Your

21  Honor --

22    THE COURT:  Sure.

23    MR. CRABB:  -- But I'd just ask the Court to consider the

24  circuits that have looked at it from the other perspective.  And

25  as I've acknowledged --

1          THE COURT:  Sure.

2          MR. CRABB:  -- and will again, the D.C. Circuit has not

3    yet had an opportunity to visit this issue, as far as we can

4    tell.

5          THE COURT:  All right.

6          MR. CRABB:  If I could just finish, Your Honor, with, that

7    regardless of how the Court were to come down on that topic and

8    whatever the legal analysis the Court were to determine were

9    proper, we still believe that based on all the circumstances,

10   namely the cooperation that Mr. Edmond has provided and the crime

11   that he committed and whatever 3553 factors the Court were to

12   deem would be appropriate to consider, that reducing his sentence

13   from life to 40 years is appropriate and is a substantial

14   reduction in a sentence.

15         Unless the Court has any questions, I have nothing further

16   to add.

17         THE COURT:  All right.

18         MR. CRABB:  Thank you, Your Honor.

19         THE COURT:  Thank you, Counsel.

20         Mr. Downs.

21         MR. DOWNS:  Thank you, Your Honor.

22         THE COURT:  Sure.

23         MR. DOWNS:  Your Honor, I would ask that this Court

24   consider the impact that Mr. Edmond's release would have on the

25   District of Columbia.  Specifically I'd ask this Court to

consider the fact that 3553 instructs that the Court promote

respect for the law, and that is directly impacting the citizens

of Colombia.

     In promoting respect for the law, I would ask the Court --

     THE COURT:  But that's assuming that he's eligible to

return to the District of Columbia, which is an open question.

     MR. DOWNS:  I think that is correct, Your Honor.  I don't

know that there's any law that would allow him to be banned for

life, but I candidly have not looked at that issue.  But if he

were to be able to return to an undisclosed location, his release

would still promote respect for the law within the District of

Columbia, because as the Court is fully aware, there is this

culture, especially in some communities, and it's called "stopped

snitching," right?  "Don't snitch, don't cooperate, don't talk to

the government, I don't know anything, I did not see anything."

     However, if Mr. Edmond were released, again, to some

undisclosed location, that would send a message to the community

that cooperating with the government is more advantageous than a

life of crime.  And we're asking the Court to promote respect for

the law; in other words, to try to end this culture of stop

snitching.  And Mr. Edmond has a unique opportunity to do so,

Your Honor, so I would ask this Court to consider that.

     In addition, Your Honor --

     THE COURT:  Counsel, you're asking a lot.  I mean, there

are some people, it appears to be 50 percent of the people who

1    participated in that survey, and I'm sure others, who take the

2    position that, you know, maybe society should thank him for his

3    cooperation, but let the sentence remain the same.

4         MR. DOWNS:  I do -- I think that's correct, Your Honor.  I

5    think it's also notable that 50 percent of the people who said

6    that Mr. Edmond should stay behind bars, none of them had the

7    benefit of understanding the full extent, the full length, the

8    full breadth of his cooperation.  None them knew that while he

9    was behind bars he was meeting with young people on a very

10   consistent basis while he was at a detention center, while he had

11   the opportunity to do so.  None of the 50 percent of the people

12   that said Mr. Edmond should stay behind bars knew that he

13   brokered a truce between Warring factions here in Simple City by

14   using his name, by using the fact that he has sway over these

15   young people in saying "Put the guns down, stop the beef, you

16   don't even know what it's about, so stop all of this violence."

17   The people that said that he should stay behind bars didn't have

18   the benefit of that information, but the Court does.

19        The Court has the benefit of that information.  The Court

20   also has the benefit of the Advisory Sentencing Guidelines, which

21   should also be a guidepost.  I think it's important that the

22   government's position -- while the government does have a

23   position of the 40 years being appropriate, they haven't

24   instructed this Court as to their methodology.  Now, candidly,

25   they're not required to do so.  They're not required to tell this

1    Court how they arrived at their number.

2         I would ask the Court in fashioning a sentence to consider

3    a methodology, and a methodology that has been universally

4    adopted is the Advisory Sentencing Guidelines.  They are

5    important.  They should not just be ignored.  The government

6    hasn't even referenced the Advisory Sentencing Guidelines, and

7    that's for a reason.  The reason is:  Someone with Mr. Edmond's

8    conviction, with the exact same adjusted offense level, meaning

9    they got the same enhancements that he got, would be eligible for

10   a 24-year sentence.  The Advisory Sentencing Guidelines would

11   call for a low-end guideline compliant sentence of 24 years,

12   notwithstanding the fact that that person didn't cooperate,

13   notwithstanding the fact that that person hasn't had years of

14   trying to help young people while they had the opportunity to do,

15   notwithstanding the fact that that person hasn't provided

16   information for 24 years that led to 111 indictments and over 340

17   defendants being charged here in the District of Columbia.

18        And so I think the Court should look at the Advisory

19   Sentencing Guidelines as a guidepost.  We should look at them.

20   And as a starting point, it's notable that the government is

21   asking for a sentence of 16 years in excess of someone that never

22   cooperated at all.  And I think -- Your Honor, I think that would

23   be unjust for a variety of reasons that we've discussed.

24        Another point that the Court -- I would ask the Court to

25   consider is the fact that someone that did cooperate with

1  Mr. Edmond's conviction, a CCE conviction, with the exact same

2  adjusted offence level, meaning the exact same enhancements, has

3  an average reduction to 15.4 years incarceration.  That's an

4  average.  There are some people who got even less than that,

5  7 years, 10 years, but the average is 15 years.  The average

6  should not even be applicable in this case because Mr. Edmond

7  provided above-average cooperation.  Every single person that

8  worked directly with him, all of the agents, said that his

9  cooperation was extraordinary, both in breadth and in substance.

10  Mr. Dominguez --

11        THE COURT:  How do I parse out -- how do I separate out

12  the cooperation vis-à-vis the Pennsylvania case and this case?

13  That's going to be difficult, isn't it?

14        MR. DOWNS:  It will be difficult.  I think the key is that

15  we're not going to ask the Court to consider any testimony that

16  he provided with regard to prison homicides in Pennsylvania.

17        What will be difficult is to say, well, he started

18  speaking with law enforcement in 1994, he provided so much

19  information the officers couldn't get to it until after 1998, and

20  it still remained useful for at least a decade or if not more.

21  That will be nearly impossible to parse out because to do so

22  would be to ignore the information that he provided pre-1998.

23  And I would ask this Court not to ignore that information, but

24  candidly, Your Honor, it will be difficult to parse it out.

25        It's just not possible to say we're going to only consider

information provided as of 1998, because that leaves out a
breadth of information that Agent Benjamin, that Agent Watkins,
both Agent Watkins, both of them said they just could not get to
between '94 and '98 because he provided so much information.  And
it makes sense.  He was meeting with law enforcement officers
five days a week, multiple hours a day, for several months.  They
just couldn't get to all the information.

So I think the sheer breadth of the information that
Mr. Edmond provided is astonishing, the length of cooperation.
He talked to government officials for 24 years, sometimes on a
monthly -- sometimes, you know, five days a week, sometimes on a
monthly basis, but it was for 24 years.  The information he
provided was diverse.  It was not only with regard to prison
homicides in Pennsylvania.  It wasn't only with regard to Cuban
drug dealers or Colombian drug dealers.  We had drug dealers here
in the District of Columbia where Mr. Edmond testified at a
trial, at the Kevin Gray trial.  He was also prepared to testify
in other trials, however, the defendants pled guilty prior to
Mr. Edmond's testimony.

He also provided information, background information, on
multiple cold case homicides directly impacting citizens of the
District of Columbia.  That's important because he's not just
providing historical information or providing one type of
cooperation, he's providing multiple types of cooperation for
two-plus decades, Your Honor.

1          I would ask the Court to consider all of that in

2     fashioning a sentence and not ignore the Advisory Sentencing

3     Guidelines, not ignore the average sentence that someone with

4     Mr. Edmond's conviction and criminal history or lack thereof

5     would have received.

6          THE COURT:  I think probably -- I think it would probably

7     be error for the Court to ignore the guidelines.  I mean, the

8     Supreme Court has instructed District Courts to consult the

9     guidelines.

10          MR. DOWNS:  Yes, Your Honor.  I agree with the Court's

11     analysis.  And in consulting the guidelines, the government is

12     asking for Mr. Edmond to receive a sentence 16 years higher than

13     someone that didn't even cooperate.  I think that's notable,

14     meaning if someone were -- had a CCE conviction that was eligible

15     for -- that their guideline -- the low end would be 292 months,

16     which is 24 -- 24 years or so, Your Honor.  So I think that's

17     notable, Your Honor.

18          I would also ask the Court --

19          THE COURT:  And that's without regard to any cooperation,

20     correct?

21          MR. DOWNS:  Meaning that person didn't cooperate at all,

22     that's correct.  That person had no cooperation, and that

23     person's advisory guideline range would be lower than the

24     government's recommendation.

25          Mr. Edmond cooperated for two-plus decades.  He should

receive a sentence lower than someone that didn't cooperate.  And

I think that's just -- that's only fair.  That sends a message to

people in the community that -- because there are people

watching.  There are people that are considering corroborating,

watching and deciding, "Should I have cooperate?  Is it

advantageous to cooperate with the government?  What's going to

happen to me if I do?"

        And I think it's important that if you cooperate -- if you

reason that if you cooperate, and if you cooperate to the extent

that Mr. Edmond did, meaning you were truthful, you didn't hold

anything back, you never declined to provide information.  The

agents told this Court that some witnesses or some corroborators

say "This information is off limits.  I'm not going to tell you

about X.  I'm not going to tell you about Y because that person

is off limits."  Mr. Edmond never did that.  He was forthcoming

from July 20th, 1994, and I think that's notable, Your Honor.

And while he was corroborating, the agents apparently didn't even

know he was helping children.  He was helping children while he

was at the jail.  He was speaking to kids at Simple City.  And he

was doing so in an environment where his movement was severely

restricted.

        We don't -- I'm not going to get into the details of his

movement, Your Honor, but this Court is aware that the director

of the Bureau of Prisons, the former director, Norman Carlson

mentioned that someone with the same types of restrictions as

Mr. Edmond, their time is harder than someone that does not have those restrictions. In other words, the BOP director said that someone in Mr. Edmond's position does three days for every one day that someone else does, meaning it's three to one. His time is harder than someone else that is not subject to his restrictions. That's not some defense attorney giving information to the Court. That is the director of the Bureau of Prisons testifying before the United States Senate, indicating to the United States Senate that it is harder for people like Mr. Edmond to do time behind bars, and it's a three to one ratio.

So Mr. Edmond has done 30 years more -- actually, a bit more than 30 years. According to the Bureau of Prisons' former director, his time was so difficult over most of that time, that it was almost like doing over 80 years because of how limited and how severe his movement has been restricted. So I would ask the Court to take that into consideration as well.

The 3553 factors also indicate that this Court should take into consideration unwarranted sentencing disparities between defendants. And I certainly don't have to belabor this point because we wrote on it, and I'm sure this Court is aware of it, but it's important for everyone to hear that there are -- that Mr. Dominguez specifically mentioned prosecuting Alpo. That's Alberto Martinez. Mr. Martinez admitted to committing multiple homicides, personally being involved in homicides, in addition to running an enterprise, in addition to being a leader of an

1    enterprise.  He was personally killing people, and he got less

2    time than the government is proposing that Mr. Edmond receive.

3         Sammy "The Bull" Gravano is one of the most notorious

4    criminals in the United States history.  He ran the Gambino

5    family.  He personally admitted to 19 murders.  19 homicides

6    while running the Gambino family, a notoriously entrenched crime

7    family in the United States, and he got significantly less time

8    after  corroborating with the government.

9         I would ask this Court to consider avoiding unwarranted

10   sentencing disparities between people like Alberto Martinez and

11   Sammy "The Bull" Gravano in fashioning a sentence in this case.

12   15 years, Your Honor, is in accordance with the average sentence

13   that someone with Mr. Edmond's background.  With regard to a CCE

14   conviction and his adjusted offense level, 15 years is the

15   average, and he provided above-average cooperation.

16        And lastly, Your Honor, on a very personal note, I was in

17   the hallway earlier, and a gentleman walked up to me and asked

18   not be identified.  And he said Mr. Edmond wouldn't believe

19   this -- oh, I'm sorry.  "You wouldn't believe this, but my

20   brother snitched on Rayful, and my brother is part of the reason

21   why Rayful got 30 extra years in Pennsylvania.  Tell Rayful that

22   I appreciate the fact that he didn't turn his back on my family."

23        He still, Mr. Edmond still respected the people that

24   corroborated against him, didn't seek any retaliation.  The words

25   that the gentleman used was, "He still has love for my family."

1    That is notable.  That shows you what type of person Mr. Edmond

2    is.  That is the -- that's the person that John Dominguez has

3    gotten know.  That's the person that the agents have gotten to

4    know.  That's the person that Bishop Steadman and Mr. Parker, all

5    the person that know Mr. Edmond personally, that's who he is

6    today.  He's not the same person he was 1994.

7         This is last but least, Your Honor.  I would be remiss if

8    I didn't use this opportunity to thank Mr. Edmond for every time

9    he calls me personally.  He knows that his time on the phone with

10   me is very limited, and we can't talk forever, for many reasons,

11   not least of which is that his timeframe is limited where he is,

12   and the nature of my practice, as I'm always business.  It's just

13   the nature of my practice.  Mr. Edmond uses the first ten minutes

14   or so, no matter how much of a rush I'm in, to ask me about my

15   family, how's my family doing, "I'm praying for your family, I

16   hope your family is okay."  He does that knowing that that is

17   very, very important to me on a very personal level.  He knows

18   that his time is limited.  He's not selfishly trying to only talk

19   about his case.  He literally calls sometimes just to check on my

20   family.  And I would ask the Court to give me permission to

21   publically thank Mr. Edmond, because I'm very much -- I very much

22   appreciate that he -- the first thing he says when he calls all

23   the time is, "How's your daughter?"  Every time.  And that's a

24   very, very important question to my family, and I very much

25   appreciate it.

1       Thank you, Your Honor.

2       THE COURT:  All right.  Thank you, Counsel.

3       Just thinking outside of the box a little bit.  I want to

4  give an answer from the Probation Department to the question that

5  the Court asked the probation officer about:  Hypothetically,

6  when would he be eligible?  I think that -- and I'd rather get

7  the answer before counsel have to file their submission so you

8  can respond to the answer.

9       So, Ms. Kraemer-Soares, I don't know, ten days, would that

10 be enough time?

11      THE PROBATION OFFICER:  Yes.

12      THE COURT:  All right.  Mr. Crabb, did you want to say

13 something?  Did you want to respond to the argument made?

14      MR. CRABB:  If I could briefly, Your Honor.

15      THE COURT:  Sure.

16      MR. CRABB:  The Court's pointed out, since it's the

17 government's motion, if I could reply very briefly?

18      THE COURT:  Yeah, sure.

19      MR. CRABB:  Also if the Court has any questions, there's

20 just three points I'd like to make.

21      One, with respect to the defense's arguments about the

22 guidelines, and I believe the defense's position is that

23 Mr. Edmond's guidelines would be 24 years.  Our position is

24 that's irrelevant.  Mr. Edmond was convicted of CCE and received

25 a mandatory life sentence.  That's the mark we're working from,

1    not a guideline sentence, advisory or other otherwise.  Back in

2    1989 they were mandatory, now they're advisory.

3         THE COURT:  But the question becomes:  Would that -- would

4    there be a mandatory life sentence option if he were sentenced

5    today, originally sentenced today?

6         MR. CRABB:  Yes, Your Honor.  If we went to trial on

7    Mr. Edmond and proved the same case we proved in 1989, the CCE

8    statute is the same.  It hasn't been changed by the First Step

9    Act, it hasn't been changed by other reforms.  The crime that

10   Mr. Edmond was convicted of in 1989 still carries a mandatory

11   life sentence, and that's the sentence that would be imposed if

12   you were convicted of the same crime.  We believe that's the

13   benchmark the Court should look at, not what the evidence might

14   establish for a different crime such as a Title 21 848 conspiracy

15   to distribute drugs, which might have a guideline similar to what

16   the defense is saying.  But the CCE statute hasn't changed, and

17   it would still carry a mandatory life if the same case were

18   presented against Mr. Edmond and the jury came to the same

19   conclusion.

20        So we ask the Court to use that as the benchmark to

21   measure whatever reduction the Court deems appropriate as a

22   measure from mandatory life, and we believe that's a substantial

23   reduction.  One would have to look at actuarial tables to

24   determine about reduction.  When we're talking about life, we

25   understand it's complicated.  It's not a term of years being

1   reduced by a specific period of time, but we still believe that a

2   reduction from mandatory life to 40 years is a substantial

3   reduction, and that the life is the more appropriate benchmark to

4   measure from.

5          The second point, very briefly, I'd like to ask the Court

6   to consider:  With respect to Mr. Edmond's time in prison being

7   more difficult, we're not quibbling with the defense, but we just

8   asking the Court to consider, that's the product of what -- the

9   situation Mr. Edmond was in, Mr. Edmond's cooperation, so it's

10  not really appropriate to say his time was more difficult than

11  others, when that was all a product of his actions, his choices,

12  and how he got here today vis-à-vis cooperating.

13         And the last factor we'd ask the Court to consider, and we

14  pointed out in our papers:  Cooperation is very fact-specific,

15  and when the defense talks about unwarranted sentencing

16  disparities, it's really apples and oranges, and it's very

17  difficult to compare one cooperator to another.  Often the

18  parties in other cases aren't aware of all the cooperation in

19  certain cases, and we believe we're asking for an appropriate

20  sentence here.

21         But if the Court would indulge me one moment.  Despite the

22  fact that it's very difficult to compare cooperation, when the

23  defense mentions Sammy "The Bull" Gravano, what the defense

24  doesn't mention is Sammy "The Bull" Gravano was a key witness in

25  taking down John Gotti, who led one of the major crime families

1   in New York City.  Mr. Edmond did nothing of that magnitude in

2   the cooperation that's here before the Court, so we ask the Court

3   not to indulge in some of these comparisons of apples and oranges

4   and other cooperations, and don't believe that's creating any

5   unwarranted sentencing disparities.

6        Unless the Court has any questions, I have nothing

7   further.

8        THE COURT:  All right.

9        MR. CRABB:  Thank you.

10        THE COURT:  Ms. Kraemer-Soares, let me ask you:  Do you

11   agree with what Mr. Crabb just said about whether or not a

12   sentence of mandatory life is still available under the statute?

13        THE PROBATION OFFICER:  Yes, Your Honor.  I brought the

14   statute book for this part of the hearing, and I was looking at

15   it, and it is the 840- -- 21 U.S.C. 848(b).  It's still a life

16   sentence --

17        THE COURT:  All right.

18        THE PROBATION OFFICER:  -- to be imposed.

19        THE COURT:  All right.  Mr. Downs, what about that?  I

20   mean, it's still on the books.

21        MR. DOWNS:  It is still on the books, Your Honor.  There

22   are a few things that are notable.  First, is that operating

23   under Rule 35, obviously mandatory life is no longer life on the

24   table because there are no mandatory minimums under Rule 35.

25        But, second, Your Honor, even if someone -- even if we

1  take off Rule 35 from the equation and we're just talking about a

2  person that went to trial, was convicted with no record, as

3  Mr. Edmond was when he went to trial, that person would

4  theoretically still be eligible for not a cooperation reduction

5  but for a safety valve reduction, and could not -- didn't have to

6  cooperate for 24 years straight and still wouldn't have to do a

7  life sentence, so I think that's notable as well.

8          So the first response is under a Rule 35, life -- a

9  mandatory sentence is not -- it's no longer mandatory because of

10  Rule 35(b).

11         And, second, even if someone went to trial, did not get a

12  Rule 35 reduction, but instead had Mr. Edmond's lack of a

13  criminal record, which he had at the time, still could do a

14  safety valve and not have to do a mandatory life.

15         THE COURT:  You know, Counsel, why don't you take the

16  opportunity also to comment on something that was attributed to

17  by Mr. Dominguez and I believe your client as well, that when

18  incarcerated, there are certain expectations from your fellow

19  inmates --

20         MR. DOWNS:  Yes.

21         THE COURT:  -- that what brought you there should continue

22  to be a part of your lifestyle.

23         MR. DOWNS:  Absolutely.

24         THE COURT:  That's something that the public doesn't

25  really understand.

1      MR. DOWNS:  It is -- USP Lewisburg is called a USP for a

2  reason.  It's a United States penitentiary.  We're not talking

3  about an FCI.  We're not talking about a medium-level security

4  facility.  This is a maximum security facility where the most

5  violent offenders were held at the time.  And in that facility,

6  when you refuse to offer someone what they call a connect or a

7  connection, that is -- that is an offense that could have

8  people -- that could cause enemies just by saying no.  If you

9  say, "No, I can't do it for whatever reason because I don't know

10  the connect, I don't have the time or the person won't talk to

11  me," that is the kind of thing that could cause a retaliation on

12  the spot.  Mr. Edmond personally witnessed people getting

13  stabbed, personally witnessed people getting killed in

14  USP Lewisburg.  This isn't hypothetical.  This is documented.

15  The Bureau of Prisons keeps track of how violent USP Lewisburg

16  was and is.  I am happy to provide those statistics.  I will look

17  those statistics up if the Court requires, but the point that

18  Mr. Dominguez was making and that Mr. Edmond was making is that

19  if you refuse that type of request at USP, you could get killed

20  for refusing the request.

21      So when Mr. Edmond was approached by the agents and they

22  gave him a way out and said, "We're not going to offer you

23  anything," Mr. Edmond was trying to stay alive and get out of the

24  drug game.  He wasn't looking for a Rule 35 reduction.  He didn't

25  mention his mother.  He was in an environment where he could have

1 gotten killed for refusing to provide a connection to an inmate.

2 This was his opportunity to get away from the drug game without

3 getting killed, and he took that opportunity and made the very

4 best out of it that he could, not only for himself but for the

5 citizens of the District of Columbia.

6 THE COURT:  All right.

7 MR. DOWNS:  Thank you, Your Honor.

8 THE COURT:  All right.  So I want your best thoughts.  If

9 I give the Probation Department ten days to provide an answer to

10 the Court's question about eligibility for release if the Court

11 were to hypothetically impose a 480-month sentence today, then

12 what's reasonable for counsel to either submit a joint

13 proposed -- joint proposed facts, Findings of Fact, conclusions

14 of law, or individual proposed Findings of Fact conclusions of

15 law?  I mean, what makes sentence?

16 Why don't you -- I'm going to invite you up also,

17 Mr. Crabb.  I doubt if you'll be able to -- but to the extent you

18 can give me a joint submission that you agree on, fine.  It may

19 be brief, but it'll be helpful.  It'd be something else that the

20 Court doesn't have to delve into and try to determine what's

21 factually appropriate or not.

22 But what makes sense?  I think the government should go

23 first, unless you're able to agree.

24 MR. CRABB:  Your Honor, we agree and would endeavor to at

25 least give the Court what common ground we have --

1          THE COURT:  Sure.

2          MR. CRABB:  -- and at least to reduce the issues the Court

3     needs to rule on.

4          May I ask:  Is the Court contemplating Findings of Fact,

5     any additional briefing, any legal issues, or is this simply

6     Findings of Fact the Court is expecting?

7          THE COURT:  Well, to the extent you wish to supplement

8     your -- the legal principles that have already been alluded to in

9     the motion to compel and the defendant's response, you can, or

10    repeat them in one concise pleading.

11         I can tell you that the Court is favorably disposed to

12    take a hard look at the 7th and 9th Circuit opinions that give

13    the Court the discretion, because this is a discretionary call.

14    That gives the Court the discretion to look at, essentially, all

15    the 3553 factors without limitation, but I'm going to keep an

16    open mind.  That's not a ruling of law.  I'm going to look at the

17    other authorities as well.

18         So it probably would be helpful to have one complete

19    submission from the government and one complete submission from

20    defense counsel.  And, again, to the extent you can agree on

21    something, that's fine.

22         So then you have to order a transcript.  It's been a

23    day-long hearing.  I mean, the stakes are awfully high.

24         And, Mr. Edmond, I take this matter very seriously.  I've

25    said that, and that's one reason why you're here because I do

 1    take this matter very seriously, but to be quite candid, you're

 2    asking a lot.  I'm going to keep an open mind now.  You have an

 3    excellent lawyer, by the way, who's dotting I and crossing

 4    every T as well.  He should because the stakes are high.

 5         So I don't want to be stingy about the time.  What makes

 6    sense?

 7         MR. CRABB:  I'm sorry, Your Honor.  Did the Court ask

 8    probation to provide the answer about the type of credits within

 9    ten days?  Is that --

10         THE COURT:  Is that reasonable?  Would that be enough

11    time?

12         THE PROBATION OFFICER:  (Nodded head affirmatively.)

13         THE COURT:  All right.

14         MR. CRABB:  And I think without ordering it on an absolute

15    overnight turnaround, we should be able to get the transcript

16    within that same time period?  You know, we'd ask the Court --

17         THE COURT:  You probably could get one about 6:00 today if

18    you wanted it.  No, what's reasonable?  I don't know what the

19    limitations are on the court reporter.

20         MR. CRABB:  I suspect we'll be able to work something out

21    to get it within that ten-day period.

22         So, Your Honor, having said that, for me to get the

23    transcript and review it and have this answer, we'd ask for 14

24    days after -- well, 34 days total, the ten days for the

25    transcript and the answer, and then two weeks after that to be

1    able to --

2         THE COURT:  That's fine.  Will that be enough time?

3         MR. CRABB:  I'm sorry, Your Honor?

4         THE COURT:  Will that be enough time?

5         MR. CRABB:  I think so, Your Honor.  Thank you.

6         THE COURT:  All right.  So that takes us to -- today's the

7    17th.  Why don't I just give you until the end of November.

8    That's --

9         MR. CRABB:  Thank you, Your Honor.  That will work.  The

10   29th?

11        THE COURT:  The 30th or -- the 30th, I mean, 29th is the

12   day after -- let's just say December the 2nd --

13        MR. CRABB:  Yes, Your Honor.

14        THE COURT:  -- because of Thanksgiving weekend.

15        And for defense counsel, I don't want to jam you up in the

16   month of December, but how much time do you need, Counsel?

17        I'm not trying to force you to get your pleading in before

18   the end of December, but I'm -- I want to accommodate you as

19   well, so what can I do?

20        MR. DOWNS:  Would the Court give us until the beginning of

21   January?

22        THE COURT:  Absolutely.  Of course.  Give me a date.

23        MR. DOWNS:  Court's brief indulgence.

24        Would the Court give us until January 10th, Your Honor?

25        THE COURT:  Sure.  Of course.  I'm not sure that a reply

1   pleading would be -- you know, some on the best pleadings are as

2   a result of reply briefs, so I'm going to assume that both sides

3   can't agree on too much.  So maybe any final reply by the --

4   let's see, the 20th is Dr. King's birthday -- by the 22nd of

5   January.

6          MR. CRABB:  Thank you, Your Honor.

7          THE COURT:  All right.  For the hearing, you know, I'm not

8   going to rule it out.  I guess the companion question would be

9   whether we need Mr. Edmond present.  I think not, but I want to

10  hear from counsel.  And if so, I can set a tentative date for a

11  hearing where he could participate by closed circuit.  It gets a

12  little tricky, though, because the first hearing was a status

13  hearing.  It wasn't really an adversarial proceeding, so he's not

14  brought in, and that kind of -- that hinders your ability to talk

15  to your client.  So help me out here.  Let me -- help me think

16  through this issue.  What makes more sense?

17         MR. DOWNS:  We're actually requesting closed circuit, Your

18  Honor.

19         THE COURT:  You are?

20         MR. DOWNS:  It should be a closed circuit.

21         THE COURT:  All right.  We'll --

22         MR. DOWNS:  It appears --

23         THE COURT:  I mean, I've done that.  I can tell you it's

24  going to inhibit your ability to hear from your client or to

25  speak to your client, unless you're -- I'm not trying to tell

1    your co-colleague to catch a plane and go wherever, but it's

2    going to inhibit -- you're not going to be able to talk to your

3    client.

4          MR. DOWNS:  Court's indulgence.

5          THE COURT:  Yeah, sure.  And that gets tricky also because

6    of other issues.

7          (Discussion had off the record between attorney and

8    client.)

9          THE COURT:  Actually, that's probably not -- I'm going to

10   think through this myself.  That's probably not even an option

11   for someone to be where your client is, so...

12         MR. DOWNS:  We would actually --

13         THE COURT:  I hadn't thought about that, but I think --

14   yeah.  So it's not -- in other words, I've had hearings where

15   someone was with a client wherever that client was.  That's not a

16   possibility here.

17         MR. DOWNS:  That is going to be -- I can't confirm that's

18   a possibility here.  I don't --

19         THE COURT:  Well, I can probably --

20         MR. DOWNS:  I don't know, though.

21         THE COURT:  I can probably confirm it for you, but --

22         MR. CRABB:  May I have a moment to confer with one --

23         THE COURT:  Yeah, sure.

24         MR. CRABB:  -- of the marshals?

25         THE COURT:  Yeah.

1              (Discussion had off the record.)

2         THE COURT:  Thank you, Marshal.

3         MR. CRABB:  Thank you, Your Honor.  The Court's correct,

4    that won't be feasible to have someone --

5         THE COURT:  I didn't think so.  All right.  So it gets

6    very complicated.

7         MR. DOWNS:  I've spoken to Mr. Edmond.  Mr. Edmond

8    understands, and we as a defense understand the Court's concern.

9    We are asking for the Court to allow Mr. Edmond to appear via

10   closed circuit television.  It would be --

11        THE COURT:  Even though --

12        MR. DOWNS:  For a few different reasons, Your Honor.  I'm

13   happy to approach, but we are asking for it to be via CCTV.

14        THE COURT:  I mean, I don't have any problems with that.

15   I'm just always concerned when a client can't say anything to his

16   attorney.  That's all.  Because there were a couple of times this

17   morning that I noticed your client wanted to say something to

18   you.

19        MR. DOWNS:  Oh, absolutely.  We communicate on a very --

20        THE COURT:  Right.

21        MR. DOWNS:  -- consistent basis.

22        THE COURT:  Right.

23        You okay with that?

24        THE DEFENDANT:  Yeah.  I'm good with it.

25        THE COURT:  All right.  That's fine, I just -- you know, I

1    just don't -- let me think about that.

2         We can pick a date.  What -- do you want to suggest a

3    date, Counsel?  If I can accommodate both sides, I will.

4         MR. DOWNS:  Court's indulgence.

5         THE COURT:  And this all may be for not.  It may well be

6    that after I get your submissions there's not a need to have

7    further argument.

8         MR. DOWNS:  Your Honor, I stand on our prior argument.  I

9    don't know that we need other arguments.  I'm happy to schedule

10   one if the Court is inclined to schedule it.  I would pick a date

11   that is convenient for the Court.

12        THE COURT:  It's probably easier to do that then wait

13   until mid-January and then try and do it, because then we're

14   looking later in the year.  And, you know, it may well be that if

15   the Court has questions, the Court can pose those questions in

16   writing.  I don't know.  I mean, there are a lot of -- I think

17   the better part of judgment's to go ahead and select a hearing

18   date, recognizing that there may not be one.  I mean, this is a

19   fully-developed record, pretty much.  I'm not sure I'm going to

20   be surprised by anything new, but I want the benefit of the best

21   thoughts of counsel, with respect to the proposed findings.

22   Because it's still kind of a murky issue I'm going to have to

23   parse through, and that's not going to be an easy job for counsel

24   or the Court.

25        MR. DOWNS:  Yes, Your Honor.  Would the Court be inclined

1   to set a hearing on the 31st, or is that not enough time, January

2   31st?  Is that -- would that give the Court enough time to

3   consider the pleadings?

4       THE COURT:  Um, probably not.  I'm starting a trial the

5   28th of January, and that may be a couple of weeks or so.  I

6   don't want to unduly delay this.

7       What about the 12th, the 12th of February?

8       MS. COLLINS:  Your Honor, can I get out my phone to check

9   my calendar, please?

10      THE COURT:  Sure.

11      (Brief pause in proceedings.)

12      MR. DOWNS:  The 12th is fine with the defense.

13      THE COURT:  All right.  At 11 a.m.?

14      MR. DOWNS:  Yes, Your Honor.

15      THE COURT:  All right.  And, again, there's a significant

16   likelihood I may just cancel that hearing.

17      MR. DOWNS:  Yes, Your Honor.

18      THE COURT:  All right.  Anything further?

19      MR. DOWNS:  Not from the defense.

20      THE COURT:  From the government?

21      MR. CRABB:  No, Your Honor.

22      THE COURT:  Ms. Kraemer-Soares, anything?

23      THE PROBATION OFFICER:  No, Your Honor.

24      THE COURT:  Okay.  Let me thank everyone.  And, again, I

25   overlooked the Court security officers this morning.  Thank you.

1    We could not have done this without your help, so thank you very

2    much.  And especially, again, the marshal service.  Thank you

3    very much for your attention.

4         And I'm going to wait and allow Mr. Edmond to be excused.

5         Mr. Edmond, take care.  We'll talk again.

6         All right.  Thank you.  The parties are excused.  Thank

7    you very much.

8         (Proceedings adjourned at 4:52 p.m.)

9
                    **C E R T I F I C A T E**
10

11              I, Scott L. Wallace, RDR-CRR, certify that
          the foregoing is a correct transcript from the record of
12        proceedings in the above-entitled matter.

13
          /s/ Scott L. Wallace              10/29/19
14
          ----------------------------      ----------------
15        **Scott L. Wallace, RDR, CRR           Date**
          **Official Court Reporter**
16

17

18

19

20

21

22

23

24

25

# C O N T E N T S

**EXAMINATIONS**                                                **Page**

  DIRECT EXAMINATION OF STEVEN BENJAMIN              45
  BY MR. DOWNS:
  DIRECT EXAMINATION OF BARBARA WATKINS             60
  BY MR. DOWNS:
  DIRECT EXAMINATION OF RICK WATKINS                63
  BY MR. DOWNS:
  DIRECT EXAMINATION OF JOHN DOMINGUEZ              72
  BY MR. DOWNS:
  DIRECT EXAMINATION OF STEVEN BENJAMIN (continued) 109
  BY MR. DOWNS:
  DIRECT EXAMINATION OF TYRONE PARKER               111
  BY MR. DOWNS:
  DIRECT EXAMINATION OF WILLIE WILSON               119
  BY MR. DOWNS:
  DIRECT EXAMINATION OF THSON ROWE                  125
  BY MR. DOWNS:
  DIRECT EXAMINATION OF PATRINA STEADMAN            130
  BY MR. DOWNS:
  DIRECT EXAMINATION OF RAYFUL EDMOND               136
  BY MR. DOWNS:

## EXHIBITS

**DESCRIPTION**                                                 **Page**

## $

**$40,000** [1] - 124:10
**$400** [1] - 6:9

## '

**'80** [1] - 45:25
**'90s** [5] - 60:12, 14; 99:4, 8; 131:18
**'92** [1] - 80:23
**'94** [5] - 69:5; 80:24; 90:22; 179:4
**'97** [2] - 112:20; 113:8
**'98** [4] - 69:6; 90:22; 112:20; 179:4

## /

**/s** [1] - 200:13

## 1

**1** [23] - 5:25; 6:6; 7:3; 17:4, 17; 18:15, 23; 19:2; 26:3, 5; 57:8, 14; 62:11, 13; 67:20; 87:19, 21; 97:25; 106:21
**1,700** [1] - 140:25
**1,800** [1] - 139:12
**10** [16] - 57:8, 10, 15, 20-21; 62:11, 13; 67:20, 25; 88:6; 97:25; 98:13; 101:25; 147:4; 157:20; 178:5
**10/29/19** [1] - 200:13
**100** [1] - 35:25
**1023** [1] - 173:6
**1048** [1] - 173:6
**1080** [1] - 6:2
**109** [1] - 201:8
**10:00** [1] - 1:6
**10:28** [1] - 3:2
**10th** [3] - 15:15; 172:22; 194:24
**11** [14] - 6:7, 12; 7:3; 17:4; 18:24; 19:4; 57:16, 23; 62:13; 67:21, 25; 121:15; 199:13
**11-844** [1] - 1:16
**111** [3] - 38:11; 177:16; 201:9
**119** [1] - 201:10
**11:15** [3] - 120:17; 121:16
**11:30** [2] - 23:17; 43:18
**11th** [3] - 16:13, 17; 172:20
**12** [1] - 88:7
**12-year** [1] - 113:20
**125** [1] - 201:11
**12th** [3] - 199:7, 12
**130** [1] - 201:12
**136** [1] - 201:13
**13th** [1] - 12:16
**14** [9] - 5:25; 6:7, 12; 7:3; 17:4; 18:25; 46:2; 54:21; 193:23
**15** [20] - 5:25; 6:7, 12; 7:3; 17:4; 18:25; 20:20, 24; 32:7; 41:12; 43:22; 101:24;

102:1, 10; 147:4; 157:20; 163:15; 178:5; 183:12, 14
**15.4** [2] - 41:13; 178:3
**16** [11] - 1:6; 3:1; 5:25; 6:7, 12; 7:3; 17:4; 18:25; 107:2; 177:21; 180:12
**17** [3] - 6:4; 130:23; 139:11
**17th** [1] - 194:7
**18** [9] - 5:21, 25; 6:7, 12; 7:3, 17; 9:9; 17:5; 18:25
**19** [2] - 183:5
**1973** [1] - 63:11
**1976** [1] - 45:24
**1980** [2] - 45:25; 46:1
**1984** [2] - 3:18; 72:9, 14; 100:19
**1986** [1] - 86:24
**1988** [1] - 69:9
**1989** [7] - 6:19; 25:25; 72:24; 83:11; 186:2, 7, 10
**1990** [8] - 5:14; 6:4, 14; 56:7; 83:11; 103:17; 140:18; 141:6
**1990s** [1] - 26:8
**1991Judge** [1] - 6:22
**1994** [21] - 3:22; 37:21; 38:1; 42:10, 25; 46:6, 21; 58:21; 64:13, 15; 70:22; 74:5; 83:24; 123:7; 136:25; 139:3, 10; 141:21; 178:18; 181:16; 184:6
**1995** [4] - 6:3, 24; 17:4; 18:2
**1996** [1] - 7:4
**1997** [2] - 7:9; 113:9
**1998** [15] - 38:3; 42:11, 17-18; 46:3; 56:7; 69:7, 10; 80:3; 81:6; 90:9, 11; 120:16; 178:19; 179:1
**1999** [1] - 87:1
**1:00** [3] - 43:16; 45:4; 106:2
**1:03** [1] - 107:1

## 2

**2** [8] - 6:1, 6, 11, 25; 12:20; 17:3, 8; 18:1
**2.1** [2] - 71:14; 97:3
**20** [4] - 1:23; 100:13; 122:25; 145:4
**200** [1] - 68:3
**20001** [1] - 2:6
**2002** [1] - 90:15
**2003** [1] - 91:18
**2008** [1] - 63:11
**2018** [2] - 17:8; 148:24
**2019** [6] - 1:6; 3:1; 107:2; 122:20; 132:18; 169:21
**202** [5] - 1:17; 71:15; 95:17; 97:4; 153:9
**202.354.3196** [1] - 2:6
**20530** [2] - 1:16, 21
**20th** [12] - 37:21; 42:25; 46:21; 70:22; 74:5; 136:25; 139:3, 10; 140:18; 141:21; 181:16; 195:4
**21** [6] - 6:23; 7:1; 118:1; 186:14; 188:15

**21201** [1] - 1:24
**21st** [2] - 4:10; 11:11
**224** [2] - 171:17; 172:9
**22nd** [1] - 195:4
**239** [1] - 14:1
**24** [12] - 38:6; 131:11; 140:7; 141:5; 177:11, 16; 179:10, 12; 180:16; 185:23; 189:6
**24-year** [3] - 103:15; 131:17; 177:10
**24/7** [1] - 53:8
**243** [1] - 14:1
**24th** [2] - 7:9; 11:13
**25** [4] - 141:5; 156:25
**252-1794** [1] - 1:17
**264** [1] - 20:19
**265** [1] - 16:15
**27** [1] - 99:15
**27th** [2] - 6:14; 15:23
**28** [4] - 14:2; 42:9, 13; 74:14
**28th** [2] - 6:24; 199:5
**29** [1] - 125:11
**292** [2] - 17:19; 180:15
**29th** [2] - 194:10
**2:00** [1] - 106:19
**2:15** [1] - 106:22
**2:21** [1] - 107:3
**2nd** [5] - 172:3, 20, 23; 173:8; 194:12

## 3

**3,000** [1] - 148:19
**30** [13] - 4:8; 7:11; 55:23; 61:10; 102:9, 11; 122:20, 25; 145:4; 182:11; 183:21
**30-some** [1] - 158:9
**30th** [4] - 9:21; 16:5; 194:11
**31st** [3] - 12:6; 199:1
**32** [1] - 99:17
**34** [3] - 17:10; 99:17; 193:24
**340** [2] - 38:11; 177:16
**35** [27] - 8:1; 9:10; 25:2, 4, 10; 68:2; 71:7, 14; 95:15, 18; 98:8; 167:15; 168:18, 20; 169:24; 170:11; 171:8, 11; 188:23; 189:1, 8, 12; 190:24
**35(b** [6] - 15:22; 80:4; 90:25; 95:25; 104:4; 173:5
**35(b)** [3] - 96:2; 149:6; 189:10
**35(b)(2)(C)** [1] - 4:4
**3553** [12] - 9:9; 169:25; 170:8, 14; 171:4, 12; 172:4, 18, 24; 174:11; 175:1; 182:17; 192:15
**3553(a** [2] - 173:3, 9
**3553(e)** [1] - 18:21
**3584(a** [1] - 7:17
**365** [1] - 17:19
**3:32** [1] - 162:17
**3rd** [2] - 6:22; 16:8

203

## 4

**40** [13] - 4:6; 17:16, 19; 27:9; 125:24; 157:1; 163:2; 168:12; 169:14; 170:22; 174:13; 176:23; 187:2
**410** [2] - 1:24
**43(b)(4)** [1] - 21:12
**441** [1] - 12:17
**45** [1] - 201:4
**46** [2] - 119:11
**462-4529** [1] - 1:24
**48** [3] - 6:7; 102:2; 165:14
**480** [3] - 4:6; 163:2, 9
**480-month** [1] - 191:11
**49.6** [1] - 9:25
**4:02** [1] - 162:18
**4:52** [1] - 200:8
**4th** [1] - 172:21

## 5

**5** [10] - 5:19, 25; 6:6, 11; 7:3, 5; 17:4; 18:24; 19:3; 107:10
**5(g** [1] - 17:6
**50** [4] - 5:19; 175:25; 176:5, 11
**50.4** [1] - 9:24
**500** [1] - 103:4
**501** [1] - 107:11
**501C** [1] - 112:2
**507** [1] - 107:11
**510** [3] - 9:22; 13:12, 25
**52** [1] - 6:2
**55** [1] - 157:1
**555** [2] - 1:15, 20
**5D** [1] - 107:10
**5th** [2] - 169:21; 172:19

## 6

**6** [4] - 86:22; 87:11, 14, 19
**60** [2] - 6:6; 201:5
**63** [1] - 201:6
**6503** [1] - 2:5
**663** [2] - 173:5
**6:00** [1] - 193:17

## 7

**7** [4] - 169:22; 171:18; 172:15; 178:5
**72** [1] - 201:7
**7th** [3] - 172:20; 173:2; 192:12

## 8

**8** [1] - 12:18
**80** [1] - 182:14

**840** [1] - 188:15
**846** [1] - 7:1
**848** [1] - 186:14
**848(b)** [1] - 188:15
**85** [2] - 163:6; 165:14
**89-162** [5] - 1:4; 3:4; 73:2; 107:5; 162:20
**8th** [1] - 172:21

## 9

**901** [1] - 1:23
**995-7200** [1] - 1:25
**9th** [5] - 172:3, 23; 173:1, 8; 192:12

## A

**a.m** [4] - 1:6; 3:2; 23:17; 199:13
**ability** [8] - 52:16; 85:10; 117:7; 122:10; 123:8; 155:24; 195:14, 24
**able** [48] - 11:25; 15:6; 27:20; 28:5; 30:18; 38:8; 40:15; 48:10; 57:3; 69:5; 75:10; 77:5; 81:4; 88:18; 91:17; 92:25; 96:1; 102:1; 109:18; 115:17; 116:22; 117:6; 121:25; 128:17; 140:7; 143:16, 22; 151:20, 23; 152:1; 154:12, 16, 18, 23; 156:5; 160:13; 161:16; 162:23; 172:7; 175:10; 191:17, 23; 193:15, 20; 194:1; 196:2
**above-average** [2] - 178:7; 183:15
**above-entitled** [1] - 200:12
**absent** [1] - 94:22
**absolute** [1] - 193:14
**absolutely** [10] - 20:23; 24:23; 88:21; 114:25; 119:17; 127:24; 133:5; 189:23; 194:22; 197:19
**abuse** [1] - 94:18
**abusing** [1] - 93:5
**accessible** [2] - 12:17, 20
**accident** [1] - 100:6
**accommodate** [2] - 194:18; 198:3
**accomplice** [1] - 89:9
**accomplish** [2] - 94:6; 155:25
**accomplished** [1] - 116:19
**accordance** [1] - 183:12
**according** [3] - 6:13; 9:22; 182:12
**accordingly** [1] - 121:20
**accountable** [2] - 102:20; 104:2
**accounted** [1] - 27:1
**accurate** [3] - 39:19; 147:23
**accurately** [1] - 88:4
**acknowledge** [1] - 114:19
**acknowledged** [1] - 173:25
**acquainted** [1] - 26:12
**Act** [2] - 165:25; 186:9
**acted** [1] - 82:14
**action** [3] - 25:15; 119:18; 125:21
**Action** [1] - 1:4

**actions** [1] - 187:11
**actively** [1] - 11:22
**activists** [1] - 40:10
**activities** [2] - 55:21; 90:17
**activity** [5] - 79:20; 163:14; 165:15, 20; 166:6
**acts** [1] - 50:1
**actual** [3] - 13:15; 30:2, 5
**actuarial** [1] - 186:23
**ad** [1] - 105:12
**add** [3] - 31:3; 170:23; 174:16
**added** [3] - 17:12; 97:20
**addiction** [1] - 99:10
**addition** [8] - 28:6; 30:5; 39:4, 23; 159:8; 175:23; 182:24
**additional** [3] - 91:1; 192:5
**address** [18] - 3:17; 4:24; 12:9; 16:6; 20:3; 24:6, 22; 27:10, 15; 31:17; 55:14; 79:13; 159:11; 167:8; 169:17
**addressed** [6] - 27:19; 123:23; 124:5; 170:3; 172:8
**addresses** [1] - 18:19
**addressing** [1] - 84:11
**adduce** [1] - 6:18
**adduced** [1] - 49:6
**adjective** [1] - 104:23
**adjourned** [1] - 200:8
**adjudication** [1] - 4:15
**adjusted** [4] - 41:11; 177:8; 178:2; 183:14
**adjustment** [1] - 17:14
**administer** [1] - 11:7
**admissible** [1] - 29:8
**admitted** [2] - 182:23; 183:5
**Adolph** [2] - 152:18; 153:1
**adopted** [3] - 170:14; 173:8; 177:4
**adult** [2] - 10:19, 22
**adults** [1] - 126:3
**advantage** [2] - 77:3; 147:5
**advantageous** [2] - 175:18; 181:6
**adversarial** [1] - 195:13
**advice** [1] - 78:17
**advisement** [1] - 4:16
**advisory** [3] - 180:23; 186:1
**Advisory** [6] - 176:20; 177:4, 6, 10, 18; 180:2
**ADX** [1] - 140:4
**affecting** [1] - 74:22
**affidavit** [4] - 86:21; 87:15; 89:6, 20
**affirmatively** [1] - 193:12
**affirmed** [1] - 6:1
**afford** [4] - 21:14; 118:6; 160:18; 161:17
**afforded** [1] - 162:4
**afternoon** [17] - 80:16; 108:8, 12, 23-24; 109:3; 111:17, 23-24; 118:22; 124:24; 130:13
**AFTERNOON** [1] - 107:2
**afterwards** [1] - 84:8

**age** [1] - 5:21
**ageing** [1] - 131:8
**agencies** [1] - 123:17
**agency** [1] - 58:2
**agent** [7] - 45:9, 25; 46:5; 53:4; 67:8; 110:5; 137:16
**Agent** [10] - 45:9; 67:5; 108:16; 109:3; 141:16; 151:21, 24; 179:2
**agent's** [1] - 45:24
**agents** [13] - 57:4; 75:18, 20; 87:1; 103:12; 137:19, 24; 141:9; 178:8; 181:12, 17; 184:3; 190:21
**agents'** [1] - 80:8
**ages** [1] - 117:23
**ago** [9] - 25:5; 79:5; 103:25; 120:3, 11; 122:13, 25; 158:9
**agree** [15] - 6:20; 7:21; 48:12; 110:3; 141:24; 146:19; 161:12, 19; 180:10; 188:11; 191:18, 23-24; 192:20; 195:3
**agreed** [5] - 26:18, 21; 64:23; 93:8; 96:7
**agreement** [5] - 7:2; 26:20; 90:23; 91:4; 142:21
**Aguilera** [5] - 81:19, 22, 24; 82:12, 14
**ahead** [3] - 115:5; 167:6; 198:17
**aid** [3] - 5:22; 9:5; 37:2
**aided** [1] - 2:8
**air** [1] - 49:2
**Albany** [2] - 46:5
**Alberto** [3] - 101:23; 182:23; 183:10
**alive** [1] - 190:23
**allegation** [2] - 16:3; 149:22
**allegations** [1] - 149:20
**alleged** [1] - 6:20
**Allenwood** [4] - 63:20; 137:8; 143:7
**Alliance** [7] - 112:1, 4, 12, 23; 115:8; 119:24; 120:4
**allow** [5] - 23:17; 34:13; 175:8; 197:9; 200:4
**allowed** [6] - 12:4; 28:14; 30:10; 93:21; 94:3
**allows** [2] - 91:1
**alluded** [2] - 25:23; 192:8
**almost** [7] - 14:3; 39:1; 48:10; 52:25; 112:14; 142:19; 182:14
**alone** [3] - 89:9; 132:5; 173:13
**Alpo** [3] - 101:22, 24; 182:22
**Alpo's** [1] - 102:4
**Amazon** [1] - 155:23
**AMERICA** [1] - 1:3
**America** [4] - 3:4; 107:5; 124:7; 162:20
**amicus** [6] - 8:19; 9:21; 10:3, 25
**amount** [13] - 13:17; 17:10; 80:24; 98:10; 120:2; 169:25; 170:16; 171:13; 172:19; 173:10, 13, 16
**amounts** [1] - 100:12
**Amy** [6] - 85:2, 8, 23; 91:10; 104:18; 150:4
**Anacostia** [1] - 119:9

**analysis** [5] - 15:17; 16:1; 174:8; 180:11
**Ananias** [1] - 129:4
**anecdotal** [1] - 117:23
**anew** [1] - 17:22; 18:8
**angry** [1] - 100:9
**announce** [1] - 21:15
**answer** [29] - 32:4; 41:16; 49:14, 18; 57:7, 19; 89:25; 94:13; 120:9; 133:17; 162:23; 163:11, 21; 164:17, 21; 165:2, 6, 12, 14; 167:1, 11; 185:4, 7-8; 191:9; 193:8, 23, 25
**answer's** [1] - 49:17
**answering** [1] - 72:10
**answers** [2] - 31:23; 85:11
**anticipate** [2] - 20:8, 10
**anticipated** [1] - 14:6
**anyway** [1] - 62:8
**apart** [2] - 41:19; 113:12
**apartment** [1] - 84:2
**apex** [1] - 155:23
**apologize** [6] - 23:1; 25:23; 32:21; 164:4; 171:22; 172:8
**Aponte** [2] - 76:24; 78:17
**Apostle** [1] - 129:1
**apparent** [1] - 119:3
**Appeals** [3] - 3:21; 6:25; 123:7
**appear** [4] - 21:17; 113:19; 115:19; 197:9
**Appearances** [1] - 2:1
**APPEARANCES** [1] - 1:12
**appeared** [1] - 88:11
**appendix** [2] - 9:21; 13:14
**apples** [2] - 187:16; 188:3
**applicable** [1] - 178:6
**apply** [1] - 78:13
**appointed** [2] - 8:18; 105:12
**appointment** [1] - 8:20
**appointments** [1] - 92:20
**appreciable** [1] - 121:5
**appreciate** [11] - 18:5; 76:3, 17; 102:18; 136:20; 152:9, 13; 154:3; 183:22; 184:22, 25
**appreciation** [1] - 4:19
**appreciative** [2] - 4:25; 5:13
**approach** [6] - 13:10; 22:8; 33:7, 19; 70:2; 197:13
**approached** [2] - 26:17; 190:21
**appropriate** [23] - 8:20; 9:4; 11:8; 21:9, 13; 22:2; 24:8; 31:15; 34:18; 64:7; 71:11; 165:9, 11; 171:7; 174:12; 176:23; 186:21; 187:3, 10, 19; 191:21
**approval** [2] - 75:5; 87:10
**approved** [3] - 51:6; 84:13; 94:4
**April** [3] - 6:24; 63:10; 169:21
**archives** [1] - 5:9
**area** [3] - 56:23; 61:11; 74:13
**Areas** [1] - 107:11
**arguing** [1] - 103:15

**argument** [14] - 34:7, 9, 11, 13; 42:1; 49:21; 160:5; 161:6; 166:8; 168:16; 185:13; 198:7
**arguments** [9] - 8:4; 36:9, 11, 13; 159:21; 160:19; 162:5; 185:21; 198:9
**arise** [1] - 31:17
**arisen** [1] - 24:17
**armed** [1] - 6:15
**Arnold** [1] - 85:3
**arrange** [2] - 52:20; 58:8
**arrangement** [1] - 120:16
**arrangements** [5] - 53:7; 84:5; 120:5, 14
**arranges** [1] - 47:4
**arrest** [1] - 81:18
**arrested** [8] - 50:13; 59:2, 7, 11; 86:25; 91:19; 131:11; 157:17
**arresting** [1] - 73:24
**arrive** [1] - 167:4
**arrived** [5] - 47:6, 8; 114:17; 137:14; 177:1
**art** [1] - 86:23
**articulate** [1] - 15:8
**articulated** [1] - 107:14
**ascertain** [4] - 8:24; 9:3, 6; 10:7
**aside** [2] - 43:8; 119:12
**aspects** [1] - 38:14
**assess** [1] - 53:15
**assessed** [1] - 79:21
**assessment** [8] - 6:9; 52:10, 12, 14; 79:10; 91:22; 95:2; 122:24
**asset** [1] - 73:3
**assigned** [3] - 45:25; 46:1; 138:18
**assignment** [2] - 60:22; 144:8
**assist** [2] - 10:14; 29:22
**assistance** [17] - 23:19; 25:14; 91:3, 22; 95:10; 102:17, 19; 109:12, 16, 21; 110:2; 167:16; 169:6; 173:11, 13, 15
**Assistant** [12] - 1:13, 18; 39:6; 70:15; 72:9, 13; 73:20; 84:1; 85:2; 86:8; 98:8
**assisting** [1] - 28:7
**associate** [2] - 3:19, 21
**associated** [1] - 81:11
**associates** [2] - 5:1; 102:3
**assume** [4] - 21:19, 22; 102:13; 195:2
**assuming** [1] - 175:5
**astonishing** [1] - 179:9
**astounded** [2] - 74:25; 75:20
**at-risk** [9] - 40:19; 112:15; 125:16, 18; 132:12; 145:1, 17; 148:3
**attached** [2] - 71:14; 95:16
**attempt** [2] - 9:6; 167:11
**attempted** [1] - 49:23
**attempting** [1] - 11:7
**attend** [2] - 21:10; 63:12
**attending** [1] - 123:23
**attention** [8] - 5:7; 13:3; 66:7; 81:17; 148:9; 149:14; 150:7; 200:3
**attitude** [2] - 53:21; 103:15

**attorney** [8] - 39:7; 58:18; 106:15; 127:7; 158:15; 182:6; 196:7; 197:16
**Attorney** [32] - 1:14, 19; 5:3; 8:3, 19; 9:5, 18, 20; 10:2, 5, 9, 12-13; 13:9; 15:3, 10; 39:7; 44:12, 17; 70:15; 72:9, 13; 75:4; 77:6; 84:1; 85:2; 86:8; 96:19; 98:8; 103:25; 117:21
**Attorney's** [9] - 5:4; 7:25; 52:5; 91:21; 109:10, 14; 110:6, 9
**ATTORNEY'S** [2] - 1:14, 19
**attorneys** [3] - 88:14; 105:14; 108:4
**Attorneys** [1] - 73:20
**attributed** [3] - 49:1, 10; 189:16
**August** [5] - 6:14; 9:21; 80:11; 81:5; 83:19
**AUSA** [6] - 39:13; 50:11; 71:3; 73:3; 131:16; 148:25
**auspices** [1] - 121:25
**authorities** [2] - 28:7; 192:17
**authority** [2] - 10:20; 35:6
**authorization** [1] - 89:22
**authorizations** [1] - 30:20
**authorize** [1] - 87:16
**authorized** [2] - 28:20; 110:4
**available** [3] - 21:19; 118:15; 188:12
**avenue** [1] - 126:19
**average** [16] - 41:6, 9, 12, 14-15; 178:3-5, 7; 180:3; 183:12, 15
**avoid** [2] - 30:14; 42:2
**avoiding** [2] - 41:24; 183:9
**aware** [10] - 37:18; 38:6; 41:2; 85:12; 94:24; 95:6; 175:12; 181:23; 182:20; 187:18
**awfully** [1] - 192:23

# B

**babies** [2] - 156:13, 17
**backdrop** [2] - 8:18; 31:5
**backed** [1] - 100:9
**background** [14] - 5:14; 28:23; 29:14; 30:19, 21; 45:23; 51:3; 61:8; 63:9; 105:16; 168:6; 179:20; 183:13
**bad** [5] - 58:12; 145:20; 147:10; 156:7; 166:15
**balance** [2] - 31:14; 168:16
**ball** [2] - 78:14
**ballpark** [1] - 54:23
**Baltimore** [3] - 1:24; 81:1; 94:21
**ban** [3] - 32:11, 15, 24
**banish** [1] - 32:16
**banned** [1] - 175:8
**Baptist** [1] - 119:9
**Barbara** [5] - 37:19; 59:24; 148:15; 151:24
**BARBARA** [3] - 59:25; 60:3; 201:5
**bars** [6] - 50:22; 176:6, 9, 12, 17; 182:10
**base** [1] - 5:19

**based** [18] - 9:23; 17:9; 18:8, 14; 19:1; 25:15; 29:11, 13; 31:1; 65:13; 68:14; 82:21; 85:6; 159:21; 167:15; 170:2, 19; 174:9
**basic** [1] - 166:19
**basis** [9] - 25:12; 40:20; 57:24; 122:23; 125:19; 128:8; 176:10; 179:12; 197:21
**beat** [1] - 127:17
**became** [8] - 26:12; 42:19; 45:25; 71:2; 82:24; 83:8; 84:8; 85:9
**become** [2] - 76:7
**becomes** [1] - 186:3
**bed** [1] - 93:2
**beef** [1] - 176:15
**BEFORE** [1] - 1:11
**began** [12] - 3:19; 11:16; 37:22; 38:1; 42:25; 64:11; 69:4; 115:9; 116:7; 137:2
**begin** [7] - 7:22; 45:16; 46:14; 112:10; 113:24; 116:21; 136:25
**beginning** [8] - 39:10, 21; 48:9; 106:25; 110:17; 116:7, 9; 194:20
**begun** [1] - 60:24
**behalf** [4] - 10:12; 133:22; 153:3; 158:18
**behavior** [3] - 40:17, 25; 115:4
**behind** [9] - 50:22; 102:21; 142:2; 156:23; 176:6, 9, 12, 17; 182:10
**beings** [2] - 147:9, 12
**belabor** [2] - 173:20; 182:19
**believes** [1] - 71:6
**below** [1] - 19:1
**belt** [1] - 164:11
**bench** [8] - 22:5; 33:7; 34:9, 11; 36:9, 12; 41:3; 55:16
**benchmark** [3] - 186:13, 20; 187:3
**beneficiary** [1] - 102:16
**benefit** [21] - 18:21; 36:8, 15; 37:25; 42:6; 91:25; 93:25; 96:9; 100:11; 102:19; 103:24; 107:22; 161:6, 20; 176:7, 18-20; 198:20
**BENJAMIN** [4] - 45:18; 109:1; 201:4, 8
**Benjamin** [13] - 37:19; 45:9, 20; 60:20; 64:20; 74:1, 6, 25; 108:16; 109:3; 141:16; 151:21; 179:2
**benjamin** [1] - 45:22
**Benning** [1] - 113:3
**best** [15] - 15:5; 29:23; 49:14; 72:11; 75:3; 78:9; 147:12; 154:7; 156:23; 161:10; 170:17; 191:4, 8; 195:1; 198:20
**bet** [1] - 99:4
**better** [5] - 28:1; 146:16; 157:5; 169:4; 198:17
**between** [22] - 40:2, 12; 42:10; 56:7; 58:18; 67:3; 69:6; 81:5; 83:19; 96:6; 107:19; 117:23; 127:7; 130:1; 144:5; 145:4, 25; 176:13; 179:4; 182:18; 183:10; 196:7
**beyond** [2] - 68:1
**Bible** [1] - 157:10
**biblical** [1] - 129:3

**big** [4] - 31:13; 48:9; 138:1; 152:10
**bigger** [1] - 170:7
**biggest** [1] - 59:7
**Bill** [5] - 91:6, 15; 150:21, 24
**billiard** [2] - 78:14
**Binghamton** [1] - 46:5
**birthday** [1] - 195:4
**bishop** [1] - 128:16
**Bishop** [5] - 130:11, 19; 132:25; 133:19; 184:4
**bit** [12] - 36:2; 43:4; 45:22; 61:8; 62:1; 64:10; 92:5; 105:24; 157:2; 169:3; 182:11; 185:3
**black** [3] - 79:6, 11
**blessed** [1] - 116:23
**blessing** [1] - 156:25
**blocks** [1] - 113:12
**blog** [1] - 13:5
**board** [1] - 172:24
**body** [1] - 31:1
**book** [1] - 188:14
**books** [3] - 79:9; 188:20
**BOP** [4] - 76:3; 94:11, 24; 182:2
**Born** [2] - 125:8
**born** [2] - 120:13; 155:8
**bosses** [1] - 77:6
**bothers** [2] - 103:6; 156:3
**bought** [1] - 151:1
**bounces** [1] - 78:15
**bound** [2] - 19:6; 103:23
**box** [1] - 185:3
**boy** [2] - 54:22; 83:8
**breadth** [5] - 36:24; 176:8; 178:9; 179:2, 8
**break** [3] - 43:17; 105:25; 162:17
**Brief** [8] - 8:15; 23:12; 45:2; 106:10; 118:10; 149:9; 172:14; 199:11
**brief** [22] - 9:18, 21-22; 10:3, 25; 13:12, 14; 24:18; 26:12; 51:13; 58:16; 62:15; 69:16; 115:11; 118:8; 127:5; 159:9; 160:1; 167:11; 172:3; 191:19; 194:23
**briefed** [1] - 167:9
**briefing** [3] - 107:24; 160:12; 192:5
**briefings** [1] - 161:5
**briefly** [12] - 23:9; 31:3; 33:7; 55:17; 63:8; 70:6; 167:13; 169:17; 185:14, 17; 187:5
**briefs** [4] - 14:19; 159:11, 18; 195:2
**brilliant** [1] - 103:4
**bring** [6] - 46:23; 48:10; 141:20; 145:4; 163:21
**bringing** [1] - 46:22
**broad** [1] - 13:9
**broke** [4] - 48:14; 50:6; 110:23
**broken** [2] - 135:8, 14
**brokered** [1] - 176:13
**brokering** [2] - 40:2; 145:24
**brother** [3] - 118:6; 183:20

**brother's** [1] - 116:23
**brothers** [1] - 113:13
**brought** [9] - 47:1; 64:16; 120:6; 137:19; 141:23; 151:6; 188:13; 189:21; 195:14
**Building** [2] - 1:15, 20
**building** [2] - 12:20; 87:5
**built** [1] - 81:10
**Bull** [4] - 183:3, 11; 187:23
**bunch** [6] - 139:16, 18; 148:19; 149:22; 151:1
**burden** [2] - 108:2, 4
**burden's** [1] - 34:24
**burdens** [1] - 106:3
**Bureau** [18] - 52:2, 6, 20; 58:3, 11; 65:14; 86:7; 92:6, 10, 14, 24; 93:23; 94:6; 165:23; 181:24; 182:7, 12; 190:15
**business** [3] - 138:9; 157:22; 184:12
**BY** [43] - 45:19; 50:19; 55:8; 56:11; 58:20; 60:4; 63:5; 64:6; 69:3; 72:7; 78:25; 80:13; 90:2; 94:9; 95:13; 96:23; 97:24; 99:12; 109:2; 111:22; 119:2, 6; 125:2; 127:9; 130:16; 136:9, 24; 140:12; 141:3; 142:25; 149:13; 153:8; 157:16; 201:4

# C

**C6** [1] - 46:2
**calculate** [1] - 31:10
**calculated** [2] - 165:25; 166:5
**calculating** [1] - 165:19
**calculation** [2] - 16:12; 166:19
**calculations** [1] - 19:21
**calendar** [1] - 199:9
**Cali** [1] - 78:22
**calm** [3] - 47:9, 11; 144:15
**camp** [1] - 93:9
**cancel** [1] - 199:16
**candid** [2] - 94:17; 193:1
**candidly** [4] - 105:22; 175:9; 176:24; 178:24
**cannot** [5] - 40:25; 41:1; 118:6
**cap** [1] - 35:16
**capitalize** [2] - 75:2, 16
**captioned** [1] - 107:9
**captured** [2] - 90:7; 96:10
**car** [2] - 80:16; 151:10
**care** [3] - 84:10; 98:23; 200:5
**career** [13] - 3:19; 4:1; 46:7, 11; 47:10; 54:6, 10, 13, 20; 61:24; 68:20; 72:13; 98:8
**careful** [1] - 139:23
**Carlson** [1] - 181:24
**Carmen** [1] - 81:24
**Carolina** [6] - 27:22; 86:1; 150:7, 11, 17
**carries** [2] - 26:4; 186:10
**carry** [1] - 186:17

**carrying** [1] - 6:16
**cars** [1] - 151:1
**cartel** [3] - 51:11; 56:20; 81:11
**Cartel** [2] - 78:22
**case** [102] - 3:25; 6:2; 8:2, 19, 21; 10:17; 17:2; 23:18; 26:1; 27:1, 25; 29:2, 24; 30:22; 31:5; 38:16, 23; 39:1, 8; 41:5; 42:5, 8; 47:13, 18; 50:11; 52:13; 53:4; 54:8; 55:22; 56:17, 25; 61:5, 8-9, 14, 16; 64:18; 65:13; 66:7, 9, 14-15, 20, 23; 67:3, 10; 69:1; 73:1; 79:24; 82:11; 83:17; 84:21; 85:7, 12, 17, 20; 86:2, 8-9; 87:25; 88:18; 90:16; 91:8, 18; 93:19; 96:19; 101:23; 105:1, 13; 107:20; 131:11; 135:6; 137:20; 140:23; 142:19; 148:9, 12, 22; 149:20, 23; 150:15, 18; 151:7; 165:3, 10; 167:23; 178:6, 12; 179:21; 183:11; 184:19; 186:7, 17
**Case** [3] - 3:3; 107:4; 162:19
**CASE** [1] - 136:1
**cases** [30] - 3:23; 27:21, 23; 28:2, 22; 30:18; 54:21; 56:15, 22, 25; 61:5; 62:5, 7; 66:12, 21; 70:24; 81:10; 83:16; 88:7; 103:10; 148:19, 22; 152:7; 168:5; 172:8; 187:18
**casualty** [1] - 99:5
**cat** [1] - 57:8
**catch** [2] - 82:14; 196:1
**categories** [2] - 27:19; 30:16
**category** [2] - 28:22; 29:1
**Caudle** [3] - 53:4; 67:5; 152:4
**caught** [2] - 86:25; 130:1
**CCE** [7] - 41:9; 178:1; 180:14; 183:13; 185:24; 186:7, 16
**CCTV** [1] - 197:13
**cell** [1] - 140:7
**center** [2] - 164:3; 176:10
**Center** [4] - 1:15, 20; 12:19; 120:24
**century** [1] - 39:17
**CEO** [1] - 103:4
**certain** [12] - 4:12; 26:13; 27:16; 29:19; 66:16; 88:19; 94:4; 129:19; 168:22; 187:19; 189:18
**certainly** [4] - 159:17; 162:6; 164:22; 182:19
**certify** [1] - 200:11
**cetera** [3] - 18:10; 170:5
**chair** [1] - 47:11
**challenged** [1] - 10:2
**challenging** [1] - 3:25
**chambers** [2] - 12:16; 107:8
**Champagne** [1] - 150:22
**chance** [10] - 48:1; 93:16; 109:12, 16; 111:8; 134:1; 142:9; 165:5
**change** [17] - 21:21; 93:24; 94:5; 95:5, 8; 103:14; 111:1; 127:2; 128:16, 20-22; 132:1; 138:14; 146:15; 155:1
**changed** [19] - 19:25; 20:1; 25:4; 50:14; 84:9, 17; 123:14; 128:21; 129:3,

6, 10; 131:23; 133:24; 171:2, 12; 186:8, 16
**changes** [9] - 18:9; 92:5; 94:11; 99:9; 131:21; 134:9; 166:20
**changing** [1] - 92:13
**chapter** [1] - 91:6
**characteristics** [2] - 9:12; 171:4
**characterize** [1] - 89:15
**characterized** [1] - 88:3
**characterizing** [1] - 102:24
**charge** [2] - 101:25; 121:23
**charged** [2] - 25:24; 177:17
**charges** [1] - 6:18
**charging** [1] - 6:23
**charisma** [1] - 103:5
**Charles** [2] - 1:23; 6:4
**chart** [2] - 57:14; 98:2
**charts** [1] - 101:9
**check** [4] - 53:5; 100:2; 184:19; 199:8
**Chicky** [3] - 78:23; 81:12, 16
**Chicky's** [2] - 79:1
**chief** [1] - 76:24
**Chief** [1] - 10:9
**children** [5] - 145:1, 3; 146:20; 181:18
**choice** [2] - 47:19; 98:24
**choices** [1] - 187:11
**choose** [2] - 133:16; 155:14
**chose** [2] - 103:6; 155:18
**Christian** [1] - 128:15
**Church** [4] - 114:15; 119:9; 125:8
**church** [28] - 40:6-8; 115:14, 16, 18; 119:19; 120:15; 121:14, 21; 125:25; 126:6; 128:16; 129:7, 13; 132:14, 24; 133:1, 4; 134:24; 135:9, 11, 15; 146:8; 148:4; 157:9
**CI** [1] - 87:11
**circuit** [7] - 6:1; 171:15; 172:10; 195:11, 17, 20; 197:10
**Circuit** [15] - 6:25; 171:9; 172:3, 7, 19-22; 173:1; 174:2; 192:12
**Circuit's** [1] - 7:2
**circuits** [8] - 170:3; 171:10, 21; 172:5, 17; 173:24
**Circuits** [2] - 172:23; 173:8
**circumstance** [1] - 9:11
**circumstances** [6] - 34:8; 53:22; 112:25; 171:13; 174:9
**cite** [1] - 171:18
**cited** [1] - 172:9
**citing** [1] - 14:18
**citizen** [1] - 157:4
**citizens** [10] - 36:20; 38:17; 40:1; 112:3, 5; 120:25; 124:6; 175:2; 179:21; 191:5
**City** [15] - 113:3, 9, 17; 114:14; 116:1; 120:3, 6; 121:24; 130:1; 145:22, 25; 176:13; 181:19; 188:1
**city** [20] - 12:13; 48:9, 11; 112:3; 113:10; 114:1; 115:8; 120:1, 12; 121:1,

4, 7; 122:9, 14; 123:1, 22; 126:10

**city's** [4] - 8:11; 9:1; 31:10; 169:12

**civilian** [1] - 105:22

**civilians** [2] - 20:11; 106:11

**clarify** [1] - 20:2

**clarity** [1] - 22:25

**Class** [2] - 19:3; 35:22

**class** [1] - 45:24

**classify** [1] - 47:21

**clear** [19] - 13:17, 21; 14:2; 15:21; 28:19; 37:16; 49:2, 23; 54:4; 104:19; 107:16; 108:3; 109:11; 110:16, 18; 141:24; 154:2; 168:10; 171:9

**clearly** [5] - 17:15; 44:11; 109:13; 164:7, 9

**clergy** [3] - 12:24; 40:19; 128:3

**CLERK** [3] - 3:3; 107:4; 162:19

**Clerk's** [2] - 5:8, 11

**client** [15] - 22:12; 40:13; 58:19; 127:8; 189:17; 195:15, 24-25; 196:3, 8, 11, 15; 197:15, 17

**clock** [1] - 43:18

**close** [6] - 68:25; 69:5; 73:9; 91:6; 146:1; 148:20

**closed** [5] - 148:22; 195:11, 17, 20; 197:10

**closely** [1] - 103:19

**closer** [1] - 84:17

**clue** [1] - 66:6

**co** [2] - 104:25; 196:1

**co-colleague** [1] - 196:1

**co-defendants** [1] - 104:25

**Coast** [1] - 65:10

**Coates** [2] - 107:7, 14

**cocaine** [7] - 5:19; 7:5; 26:16; 78:23; 82:3; 86:24

**Code** [3] - 7:1, 17; 9:9

**code** [6] - 5:17, 20-21, 23-24; 7:6

**cold** [19] - 29:2, 24; 30:22; 38:16; 53:4; 66:7, 9, 14-15, 20, 23; 67:3, 10; 148:9, 12, 19; 150:2; 168:6; 179:21

**colleague** [3] - 6:5; 108:6; 196:1

**colleagues** [1] - 93:7

**collect** [5] - 58:6; 81:15; 93:6; 94:3, 19

**COLLINS** [4] - 1:22; 108:8, 11; 199:8

**Collins** [3] - 108:7, 9, 11

**Colombia** [8] - 58:7; 81:1, 12, 14, 16; 93:6; 94:19; 175:3

**Colombian** [5] - 51:11; 56:20; 82:7, 22; 179:15

**Colombians** [3] - 26:13; 168:2

**Columbia** [32] - 3:20; 5:3, 15; 7:16; 9:6, 17; 10:5, 15; 25:25; 26:15; 27:22; 28:8, 15; 32:12, 16; 36:20; 38:16; 40:2, 6; 70:16; 112:16; 113:4; 119:16; 152:23; 174:25; 175:6, 12; 177:17; 179:16, 22; 191:5

**COLUMBIA** [1] - 1:1

**Columbian** [1] - 169:1

**combative** [1] - 47:7

**combination** [1] - 173:16

**comfortable** [1] - 52:7

**coming** [7] - 27:6; 59:5; 113:19; 115:25; 145:10, 12; 151:10

**commend** [1] - 11:21

**commensurate** [1] - 36:23

**comment** [3] - 20:15; 64:22; 189:16

**commentators** [1] - 14:11

**commented** [1] - 9:24

**comments** [3] - 3:18; 13:21; 18:9

**commissary** [1] - 92:25

**commission's** [4] - 15:20, 23; 16:1, 9

**Commission's** [2] - 4:21; 15:16

**commit** [1] - 76:6

**committed** [4] - 73:21; 77:2; 100:14; 174:11

**Committee** [1] - 96:19

**committing** [1] - 182:23

**common** [3] - 152:13; 161:15; 191:25

**communicate** [7] - 52:21; 61:25; 66:4; 83:23; 85:5; 110:7; 197:19

**communicated** [1] - 39:9

**communicating** [3] - 55:10; 56:13; 83:20

**communication** [7] - 5:23; 74:4; 84:5; 110:16; 111:3; 131:9

**communications** [5] - 11:21; 84:12; 85:9; 96:6; 100:8

**communities** [2] - 113:12; 175:13

**Community** [1] - 107:9

**community** [63] - 8:7, 24; 9:4, 7, 19; 10:7, 23; 11:12, 15, 17, 21; 12:14, 24; 13:6, 8, 10; 14:20, 23; 15:1; 29:12; 31:11; 39:24; 40:10, 15, 17-18; 48:5; 57:5; 66:19; 92:17; 98:23; 103:8; 107:9; 114:18, 22; 116:9, 20; 117:10, 20; 119:12-15, 19-20; 120:22; 121:1; 148:7; 154:24; 157:4; 170:5, 15, 18; 175:17; 181:3

**community's** [3] - 10:19; 14:3; 15:5

**companion** [1] - 195:8

**compare** [4] - 3:24; 169:13; 187:17, 22

**compares** [1] - 98:10

**comparisons** [1] - 188:3

**compartmentalize** [3] - 80:1, 5

**compel** [3] - 63:12; 153:10; 192:9

**compelled** [2] - 37:6; 60:7

**compelling** [1] - 89:3

**complete** [2] - 192:18

**completely** [1] - 65:17

**completion** [1] - 7:22

**compliant** [1] - 177:11

**complicated** [7] - 25:21; 82:25; 83:9; 105:12; 163:10; 186:25; 197:6

**complied** [1] - 136:15

**component** [2] - 28:6; 29:25

**computer** [1] - 2:8

**computer-aided** [1] - 2:8

**concede** [1] - 39:11

**concedes** [2] - 39:2, 4

**concern** [4] - 55:4; 71:10; 160:2; 197:8

**Concerned** [6] - 112:1, 4, 13, 23; 115:9; 119:24

**concerned** [7] - 18:6; 134:23; 157:24; 158:2-4; 197:15

**concerning** [1] - 9:19

**concerns** [2] - 59:7; 129:12

**concert** [1] - 122:18

**concise** [1] - 192:10

**concluded** [3] - 24:25; 35:4; 70:13

**concludes** [1] - 105:21

**conclusion** [4] - 112:9; 113:19; 158:25; 186:19

**conclusions** [4] - 31:20; 167:4; 191:13

**concretely** [1] - 29:15

**concurrence** [1] - 109:10

**concurrently** [3] - 6:8, 12; 7:20

**conditions** [5] - 34:20; 122:24; 123:6, 14, 19

**conduct** [7] - 80:20, 24; 100:4; 102:22; 104:2; 140:1; 163:24

**conducted** [2] - 31:9, 12

**conducting** [3] - 26:10; 58:5; 169:10

**confer** [1] - 196:22

**conference** [5] - 21:18; 85:14; 123:8, 13

**confident** [2] - 80:7; 104:7

**confidential** [7] - 86:22; 87:13, 20; 88:24; 89:1; 90:4

**confined** [1] - 34:20

**confinement** [2] - 34:8; 52:2

**confirm** [3] - 71:12; 196:17, 21

**confirmed** [1] - 7:24

**conflated** [1] - 167:24

**conflating** [1] - 168:23

**conflicts** [2] - 139:16, 19

**confusing** [1] - 126:12

**congregation** [5] - 126:6; 127:1, 23; 133:4; 134:3

**Congress** [1] - 25:4

**conjunction** [1] - 26:25

**connect** [2] - 190:6, 10

**connecting** [1] - 49:6

**connection** [6] - 6:16; 66:18; 76:7; 128:2; 139:9, 14; 190:7; 191:1

**consecutive** [2] - 102:10, 12

**consecutively** [2] - 7:16, 19

**consensus** [1] - 107:12

**consequences** [1] - 83:13

**consider** [38] - 9:8; 31:4, 8; 33:14; 34:20; 37:3; 41:5; 42:24; 91:1; 98:22; 163:22; 168:14, 21; 170:6, 13, 19-20; 171:1, 11; 172:24; 173:2, 9, 23; 174:12, 24; 175:1, 22; 177:2, 25; 178:15, 25; 180:1; 183:9; 187:6, 8, 13; 199:3

**consideration** [8] - 36:25; 49:10, 22; 88:5; 105:15; 108:5; 182:16, 18

**considered** [6] - 38:22; 113:3, 15; 170:8; 172:18; 173:13

**considering** [5] - 31:6; 94:11; 164:19; 173:15; 181:4

**considers** [1] - 31:4

**consistent** [3] - 40:20; 176:10; 197:21

**consolidate** [1] - 114:12

**conspiracy** [6] - 5:17; 6:17; 7:1, 4; 17:12; 186:14

**Constance** [3] - 38:4; 80:4; 90:24

**constant** [1] - 74:3

**constantly** [1] - 80:25

**Constitution** [1] - 21:11

**consult** [1] - 180:8

**consultation** [1] - 76:23

**consulting** [1] - 180:11

**Cont** [1] - 2:1

**contact** [5] - 5:5; 56:14; 72:22; 164:24

**contacted** [2] - 16:8; 66:14

**contacts** [2] - 26:15; 120:4

**contemplating** [2] - 143:14; 192:4

**contents** [2] - 113:11; 116:24

**context** [2] - 96:15, 21

**continue** [8] - 45:3; 52:9; 59:22; 131:8, 12; 149:10; 189:21

**continued** [11] - 27:4; 38:5; 42:18; 43:6; 66:16; 85:24; 90:10, 21; 109:1; 131:7; 201:8

**continuing** [4] - 5:16; 26:3; 33:21; 41:10

**contours** [1] - 70:7

**contraband** [1] - 74:21

**contradictory** [1] - 54:3

**contrary** [1] - 172:23

**contribute** [1] - 15:1

**contribution** [1] - 121:2

**control** [1] - 10:21

**controlled** [1] - 18:15

**convened** [1] - 12:13

**convenient** [1] - 198:11

**conversation** [14] - 47:20, 22; 74:7, 25; 109:5, 23, 25; 111:5; 115:6, 11, 22; 131:23; 137:23; 149:4

**convicted** [14] - 8:11, 13, 16; 9:1; 26:1, 5; 41:9; 49:3; 169:14; 185:24; 186:10, 12; 189:2

**convicting** [3] - 73:5; 102:2; 104:25

**conviction** [9] - 6:1; 7:1; 49:7; 177:8; 178:1; 180:4, 14; 183:14

**convictions** [2] - 17:2; 61:13

**convince** [1] - 52:16

**convincing** [1] - 87:15

**cooperate** [45] - 26:18, 21; 27:4; 31:7; 36:21; 42:8; 46:20; 47:25; 48:2, 12; 50:14; 51:10; 52:8, 23; 57:6; 58:1, 22; 64:23; 68:22; 73:15; 74:3, 16; 75:18; 83:4; 91:25; 100:7; 109:22; 110:3, 11, 19; 111:4; 141:25; 143:3; 175:14; 177:12, 25; 180:13, 21; 181:1, 5-6, 8-9; 189:6

**cooperated** [5] - 25:13; 38:6; 58:1; 177:22; 180:25

**cooperating** [22] - 38:1; 43:1; 46:8; 57:5; 58:11; 59:3; 60:25; 61:3; 68:11; 69:4; 72:20; 74:10; 79:11; 81:19; 82:19; 137:2; 141:11; 142:15, 20; 143:2; 175:18; 187:12

**cooperation** [114] - 14:4, 10-11; 25:17; 26:19, 24; 27:1, 7, 17; 29:1, 4, 25; 30:17; 36:23; 37:21, 25; 38:9, 11-12, 15, 21, 25; 39:10, 12, 14, 16; 41:5, 15, 18-19, 24; 42:3, 5, 10, 21, 24; 55:20, 24; 56:17; 57:11; 62:12; 64:3, 8, 10; 66:4; 67:19; 70:22, 24; 71:6; 74:17; 75:9; 79:18, 23; 82:22; 83:14; 84:8; 85:17; 88:6, 15; 89:12, 16; 91:1; 94:12; 96:10; 98:1, 10; 101:4; 102:2, 24; 104:8, 21; 107:19, 21; 109:12, 18; 110:1, 8; 141:9; 144:22; 154:10, 13; 160:3; 167:19, 22; 168:19; 169:9, 12; 170:13, 20; 174:10; 176:3, 8; 178:7, 9, 12; 179:9, 24; 180:19, 22; 183:15; 187:9, 14, 18, 22; 188:2; 189:4

**cooperations** [2] - 27:11; 188:4

**cooperator** [12] - 52:11; 68:2; 73:18; 75:10; 77:24; 82:15, 25; 83:3, 5, 7; 86:13; 101:5; 102:1; 187:17

**cooperators** [14] - 42:19; 54:6, 10, 13, 19; 68:3, 5, 9, 24; 71:2; 96:8; 98:19; 100:22; 101:16

**coordinated** [1] - 77:21

**coordinator** [1] - 67:3

**copy** [2] - 97:6, 12

**correct** [32] - 17:23; 18:11, 14; 19:25; 20:22; 32:17; 33:11; 37:12; 41:23; 42:4, 7; 47:2; 49:3; 54:5; 70:16; 83:24; 88:20; 93:10; 94:23; 95:1; 100:19; 126:22; 134:11; 138:19; 172:22; 175:7; 176:4; 180:20, 22; 197:3; 200:11

**correctly** [1] - 159:3

**corridor** [1] - 127:18

**corroborated** [4] - 89:2, 18; 160:8; 183:24

**corroborating** [7] - 72:15; 82:11; 88:19; 90:4; 181:4, 17; 183:8

**corroboration** [3] - 88:20; 89:7, 9

**corroborative** [2] - 89:17; 90:14

**corroborators** [1] - 181:12

**counsel** [20] - 5:5; 8:5; 12:16; 19:12; 22:16; 23:18; 25:6; 79:22; 104:14; 159:15; 161:10; 165:11; 175:24; 185:7; 191:12; 192:20; 194:15; 195:10; 198:21, 23

**Counsel** [20] - 3:9; 22:4; 25:1; 41:18; 45:6; 58:15; 70:18; 71:22, 24; 105:19; 108:12; 109:4; 135:20; 162:13; 167:6; 174:19; 185:2; 189:15; 194:16; 198:3

**count** [8] - 6:8, 15; 99:5; 139:8; 151:20, 22-23; 152:1

**Count** [24] - 5:25; 6:1, 6-7, 11, 23, 25; 17:3, 5, 8, 17; 18:1, 15, 23-24; 19:2-4; 26:3, 5

**counted** [1] - 100:24

**country** [4] - 57:6; 123:12, 22; 124:9

**Counts** [6] - 6:6, 12; 7:3; 17:4; 18:25

**counts** [6] - 5:25; 6:14; 17:17, 19; 18:15; 19:4

**County** [1] - 86:25

**county** [11] - 144:24; 145:3, 18; 146:6, 10; 147:15, 22, 25; 148:23

**coup** [2] - 39:16

**couple** [7] - 21:18; 57:19; 102:4; 107:6; 120:23; 197:16; 199:5

**course** [12] - 21:21; 38:12; 43:9; 44:19; 54:10; 62:2, 6; 68:20; 110:6; 124:3; 194:22, 25

**Court** [279] - 2:4; 3:12, 20-22; 4:2, 5, 7, 10-11, 16, 18, 22, 24; 5:7; 6:24; 7:6, 14, 19, 23; 8:2, 8-9, 18, 22-23, 25; 9:2, 4, 8, 11, 17-18; 10:4, 8, 14; 12:2, 25; 15:7, 15, 19, 23-24; 16:8, 10, 14-15, 18, 25; 17:22; 18:6, 13; 19:23; 20:3, 5, 17-18, 20; 21:9, 15, 19, 24; 22:5; 23:16, 20; 24:6, 22; 25:11; 26:2, 21; 27:6, 14-15; 28:9, 17, 21, 24; 29:6; 31:2-4, 8, 14, 16, 22; 32:6, 8, 11, 15, 24; 33:13; 34:2, 13, 18-19; 35:1; 36:22, 25; 37:2, 18, 20; 38:2, 6, 8-9, 21; 39:18, 20, 25; 40:11, 22, 24; 41:2, 4, 7-8, 13-14, 16; 42:11, 16, 24; 43:13; 44:24; 45:8; 49:21; 55:14; 62:18; 79:13; 81:22; 88:6; 89:4; 97:6; 105:9, 11, 14, 23, 25; 107:10, 13, 17, 21; 108:2; 123:7; 129:2; 136:17; 147:14; 152:22; 154:3; 157:14; 158:24; 159:2, 7, 10, 12, 23; 160:7, 12-14, 17; 161:5; 162:11; 163:1; 166:3, 17; 167:8, 10, 12, 14; 168:3, 13-14, 21; 169:2, 8, 13, 16, 18, 24; 170:6, 13, 17, 19, 21, 23; 171:1; 172:4, 10, 16, 24; 173:9, 23; 174:7, 11, 15, 23, 25; 175:1, 4, 12, 19, 22; 176:18, 24; 177:1, 18, 24; 178:15, 23; 180:1, 7-8, 18; 181:12, 23; 182:7, 16-17, 20; 183:9; 184:20; 185:5, 19; 186:13, 20-21; 187:5, 8, 13, 21; 188:2, 6; 190:17; 191:10, 20, 25; 192:2, 4, 6, 11, 13-14; 193:7, 16; 194:20, 24; 197:9; 198:10, 15, 24-25; 199:2, 25; 200:15

**court** [30] - 5:8; 6:1; 10:18; 21:14; 22:18; 37:6, 20; 39:24; 44:4; 63:13; 91:2; 106:3, 17; 108:13; 117:2; 129:2; 131:16; 133:20; 140:5; 151:6; 159:25; 160:9; 161:25; 162:5; 167:9; 170:15; 171:11; 193:19

**court's** [8] - 4:8; 62:15; 69:16; 127:5; 163:13; 169:23; 194:23; 196:4

**Court's** [44] - 4:15; 5:5, 8; 13:1; 16:16, 18; 19:11, 23; 21:22; 25:8, 23; 26:19; 27:8, 10, 23; 31:5, 21; 34:11; 35:6; 58:16; 105:15; 108:1, 5, 15; 111:15;

118:8, 18; 124:21; 130:10; 159:3, 9;
160:1; 164:17, 19; 165:17; 169:20;
170:4; 180:10; 185:16; 191:10; 197:3,
8; 198:4

**courtesy** [1] - 43:20
**courthouse** [3] - 86:4; 151:8, 10
**Courthouse** [1] - 2:5
**courtroom** [5] - 10:12; 37:9; 39:21;
43:11; 106:18
**COURTROOM** [3] - 3:3; 107:4; 162:19
**courts** [9] - 3:19, 22; 11:5; 15:21;
126:14; 170:10, 14
**Courts** [2] - 173:2; 180:8
**cousins** [1] - 113:13
**coverage** [2] - 13:4
**covered** [1] - 74:13
**covert** [5] - 55:21; 75:3; 79:15, 20;
168:24
**covertly** [5] - 75:14; 77:25; 79:18;
82:14; 168:1
**CRABB** [93] - 3:7; 19:17; 20:1; 22:8,
17, 21, 25; 24:5, 10, 12, 15, 17, 21, 24;
25:8, 19, 23; 27:13; 32:2, 13, 19; 33:1,
4, 6, 13, 18; 37:14; 44:24; 49:18, 23;
55:14, 17, 19; 59:17, 19; 62:21; 69:20;
70:2, 5, 11, 17; 71:19; 72:4; 79:13, 15;
118:13; 124:15; 135:18; 158:13, 21, 24;
159:3; 160:25; 161:3, 15; 165:17;
166:12, 14, 17; 167:7; 168:21; 169:8;
171:3, 7, 16, 25; 172:2, 12, 15; 173:20,
23; 174:2, 6, 18; 185:14, 16, 19; 186:6;
188:9; 191:24; 192:2; 193:7, 14, 20;
194:3, 5, 9, 13; 195:6; 196:22, 24;
197:3; 199:21
**Crabb** [20] - 1:13; 3:7; 19:16; 44:23;
59:16; 62:20; 69:19; 88:3; 124:14;
135:17; 153:21; 158:12, 19; 160:23;
185:12; 188:11; 191:17
**crack** [1] - 14:12
**create** [3] - 106:5; 116:21
**created** [3] - 11:9, 24
**creating** [1] - 188:4
**credit** [5] - 14:4; 88:2; 163:15; 164:11;
166:10
**credited** [1] - 79:21
**credits** [5] - 165:25; 166:3, 19; 193:8
**crew** [3] - 61:10; 112:8; 127:17
**crews** [1] - 40:12
**cried** [1] - 135:14
**Crime** [1] - 88:9
**crime** [14] - 8:21; 73:2; 76:6; 77:2;
100:15; 120:1; 169:13; 174:10; 175:19;
183:6; 186:9, 12, 14; 187:25
**crimes** [13] - 5:16; 6:19; 9:15; 31:8;
73:21; 80:20; 94:8; 100:13; 102:21;
169:10; 170:21
**Criminal** [8] - 1:4; 3:3; 4:4; 21:11;
25:10; 73:1; 107:4; 162:19
**criminal** [20] - 5:16; 10:19, 22; 14:15;
26:3; 41:10; 47:25; 80:20, 24; 81:2;

94:18; 100:4; 102:22; 104:2; 163:14;
165:15, 20; 166:6; 180:4; 189:13
**criminals** [1] - 180:4
**critical** [5] - 38:23; 89:7; 104:23; 105:3
**cross** [1] - 85:24
**cross-examine** [1] - 85:24
**crossed** [1] - 100:15
**crossing** [1] - 193:3
**CRR** [3] - 2:4; 200:11, 15
**crucial** [1] - 28:25
**crying** [1] - 48:14
**crystal** [1] - 108:2
**Cuban** [2] - 56:20; 179:14
**culture** [2] - 175:13, 20
**curiae** [1] - 8:19
**current** [7] - 13:12; 18:3; 20:23; 87:2,
4; 94:16; 163:5
**curtailing** [1] - 122:2

# D

**D.C** [36] - 1:8; 2:6; 3:21; 6:25; 7:2;
26:12; 27:1; 50:12; 56:22, 25; 58:23;
59:5; 61:11; 74:4; 81:1, 16; 84:2; 94:20;
100:14; 107:21; 109:15; 119:9; 121:2;
123:7, 21; 129:24; 137:19, 24; 139:9;
140:25; 149:19; 168:2; 171:9; 172:6;
174:2
**damage** [3] - 48:7; 110:25; 111:8
**dangerous** [15] - 17:11; 32:2; 51:2;
52:14; 65:7-9; 76:5, 19; 77:25; 78:19;
82:10, 12; 143:10; 168:1
**data** [4] - 10:6; 15:17; 16:1
**Data** [3] - 4:22; 15:17, 20
**Date** [1] - 200:15
**date** [8] - 4:9; 42:21; 194:22; 195:10;
198:2, 10, 18
**dates** [1] - 52:25
**daughter** [2] - 146:1; 184:23
**Dave** [1] - 73:3
**David** [2] - 1:18; 3:8
**Davis** [1] - 172:21
**day-long** [1] - 192:23
**days** [27] - 27:6; 61:12; 66:6; 85:24;
112:17; 113:21; 117:17; 129:3; 143:8,
12-13; 149:25; 150:20; 156:8, 23;
157:1; 179:6, 11; 182:3; 185:9; 191:9;
193:9, 24
**DC** [2] - 1:16, 21
**deal** [12] - 5:6; 22:5; 58:8; 90:7; 99:22;
110:17; 112:4; 122:2; 128:16; 140:10;
144:12; 159:6
**dealer** [4] - 48:5; 103:3; 142:2; 151:12
**dealers** [13] - 30:5; 51:11; 52:9; 56:23;
58:10; 82:7, 22; 83:6; 168:1; 179:15
**dealing** [7] - 27:18; 54:10; 75:22;
78:21; 83:15; 96:8; 119:25
**deals** [5] - 26:14, 16; 58:6; 87:22;
112:2

**dealt** [4] - 30:6; 54:19; 98:19; 134:18
**death** [3] - 99:2, 7
**debriefed** [3] - 61:15, 19; 80:10
**debriefing** [2] - 63:22; 90:8
**debriefings** [1] - 90:22
**decade** [3] - 39:17; 90:11; 178:20
**decades** [3] - 112:14; 179:25; 180:25
**deceased** [2] - 47:17; 66:13
**December** [3] - 194:12, 16, 18
**decide** [3] - 48:1; 83:16; 113:16
**decided** [4] - 3:23; 78:1; 92:19; 113:23
**decides** [1] - 92:1
**deciding** [3] - 9:10; 15:21; 181:5
**deciphering** [1] - 56:6
**decision** [23] - 3:24; 6:2; 7:2; 8:1; 21:5,
16, 19; 53:18; 54:8; 58:22; 73:18;
74:15; 80:6; 96:16; 100:6, 9; 109:22;
110:11, 13; 143:2; 173:5
**decisions** [4] - 4:1; 10:23; 103:13, 24
**decline** [2] - 82:6, 9
**declined** [1] - 181:11
**decrease** [1] - 167:20
**decreased** [1] - 116:3
**dedicated** [4] - 5:11; 26:24; 55:24;
79:19
**deem** [2] - 39:20; 174:12
**deemed** [3] - 21:9; 82:10; 105:2
**deems** [1] - 186:21
**deep** [3] - 5:9; 31:7; 64:21
**deeply** [2] - 4:25; 5:13
**defeats** [1] - 100:4
**defendant** [5] - 9:13, 15; 41:9; 106:18;
173:17
**Defendant** [3] - 1:8, 22; 11:18
**DEFENDANT** [27] - 3:14; 21:4, 7;
22:15; 43:23; 136:1, 3, 6, 15, 17, 19;
140:2, 20; 142:18; 153:5, 7; 154:11, 15,
22; 155:7; 156:2, 12, 16, 22; 157:25;
158:16; 197:24
**defendant's** [3] - 107:13; 173:12;
192:9
**DEFENDANT'S** [8] - 45:10; 59:25;
63:1; 71:23; 111:19; 118:21; 124:23;
130:12
**defendants** [13] - 28:18; 38:12; 42:19;
66:13, 21; 70:25; 71:1; 73:1; 85:8;
104:25; 177:17; 179:18; 182:19
**defense** [21] - 8:5; 9:12; 20:3; 21:25;
55:20; 69:24; 70:7; 85:22; 88:14;
158:18; 182:6; 186:16; 187:7, 15, 23;
192:20; 194:15; 197:8; 199:12, 19
**defense's** [3] - 22:23; 185:21
**defer** [2] - 44:24; 105:23
**defined** [1] - 8:21
**definitely** [2] - 59:4; 122:7
**definitive** [1] - 42:21
**degree** [1] - 6:15
**delay** [3] - 3:16; 153:14; 199:6
**delivered** [1] - 94:20

**delve** [1] - 191:20
**demeanor** [4] - 47:7; 61:18; 64:14
**deny** [1] - 76:5
**Department** [19] - 2:2; 30:8, 24; 47:17; 51:7; 52:5; 63:10; 66:24; 75:6; 77:7; 92:14, 18; 93:8; 96:20; 100:18; 101:24; 185:4; 191:9
**department** [3] - 68:3; 83:15; 148:18
**Departure** [1] - 96:18
**deprived** [1] - 91:24
**deputies** [2] - 5:1, 4
**deputy** [1] - 10:8
**Deputy** [1] - 10:9
**derived** [1] - 42:6
**describe** [9] - 47:6; 61:18; 62:10; 63:8; 64:14; 65:6; 71:3, 5
**described** [1] - 55:21
**DESCRIPTION** [1] - 201:15
**deserving** [1] - 167:19
**designated** [1] - 115:16
**designation** [2] - 164:3, 23
**desperate** [1] - 103:13
**despite** [3] - 41:14; 109:25; 187:21
**destroyed** [2] - 145:14; 146:11
**destruction** [3] - 99:2, 7; 103:7
**destructive** [4] - 8:12; 9:2; 31:9; 169:11
**detail** [4] - 37:20; 154:10, 14; 166:7
**detailed** [2] - 60:20; 64:18
**detailing** [1] - 70:22
**details** [2] - 59:10; 181:22
**Detective** [4] - 47:15; 48:4; 53:4
**detention** [1] - 176:10
**deter** [1] - 133:15
**determination** [2] - 37:2; 104:5
**determinative** [2] - 88:5; 89:13
**determine** [8] - 8:24; 80:1; 123:9; 165:2; 172:7; 174:8; 186:24; 191:20
**determined** [2] - 103:23; 173:14
**determining** [4] - 31:14; 34:19; 173:4, 10
**develop** [2] - 24:22; 30:11
**developed** [4] - 27:16; 66:16; 142:4; 198:19
**developing** [1] - 67:11
**die** [1] - 158:8
**difference** [8] - 10:1; 88:17; 120:22; 121:5; 122:8, 19; 124:6; 164:6
**different** [12] - 7:18; 15:21; 27:10; 30:2; 35:24; 62:2, 5; 95:5; 133:15; 160:2; 186:14; 197:12
**differently** [1] - 65:18
**difficult** [17] - 3:25; 42:17, 20; 50:20; 53:19; 92:13; 93:17; 178:13, 17, 24; 182:13; 187:7, 10, 17, 22
**difficulty** [1] - 165:19
**diligently** [1] - 4:24
**dime** [1] - 37:4
**DIRECT** [20] - 45:18; 60:3; 63:4; 72:6;

109:1; 111:21; 119:1; 125:1; 130:15; 136:8; 201:4
**direct** [4] - 49:25; 72:20; 85:23; 102:22
**directed** [2] - 15:24; 16:15
**direction** [5] - 34:3; 68:16; 126:21; 141:1; 171:21
**directions** [1] - 172:5
**directly** [7] - 26:14; 38:16; 83:7; 153:21; 175:2; 178:8; 179:21
**director** [8] - 15:19; 112:1, 23; 181:23; 182:2, 7, 13
**disagree** [1] - 95:2
**disappear** [1] - 69:12
**disappointed** [1] - 154:6
**disastrous** [1] - 83:13
**disciplinary** [2] - 52:2; 77:1
**disclosed** [1] - 82:24
**discovered** [1] - 26:17
**discretion** [2] - 192:13
**discretionary** [1] - 192:13
**discuss** [1] - 16:16
**discussed** [5] - 41:3; 70:6; 150:5; 169:10; 177:23
**discussing** [4] - 41:24; 144:21; 149:4
**discussion** [8] - 22:10; 24:25; 33:10; 35:4; 70:4, 13; 109:13
**Discussion** [5] - 58:18; 127:7; 162:14; 196:7; 197:1
**discussions** [6] - 88:12; 96:11; 127:23; 152:10; 165:23
**dismissed** [1] - 6:20
**dismissing** [1] - 6:23
**disparities** [5] - 14:15; 182:18; 183:10; 187:16; 188:5
**disposed** [1] - 192:11
**dispute** [3] - 38:10, 25; 39:15
**disputes** [1] - 9:8
**disqualified** [1] - 166:5
**disseminated** [1] - 19:13
**distance** [1] - 169:4
**distinction** [2] - 20:19; 108:3
**distinguishable** [1] - 41:19
**distinguished** [1] - 25:17
**distraction** [1] - 103:23
**distribute** [4] - 5:18; 7:5; 186:15
**distribution** [6] - 7:8; 8:12, 17; 9:2; 155:23
**distributors** [1] - 82:3
**District** [55] - 3:20; 5:3, 15; 7:6, 10, 15-16, 25; 8:4; 9:6, 17; 10:5, 15; 12:4; 13:13; 14:13, 19; 23:16; 25:18, 25; 26:15; 27:21; 28:8, 15; 32:12, 16; 36:20; 38:16; 40:1, 6; 41:22; 55:23; 56:18; 63:21; 70:15; 79:17; 102:9; 112:16; 113:4; 119:16; 152:22; 173:2, 9; 174:25; 175:6, 11; 177:17; 179:16, 22; 180:8; 191:5
**DISTRICT** [3] - 1:1, 11
**District's** [1] - 10:21

**diverse** [1] - 179:13
**divided** [1] - 14:3
**Division** [2] - 46:5
**docket** [1] - 15:24
**Document** [7] - 20:19; 71:15; 95:16; 97:4; 153:9; 171:17; 172:9
**document** [5] - 18:19; 20:22; 97:3, 10, 21
**documented** [1] - 190:14
**documents** [1] - 13:15
**Dodge** [1] - 129:25
**Doe** [1] - 12:8
**Dominguez** [35] - 22:19, 24; 23:5; 24:6; 39:8, 13-15, 22; 49:13, 15; 50:11; 59:10; 69:25; 70:8, 14, 20-21; 71:3, 5, 11; 72:8; 111:3; 131:16; 137:1; 148:25; 150:13; 168:17, 22; 178:10; 182:22; 184:2; 189:17; 190:18
**DOMINGUEZ** [3] - 71:23; 72:6; 201:7
**Dominguez's** [1] - 39:8
**done** [22] - 13:4; 15:5; 31:11, 13; 36:2; 48:7; 59:4; 66:25; 67:1; 87:22; 98:4; 110:25; 111:8; 114:7; 116:24; 117:22; 120:4; 134:19; 144:20; 182:11; 195:23; 200:1
**door** [2] - 126:19; 135:7
**doors** [1] - 50:16
**dot** [1] - 120:17
**dotting** [1] - 193:3
**doubt** [4] - 21:20; 116:13; 126:7; 191:17
**down** [13] - 48:14, 24; 50:6; 64:16; 69:23; 104:14; 110:23; 112:9; 135:7; 145:6; 174:7; 176:15; 187:25
**Downs** [8] - 1:22; 3:11; 19:19; 20:7; 36:15; 166:21; 174:20; 188:19
**DOWNS** [173] - 1:22; 3:10; 19:20; 20:8, 10, 14, 17, 25; 22:13; 23:7, 9, 14, 22, 25; 24:2; 34:6, 13, 16, 18, 23; 35:1; 36:17, 19; 37:10, 13, 17; 40:14; 41:21, 23; 42:9; 43:24; 44:8, 12; 45:5, 8, 16, 19; 49:4, 12; 50:19; 55:8; 56:2, 4, 9, 11; 58:16, 20; 59:14, 22, 24; 60:4; 62:15, 17, 23, 25; 63:5; 64:6; 69:3, 16, 18, 24; 70:21; 71:17; 72:7; 78:25; 80:13; 90:2; 94:9; 95:13; 96:23; 97:3, 6, 9, 15, 18, 24; 99:12; 100:16; 104:13, 18, 21; 105:7, 21; 106:7, 9, 11, 20, 23; 108:7, 15, 18; 109:2; 111:10, 15, 22; 117:11; 118:8, 11, 18; 119:2, 6; 123:3; 124:13, 21; 125:2; 127:5, 9; 128:6; 130:7, 10, 16; 134:7; 135:21, 24; 136:9, 24; 140:12; 141:3; 142:25; 149:10, 12-13; 153:8; 157:13, 16; 158:10, 17; 159:16; 160:22; 166:23, 25; 174:21, 23; 175:7; 176:4; 178:14; 180:10, 21; 188:21; 189:20, 23; 190:1; 191:7; 194:20, 23; 195:17, 20, 22; 196:4, 12, 17, 20; 197:7, 12, 19, 21; 198:4, 8, 25; 199:12, 14, 17, 19; 201:4

**Dr** [1] - 195:4
**draft** [11] - 71:7, 13; 95:15, 18-19; 96:21, 24; 97:2, 14
**drives** [1] - 17:6
**drove** [1] - 80:15
**drug** [62] - 6:16, 18; 17:10; 25:25; 26:10, 13, 15, 23; 27:2, 18, 21; 30:5; 31:9, 12; 38:13; 46:2; 48:5; 49:25; 50:21; 51:11; 52:9; 54:21; 56:22; 58:6, 8, 10; 66:17; 74:20; 76:6, 16; 82:7, 22; 83:6; 87:2, 4, 22; 89:22; 90:8, 17; 91:14; 92:15; 98:14; 100:14; 102:2; 103:3; 142:1; 149:23; 150:18; 151:12; 152:19; 168:1; 169:1, 11; 179:15; 190:24; 191:2
**Drug** [1] - 88:9
**drug-related** [1] - 6:18
**drugs** [12] - 48:10; 75:22, 25; 103:7; 138:8; 139:9; 141:13; 146:12; 147:11; 150:19; 155:12; 186:15
**Duckin'** [2] - 129:24
**due** [1] - 30:12
**Dump** [2] - 91:8, 16
**Dunbar** [1] - 99:3
**duration** [1] - 149:2
**during** [17] - 3:22; 11:18; 17:11; 21:21; 43:9; 44:2; 52:4; 53:2, 13; 54:6, 13; 61:24; 62:2, 6; 105:1; 148:23; 165:20
**duty** [1] - 133:25

## E

**e-mail** [1] - 12:9
**ear** [1] - 22:10
**early** [5] - 8:23; 26:8; 60:12; 104:15; 131:18
**earshot** [1] - 36:10
**earth** [1] - 157:3
**easier** [1] - 198:12
**east** [1] - 51:1
**East** [1] - 65:10
**Eastern** [2] - 63:21; 102:9
**easy** [2] - 94:17; 198:23
**ECF** [1] - 16:14
**echo** [1] - 31:3
**edmond** [1] - 91:13
**EDMOND** [4] - 1:6; 136:1, 8; 201:13
**Edmond** [284] - 3:4, 11, 13; 4:6, 8, 12; 5:15; 6:2, 9, 14, 21, 24; 7:4, 11; 8:10, 25; 10:2; 11:18; 12:4; 14:12, 14, 22, 24-25; 16:2; 17:13; 18:8; 20:11, 17, 20; 21:1, 9, 17; 22:9; 25:13, 24; 26:6, 10, 17, 21; 27:2, 4, 20, 25; 28:3, 10, 22; 29:4, 6, 9, 21; 30:4, 16; 31:6; 32:6, 11; 33:14, 20-21; 37:21; 38:1, 5, 17; 39:10; 40:1, 8, 21-22, 24; 42:10; 43:11, 20; 46:12, 15-16, 19, 22; 47:6; 49:2, 6, 10; 50:1; 51:24; 52:8, 10, 15; 53:2, 14; 54:8; 55:9, 22; 56:5, 12, 21; 58:4, 9, 22,

24; 60:13, 18, 24; 61:2-4, 11, 14-15, 25; 62:4, 7; 63:18; 64:21; 65:11, 20; 66:4, 8, 22; 67:4, 16; 68:4, 12; 69:4; 70:24; 71:1; 72:21-23, 25; 73:5, 9, 13, 15, 17, 22; 74:1, 9, 15; 75:21; 76:4, 14, 20; 77:17; 78:1, 18; 79:16; 82:6; 83:21; 84:3, 6; 85:5; 86:2, 14-15; 90:3; 91:15, 20; 92:10, 21; 93:5; 94:15, 19; 95:21; 99:14, 19; 100:14; 101:4; 102:4, 24; 103:20; 106:14; 107:5; 109:6, 14; 112:18-20, 22; 113:1; 114:2, 19, 23; 115:1, 19-20; 116:10; 117:19; 119:22; 120:11; 121:8; 122:4, 12, 21-22; 126:4, 13, 18, 23, 25; 127:14, 21; 128:18; 129:10; 130:24; 131:2, 4, 7, 17; 132:3, 18; 133:3; 134:3, 10; 135:24; 136:2, 12, 25; 149:14; 153:9; 157:17; 162:3, 10, 20; 163:2; 165:19, 24; 167:25; 168:25; 169:13; 170:4, 12; 174:10; 175:16, 21; 176:6, 12; 178:6; 179:9, 16; 180:12, 25; 181:10, 15; 182:1, 10-11; 183:2, 18, 23; 184:1, 5, 8, 13, 21; 185:24; 186:7, 10, 18; 187:9; 188:1; 189:3; 190:12, 18, 21, 23; 192:24; 195:9; 197:7, 9; 200:4
**Edmond's** [87] - 3:11; 4:3, 5; 5:5; 6:25; 7:3, 13, 15, 21; 8:3; 9:16, 20, 23; 12:3; 14:4, 9; 15:18; 17:2; 25:10; 26:14, 24; 27:13, 17; 28:6, 19; 29:1, 11, 25; 30:12; 31:2, 8; 36:23; 38:9, 21; 39:12, 14, 16; 41:5; 42:5, 24; 50:5; 61:18; 62:11; 64:2, 8, 14; 67:12; 69:1; 70:22; 71:6; 75:8; 79:10; 82:21, 23; 84:18, 24; 85:16, 20; 87:7; 94:10, 12; 98:1; 100:6; 104:21; 105:2; 117:6; 122:10; 128:8; 133:22; 167:15, 19, 22; 169:9; 170:21; 174:24; 177:7; 178:1; 179:19; 180:4; 182:3; 183:13; 185:23; 187:6, 9; 189:12
**Edmonds** [2] - 25:16; 118:2
**educate** [1] - 11:18
**education** [3] - 123:19, 24
**effect** [8] - 14:22; 50:7, 18; 78:13, 16; 126:24; 137:23; 162:2
**effective** [1] - 159:12
**effort** [4] - 5:10; 52:18; 53:23; 79:25
**efforts** [4] - 10:7; 30:12; 107:20
**eight** [3] - 6:11; 85:8; 137:20
**either** [11] - 66:13, 17; 67:11; 91:23; 107:22; 118:1; 126:6; 161:21; 166:16, 22; 191:12
**elaborate** [1] - 53:11
**elected** [2] - 9:5; 15:10
**elementary** [1] - 131:3
**elicit** [2] - 70:7, 19
**eligibility** [1] - 191:10
**eligible** [9] - 163:10; 165:13, 24; 166:2; 175:5; 177:9; 180:14; 185:6; 189:4
**eliminated** [1] - 29:20
**eliminating** [2] - 67:12; 113:20
**Ellis** [1] - 102:9
**Email** [2] - 1:17, 25

**emergency** [1] - 53:7
**emerges** [1] - 160:20
**EMMET** [1] - 1:11
**employed** [1] - 120:25
**employee** [1] - 5:11
**employing** [1] - 5:20
**employment** [2] - 122:1; 123:25
**enabling** [1] - 88:17
**encounter** [1] - 116:9
**encountered** [3] - 64:15; 74:9; 77:23
**encourage** [3] - 36:20; 121:8; 147:16
**encouraged** [2] - 40:7, 9
**end** [19] - 7:20; 8:12; 9:15; 16:4; 23:16; 32:15; 34:14; 36:14; 46:18; 73:24; 104:3; 124:2; 145:19; 146:17; 175:20; 177:11; 180:15; 194:7, 18
**endeavor** [1] - 191:24
**ended** [9] - 28:3; 86:9; 90:10; 91:20; 97:10; 102:2; 140:5; 142:14, 24
**ending** [1] - 122:11
**ends** [1] - 23:22
**enemies** [2] - 76:8; 190:8
**enemy** [2] - 29:16; 76:7
**Enforcement** [1] - 88:9
**enforcement** [42] - 20:2, 10; 23:2; 26:18; 29:22; 30:3; 37:3, 23; 38:2, 7; 39:5, 23; 45:23; 46:7, 11, 25; 47:10; 51:8; 53:16; 57:3, 13; 61:24; 63:9; 90:5; 91:3, 23; 95:11; 96:7; 98:12; 101:7; 102:20; 104:8; 105:21; 106:1; 137:7; 148:12, 14; 151:2; 154:25; 178:18; 179:5
**engage** [3] - 11:12, 14, 22
**engaged** [1] - 29:14
**engagement** [1] - 11:21
**engaging** [1] - 5:16
**England** [1] - 104:16
**enhancements** [2] - 177:9; 178:2
**enjoy** [1] - 140:9
**enjoyed** [1] - 168:19
**enlightened** [4] - 171:24; 172:1, 16; 173:18
**enlist** [1] - 9:5
**enter** [1] - 112:10
**entered** [1] - 6:22
**enterprise** [8] - 5:17; 26:3, 11; 41:10; 48:6; 49:25; 182:25; 183:1
**entertain** [1] - 8:4
**entire** [2] - 166:1; 168:19
**entities** [1] - 4:20
**entitled** [1] - 200:12
**entrenched** [1] - 183:6
**environment** [5] - 138:21; 168:1, 24; 181:20; 190:25
**envy** [1] - 102:23
**epidemic** [1] - 14:13
**equally** [2] - 14:3; 29:18
**equation** [1] - 189:1
**equipment** [1] - 23:10

**Eric** [1] - 75:5
**error** [1] - 180:7
**escaped** [1] - 100:1
**Escobar** [3] - 81:25; 82:1, 10
**especially** [9] - 4:22; 5:2, 9; 44:18; 132:16; 168:25; 175:13; 200:2
**Esq** [1] - 1:22
**essential** [1] - 115:6
**essentially** [5] - 11:12; 17:5; 107:12; 144:8; 192:14
**establish** [1] - 186:14
**established** [1] - 12:9
**establishing** [1] - 87:10
**et** [3] - 18:10; 170:5
**evaluate** [2] - 27:6; 72:17
**evaluated** [1] - 70:23
**evaluating** [1] - 67:15
**event** [4] - 4:20; 12:16, 18
**events** [1] - 74:22
**eventually** [5] - 26:6; 67:1; 75:6; 77:6; 143:16
**everywhere** [1] - 158:2
**evidence** [11] - 6:19; 20:4; 29:8; 41:5; 49:5, 8-9, 25; 160:4; 168:17; 186:13
**evident** [2] - 53:17; 125:5
**evidentiary** [5] - 4:11, 14; 89:4; 159:20; 161:4
**evolution** [1] - 97:25
**evolutionary** [1] - 97:16
**exact** [9] - 41:10; 52:25; 62:3; 134:9; 138:24; 146:9; 177:8; 178:1
**exactly** [3] - 93:11; 172:10
**EXAMINATION** [20] - 45:18; 60:3; 63:4; 72:6; 109:1; 111:21; 119:1; 125:1; 130:15; 136:8; 201:4
**EXAMINATIONS** [1] - 201:3
**examine** [1] - 85:24
**example** [6] - 86:20; 89:5; 115:5; 126:12; 135:10
**exceeded** [1] - 68:4
**excellent** [1] - 193:3
**exceptional** [1] - 55:2; 71:6
**excess** [2] - 68:3; 177:21
**excuse** [10] - 20:8; 86:15, 23; 87:23; 106:14; 149:8; 152:17; 162:10; 169:21
**excused** [5] - 44:1, 13, 17; 200:4, 6
**executive** [2] - 112:1, 23
**exemplified** [1] - 120:20
**exercise** [1] - 140:9
**Exhibit** [2] - 71:14; 97:3
**exhibits** [2] - 153:12; 160:10
**EXHIBITS** [1] - 201:14
**expect** [4] - 74:18; 76:25; 96:20; 162:24
**expectation** [3] - 75:17; 139:25; 140:9
**expectations** [2] - 74:2; 189:18
**expected** [1] - 160:7
**expecting** [3] - 50:12; 73:15; 192:6
**experience** [8] - 13:8; 51:8; 82:21;

131:25; 133:10, 13, 18
**expertise** [1] - 78:17
**experts** [1] - 76:3
**explain** [7] - 13:1; 15:20; 28:9; 29:5, 15; 50:21; 103:10
**explained** [9] - 47:12; 64:17; 75:19; 78:1, 3, 8, 18; 156:22; 170:10
**explaining** [1] - 156:8
**explicitly** [1] - 110:2
**exposed** [2] - 82:15, 22
**express** [3] - 4:18; 11:19; 126:1
**extend** [1] - 43:20
**extensive** [4] - 37:20, 22; 39:1; 61:12
**extent** [12] - 9:10; 64:3; 71:10; 89:16; 168:22; 173:3; 176:7; 181:9; 191:17; 192:7, 20
**extra** [1] - 183:21
**extract** [1] - 53:10
**extraordinarily** [2] - 47:11; 51:2
**extraordinary** [19] - 47:9, 20-22; 48:14; 51:12; 53:21; 77:23; 83:15; 98:7; 116:18; 167:22; 168:3, 13, 24; 169:1, 6, 9; 178:9
**extreme** [1] - 162:7
**extremely** [4] - 75:9; 76:11; 77:22; 100:1
**eyes** [1] - 139:2

# F

**F.3d** [3] - 6:2; 173:6
**facet** [1] - 39:13
**facets** [1] - 39:12
**facilitate** [8] - 85:10, 14; 122:5, 7, 10; 127:22; 128:1; 133:2
**facilities** [1] - 5:23
**facility** [5] - 93:10; 140:4; 190:4
**Fact** [6] - 108:2; 159:5; 191:13; 192:4, 6
**fact** [28] - 13:4; 25:5, 12; 29:12; 34:20; 38:10, 25; 41:14; 42:19; 87:13; 109:25; 110:4; 120:23; 122:19; 128:13; 159:6; 165:19; 167:8, 15; 175:1; 176:14; 177:12, 15, 25; 183:22; 187:14, 22
**fact-specific** [1] - 187:14
**factions** [2] - 120:6; 176:13
**factor** [5] - 9:13; 170:14; 171:4; 172:18; 187:13
**factored** [2] - 165:21; 166:18
**factors** [18] - 9:9; 15:2; 37:1; 123:23, 25; 169:25; 170:8, 20; 171:12; 172:4, 24; 173:3, 9, 11, 15; 174:11; 182:17; 192:15
**facts** [5] - 68:9; 104:8; 161:19; 191:13
**Facts** [2] - 107:22; 108:5
**factually** [3] - 71:7, 13; 191:21
**fair** [5] - 29:21; 51:19; 64:2; 91:5; 181:2
**Faith** [1] - 125:8

**fall** [1] - 155:4
**falls** [1] - 27:19
**false** [6] - 54:1; 62:8; 67:17; 97:17
**faltered** [1] - 68:18
**familiar** [5] - 27:23; 84:20, 23; 105:15; 154:10
**families** [1] - 187:25
**family** [32] - 68:7, 22, 25; 82:23; 83:8; 84:11; 99:22; 100:1, 7-8; 127:18; 138:13, 15; 145:14; 155:10, 13; 157:17; 162:3; 183:5-7, 22, 25; 184:15, 20, 24
**far** [9] - 24:17; 48:24; 68:4; 94:5; 100:2; 147:11; 172:7; 174:3
**fashioning** [3] - 177:2; 180:2; 183:11
**fast** [4] - 61:21; 80:9; 156:15, 18
**faster** [1] - 158:6
**favorably** [1] - 192:11
**Fax** [1] - 1:25
**FBI** [4] - 45:24; 52:5; 60:20; 67:2; 98:13
**FCI** [1] - 190:3
**fear** [8] - 129:20, 23; 130:3, 5; 135:6, 14; 158:7
**fears** [1] - 129:19
**feasible** [1] - 197:4
**February** [1] - 199:7
**federal** [20] - 5:15, 17, 20-22, 24; 7:6; 10:18; 14:10; 23:15; 26:6; 27:18; 28:7; 30:8; 46:18; 51:9; 73:25; 74:12; 99:25
**Federal** [4] - 4:3; 21:11; 25:9; 27:22
**feet** [1] - 128:24
**fell** [1] - 155:4
**fellow** [2] - 76:23; 189:18
**felonies** [1] - 19:3
**felony** [1] - 35:22
**felt** [10] - 9:2; 53:8, 10; 63:16; 110:12; 132:1; 138:12; 142:8; 144:12
**fence** [1] - 152:11
**ferret** [1] - 26:22
**few** [10] - 3:16, 18; 61:5; 68:8; 121:16, 21; 127:16; 142:22; 188:22; 197:12
**Field** [2] - 46:1
**field** [1] - 46:4
**fight** [1] - 139:22
**fighting** [1] - 113:13
**figure** [9] - 9:3; 75:2; 76:1; 77:3, 14-15; 122:13; 171:22
**figured** [4] - 77:17; 114:10; 141:11; 165:21
**file** [6] - 8:1; 9:18; 25:4; 96:1; 161:11; 185:7
**filed** [10] - 15:23; 16:14; 24:19; 25:2, 9; 97:14; 165:3, 10; 169:21; 171:17
**files** [1] - 5:12
**filing** [4] - 8:5; 28:16; 97:11; 153:15
**filled** [1] - 67:2
**final** [1] - 195:3
**finally** [9] - 52:17, 19; 64:20, 22, 24; 65:20; 110:22, 25; 144:19

**Findings** [8] - 107:22; 108:1, 4; 159:5; 191:13; 192:4, 6

**findings** [6] - 11:3; 13:11; 160:21; 161:13; 167:4; 198:21

**Fine** [1] - 74:2

**fine** [21] - 3:15; 15:9; 16:23; 21:8; 44:16; 64:22; 70:11; 105:6; 106:13; 107:19; 108:19; 117:15; 149:11; 161:18; 162:23; 191:18; 192:21; 194:2; 197:25; 199:12

**finger** [2] - 165:18; 166:17

**fingers** [1] - 100:15

**finish** [4] - 43:7; 69:8; 174:6

**finished** [2] - 85:23; 119:24

**firearm** [2] - 6:16; 17:11

**firm** [1] - 155:23

**First** [4] - 125:8; 165:25; 186:8

**first** [43] - 4:18, 21; 6:15; 10:11, 17; 11:24; 19:13; 21:12; 25:24; 42:25; 43:12; 45:6; 46:14, 16; 63:18; 64:16; 72:23; 73:5, 12; 74:25; 85:8; 106:15; 107:7; 109:5; 112:20; 120:6; 137:1, 6, 15, 20; 140:8; 145:12, 24; 162:10; 165:11; 184:13, 22; 188:22; 189:8; 191:23; 195:12

**firsthand** [2] - 29:7; 30:17

**fits** [1] - 57:14

**five** [9] - 18:23; 19:2; 35:19, 21; 62:5, 7; 144:5; 179:6, 11

**fix** [1] - 58:13

**fixing** [1] - 58:3

**flag** [3] - 33:13, 19; 34:1

**flipped** [1] - 86:22

**flood** [1] - 48:10

**focus** [8] - 8:7; 12:22; 29:17; 30:22; 56:25; 66:7, 20

**focused** [2] - 115:24; 125:23

**focusing** [2] - 29:22; 99:22

**folk** [3] - 126:9, 17; 128:4

**folks** [2] - 126:1, 20

**follow** [9] - 37:24; 81:4; 93:18; 99:23; 105:18; 157:13; 160:20; 161:24

**follow-up** [4] - 105:18; 157:13; 160:20; 161:24

**followed** [3] - 56:7; 102:3; 103:14

**following** [4] - 4:19; 5:16; 6:10; 22:17

**Following** [3] - 22:11; 33:10; 70:4

**follows** [1] - 173:8

**football** [2] - 127:16

**FOR** [1] - 1:1

**Force** [1] - 88:9

**force** [7] - 63:12; 93:17, 24; 117:2; 127:10; 133:19; 194:17

**forced** [2] - 60:7; 65:18

**foregoing** [1] - 200:11

**forever** [3] - 124:4; 142:3; 184:10

**forfeit** [1] - 164:1

**forfeiture** [2] - 73:3; 166:10

**forget** [1] - 86:22

**forgive** [1] - 82:19

**forgot** [2] - 33:4; 91:18

**forgotten** [1] - 32:22

**form** [1] - 131:9

**Former** [1] - 45:9

**former** [5] - 6:4; 13:13; 26:14; 181:24; 182:12

**formulate** [1] - 52:7

**forth** [8] - 9:9; 26:2; 28:16; 64:18; 96:14; 169:19, 22; 172:6

**forthcoming** [1] - 181:15

**fortune** [1] - 83:12

**Fortune** [1] - 103:4

**forums** [1] - 12:13

**forward** [8] - 3:5; 30:21; 31:18; 44:3; 53:22; 58:7; 86:3; 156:21

**four** [19] - 6:11; 17:12; 27:19; 30:16; 39:11; 42:15; 61:12; 62:5; 74:7, 24; 85:25; 89:2; 125:19; 130:2; 149:1, 25; 156:12

**four-hour** [2] - 74:7, 24

**four-year** [1] - 42:15

**fourth** [3] - 12:22; 29:25; 134:1

**Fourth** [3] - 1:15, 20; 12:17

**Frank** [1] - 12:19

**frankly** [3] - 40:3; 49:15; 159:21

**fraud** [1] - 58:5

**Fred** [2] - 81:19, 24

**Freddy** [2] - 82:12, 14

**free** [3] - 51:24; 140:10; 151:1

**freedom** [1] - 140:7, 13

**freeze** [1] - 138:5

**Friday** [4] - 43:8; 80:11, 15; 83:19

**friend** [3] - 9:18; 114:6; 127:14

**friends** [5] - 68:23, 25; 76:7; 146:11; 162:3

**frightening** [1] - 99:10

**front** [8] - 11:11; 101:23; 103:16; 113:23; 142:8, 20; 145:13; 154:5

**fugitive** [1] - 91:19

**full** [11] - 119:10, 13; 121:18; 125:7; 130:20; 155:16, 18; 176:7

**full-time** [3] - 119:10, 13; 125:7

**fully** [6] - 32:20; 50:12; 68:21; 69:7; 175:12; 198:19

**fully-developed** [1] - 198:19

**funerals** [1] - 116:6

**funny** [1] - 61:20

**future** [6] - 14:22; 30:15; 75:14; 109:16; 128:5; 156:20

## G

**gain** [1] - 75:10

**gainful** [1] - 121:25

**gainfully** [1] - 120:25

**Gambino** [2] - 183:4, 6

**game** [8] - 50:21; 65:22; 76:16; 142:2; 190:24; 191:2

**games** [1] - 127:16

**gang** [3] - 48:8; 76:9; 112:7

**Garcia** [2] - 81:20, 22

**garnered** [1] - 13:3

**gathering** [3] - 11:16; 80:19; 125:25

**gatherings** [1] - 134:5

**geared** [1] - 41:25

**gears** [2] - 75:1

**Geddis** [1] - 101:23

**gender** [1] - 104:16

**General** [17] - 5:3; 8:19; 9:5, 18, 20; 10:5, 9, 12-13; 13:9; 15:3, 11; 30:8, 24; 44:17; 168:9

**general** [13] - 23:4; 76:20; 77:18; 78:2, 5; 137:23; 139:5; 142:11; 148:16; 149:3; 160:9; 165:23

**General's** [3] - 10:3; 44:12; 58:2

**generally** [11] - 27:16; 28:9; 36:11; 54:19; 77:24; 91:12, 15; 113:8; 125:21; 145:11; 146:7

**gentleman** [2] - 183:17, 25

**genuine** [1] - 80:7

**George's** [1] - 86:25

**gifted** [1] - 116:23

**Gilmore** [1] - 121:23

**girlfriend** [1] - 66:18

**girls** [1] - 156:13

**given** [17] - 9:16; 18:12; 40:23; 63:16, 25; 68:14; 102:10; 116:10; 120:15; 121:16; 122:6, 23; 126:23; 133:2, 12; 134:20; 154:7

**glare** [1] - 43:18

**Glenn** [1] - 15:19

**goal** [1] - 145:17

**God** [10] - 125:9; 128:17, 20, 22; 129:3, 5; 132:5; 142:8; 156:25; 158:7

**God's** [5] - 128:23; 129:7; 130:5

**Godly** [1] - 134:19

**gods** [1] - 128:25

**Goodhand** [2] - 1:18; 3:8

**gosh...** [1] - 91:11

**Gotti** [1] - 187:25

**government** [74] - 4:4, 13; 6:18; 7:24; 8:2, 10; 10:2; 14:10; 16:1; 19:12, 17, 24; 20:4; 21:24; 22:22; 24:19; 25:3, 6, 9, 13; 26:9; 27:2, 5, 18; 28:14; 30:4, 7, 13; 36:21; 39:2, 4, 11, 18; 46:9; 58:2; 88:16, 18; 90:11; 96:3; 123:17; 124:8; 126:15; 141:12, 25; 142:15, 19, 21; 151:15; 153:4, 15-16; 154:13; 162:25; 165:10; 167:16, 21; 171:14, 17; 175:15, 18; 176:22; 177:5, 20; 179:10; 180:11; 181:6; 183:2, 8; 191:22; 192:19; 199:20

**government's** [16] - 4:2, 14; 25:2; 32:18; 49:20; 165:9; 167:13; 169:22, 25; 170:2, 7, 16, 25; 176:22; 180:24; 185:17

**graduated** [2] - 99:3, 6

**grams** [1] - 5:19

**grand** [1] - 156:5

**grandchildren** [1] - 156:10
**grandfather** [1] - 156:4
**grant** [2] - 93:4; 163:1
**granting** [1] - 89:5
**grateful** [1] - 4:22
**Gravano** [4] - 183:3, 11; 187:23
**gravity** [2] - 31:8; 170:21
**gray** [1] - 104:25
**Gray** [18] - 27:24; 38:18, 25; 61:4, 8-10, 14, 16; 84:21; 85:7, 17, 20; 90:16; 104:22; 149:15; 179:17
**great** [17] - 78:20; 81:9; 83:12; 90:7; 93:24; 106:13; 122:1; 124:6; 125:17; 126:10; 127:21; 128:9, 12; 147:13; 157:19; 159:6
**greater** [4] - 57:21; 99:5; 117:10; 173:12
**Greater** [1] - 125:7
**greatest** [1] - 147:9
**greatly** [1] - 127:2
**Gregory** [1] - 1:22
**grew** [7] - 78:12; 126:13; 127:14; 129:18; 131:3, 10; 155:9
**ground** [2] - 161:15; 191:25
**groups** [4] - 12:22; 27:24; 121:25
**grow** [1] - 156:15
**growing** [2] - 131:5; 155:12
**grown** [2] - 131:7; 156:17
**guaranteed** [1] - 157:1
**guardian** [1] - 105:12
**guards** [2] - 143:22; 147:19
**guess** [4] - 23:1; 42:12; 166:8; 195:8
**Guess** [1] - 111:4
**guessing** [1] - 166:12
**guidance** [1] - 132:2
**guide** [1] - 29:15
**guideline** [7] - 19:5, 21; 177:11; 180:15, 23; 186:1, 15
**guidelines** [17] - 16:12; 17:5, 7, 20; 18:3, 9-10; 19:3; 35:17; 180:7, 9, 11; 185:22
**Guidelines** [7] - 104:4; 176:20; 177:4, 6, 10, 19; 180:3
**guidepost** [2] - 176:21; 177:19
**guilty** [10] - 5:15; 7:4; 55:22; 79:17, 19; 91:20; 92:1; 101:24; 151:7; 179:18
**gunfire** [1] - 130:1
**guns** [2] - 112:10; 176:15
**guy** [9] - 48:1; 98:24; 118:2; 127:21; 128:9, 12; 150:18, 22
**guys** [6] - 99:3; 135:10; 144:11; 146:24; 152:6, 19

# H

**half** [2] - 139:12; 140:25
**hallway** [1] - 183:17
**handle** [2] - 139:24; 162:15
**handling** [1] - 23:14

**handpicked** [1] - 12:22
**hands** [1] - 128:23
**happy** [8] - 41:16; 97:6; 105:24; 140:6; 190:16; 197:13; 198:9
**hard** [6] - 31:10; 43:17; 62:1; 78:10; 144:10; 192:12
**harder** [3] - 182:1, 5, 9
**hardest** [1] - 156:8
**hardship** [2] - 44:14; 106:5
**hardworking** [1] - 19:9
**harkens** [1] - 30:1
**harm** [1] - 31:10
**Haynes** [4] - 152:16-18; 153:1
**he..** [1] - 151:10
**head** [7] - 33:24; 78:10; 98:8; 110:22; 113:22; 163:20; 193:12
**headaches** [2] - 140:16, 19
**headquarters** [3] - 46:3; 52:5
**health** [1] - 47:3
**healthy** [1] - 116:9
**hear** [21] - 12:24; 16:18; 19:11; 21:16; 22:10, 12, 14; 25:6; 40:8; 44:4; 115:12; 126:20; 160:6; 161:10, 23; 162:5; 165:11; 182:21; 195:10, 24
**heard** [16] - 10:24; 44:11; 56:2; 62:10; 64:1; 82:1; 103:9; 114:6; 116:23; 117:22; 128:17; 137:1; 145:22; 157:5; 161:23; 170:4
**hearing** [44] - 4:11, 14; 21:10, 12, 15, 17, 22; 23:15, 19, 22; 24:2; 34:14; 36:14; 40:21; 41:4; 43:6; 104:8; 107:25; 152:21, 25; 159:9, 18-20; 160:3, 14, 20; 161:4, 11, 24; 188:14; 192:23; 195:7, 11-13; 198:17; 199:1, 16
**HEARING** [1] - 1:10
**hearings** [3] - 39:3; 161:25; 196:14
**heart** [6] - 13:22; 120:20; 132:1; 137:18; 147:13; 152:9
**hearted** [1] - 133:7
**hearts** [2] - 137:18; 152:10
**held** [13] - 12:22; 13:18; 16:3; 102:20; 169:23; 171:15, 21; 172:5, 18, 23; 173:2; 190:5
**help** [38] - 29:15; 30:4, 24; 76:3, 6; 77:5; 82:14; 85:14; 92:2; 94:6; 98:14; 114:9, 11-12; 116:16; 117:7; 126:19; 133:15; 134:4; 135:9; 145:19; 148:20; 153:15, 22; 154:25; 157:3; 168:8; 170:5; 177:14; 195:15; 200:1
**helped** [4] - 26:22; 30:19, 22; 40:1
**helpful** [6] - 67:14; 88:4; 159:10, 17; 191:19; 192:18
**helping** [8] - 29:1; 30:13; 88:2; 115:7; 155:3; 168:8; 181:18
**hemorrhaging** [1] - 113:25
**hesitate** [1] - 66:1
**hidden** [1] - 64:4
**hideout** [1] - 130:4
**high** [17] - 3:23; 11:2; 13:11; 52:14; 65:5; 75:6; 77:7; 99:6; 100:1; 105:8, 13;

117:24; 131:3; 192:23; 193:4
**high-level** [1] - 11:2
**high-profile** [1] - 105:13
**higher** [3] - 96:19; 166:2; 180:12
**highest** [4] - 51:1, 6; 52:19; 65:9
**highly** [1] - 12:21
**himself** [6] - 5:11; 26:7; 58:9, 13; 170:5; 191:4
**hinders** [1] - 195:14
**historical** [7] - 28:11; 75:12, 15; 80:21; 90:14, 16; 179:23
**historically** [1] - 124:4
**history** [5] - 9:12; 171:4, 13; 180:4; 183:4
**hit** [5] - 58:12, 23; 74:16, 19; 78:14
**hmm** [3] - 128:10; 130:9; 134:16
**Hogan** [2] - 101:23; 102:10
**hold** [4] - 96:21; 104:2; 118:5; 181:10
**Holder** [1] - 75:5
**hole** [1] - 144:14
**home** [5] - 40:16; 102:4; 147:7; 157:20, 22
**hometown** [1] - 99:2
**homicide** [4] - 6:24; 29:7; 66:14
**homicides** [21] - 29:2, 8, 24; 30:23; 38:16; 61:11; 66:7, 9; 67:10; 101:24; 102:1; 113:5; 148:10, 12; 178:16; 179:14, 21; 182:24; 183:5
**honest** [1] - 129:21
**honestly** [1] - 98:20
**Honor** [201] - 3:3, 7, 10, 14; 10:11, 21; 11:5; 13:18; 13:5, 25; 15:3, 11, 14; 16:21; 17:1, 15, 18, 24; 18:3, 11, 14, 16; 19:1, 17, 20; 20:1, 8, 11, 25; 22:8, 13, 17; 23:7, 9, 14, 25; 24:5; 25:8, 19; 32:13; 34:6, 23; 35:2, 9, 24; 36:17, 19; 37:13, 17; 38:4, 12; 39:4; 41:2, 23; 42:15; 43:24; 44:1, 24; 45:5, 9, 16; 49:18, 23; 54:22; 55:14, 19; 56:2, 9; 57:16; 59:17, 19, 22; 62:15, 18, 21, 25; 63:3; 69:18, 20, 22, 24; 70:2, 5, 9, 17, 21; 71:17, 19; 72:1; 79:13, 15; 89:25; 95:3; 97:9; 100:20; 102:23; 104:13; 105:20; 106:7, 11-12, 20, 23; 107:4; 108:7, 15, 22; 111:11, 14, 17; 118:11, 13; 123:3; 124:13, 15; 130:7, 10, 14; 134:8; 135:18, 21; 136:3; 149:10, 12; 155:8; 157:13, 25; 158:11, 13, 17, 21; 159:16, 19; 160:15, 22, 25; 162:19; 163:17, 21; 164:7, 23; 166:12, 23; 167:7, 23; 169:3; 171:3, 16, 22, 25; 172:15; 173:21; 174:6, 18, 21, 23; 175:7, 22-23; 176:4; 177:22; 178:24; 179:25; 180:10, 16-17; 181:16, 23; 183:12, 16; 184:7; 185:1, 14; 186:6; 188:13, 21, 25; 191:7, 24; 193:7, 22; 194:3, 5, 9, 13, 24; 195:6, 18; 197:3, 12; 198:8, 25; 199:8, 14, 17, 21, 23
**honor** [2] - 11:6; 15:6
**HONORABLE** [1] - 1:11

**honored** [1] - 3:18
**hope** [4] - 33:18; 44:20; 93:16; 184:16
**hopefully** [2] - 12:25; 164:24
**hopes** [1] - 117:5
**hoping** [4] - 96:17; 134:2, 4; 157:8
**horrific** [1] - 100:12
**horse's** [1] - 126:21
**hospital** [1] - 47:5
**Hospital** [1] - 120:24
**host** [1] - 22:7
**hotel** [12] - 46:22; 47:1; 63:21; 64:11, 15; 73:10, 12-13; 140:17; 141:7; 142:10; 143:5
**hour** [5] - 43:3; 74:7, 24; 107:8
**hours** [7] - 66:6; 80:14, 22; 103:2; 140:8; 142:22; 179:6
**housing** [1] - 121:24
**huddle** [4] - 45:1; 160:17; 161:9; 162:9
**huge** [2] - 94:5; 168:12
**human** [5] - 109:17; 147:9
**humbled** [1] - 136:20
**hundred** [1] - 101:16
**hundreds** [9] - 54:22, 24-25; 72:16; 98:4, 19; 100:24; 101:1
**hurt** [2] - 138:13; 154:6
**hurting** [1] - 138:13
**hyperbole** [2] - 39:19; 82:16
**hyperbolic** [1] - 99:8
**hypothesis** [1] - 89:20
**hypothetical** [2] - 94:14; 190:14
**hypothetically** [3] - 32:6; 185:5; 191:11

## I

**iconic** [2] - 120:11; 122:13
**idea** [3] - 83:25; 88:13; 132:18
**ideas** [1] - 100:5
**identified** [2] - 22:6; 183:18
**identify** [1] - 3:6
**idolize** [1] - 126:11
**if's** [1] - 33:19
**IG's** [3] - 92:19; 93:19; 95:9
**ignore** [5] - 178:22; 180:2, 7
**ignored** [1] - 177:5
**image** [2] - 128:14; 147:8
**imagine** [1] - 92:16
**immediately** [2] - 11:14; 53:9
**immigration** [1] - 105:13
**impact** [20] - 7:2; 9:16; 10:23; 14:18; 17:16; 48:5; 107:9; 115:8, 21; 116:17; 122:22; 133:11, 14; 134:6; 137:25; 138:1; 164:9; 174:24
**Impact** [1] - 107:10
**impacting** [2] - 175:2; 179:21
**impacts** [1] - 38:17
**impassioned** [1] - 13:16
**implicated** [1] - 50:1
**important** [20] - 8:8; 10:16; 28:13, 25;

29:18; 30:12, 17; 31:7; 88:20; 104:24; 114:19; 162:3; 176:21; 177:5; 179:22; 181:8; 182:21; 184:17, 24
**importantly** [2] - 26:3; 49:5
**impose** [7] - 20:18; 32:8, 24; 35:6; 36:22; 44:14; 191:11
**imposed** [9] - 4:5; 6:5, 10; 7:14, 18; 25:11; 166:9; 186:11; 188:18
**impossible** [3] - 37:23; 38:3; 178:21
**impress** [1] - 155:20
**impressed** [1] - 155:21
**impression** [5] - 28:24; 42:11; 94:24; 127:19; 131:19
**imprisonment** [3] - 4:6; 7:11, 18
**IN** [1] - 136:1
**inaccurate** [1] - 71:13
**incapacitating** [1] - 94:7
**incarcerate** [1] - 124:10
**incarcerated** [17] - 26:25; 29:5; 40:1; 77:8; 99:19; 120:13; 131:22; 132:3; 138:17; 140:1, 3; 157:21; 163:13; 164:8; 189:18
**incarcerates** [1] - 124:8
**incarceration** [3] - 165:20; 166:2; 178:3
**incident** [2] - 54:2; 94:25
**inclination** [1] - 50:25
**inclined** [8] - 12:11; 17:15; 19:1; 31:21, 24-25; 198:10, 25
**include** [2] - 17:14; 173:5
**included** [2] - 13:14; 122:19
**increase** [2] - 170:1; 171:14
**indeed** [3] - 25:3; 89:21; 105:9
**independent** [1] - 89:2
**indicate** [1] - 182:17
**indicated** [1] - 20:17
**indicating** [1] - 182:8
**indicating)** [1] - 72:5
**indication** [1] - 109:20
**indictment** [2] - 5:25; 6:23
**indictments** [3] - 28:17; 38:11; 177:16
**indirectly** [1] - 119:23
**individual** [8] - 86:12; 120:12; 129:11; 161:22; 163:6; 171:5, 13; 191:14
**individuals** [10] - 4:19; 9:22; 67:13; 68:5; 112:9; 116:5, 15; 117:7; 134:24
**indulge** [3] - 106:7; 187:21; 188:3
**indulgence** [8] - 58:16; 62:15; 69:16; 118:8; 127:5; 194:23; 196:4; 198:4
**infiltrate** [1] - 82:3
**influence** [1] - 92:25
**inform** [2] - 11:19; 38:2
**informal** [1] - 57:14
**informant** [5] - 87:13, 20; 88:24; 89:2, 8
**informants** [3] - 87:14; 90:4
**information** [108] - 16:9; 28:11-14, 23, 25; 29:7, 14, 16; 30:7, 19, 22-23; 37:23; 42:18; 51:17; 53:15; 54:1, 4; 56:6; 61:4,

21-22; 62:4, 6, 8; 64:17; 66:9, 19, 23; 67:11; 68:6, 14; 69:5, 8, 11; 71:2, 7; 74:16; 75:12, 14; 77:4; 80:2, 5, 8-9, 19; 81:5, 9; 82:4, 6, 9, 13; 85:6; 86:16; 87:3, 7; 88:17, 19; 90:4, 7-9, 14, 21; 91:15; 92:9, 15; 93:23; 94:10; 97:13; 98:10; 99:21; 148:16; 149:21; 151:2, 4, 6, 14, 17, 19; 168:6; 176:18; 177:16; 178:19, 22-23; 179:1, 4, 7-8, 12, 20, 23; 181:11, 13; 182:7
**informative** [1] - 61:23
**informs** [1] - 13:9
**infraction** [2] - 77:1; 163:23
**inhibit** [2] - 195:24; 196:2
**initial** [2] - 83:10; 172:25
**inkling** [1] - 109:15
**inmate** [4] - 75:23; 77:1; 94:1; 191:1
**inmate's** [1] - 75:25
**inmates** [11] - 34:21; 76:25; 82:19; 92:25; 93:5, 22; 94:2, 17; 139:12; 140:25; 189:19
**inordinate** [1] - 120:2
**input** [2] - 11:1; 13:10
**inquire** [2] - 19:13; 162:21
**inquiry** [1] - 173:7
**inside** [5] - 47:14; 50:25; 51:11; 74:22; 78:13, 15; 92:16
**insight** [1] - 164:25
**insignificant** [1] - 14:11
**Inspector** [4] - 30:8, 24; 58:2; 168:9
**instead** [2] - 29:11; 144:21; 189:12
**institution** [2] - 74:21; 77:25
**institutions** [1] - 93:23
**instructed** [2] - 176:24; 180:8
**instructs** [1] - 175:1
**instrument** [1] - 95:8
**instruments** [1] - 116:16
**intellect** [1] - 98:24
**intelligence** [1] - 39:16
**intend** [4] - 4:13; 20:4; 158:24; 167:11
**intends** [2] - 4:12; 70:7
**intent** [3] - 5:18; 7:5; 120:21
**intentional** [1] - 41:24; 42:2
**interact** [10] - 53:2; 100:22; 112:15; 117:16; 119:16; 122:23; 125:13, 15, 18; 132:12
**interacted** [3] - 53:13; 101:16; 137:6
**interacting** [2] - 65:13; 134:10
**interaction** [3] - 125:22; 126:23; 145:1
**interactions** [2] - 61:2; 67:15
**interest** [3] - 8:6; 162:7; 170:17
**interested** [2] - 33:21; 57:6
**interesting** [3] - 14:7; 57:2; 126:11
**interestingly** [1] - 39:17
**Internet** [2] - 12:11; 132:20
**internet** [1] - 132:21
**interpret** [1] - 80:21
**interrelated** [1] - 119:18
**interrupt** [1] - 58:15

**interstate** [1] - 5:22
**interview** [8] - 61:6; 66:16; 74:1, 6; 85:15; 109:9; 132:24; 133:1
**interviewed** [2] - 93:24; 132:23
**interviewing** [1] - 94:15
**interviews** [1] - 92:21
**introduction** [2] - 47:13; 74:21
**inured** [1] - 42:7
**investigate** [2] - 69:6; 93:20
**investigating** [1] - 73:21
**investigation** [25] - 25:14; 28:21; 29:17; 30:3, 21; 38:3, 5, 14; 42:22; 46:18; 73:6, 9; 81:13; 87:5; 89:23; 92:13, 20; 98:17
**investigations** [12] - 28:8; 29:15, 22; 30:20, 22; 38:13; 42:18; 52:9; 62:2, 12; 69:14
**investigative** [1] - 47:15
**investigators** [3] - 29:17; 52:13
**invincible** [1] - 133:17
**invite** [2] - 16:19; 191:16
**invited** [2] - 12:1, 7
**invites** [1] - 10:4
**invoked** [1] - 37:11
**involved** [19] - 23:18; 26:13; 73:6; 89:21; 91:14; 98:16; 114:5; 119:17; 138:8; 145:24; 146:12; 147:11; 152:19; 155:11; 163:14; 165:20; 182:24
**involvement** [4] - 29:12; 105:11; 150:11, 24
**involves** [1] - 162:6
**involving** [2] - 73:22; 84:11
**irrelevant** [1] - 185:24
**issue** [24] - 8:22; 16:7; 21:17, 19-20, 23; 24:15; 27:5; 30:1; 33:13; 34:2; 107:17; 160:13; 164:10; 166:17; 170:3; 171:10; 172:8; 174:3; 175:9; 195:16; 198:22
**issue's** [1] - 167:9
**issued** [3] - 6:3; 11:13; 13:2
**issues** [15] - 3:17; 4:24; 5:6; 13:9; 31:17, 21; 33:24; 84:11; 160:1; 161:7; 169:17; 170:3; 192:2, 5; 196:6
**IT** [1] - 94:1
**it'd** [3] - 17:19; 117:8; 191:19
**it'll** [8] - 23:16; 55:5; 107:11; 136:14; 161:25; 171:22; 172:9; 191:19
**itself** [1] - 170:13

**J**

**J.O** [1] - 127:15
**Jackson** [4] - 152:15, 18; 153:1
**jail** [17] - 14:25; 28:10; 79:18; 103:16; 144:24; 145:3, 18; 146:7, 10; 147:3, 15, 22, 25; 148:23; 167:25; 181:19
**jam** [1] - 194:15
**James** [1] - 142:17
**Jane** [1] - 12:8

**January** [8] - 6:22; 46:6; 194:21, 24; 195:5; 198:13; 199:1, 5
**Jason** [2] - 1:22; 3:10
**jason@downscollins.com** [1] - 1:25
**Jeffress** [7] - 85:2, 8, 23; 104:18; 105:9, 18; 150:4
**Jeffress'** [1] - 91:10
**jeopardy** [3] - 53:8, 11; 58:9
**jim** [1] - 152:4
**Jimmy** [2] - 53:4; 67:5
**job** [6] - 75:16; 82:25; 85:10; 102:23; 121:22; 198:23
**jobs** [1] - 123:19
**John** [17] - 1:13; 3:7; 12:8; 39:7, 13, 21; 49:13, 15; 50:11, 13; 69:24; 111:5; 142:13; 148:25; 184:2; 187:25
**JOHN** [3] - 71:23; 72:6; 201:7
**John.D.Crabb@usdoj.gov** [1] - 1:17
**join** [2] - 23:17, 23
**joined** [4] - 3:21; 45:24; 63:10; 108:6
**joint** [4] - 161:21; 191:12, 18
**jointly** [1] - 107:23
**joyful** [1] - 53:21
**Jr** [1] - 1:13
**Judge** [19] - 6:4, 7, 10, 17; 7:9, 13; 57:8; 59:21; 61:7; 62:10; 63:20; 74:11; 80:3; 101:23; 102:9; 113:7; 124:25; 154:2
**JUDGE** [1] - 1:11
**judge** [15] - 3:19, 21; 36:4; 49:9; 74:12; 87:15; 88:25; 91:1; 103:16; 104:4; 117:25; 118:15; 166:9; 172:16
**judges** [2] - 11:5; 102:18
**judgment** [1] - 169:4
**judgment's** [1] - 198:17
**judicial** [2] - 3:19; 4:1; 123:8
**Judiciary** [2] - 1:15, 20
**July** [13] - 7:9; 37:21; 42:25; 46:21; 64:13; 70:22; 74:5; 136:25; 139:3, 10; 140:18; 141:21; 181:16
**jump** [1] - 143:19
**June** [4] - 12:16; 69:7, 10; 81:6
**jurisdictions** [2] - 171:24; 172:1
**jurors** [1] - 103:10
**jury** [2] - 5:15; 186:18
**Justice** [13] - 30:8, 24; 51:7; 52:6; 75:6, 8; 77:7; 92:14, 18; 93:8; 96:20; 100:18; 101:25
**justice** [6] - 8:6; 11:7, 9; 14:15; 17:14; 52:19
**justified** [1] - 89:4
**juvenile** [2] - 123:9

**K**

**Karl** [1] - 5:4
**keep** [10] - 12:1; 59:8; 61:20; 80:10; 100:15; 139:15, 18; 152:6; 192:15; 193:2

**keeps** [1] - 190:15
**Kelly** [3] - 2:2; 5:2; 16:19
**kept** [6] - 53:21; 64:4; 90:9; 143:7; 144:13, 17
**Kevin** [18] - 27:23; 38:18, 25; 61:4, 7, 9-10, 14, 16; 84:20; 85:7, 17, 20; 90:16; 104:21; 149:14; 179:17
**key** [3] - 96:5; 178:14; 187:24
**kick** [1] - 164:14
**kid** [3] - 113:21; 155:9, 12
**kids** [18] - 115:3, 13, 18; 116:20; 117:23; 118:5; 126:11; 145:4, 9, 25; 146:8; 147:16; 148:3, 6; 154:25; 156:17; 181:19
**kill** [3] - 82:20; 143:23, 25
**killed** [11] - 83:4; 113:21; 143:21, 25; 148:21; 149:23; 158:5; 190:13, 19; 191:1, 3
**killing** [12] - 40:3, 10-11, 13; 113:13; 114:14; 120:2, 9, 19; 146:14; 183:1
**kilo** [3] - 86:23
**kilogram** [2] - 26:16
**kilograms** [2] - 5:19; 7:5
**kilos** [4] - 81:12, 15; 93:7; 94:20
**kind** [15] - 17:6; 43:10; 48:1; 55:5; 59:11; 61:20; 68:15; 80:8; 110:16; 123:18; 127:20; 131:21; 190:11; 195:14; 198:22
**kindly** [1] - 106:12
**king's** [1] - 195:4
**kingpin** [1] - 102:3
**knocking** [1] - 50:15
**knowing** [1] - 184:16
**knowledge** [6] - 29:11; 30:17; 75:24; 94:10; 126:23; 154:17
**known** [5] - 75:21; 84:8; 112:19; 113:2; 117:19
**knows** [10] - 33:14; 39:13; 61:7; 80:20; 91:13; 113:7; 167:14; 184:9, 17
**Kraemer** [10] - 2:2; 5:2; 16:19; 19:15; 33:8; 35:5; 162:22; 185:9; 188:10; 199:22
**Kraemer-Soares** [10] - 2:2; 5:2; 16:19; 19:15; 33:8; 35:5; 162:22; 185:9; 188:10; 199:22

**L**

**lack** [13] - 10:21; 22:25; 49:7; 74:17; 123:18, 24-25; 180:4; 189:12
**ladder** [1] - 65:16
**lady** [1] - 151:5
**laid** [4] - 47:12, 17; 48:6; 109:13
**landslide** [1] - 118:2
**languished** [1] - 29:3
**large** [6] - 7:7; 8:17; 25:25; 26:16; 28:2; 160:4
**large-scale** [4] - 7:7; 8:17; 25:25; 28:2
**larger** [2] - 27:24; 36:6

**largest** [5] - 8:11; 9:1; 31:9; 78:23; 169:11

**last** [10] - 11:10; 16:7; 28:16; 34:22; 50:3; 108:10; 120:24; 127:16; 184:7; 187:13

**lasted** [1] - 98:13

**lastly** [1] - 183:16

**late** [4] - 43:4; 45:25; 46:1; 60:14

**laughter** [1] - 118:16

**launderer** [1] - 91:11

**laundering** [2] - 73:4; 91:14

**law** [52] - 18:9; 20:2, 10; 23:2; 26:17; 29:22; 30:2; 36:22; 37:3, 23; 38:1, 7; 39:4, 23; 45:23; 46:7, 11, 25; 47:10; 51:8; 53:16; 57:3, 12; 61:24; 63:8; 90:5; 91:3, 22; 95:11; 96:6; 98:12; 101:7; 102:20; 104:8; 105:21; 106:1; 137:7; 148:11, 14; 151:2; 154:25; 175:2, 4, 8, 11, 20; 178:18; 179:5; 191:14; 192:16

**lawful** [1] - 32:11

**lawyer** [2] - 142:14; 193:3

**lead** [6] - 46:7, 11; 57:20; 88:8; 101:19; 109:18

**leader** [2] - 17:13; 182:25

**leaders** [4] - 12:23; 78:21; 81:11

**leading** [2] - 28:20; 40:4

**leak** [1] - 59:3

**learn** [2] - 68:21; 140:13

**learned** [2] - 26:9; 140:13

**least** [18] - 18:13, 24; 31:13; 35:9, 11, 13-14; 38:11; 53:5; 84:12; 108:4; 130:1; 149:2; 178:20; 184:7, 11; 191:25; 192:2

**leave** [4] - 12:7; 23:23; 43:11; 161:19

**leaves** [4] - 43:12; 162:11; 179:1

**lectern** [3] - 3:5; 10:6; 16:20

**led** [8] - 28:17, 21; 38:11; 88:7; 98:17; 100:14; 177:16; 187:25

**leeway** [2] - 56:8; 79:22

**left** [14] - 17:4; 96:13; 99:1; 102:21; 106:18; 137:7; 143:5; 144:6, 23; 147:22, 24; 148:23; 157:2

**legacy** [2] - 98:21; 99:2

**legal** [6] - 84:14; 161:7; 174:8; 192:5, 8

**legitimate** [1] - 155:23

**length** [4] - 36:23; 169:10; 176:7; 179:9

**leniency** [1] - 14:10

**less** [10] - 17:9; 65:7; 113:12; 116:5; 126:1; 173:12; 178:4; 183:1, 7

**lesser** [1] - 32:7

**letter** [9] - 12:12; 15:18, 20, 24; 16:1, 3, 10; 134:14

**letters** [5] - 13:6; 129:2; 131:14

**level** [19] - 11:2; 13:11; 17:9, 14, 16, 19; 41:11; 65:9; 93:12; 101:4; 166:2, 7; 168:19; 177:8; 178:2; 183:14; 184:17; 190:3

**levels** [7] - 17:12; 51:6; 52:19; 75:6; 77:7

**Lewisburg** [64] - 26:7, 10, 22; 27:3;

30:2, 5; 51:1, 10, 22; 52:6, 11, 23; 53:9; 56:21; 58:5; 59:5; 63:19; 65:1, 6, 14; 73:7, 22; 74:10, 13, 20; 75:22, 25; 76:2, 5, 12, 19, 25; 78:13, 16; 80:17; 81:11, 15; 92:16, 22, 24; 115:2; 137:7; 138:19, 21, 23; 139:1, 3, 10-11; 140:6, 14; 142:11; 143:9, 18, 23; 144:2, 22-23; 167:25; 190:1, 14

**liaison** [1] - 66:14

**liberty** [1] - 26:12

**life** [64] - 4:5; 6:5; 17:6, 17; 26:4; 27:9; 29:13; 56:20; 67:24; 73:25; 76:2, 12, 19; 77:10; 93:15; 98:25; 100:13; 103:16; 109:19; 112:10; 116:7; 124:6; 129:3; 131:24; 132:8; 133:18; 137:21, 25; 138:14; 142:1; 145:13; 146:10, 12, 15-16; 147:3; 152:8; 156:8; 158:7; 168:12; 169:14; 170:22; 174:13; 175:9, 19; 185:25; 186:4, 11, 17, 22, 24; 187:2; 188:12, 15, 23; 189:7, 14

**lifestyle** [1] - 189:22

**lifetime** [4] - 32:8, 19, 24; 35:23

**lift** [1] - 48:17

**light** [8] - 7:1; 14:21; 87:13; 110:9; 159:6; 166:20; 167:8; 169:8

**Lightfoot** [1] - 172:19

**lights** [1] - 93:3

**likelihood** [4] - 4:15, 17; 99:24; 199:16

**likely** [3] - 37:18; 78:18; 88:24

**limitation** [1] - 192:15

**limitations** [1] - 193:19

**limited** [5] - 108:16; 182:14; 184:10, 18

**limits** [3] - 35:6; 181:13, 15

**line** [1] - 107:19

**lines** [1] - 71:20

**lingo** [1] - 68:17

**linked** [2] - 66:17; 82:10

**list** [9] - 13:6; 98:13; 101:10, 12-13, 15, 20

**listen** [1] - 39:24

**listened** [1] - 64:19

**listening** [4] - 47:23; 115:19; 126:3

**lists** [2] - 94:5; 101:14

**litem** [1] - 105:12

**literally** [1] - 184:19

**litigants** [1] - 159:24

**live** [7] - 76:9; 82:17; 130:3, 5; 156:24; 158:7

**lived** [3] - 99:4, 8; 129:24

**lives** [3] - 103:8; 113:25; 155:1

**living** [6] - 60:15; 111:25; 113:14; 119:4; 125:6; 130:19

**Living** [2] - 125:8

**local** [2] - 13:3; 28:7

**locate** [1] - 5:10

**located** [1] - 137:6

**location** [7] - 40:16; 116:11; 122:5; 126:4; 127:25; 175:10, 17

**lockdown** [2] - 52:1; 140:4

**locked** [3] - 68:8; 116:6; 156:16

**lodge** [2] - 24:8; 70:8

**logistical** [2] - 5:6; 33:24

**logistically** [1] - 66:22

**London** [3] - 38:20, 24; 105:4

**Londono** [1] - 81:25

**look** [30] - 13:13; 32:14, 20; 78:21; 81:3; 96:16; 98:15, 20; 99:3, 23; 101:22; 102:21; 104:9; 119:11; 122:16; 123:13, 21; 124:2; 146:25; 158:3; 169:24; 172:4; 177:18; 186:13, 23; 190:16; 192:12, 14, 16

**looked** [4] - 14:18; 166:18; 173:24; 175:9

**looking** [10] - 12:23; 66:21; 87:2; 115:21; 118:5; 124:2; 141:10; 188:14; 190:24; 198:14

**looks** [1] - 168:14

**Lord** [5] - 131:24; 132:6; 134:18

**Lords** [1] - 169:1

**lose** [1] - 118:6

**loss** [1] - 113:25

**lost** [5] - 18:4; 68:15; 118:6; 146:12, 25

**loud** [1] - 103:11

**lovable** [1] - 133:8

**love** [3] - 154:22; 183:25

**loved** [1] - 132:6

**low** [2] - 177:11; 180:15

**low-end** [1] - 177:11

**lower** [4] - 65:16; 180:23; 181:1

**Ludaway** [1] - 10:9

**LUDAWAY** [10] - 10:11; 11:10; 13:23, 25; 14:7, 9; 15:10; 44:1, 6, 16

**lunch** [5] - 43:17; 76:10; 82:17; 106:12; 107:8

**luncheon** [1] - 106:25

**luxury** [1] - 48:23

## M

**machine** [1] - 2:8

**magistrate** [1] - 88:25

**magnitude** [2] - 61:9; 188:1

**mail** [2] - 12:9

**main** [2] - 68:21; 146:17

**mainstream** [2] - 112:10; 116:7

**maintain** [2] - 65:4, 15

**maintaining** [1] - 65:18

**major** [9] - 51:11; 52:9, 18; 56:20; 58:6; 115:8; 123:22; 155:23; 187:25

**majority** [5] - 124:6; 170:3; 171:10, 18; 172:5

**Malcolm** [2] - 7:9; 74:11

**man** [9] - 84:12; 126:12; 128:19; 129:6, 10; 133:7

**man's** [1] - 129:3

**managed** [1] - 88:7

**managers** [1] - 103:25

**mandatory** [17] - 6:5; 19:6; 26:4; 27:9;

185:25; 186:2, 4, 10, 17, 22; 187:2;
188:12, 23-24; 189:9, 14
**manned** [1] - 84:3
**manner** [1] - 48:6
**manual** [1] - 17:8
**Marcus** [5] - 152:15-17; 153:1
**marcus** [1] - 152:18
**mark** [1] - 185:25
**marks** [1] - 10:17
**married** [1] - 81:24
**Marshal** [3] - 4:23, 25; 197:2
**marshal** [1] - 200:2
**Marshals** [1] - 86:7
**marshals** [1] - 196:24
**Martha's** [1] - 12:18
**Martinez** [4] - 101:23; 182:23; 183:10
**masses** [1] - 123:20
**matches** [1] - 103:5
**material** [5] - 38:21; 104:22; 159:7, 22;
167:10
**materials** [3] - 17:2; 159:8; 165:22
**matter** [15] - 4:16; 10:19; 53:10, 19;
55:6; 150:8, 12, 17; 162:12; 169:4;
184:14; 192:24; 193:1; 200:12
**matters** [1] - 52:2
**maximize** [2] - 103:25; 105:2
**maximum** [5] - 18:24; 93:10, 14, 22;
190:4
**MD** [1] - 1:24
**mean** [41] - 21:18; 25:24; 33:16; 48:14;
51:21; 55:6; 57:9; 65:12, 21; 75:21;
78:3, 9, 21; 80:9; 87:24; 98:3; 100:25;
106:2; 115:24; 123:6; 133:8; 139:18;
155:24; 157:20; 160:25; 161:3, 25;
164:19; 173:20; 175:24; 180:7; 188:20;
191:15; 192:23; 194:17; 195:23;
197:14; 198:16, 18
**mean-spirited** [1] - 133:8
**meaning** [7] - 123:16; 177:8; 178:2;
180:14, 21; 181:10; 182:4
**means** [5] - 10:22; 76:16; 98:5; 116:22;
128:2
**meant** [2] - 158:8; 161:4
**measure** [3] - 186:21; 187:4
**mechanism** [1] - 90:25
**Medellín** [1] - 78:21
**media** [2] - 13:6; 143:1
**medical** [1] - 47:3
**medium** [1] - 190:3
**medium-level** [1] - 190:3
**meet** [7] - 45:14; 60:13, 18; 63:18;
112:22; 129:4; 147:12
**meeting** [9] - 40:4; 113:1; 116:22;
120:7; 134:5; 176:9; 179:5
**meetings** [2] - 90:9
**member** [1] - 68:7
**members** [11] - 12:14; 14:21, 23;
39:24; 40:14, 18-19; 56:20; 68:22;
138:15

**memorandum** [2] - 16:14, 16
**memory** [3] - 59:1; 103:4; 172:22
**Men** [5] - 112:2, 4, 23; 115:9; 119:24
**men** [9] - 40:6, 12, 17; 120:14, 18, 24;
121:17; 122:1; 156:17
**Menella** [1] - 172:21
**mention** [7] - 22:2; 29:9; 33:16; 34:4,
6; 187:24; 190:25
**mentioned** [11] - 10:25; 17:6; 34:22;
51:19; 89:11; 120:3; 131:16; 159:4, 9;
181:25; 182:22
**mentioning** [1] - 42:2
**mentions** [1] - 187:23
**mentor** [1] - 112:7
**merited** [1] - 14:10
**merits** [4] - 27:8; 88:5; 89:22
**message** [2] - 175:17; 181:2
**met** [7] - 46:14, 16; 60:14, 24; 63:19;
112:20; 150:5
**methodology** [5] - 10:6; 11:1; 176:24;
177:3
**meticulous** [1] - 160:7
**Metro** [2] - 12:17, 20
**Metropolitan** [3] - 47:16; 63:10; 66:23
**microphone** [2] - 44:4; 136:14
**mid** [1] - 198:13
**mid-'90s** [1] - 60:14
**mid-January** [1] - 198:13
**middle** [3] - 65:8; 85:14; 117:24
**Middle** [9] - 7:7, 10, 15, 25; 8:4; 25:18;
55:23; 56:17; 79:17
**might** [19] - 14:22; 23:2; 29:16; 33:24;
34:2; 46:20; 92:16; 100:5; 109:18;
124:5; 130:3; 139:21; 151:18; 159:12;
161:7; 186:13, 15
**mildly** [1] - 162:8
**miles** [1] - 74:14
**mill** [1] - 168:5
**mind** [6] - 21:21; 78:11; 95:11; 142:7;
192:16; 193:2
**mindful** [1] - 106:3
**mindset** [2] - 138:3
**mine** [2] - 57:14; 146:11
**minimal** [1] - 82:24
**minimums** [2] - 19:6; 188:24
**ministry** [1] - 119:18
**minute** [4] - 11:13; 16:16; 106:7;
169:20
**minutes** [4] - 43:22; 121:16; 162:9;
184:13
**misbehaving** [2] - 145:5, 10
**misdemeanors** [1] - 19:5
**misguided** [1] - 146:25
**misleading** [2] - 62:8; 67:17
**missing** [1] - 113:22
**mission** [1] - 94:6
**Mississippi** [4] - 23:16; 24:1, 3; 51:1
**misstate** [1] - 89:12
**mistake** [1] - 147:10

**mix** [1] - 103:8
**moment** [16] - 23:15; 38:20, 24; 41:2;
44:6; 59:17; 73:10; 120:3, 11; 122:13;
159:13; 171:22; 172:9, 12; 187:21;
196:22
**moments** [1] - 47:10
**Monday** [2] - 80:10; 83:19
**money** [4] - 48:17; 73:3; 91:10, 14
**month** [9] - 84:13, 15; 100:3; 145:3, 8;
149:1; 194:16
**monthly** [3] - 125:25; 179:11
**months** [21] - 4:6; 6:6; 17:19; 40:4;
42:9, 13; 51:5, 20; 77:12, 14, 19; 80:18;
144:5; 152:7; 159:19; 163:2, 9; 165:14;
179:6; 180:15
**moreover** [1] - 9:13
**MORNING** [1] - 3:1
**morning** [33] - 3:7, 9-10, 13; 10:10;
16:20-22; 24:17; 36:18; 45:11, 20-21;
60:1, 5; 63:2, 6-7; 70:6; 71:24; 72:1;
82:17; 120:15; 121:15; 197:17; 199:25
**most** [20] - 3:25; 8:11; 9:1; 10:16; 26:2;
31:9; 64:4; 75:9; 92:12; 93:16; 113:4;
119:17; 122:7; 129:8; 145:15; 157:20;
169:11; 182:13; 183:3; 190:4
**mostly** [2] - 125:23; 149:5
**motel** [5] - 46:17, 22-23; 137:10
**mother** [13] - 26:25; 37:25; 42:7;
55:24; 79:1, 19; 90:24; 109:23; 110:1;
141:20; 190:25
**motion** [21] - 4:2, 14; 8:1, 6; 9:10;
11:14; 24:19; 25:2, 4, 6, 9, 12; 80:4;
95:16; 96:1; 153:9, 14; 163:1; 165:10;
185:17; 192:9
**MOTION** [1] - 1:10
**motions** [2] - 15:22; 24:2
**motivate** [1] - 155:24
**motivation** [1] - 110:19
**motives** [1] - 76:15
**mouth** [1] - 126:21
**move** [2] - 34:2; 140:7
**movement** [9] - 51:24; 75:8; 147:24;
148:2, 7, 24; 181:20, 23; 182:15
**moves** [1] - 156:18
**movies** [1] - 79:9
**moving** [4] - 30:21; 143:12; 165:9;
167:14
**MPD** [1] - 66:23
**MR** [266] - 3:7, 10; 15:14; 19:17, 20;
20:1, 8, 10, 14, 17, 25; 22:8, 13, 17, 21,
25; 23:7, 9, 14, 22, 25; 24:2, 5, 10, 12,
15, 17, 21, 24; 25:8, 19, 23; 27:13;
32:2, 13, 19; 33:1, 4, 6, 13, 18; 34:6,
13, 16, 18, 23; 35:1; 36:17, 19; 37:10,
13-14, 17; 40:14; 41:21, 23; 42:9;
43:24; 44:8, 12, 24; 45:5, 8, 16, 19;
49:4, 12, 18, 23; 50:19; 55:8, 14, 17,
19; 56:4, 9, 11; 58:16, 20; 59:14, 17,
19, 22, 24; 60:4; 62:15, 17, 21, 23, 25;
63:5; 64:6; 69:3, 16, 18, 20, 24; 70:2, 5,

11, 17, 21; 71:17, 19; 72:4, 7; 78:25;
79:13, 15; 80:13; 90:2; 94:9; 95:13;
96:23; 97:3, 6, 9, 15, 18, 24; 99:12;
100:16; 104:13, 18, 21; 105:7, 21;
106:7, 9, 11, 20, 23; 108:7, 15, 18;
109:2; 111:10, 15, 22; 117:11; 118:8,
11, 13, 18; 119:2, 6; 123:3; 124:13, 15,
21; 125:2; 127:5, 9; 128:6; 130:7, 10,
16; 134:7; 135:18, 21, 24; 136:9, 24;
140:12; 141:3; 142:25; 149:10, 12-13;
153:8; 157:13, 16; 158:10, 13, 17, 21,
24; 159:3, 16; 160:22, 25; 161:3, 15;
165:17; 166:12, 14, 17, 23, 25; 167:7;
168:21; 169:8; 171:3, 7, 16, 25; 172:2,
12, 15; 173:20, 23; 174:2, 6, 18, 21, 23;
175:7; 176:4; 178:14; 180:10, 21;
185:14, 16, 19; 186:6; 188:9, 21;
189:20, 23; 190:1; 191:7, 24; 192:2;
193:7, 14, 20; 194:3, 5, 9, 13, 20, 23;
195:6, 17, 20, 22; 196:4, 12, 17, 20, 22,
24; 197:3, 7, 12, 19, 21; 198:4, 8, 25;
199:12, 14, 17, 19, 21; 201:4
    **MS** [13] - 10:11; 11:10; 13:23, 25; 14:7,
9; 15:10; 44:1, 6, 16; 108:8, 11; 199:8
    **Muir** [4] - 7:9, 13; 63:20; 74:11
    **MUIR** [1] - 7:10
    **multi** [1] - 26:16
    **multi-kilogram** [1] - 26:16
    **multiple** [8] - 7:18; 52:9; 66:5; 179:6,
21, 24; 182:23
    **municipal** [1] - 12:20
    **murder** [4] - 6:15; 49:3, 6
    **murdered** [1] - 139:4
    **murders** [6] - 16:4; 48:7; 49:1, 10;
149:22; 183:5
    **murky** [1] - 198:22
    **must** [1] - 42:21
    **mutually** [1] - 152:12

## N

    **nah** [2] - 141:15; 147:18
    **name** [13] - 12:7; 67:5; 105:13; 108:10;
119:5, 7; 125:3; 126:10; 130:17;
136:11; 151:5, 16; 176:14
    **named** [2] - 76:23; 142:14
    **namely** [3] - 169:1; 172:23; 174:10
    **names** [5] - 37:17; 66:17; 79:6; 105:14;
151:13
    **narcotic** [1] - 28:2
    **narcotics** [7] - 7:8; 8:12, 17; 9:2; 28:8,
16; 30:19
    **narrow** [1] - 66:20
    **Natalie** [1] - 10:9
    **nation** [2] - 119:14; 133:11
    **national** [1] - 13:3; 103:6
    **nature** [8] - 9:11; 31:22; 61:2; 150:16;
160:9; 169:9; 184:12
    **Nealis** [3] - 47:16; 48:4; 60:21

    **near** [1] - 169:23
    **Near** [1] - 171:19
    **nearly** [1] - 178:21
    **Neary** [1] - 172:22
    **necessary** [4] - 28:4; 43:8; 104:24;
123:18
    **need** [21] - 9:13; 23:19; 32:14, 18;
43:4, 15, 19, 21; 44:23; 53:12; 78:17;
122:7; 143:16; 146:15; 159:20; 160:5;
194:16; 195:9; 198:6, 9
    **needed** [10] - 77:3, 8, 14; 78:17; 84:4;
87:11; 120:10; 148:20; 154:16, 18
    **needs** [5] - 22:5; 96:20; 97:6; 169:3;
192:3
    **negative** [1] - 116:19
    **neglected** [1] - 127:10
    **negotiate** [2] - 112:8; 115:9
    **negotiating** [4] - 26:13, 15; 52:4; 113:2
    **neighborhood** [2] - 40:11; 155:10
    **neighborhoods** [1] - 40:3
    **Nelson** [3] - 76:24; 78:17; 81:19
    **network** [1] - 31:12
    **neutral** [1] - 88:25
    **never** [21] - 6:21; 35:23; 49:2, 4; 57:21;
68:18; 77:23; 100:24; 102:25; 103:3;
110:5; 127:17; 134:20; 143:16; 144:18;
153:20; 177:21; 181:11, 15
    **new** [2] - 23:10; 198:20
    **New** [4] - 46:6; 129:8; 188:1
    **news** [4] - 58:23; 59:1; 74:16, 19
    **newspapers** [1] - 58:23
    **Newtonian** [1] - 78:12
    **next** [4] - 28:6; 52:24; 87:21; 126:16
    **nice** [2] - 164:20; 167:2
    **night** [4] - 93:2; 109:19; 142:10
    **nights** [1] - 80:15
    **nineteen** [1] - 169:21
    **nobody** [2] - 109:14; 144:9
    **nobody's** [2] - 83:4; 157:21
    **nominal** [1] - 36:3
    **non** [2] - 173:11, 15
    **non-assistance** [2] - 173:11, 15
    **none** [7] - 3:23; 37:5; 110:16; 176:6, 8,
11
    **nonjury** [1] - 48:22
    **normal** [1] - 68:1
    **normally** [2] - 43:11; 76:11
    **Norman** [1] - 181:24
    **norms** [1] - 168:14
    **North** [6] - 27:22; 86:1; 150:7, 11, 16
    **northeast** [2] - 127:18; 129:25
    **notable** [8] - 176:5; 177:20; 180:13,
17; 181:16; 184:1; 188:22; 189:7
    **note** [3] - 12:6; 171:19; 183:16
    **noted** [1] - 27:8
    **notes** [1] - 21:24
    **nothing** [10] - 24:17; 69:18; 98:7;
118:11; 146:14; 169:6; 170:23; 174:15;
188:1, 6

    **noticed** [6] - 44:9; 88:7; 134:9, 13, 17;
197:17
    **noting** [1] - 169:9
    **notorious** [2] - 99:11; 183:3
    **notoriously** [1] - 183:6
    **notwithstanding** [5] - 153:14; 177:12,
15
    **November** [1] - 194:7
    **number** [20] - 3:23; 5:10; 12:9; 28:8,
17; 53:6; 62:3; 66:5; 86:22; 87:14, 19,
21; 103:10; 119:25; 151:20, 23; 152:1;
177:1
    **Number** [5] - 16:15; 20:19; 87:11;
95:17; 97:4
    **numbers** [1] - 117:22
    **numerous** [1] - 47:14
    **NW** [2] - 1:15, 20

## O

    **OAG** [1] - 11:18
    **OAG's** [1] - 13:8
    **oath** [1] - 108:21
    **object** [7] - 16:2; 21:25; 22:22; 23:2, 4;
71:19; 160:3
    **objected** [1] - 16:2
    **objection** [2] - 22:10; 159:17
    **objections** [10] - 19:14, 17, 20; 22:3-5;
24:8; 70:8; 71:18
    **objectives** [1] - 155:25
    **obligation** [2] - 21:2; 136:4
    **observes** [1] - 22:22
    **obstruction** [1] - 17:14
    **obtained** [2] - 90:7; 109:9
    **obtaining** [1] - 30:20
    **obvious** [1] - 64:4
    **obviously** [1] - 188:23
    **occasion** [3] - 100:22; 117:16; 125:12
    **occasionally** [1] - 47:4
    **occasions** [1] - 150:4
    **occur** [1] - 116:9
    **occurred** [3] - 40:5; 113:5; 117:6
    **occurring** [5] - 113:25; 114:7, 12;
115:7; 116:25
    **OCDETF** [3] - 88:8; 98:9
    **OCTOBER** [2] - 3:1; 107:2
    **October** [6] - 1:6; 16:5, 8, 13, 17;
63:11
    **odds** [1] - 100:4
    **OF** [23] - 1:1, 3, 10; 45:18; 60:3; 63:4;
72:6; 109:1; 111:21; 119:1; 125:1;
130:15; 136:8; 201:4
    **offence** [1] - 178:2
    **offenders** [1] - 190:5
    **offense** [12] - 6:16; 9:12; 17:10, 16;
26:3; 41:10; 49:4; 177:8; 183:14; 190:7
    **offenses** [5] - 6:17; 26:2, 5; 35:24;
49:3
    **offer** [13] - 19:24; 75:12; 109:8, 12, 17,

21; 110:2, 5; 132:2; 141:17; 146:16; 190:6, 22
**offered** [6] - 9:22; 114:8, 11; 135:12; 141:9
**OFFICE** [2] - 1:14, 19
**Office** [26] - 4:21; 5:2, 5, 8, 11; 7:25; 10:5, 13; 15:16, 20; 30:7, 23; 44:13, 16; 46:1; 52:5; 58:2; 91:21; 109:10, 14; 110:6, 9; 168:9
**office** [13] - 4:23; 10:18; 11:13, 20; 70:16; 88:8; 92:19; 93:19; 95:9; 98:9; 104:7; 120:8
**office's** [1] - 17:22
**officer** [15] - 16:9, 14, 19; 39:5; 47:14; 51:9; 57:13; 60:17, 19; 61:25; 68:7; 76:25; 163:5; 185:5
**Officer** [1] - 2:2
**OFFICER** [33] - 16:21, 23; 17:1, 24; 18:1, 11, 14, 18, 23; 19:8, 10; 35:8, 12, 14, 16, 19, 21; 36:2; 163:3, 7, 17, 20; 164:1, 6, 14, 22; 165:4, 7; 185:11; 188:13, 18; 193:12; 199:23
**officer's** [1] - 19:13
**officers** [17] - 20:10; 37:4, 24; 38:2, 7; 39:5, 23; 57:3; 68:8; 90:5; 105:22; 137:7; 148:12, 14; 178:19; 179:5; 199:25
**Official** [2] - 2:5; 200:15
**officially** [1] - 12:6
**officials** [1] - 179:10
**often** [15] - 10:21; 11:4; 53:2; 61:24; 66:3; 83:23; 98:17; 112:15; 124:2; 125:18; 132:12; 145:7; 148:25; 187:17
**old** [5] - 103:15; 113:20; 131:17; 141:4; 156:12
**once** [10] - 52:24; 53:5; 54:8; 69:4; 76:18; 84:12; 151:7; 154:3; 165:2
**one** [89] - 3:24; 5:11, 16; 6:15; 8:11, 23; 9:1; 10:15; 12:16; 18:15, 25; 19:4; 21:25; 22:23; 27:22, 24; 28:20; 31:19; 33:13; 37:11; 39:9, 12, 20; 44:6; 47:9; 48:20; 49:12; 58:4; 59:7; 64:20; 66:14; 68:15; 72:20; 76:5; 83:2; 89:1; 92:12; 94:24; 95:11, 18; 96:15; 98:22; 99:19; 102:23; 103:22; 105:13; 110:12; 113:3, 13; 123:16; 126:12; 128:18; 129:7; 135:13; 141:25; 147:9, 12; 149:8; 152:11; 156:8, 14; 157:7, 13; 164:3, 23; 168:7; 169:3; 179:23; 182:3, 10; 183:3; 185:21; 186:23; 187:17, 21, 25; 192:10, 18-19, 25; 193:17; 196:22; 198:10, 18
**one's** [1] - 89:8
**one-way** [1] - 98:22
**one-year** [1] - 18:25
**ones** [1] - 145:12
**online** [1] - 13:5
**open** [9] - 99:11; 121:16; 126:19; 138:25; 161:25; 162:5; 175:6; 192:16; 193:2
**opened** [1] - 12:6

**opening** [2] - 24:18; 36:16
**opens** [1] - 35:12
**operating** [2] - 74:20; 188:22
**operation** [7] - 7:8; 8:17; 59:4; 74:22; 92:16; 100:14; 152:19
**operationally** [1] - 56:14
**operations** [2] - 8:12; 79:16
**opine** [3] - 71:11; 172:2
**opinion** [7] - 14:2; 15:8; 57:12; 71:9; 98:6; 107:17
**opinions** [3] - 9:23; 98:5; 192:12
**opportunities** [1] - 161:21
**opportunity** [64] - 10:14, 24; 11:8, 19; 12:7; 13:2; 24:21; 27:15; 32:20; 40:24; 52:8; 53:15; 64:1; 65:23; 72:14, 17; 75:2, 4, 13, 17; 78:20; 91:24; 101:22; 111:1; 116:10, 25; 117:25; 119:16, 22; 122:6; 125:15; 126:5, 18, 25; 133:2; 134:20; 136:20; 147:2-5; 148:3, 6; 154:7; 155:14, 17; 157:7; 159:8; 160:18; 161:11, 18; 162:4; 166:6; 167:8; 174:3; 175:21; 176:11; 177:14; 184:8; 189:16; 191:2
**oppose** [1] - 162:4
**opposed** [8] - 9:25; 14:1; 40:21; 43:22; 67:25; 87:19; 88:19; 126:2
**oppressed** [1] - 123:20
**optimistic** [1] - 161:12
**option** [3] - 12:8; 186:4; 196:10
**options** [2] - 21:18; 46:20
**oral** [3] - 160:5; 161:6
**oranges** [2] - 187:16; 188:3
**order** [14] - 6:22; 7:13; 11:13; 13:1; 16:16; 40:7; 63:20; 65:16; 74:11; 93:6; 94:20; 107:18; 169:21; 192:22
**ordered** [1] - 6:8
**ordering** [3] - 81:12, 15; 193:14
**orders** [2] - 7:19; 28:14
**ordinarily** [2] - 88:17; 116:8
**ordinary** [1] - 169:6
**organization** [5] - 31:9; 107:12; 112:2, 6; 169:11
**organizations** [1] - 30:10
**Organized** [1] - 88:9
**organizer** [1] - 17:13
**original** [7] - 90:22; 91:4; 102:6-8; 163:13; 171:7
**originally** [3] - 140:3; 167:17; 186:5
**otherwise** [1] - 186:1
**outcome** [3] - 88:4; 89:13; 115:4
**outcomes** [1] - 15:21
**outlined** [1] - 13:12
**outraged** [1] - 92:17
**outside** [5] - 36:10; 55:11; 58:7; 74:23; 185:3
**outstanding** [2] - 4:19; 105:14
**overlooked** [1] - 199:25
**overlooks** [1] - 11:4
**overnight** [1] - 193:15

**overture** [1] - 76:6
**overwhelmed** [1] - 136:21
**own** [6] - 37:4; 68:10; 99:2; 139:2; 155:19; 157:24
**owners** [2] - 157:22

## P

**p.m** [5] - 107:1, 3; 162:17; 200:8
**PA** [1] - 1:22
**Pablo** [3] - 81:25; 82:1, 10
**Page** [2] - 201:3, 15
**page** [5] - 92:7; 113:23; 169:22; 171:18; 172:15
**paid** [1] - 81:17
**paint** [1] - 133:9
**panicking** [1] - 142:23
**paper** [2] - 142:15, 20
**papers** [6] - 5:10; 31:6; 49:24; 161:7; 167:18; 187:14
**parameters** [1] - 24:7
**paranoid** [2] - 142:23; 144:16
**pardon** [1] - 121:17
**parents** [1] - 155:13
**Parker** [10] - 111:16, 23, 25; 117:2; 119:24; 120:11; 145:23; 146:3; 154:23; 184:4
**PARKER** [3] - 111:19, 21; 201:9
**Parker's** [2] - 146:1, 20
**parole** [2] - 6:5
**paroled** [1] - 81:13
**parse** [6] - 42:17, 20; 178:11, 21, 24; 198:23
**parsing** [1] - 160:2
**part** [28] - 23:1; 28:1; 32:10, 21, 25; 33:1; 48:9; 55:5, 19; 64:4; 72:24; 83:14; 84:3-5, 10; 96:8; 97:2; 111:5; 114:11; 115:6; 124:11; 160:4; 183:20; 188:14; 189:22; 198:17
**participate** [1] - 195:11
**participated** [3] - 83:10; 90:18; 176:1
**participating** [1] - 123:13
**particular** [20] - 30:7; 40:10, 12; 42:23; 65:24; 72:21; 83:17; 87:25; 89:21; 115:6, 11; 121:15; 137:5; 141:21, 24; 150:15, 18; 151:7, 18; 165:18
**particularly** [1] - 40:21
**parties** [21] - 3:5; 5:8; 6:20; 7:21; 15:24; 16:6, 15; 21:16; 69:14; 107:18, 23-24; 159:8; 160:8, 18; 161:12, 18; 165:5; 187:18; 200:6
**parties'** [1] - 7:2
**partly** [2] - 90:17
**partner** [2] - 23:14; 85:3
**parts** [1] - 92:13
**party** [2] - 9:8; 165:9
**pass** [1] - 92:9
**passed** [1] - 74:12
**passion** [2] - 146:23; 155:2

**passionate** [1] - 133:7
**passionate-hearted** [1] - 133:7
**past** [3] - 75:13; 76:9; 82:17
**Pastor** [2] - 124:22; 130:8
**pastor** [13] - 119:8, 10, 13; 125:3, 7, 10-12; 132:9; 135:5; 157:8
**pastoring** [2] - 130:20
**pastors** [1] - 154:23
**path** [2] - 155:16, 18
**PATRINA** [3] - 130:12, 15; 201:12
**Patrina** [1] - 130:18
**Patrol** [1] - 107:10
**Paul** [3] - 129:1, 7, 9
**pause** [8] - 8:15; 23:12; 45:2; 106:10; 118:10; 149:9; 172:14; 199:11
**pay** [1] - 6:9
**paying** [1] - 104:3
**penalties** [1] - 18:20
**pending** [2] - 4:2; 6:14
**penitentiary** [22] - 26:6; 27:18; 30:1, 9; 46:18; 51:10; 52:6, 11, 23; 53:9; 56:21; 65:5; 73:25; 74:14; 99:25; 137:8; 138:19; 143:10, 12; 146:24; 190:2
**Penn** [1] - 80:3
**Pennsylvania** [26] - 7:7, 10, 15, 21, 25; 8:4, 18; 25:18; 26:7; 41:20, 25; 42:1, 6, 8; 55:23; 63:21; 79:17, 24; 107:20; 137:10; 164:9; 166:9; 178:12, 16; 179:14; 183:21
**people** [105] - 9:6, 24; 11:8, 25; 12:1, 7, 10, 12; 13:21, 25; 14:1, 13, 24; 29:13, 19; 40:9; 41:1; 46:8; 48:17; 57:20; 66:15, 17, 20; 68:11, 21; 76:5; 81:1; 82:19; 83:6; 90:17; 92:18; 93:24; 94:4, 7, 20; 99:10, 13; 102:20; 103:8; 104:2; 107:11; 114:13, 22, 24; 117:17; 120:12; 121:6, 9; 122:5, 14, 16; 123:12, 20; 124:9; 125:22; 126:6, 24-25; 128:16, 20, 25; 129:1, 20; 133:3, 9, 13; 134:5, 24; 135:8; 138:13; 139:4, 8, 14; 143:11; 149:23; 151:18; 155:1, 3, 25; 157:3, 5; 158:1; 164:16; 175:25; 176:5, 9, 11, 15, 17; 177:14; 178:4; 181:3; 182:9; 183:1, 10, 23; 190:8, 12
**people's** [1] - 11:5
**per** [2] - 17:7; 124:10
**percent** [9] - 9:24; 35:25; 163:6, 15; 165:14; 175:25; 176:5, 11
**perception** [2] - 47:24; 110:20
**performed** [1] - 118:4
**perhaps** [5] - 26:2, 22; 29:18; 39:17; 169:11
**period** [13] - 32:8, 12; 100:23; 113:5; 163:12, 15; 165:20; 166:1, 4-5; 187:1; 193:16, 21
**permanently** [1] - 112:9
**permission** [8] - 34:11; 108:15; 109:9; 111:15; 118:18; 124:21; 130:10; 184:20
**permit** [1] - 157:14
**Perry** [4] - 38:4; 80:4; 90:24; 101:24

**person** [42] - 5:20; 12:15; 29:17; 39:9, 12, 20; 46:15; 48:10; 49:14; 57:14; 58:7; 66:25; 78:24; 85:9; 87:23; 96:6; 103:1; 120:21; 127:20; 147:2; 148:21; 151:12, 14, 16; 171:2; 177:12, 15; 178:7; 180:21; 181:14; 184:1-6; 189:2; 190:10
**person's** [2] - 76:6; 180:23
**personal** [2] - 183:16; 184:17
**personality** [2] - 51:3; 103:5
**personally** [11] - 62:5, 7; 112:15; 129:22; 182:24; 183:1, 5; 184:5, 9; 190:12
**personnel** [1] - 65:14
**persons** [1] - 66:13
**perspective** [6] - 57:3; 87:25; 88:15; 117:1; 169:4; 173:24
**pervasive** [1] - 58:8
**phone** [33] - 47:23; 55:11; 56:5; 58:3; 80:23, 25; 81:14; 84:2, 4; 92:6, 25; 93:5, 7, 20; 94:3, 5, 16, 18-19, 25; 96:11; 111:4; 131:13; 132:4; 134:11; 146:2; 162:1; 184:9; 199:8
**phones** [7] - 22:10; 47:24; 52:3; 58:5; 84:1; 92:22; 94:19
**phrase** [1] - 75:19
**Phyllis** [8] - 86:11, 15, 24; 87:8, 23; 151:11
**physically** [9] - 73:12; 78:2; 114:2; 115:13, 15; 143:5; 146:5; 151:8
**physics** [1] - 78:12
**pick** [3] - 136:14; 198:2, 10
**picture** [2] - 89:4; 133:9
**pictures** [1] - 137:16
**piece** [2] - 37:24; 81:5
**pieces** [1] - 160:2
**pit** [1] - 100:2
**pivot** [1] - 132:9
**place** [9] - 12:5; 56:4; 65:7; 76:11; 92:24; 113:2; 115:17; 145:21; 149:18
**placed** [2] - 26:6; 52:1
**places** [1] - 113:4
**Plaintiff** [1] - 1:4
**plan** [15] - 11:12, 14; 33:16; 34:4; 51:5; 52:7; 77:14, 17, 21; 142:4-7; 158:7
**plane** [1] - 196:1
**planned** [1] - 99:1
**planning** [2] - 4:21; 162:2
**plans** [4] - 53:11; 156:19; 159:5
**plaque** [1] - 14:15
**plastic** [1] - 14:15
**play** [2] - 87:15; 123:25
**played** [1] - 127:15
**players** [1] - 82:2
**plea** [4] - 26:20; 79:17; 90:23; 91:4
**plead** [1] - 92:1
**pleading** [5] - 34:22; 91:20; 192:10; 194:17; 195:1
**pleadings** [4] - 88:4; 104:10; 195:1; 199:3

**pleasure** [1] - 15:6
**pled** [7] - 7:4; 55:22; 70:25; 79:19; 101:24; 151:7; 179:18
**plus** [2] - 179:25; 180:25
**podium** [2] - 162:23
**point** [40] - 16:5; 24:14; 26:18; 33:21; 34:12; 35:25; 41:17; 48:12; 50:16; 51:25; 52:24; 55:4; 64:20; 67:16, 23; 70:2, 5; 85:9; 107:17; 110:10; 113:18; 115:3; 117:9; 118:3; 147:23; 148:11; 156:20; 158:20, 25; 159:13; 163:22; 169:1; 173:15, 20; 177:20, 24; 182:19; 187:5; 190:17
**pointed** [3] - 25:8; 185:16; 187:14
**points** [2] - 166:3; 185:20
**police** [6] - 60:17, 19; 68:2, 7-8; 76:24
**Police** [3] - 47:17; 63:10; 66:24
**policies** [3] - 92:6; 163:5
**politicians** [1] - 103:6
**population** [6] - 76:20; 77:18; 78:2, 5; 142:11; 144:13
**portal** [2] - 11:25; 12:5
**Porter** [1] - 85:3
**portion** [1] - 105:1
**pose** [1] - 198:15
**position** [24] - 15:4; 32:18; 39:8; 55:24; 56:16; 66:18; 67:3, 8; 72:2; 79:23; 110:8; 167:14; 169:5, 22; 170:2, 25; 171:3; 176:2, 22-23; 182:3; 185:22
**positive** [7] - 116:20; 125:24; 128:15; 133:14; 138:14; 141:10; 157:10
**positively** [2] - 139:15, 17
**possess** [2] - 5:18; 7:4
**possessed** [2] - 17:11
**possibility** [2] - 196:16, 18
**possible** [3] - 58:10; 151:13; 178:25
**possibly** [1] - 111:1
**Post** [1] - 113:23
**post** [5] - 107:15; 159:9, 18; 161:5, 11
**post-hearing** [4] - 159:9, 18; 161:5, 11
**postal** [1] - 12:10
**posted** [3] - 13:6; 15:18; 107:11
**posts** [1] - 13:5
**posture** [2] - 25:20; 65:19
**potential** [8] - 4:24; 9:23; 11:17; 14:18; 21:25; 22:23; 34:1; 58:10
**potentially** [2] - 163:17
**pouring** [1] - 61:22
**poverty** [2] - 123:18, 25
**powers** [1] - 123:16
**practice** [4] - 32:2; 91:21; 184:12
**pray** [1] - 135:15
**prayed** [1] - 132:4
**prayer** [2] - 135:12
**praying** [1] - 184:15
**pre-1998** [1] - 178:22
**preach** [1] - 129:9
**preaching** [1] - 129:9
**precipitated** [1] - 100:5

**predicament** [1] - 123:22

**predict** [1] - 78:16

**predisposition** [2] - 87:1, 3

**preface** [1] - 32:13

**prefer** [1] - 118:2

**prejudice** [1] - 6:23

**preliminarily** [1] - 20:14

**preliminary** [2] - 20:14; 170:11

**prep** [1] - 150:1

**preparation** [2] - 84:23; 85:1

**prepare** [2] - 85:11

**prepared** [7] - 16:15; 28:3; 39:3; 40:18; 97:21; 167:11; 179:17

**presence** [1] - 21:10

**present** [8] - 3:11, 24; 15:5; 20:4; 37:8; 104:4, 15; 195:9

**presented** [8] - 49:19; 104:7; 159:7, 22; 160:4, 24; 167:10; 186:18

**presentence** [1] - 6:13

**presenting** [1] - 23:3

**presents** [1] - 89:3

**preside** [1] - 123:7

**press** [5] - 13:2; 50:12, 15; 59:4

**pressure** [1] - 162:25

**pressured** [2] - 65:4, 11

**presumptuous** [1] - 172:2

**pretty** [3] - 65:18; 173:18; 198:19

**prevail** [2] - 122:25; 123:6

**prevailed** [1] - 122:25

**previously** [10] - 4:5; 7:14; 8:9, 25; 18:2; 22:6; 25:11; 26:11; 30:6; 169:19

**price** [1] - 104:3

**primarily** [5] - 23:1; 27:19; 30:16; 113:11; 134:11

**prime** [1] - 135:10

**Prince** [1] - 86:25

**principles** [1] - 192:8

**prison** [45] - 7:8; 8:17; 26:9; 27:3; 30:13, 25; 31:12; 33:15; 42:13; 47:4, 14, 24; 50:25; 51:1; 55:22; 64:25; 65:10, 19; 74:22; 75:11; 78:23; 82:13; 84:1; 93:7, 9; 103:13; 122:21; 132:8; 138:25; 139:1; 145:19; 146:6, 17; 156:6; 157:18; 158:1; 168:9, 23-24; 178:16; 179:13; 187:6

**prisoners** [2] - 65:5, 17

**Prisons** [15] - 52:2, 6, 20; 58:3, 11; 65:14; 86:7; 92:14, 24; 93:23; 94:6; 165:23; 181:24; 182:8; 190:15

**prisons** [2] - 26:23; 30:11

**Prisons'** [3] - 92:6, 11; 182:12

**privilege** [1] - 11:6

**privileges** [7] - 92:25; 93:1, 6, 20; 94:12, 18

**probable** [2] - 87:10; 89:1

**probation** [8] - 16:9, 13, 18; 19:12; 163:4; 185:5; 193:8

**Probation** [5] - 2:2; 5:1; 185:4; 191:9

**PROBATION** [33] - 16:21, 23; 17:1, 24;

18:1, 11, 14, 18, 23; 19:8, 10; 35:8, 12, 14, 16, 19, 21; 36:2; 163:3, 7, 17, 20; 164:1, 6, 14, 22; 165:4, 7; 185:11; 188:13, 18; 193:12; 199:23

**problem** [7] - 29:19; 58:3; 60:6; 95:6; 124:11; 161:1; 165:18

**problems** [10] - 30:9; 88:25; 92:23; 124:5; 140:14, 19; 197:14

**procedural** [1] - 25:20

**Procedure** [3] - 4:4; 21:11; 25:10

**proceed** [5] - 44:25; 71:22; 158:24; 159:2; 162:12

**proceeding** [7] - 43:10; 44:2; 48:25; 55:25; 162:6; 195:13

**proceedings** [12] - 8:15; 10:16; 23:12; 45:2; 63:13; 79:20; 106:10; 118:10; 149:9; 172:14; 199:11; 200:12

**Proceedings** [2] - 2:8; 200:8

**PROCEEDINGS** [1] - 1:10

**process** [5] - 11:2, 16; 96:13; 97:16; 173:7

**produced** [3] - 2:8; 86:7; 122:17

**producing** [1] - 78:24

**product** [2] - 187:8, 11

**Productions** [1] - 150:23

**productive** [4] - 62:11, 13; 120:25; 157:4

**profess** [1] - 163:11

**proffer** [4] - 24:7; 70:7, 19; 104:20

**profile** [3] - 3:23; 65:5; 105:13

**profiting** [1] - 103:7

**profound** [1] - 118:4

**profoundly** [1] - 10:23

**program** [1] - 98:9

**Program** [1] - 33:15

**programs** [3] - 119:19, 21; 121:22

**projects** [1] - 119:25

**promise** [5] - 121:11; 141:14; 146:20; 147:16

**promote** [3] - 175:1, 11, 19

**promoting** [2] - 36:21; 175:4

**promotion** [1] - 46:3

**promptly** [1] - 106:19

**proper** [1] - 174:9

**properly** [1] - 173:9

**propose** [1] - 108:4

**proposed** [9] - 107:22; 159:5; 160:20; 161:13, 19; 191:13; 198:21

**proposing** [1] - 183:2

**prosecute** [2] - 88:18

**prosecuted** [12] - 27:25; 28:18; 38:19; 72:24; 86:12; 95:11; 99:13; 101:22; 128:18; 129:7

**prosecuting** [3] - 73:21; 87:7; 182:22

**prosecution** [8] - 25:15; 28:21; 30:3, 5; 86:15; 90:20; 91:10; 150:24

**prosecutions** [9] - 28:25; 73:2, 4; 80:2; 83:10; 91:2; 105:11

**prosecutor** [9] - 38:19; 61:5; 88:8;

98:22; 99:9; 100:17; 103:19; 104:15; 128:18

**prosecutorial** [1] - 10:20

**prosecutors** [5] - 88:13; 89:8; 92:17; 104:1; 110:15

**prospectively** [1] - 163:9

**protect** [6] - 9:14; 53:11; 54:17; 83:3, 5; 170:15

**protection** [1] - 68:10

**Protection** [4] - 33:15, 22, 25; 34:5

**proud** [1] - 157:19

**proved** [2] - 186:7

**provide** [24] - 15:17, 25; 22:9; 30:6; 54:1; 62:7; 75:14; 82:6, 9; 86:16; 90:3; 91:15; 92:10; 149:21; 151:2, 4, 6; 154:12; 164:25; 181:11; 190:16; 191:1, 9; 193:8

**provided** [35] - 25:14, 18; 27:2, 17; 29:14; 30:16, 19, 21, 23; 37:21; 41:15; 42:10; 53:15; 66:8; 71:2; 90:9, 14, 22; 98:12; 101:4; 151:14; 155:17; 167:16; 174:10; 177:15; 178:7, 16, 18, 22; 179:1, 4, 9, 13, 20; 183:15

**provides** [1] - 7:17

**providing** [10] - 28:23; 29:4; 37:23; 62:6; 88:15; 91:22; 148:17; 179:23

**public** [25] - 9:14; 11:19; 12:13; 13:1, 8; 15:24; 24:20; 33:17; 34:1; 36:8, 10, 13; 64:2; 70:10; 76:11; 92:15; 116:16, 25; 121:23; 162:6; 189:24

**publically** [1] - 184:21

**publicity** [3] - 58:12; 140:23; 143:1

**publicize** [2] - 11:22; 12:25

**pull** [2] - 128:3; 136:13

**pulled** [2] - 143:10; 144:19

**pulling** [1] - 141:1

**purpose** [3] - 108:16; 113:1; 125:21

**purposeful** [1] - 120:21

**pursuant** [10] - 4:3; 7:17; 16:16; 22:1; 25:2, 9; 74:11; 163:5; 167:15

**pursued** [1] - 6:21

**Put** [1] - 176:15

**put** [36] - 17:15; 24:13; 58:9, 13; 62:3; 64:18; 66:5; 68:16; 77:1, 10; 84:14; 85:4; 87:25; 93:25; 100:7; 103:16; 105:10, 16; 108:2, 4; 112:9; 121:22; 123:17; 142:1, 8; 144:3; 146:2; 148:21; 162:8, 24; 165:18; 166:17; 169:12

**putting** [2] - 59:8; 152:7

## Q

**quarter** [1] - 129:25

**questioning** [1] - 71:20

**questions** [38] - 12:2; 14:23; 22:18; 31:16, 22-23; 32:14; 41:16; 49:13; 59:16; 62:19, 21; 64:19; 69:20; 72:10; 85:11; 103:18; 104:12; 108:18; 111:10; 118:12; 123:4; 124:12; 130:6; 134:7;

135:17, 19; 154:1; 158:12; 161:6;
167:12; 170:24; 174:15; 185:19; 188:6;
198:15

**quibbling** [1] - 187:7
**quite** [6] - 62:1; 68:17; 90:6; 105:15;
164:8; 193:1
**quote** [11] - 7:17, 20; 8:10, 12-13;
9:11, 14-15; 16:3; 126:20
**quote-unquote** [1] - 126:20
**quoted** [1] - 31:5
**quoting** [1] - 22:20

# R

**racial** [1] - 14:15
**Racine** [5] - 5:4; 10:12; 13:9; 15:13;
44:21
**RACINE** [1] - 15:14
**racketeering** [1] - 5:22
**radio** [1] - 13:5
**raised** [3] - 14:23; 159:11; 161:7
**raising** [1] - 34:1
**rampant** [1] - 123:10
**ran** [3] - 120:23; 150:22; 183:4
**range** [1] - 180:23
**rank** [4] - 67:23; 98:1; 101:3
**rate** [1] - 67:19
**rather** [2] - 15:4; 185:6
**ratio** [1] - 182:10
**rationale** [1] - 48:16
**Ray** [6] - 53:5; 62:1; 66:16; 140:22;
144:16
**RAYFUL** [4] - 1:6; 136:1, 8; 201:13
**Rayful** [37] - 3:4, 11; 11:18; 46:11;
50:16; 60:13; 72:21, 23, 25; 73:22;
74:1, 9; 91:13; 92:21; 94:15; 95:21;
102:3; 107:5; 114:2, 4, 6, 19, 23; 115:1;
117:6; 118:1; 120:11, 15; 130:25;
132:25; 135:24; 136:12; 162:20; 183:20
**rayfuledmondfeedback.com** [1] -
11:24
**RDR** [3] - 2:4; 200:11, 15
**RDR-CRR** [1] - 200:11
**reach** [5] - 31:20; 126:19; 127:3;
128:4; 164:22
**reached** [4] - 8:1; 15:21; 92:15; 135:12
**reaching** [1] - 116:22
**reaction** [1] - 73:18
**read** [11] - 13:21; 31:24; 49:16; 55:15;
102:25; 107:11; 155:20; 164:17; 167:2
**ready** [4] - 27:20; 28:5; 30:18; 44:25;
50:9, 12
**real** [5] - 78:12; 124:6; 146:1; 165:18
**realize** [1] - 136:4
**realized** [3] - 91:4; 110:21, 25
**realizing** [1] - 111:8
**really** [20] - 11:20; 50:25; 52:15; 53:22;
93:25; 98:23; 99:9; 126:2; 127:2, 17;
136:20; 147:8; 152:9, 13; 153:20;

157:9; 187:10, 16; 189:25; 195:13
**realtime** [1] - 18:12
**rearrange** [1] - 105:5
**rearrested** [1] - 74:20
**reason** [19] - 36:12; 41:1; 48:13; 63:16;
68:10, 21; 128:12; 137:11; 170:10;
177:7; 181:9; 183:20; 190:2, 9; 192:25
**reasonable** [5] - 21:22; 161:11;
191:12; 193:10, 18
**reasons** [10] - 22:7; 25:7; 47:3; 64:5;
107:14; 110:12; 167:5; 177:23; 184:10;
197:12
**reassured** [1] - 138:3
**recalculated** [1] - 17:9
**recalculating** [1] - 17:7
**recap** [1] - 30:16
**receive** [4] - 28:14; 110:8; 163:15;
180:12; 181:1; 183:2
**received** [5] - 13:12; 15:19; 42:12;
180:5; 185:24
**receivership** [1] - 121:23
**receiving** [1] - 110:1
**recent** [1] - 124:4
**recently** [1] - 105:12
**recess** [11] - 43:5, 16, 19, 21; 44:23,
25; 106:14, 17, 25; 160:17; 162:16
**recesses** [1] - 43:9
**recidivated** [2] - 99:21; 157:18
**recidivism** [1] - 99:25
**recognize** [2] - 10:8; 126:14
**recognized** [1] - 66:13
**recognizing** [3] - 163:10, 12; 198:18
**recollection** [6] - 47:2; 74:19; 77:12;
78:9; 110:23; 141:18
**recommendation** [4] - 17:22; 18:13;
159:1; 180:24
**recommended** [1] - 36:5
**recommends** [2] - 4:4, 7
**record** [27] - 3:6; 22:11; 24:14; 33:10,
17; 36:13; 37:15; 58:18; 70:4, 10, 14;
97:2; 104:10; 105:10, 17; 125:3; 127:7;
130:17; 136:11; 162:14; 169:20; 189:2,
13; 196:7; 197:1; 198:19; 200:11
**recorded** [1] - 55:12
**redemption** [1] - 133:25
**redirect** [1] - 125:24
**reduce** [18] - 4:3, 5, 7; 9:19; 12:3; 25:4,
10; 31:2; 107:13; 163:1; 167:14;
169:25; 170:15, 21; 171:13; 172:18;
173:11; 192:2
**reduced** [3] - 27:14; 42:9; 187:1
**reduces** [1] - 8:2
**reducing** [4] - 27:9; 104:6; 164:7;
174:12
**reduction** [39] - 9:23, 25; 11:17; 14:1;
27:8; 31:15; 41:8; 42:12, 14-15; 90:23;
96:17; 168:11; 169:14, 24; 170:7, 9, 16;
171:14; 172:19; 173:4, 10, 14; 174:14;
178:3; 186:21, 23-24; 187:2; 189:4, 12;
190:24

**redundant** [1] - 25:24
**Reeves** [1] - 12:19
**reference** [2] - 104:14; 173:14
**referenced** [3] - 86:1; 160:10; 177:6
**references** [1] - 49:1
**referred** [3] - 41:18; 78:11; 104:16
**referring** [3] - 22:18; 101:15; 105:17
**reflection** [1] - 113:10
**reform** [1] - 168:9
**reformed** [1] - 170:4
**reforms** [4] - 26:23; 30:13, 25; 186:9
**refuse** [2] - 190:6, 19
**refused** [1] - 75:24
**refusing** [2] - 190:20; 191:1
**regard** [19] - 10:8; 30:12; 38:15; 55:2;
66:4, 9; 67:10; 85:17; 92:10; 105:8;
115:10; 123:24; 139:9; 178:16; 179:13;
180:19; 183:13
**regarding** [12] - 9:18; 11:17; 15:17;
16:9, 11; 17:2; 19:12; 47:13; 52:3; 61:4;
62:4; 161:7
**regardless** [2] - 49:24; 174:7
**regards** [5] - 113:19; 114:7, 9, 21;
115:7
**regular** [3] - 116:8; 122:23; 132:15
**rejoin** [1] - 158:14
**relate** [1] - 66:19
**related** [6] - 6:18; 36:11; 38:8; 42:15;
49:25; 66:12
**relates** [1] - 18:18
**relating** [2] - 18:20; 115:22
**relationship** [1] - 152:6
**relaxed** [2] - 64:22; 144:15
**release** [18] - 6:10; 7:12; 13:2; 16:11;
18:19; 32:9, 19; 33:25; 42:8; 50:12;
59:1, 4, 11; 163:10; 174:24; 175:10;
191:10
**released** [15] - 15:2; 33:20; 99:14, 20,
24; 116:10; 122:4; 126:4; 127:23, 25;
134:3; 154:21; 156:20; 175:16
**relevant** [12] - 5:14; 9:10, 13; 14:25;
15:17, 25; 23:3; 55:25; 79:20; 170:6;
173:4
**relief** [1] - 89:5
**religious** [1] - 14:19
**reluctance** [1] - 68:22
**remain** [6] - 43:13; 106:16, 24; 123:20;
162:11; 176:3
**remained** [2] - 17:5; 178:20
**remaining** [3] - 17:17, 19; 19:4
**remarkable** [1] - 75:19
**remember** [24] - 50:16; 52:25; 58:23;
64:12, 24; 67:2; 74:5; 77:9, 11; 79:1;
85:13; 92:23; 110:23; 111:2; 137:3;
142:12; 149:16, 24; 150:9, 13-14; 151:4
**remind** [2] - 35:1; 108:20
**reminder** [1] - 34:24
**remiss** [1] - 184:7
**remorse** [1] - 134:21

**remorseful** [1] - 154:4
**remote** [1] - 21:12
**removed** [3] - 17:3; 94:7; 122:21
**rendered** [1] - 173:16
**rendering** [1] - 3:24
**repeat** [3] - 40:16, 24; 192:10
**reply** [4] - 185:17; 194:25; 195:2
**report** [5] - 6:13; 16:11; 22:2; 59:1; 93:25
**reported** [2] - 2:8; 58:25
**reporter** [4] - 5:9; 44:4; 106:3; 193:19
**Reporter** [3] - 2:4; 200:15
**REPORTER** [1] - 119:5
**represent** [1] - 10:18
**representations** [2] - 16:25; 19:13
**representatives** [2] - 10:4; 20:2
**reputation** [2] - 114:10; 118:4
**request** [14] - 15:3, 16; 20:23; 44:12; 75:25; 85:6; 107:18; 121:12-14; 146:20; 162:4; 190:19
**requested** [5] - 9:17; 16:10; 20:20; 89:5; 95:19
**requesting** [3] - 20:18; 36:22; 195:17
**require** [1] - 46:7
**required** [5] - 6:9; 21:10; 84:12; 176:25
**requires** [2] - 105:25; 190:17
**Research** [3] - 4:22; 15:16, 20
**research** [3] - 13:18; 36:3; 76:13
**resentence** [1] - 163:1
**resentenced** [1] - 38:4
**resentencing** [4] - 15:18; 170:11; 171:11
**reserve** [1] - 31:16
**reserved** [1] - 21:24
**residence** [1] - 12:5
**residents** [11] - 9:17; 10:15, 22, 24; 12:2; 13:13, 15
**resides** [1] - 33:23
**resolve** [2] - 3:17; 161:16
**resolved** [1] - 29:3
**resources** [4] - 29:23; 83:15; 123:18, 24
**respect** [19] - 8:5; 24:5; 27:2; 31:20; 32:19; 33:6; 35:5; 36:21; 102:22; 107:20; 108:3; 175:2, 4, 11, 19; 185:21; 187:6; 198:21
**respected** [1] - 183:23
**respective** [2] - 160:18; 162:5
**respectively** [1] - 161:20
**respond** [9] - 12:2; 48:3; 139:13, 15, 17; 141:8; 165:6; 185:8, 13
**responded** [2] - 121:19; 141:10
**response** [5] - 32:13; 50:5; 169:20; 189:8; 192:9
**responses** [1] - 15:25
**responsibilities** [2] - 84:9
**responsibility** [6] - 10:14; 18:8; 85:4; 103:21; 155:16, 18
**responsible** [4] - 14:12; 16:3; 61:10;

155:15
**rest** [4] - 31:17; 96:6; 103:16; 109:19
**restricted** [6] - 147:24; 148:2, 7, 24; 181:21; 182:15
**restrictions** [3] - 181:25; 182:2, 6
**restrictive** [2] - 34:10, 21
**result** [6] - 42:4, 8, 10; 124:2; 195:2
**resulted** [2] - 61:12; 80:3
**results** [4] - 10:1, 7; 102:22; 124:3
**resuming** [1] - 107:4; 162:19
**retain** [2] - 115:7; 116:17
**retaliation** [3] - 83:3; 183:24; 190:11
**retired** [2] - 46:6; 63:11
**return** [3] - 12:4; 175:6, 10
**returning** [3] - 32:12; 112:3, 5
**Reverend** [4] - 118:19; 126:10; 128:14; 145:23
**reverend** [3] - 119:3, 8; 124:16
**review** [1] - 193:23
**reviewing** [4] - 17:1; 68:16; 87:15; 88:25
**revised** [1] - 6:13
**revisiting** [1] - 87:4
**revocation** [1] - 36:4
**rework** [1] - 18:3
**Richey** [5] - 6:4, 7, 10, 17, 22
**Rick** [8] - 37:19; 47:15; 60:21; 62:25; 76:15; 142:13; 148:15; 152:2
**RICK** [3] - 63:1, 4; 201:6
**ring** [2] - 103:10
**ripe** [1] - 4:15
**rise** [1] - 48:9
**risk** [18] - 40:19; 52:10, 12-13; 78:20; 79:10; 82:23; 84:11; 100:7; 112:15; 125:16, 18; 132:12; 143:18; 145:1, 17; 148:3
**rivaled** [2] - 26:11; 31:13
**road** [1] - 76:8
**roads** [1] - 133:15
**roadways** [1] - 133:15
**role** [11] - 11:13; 28:19; 60:19; 72:25; 87:2, 15; 88:3; 112:22; 125:12; 132:9
**Roman** [1] - 73:20
**room** [19] - 39:6; 63:22; 64:11, 15; 73:10, 12-13; 140:17; 141:7; 142:11; 143:6
**Room** [2] - 1:16; 2:5
**roommate** [3] - 78:22; 81:13
**roommates** [1] - 79:11
**roughing** [1] - 74:18
**roughly** [2] - 74:24; 80:23
**round** [1] - 85:8
**rouse** [1] - 46:17
**route** [1] - 134:20
**routinely** [1] - 110:14
**Rowe** [3] - 124:22; 125:4
**ROWE** [3] - 124:23; 125:1; 201:11
**Rubley** [1] - 172:21
**Rudasill** [2] - 142:14, 17

**Rule** [33] - 4:3; 8:1; 9:10; 15:22; 21:11; 25:2, 4; 71:7, 14; 80:4; 90:25; 95:15, 18, 25; 96:2; 104:4; 149:6; 167:15; 169:25; 170:11; 171:8, 11, 19; 173:5; 188:23; 189:1, 8, 10, 12; 190:24
**rule** [7] - 31:21; 37:11; 160:13; 169:23; 171:18; 192:3; 195:8
**ruled** [2] - 80:3; 171:9; 172:4
**rules** [3] - 25:3; 93:18; 170:14
**Rules** [1] - 25:9
**ruling** [2] - 160:13; 192:16
**rumor** [2] - 129:4
**run** [9] - 6:8, 12; 7:7, 13, 18-19; 8:11, 16; 168:5
**run-of-the-mill** [1] - 168:5
**run..** [1] - 8:14
**rung** [1] - 65:16
**running** [5] - 9:1; 74:22; 92:15; 182:25; 183:6
**runs** [1] - 7:15
**rush** [1] - 184:14

## S

**safety** [13] - 13:9; 84:5, 10; 116:16, 25; 129:12; 134:23; 157:24; 158:3; 189:5, 14
**sammy** [1] - 183:3
**Sammy** [3] - 183:11; 187:23
**sample** [1] - 9:24
**sandbox** [1] - 127:15
**Sanhedrin** [1] - 129:2
**Santacruz** [1] - 81:24
**sat** [4] - 47:11; 64:16, 21; 152:7
**satisfied** [1] - 90:23
**Saturday** [2] - 12:18
**Saturdays** [1] - 132:16
**save** [3] - 44:9; 127:4
**saw** [7] - 78:20; 99:9; 113:18; 117:21; 129:6; 132:23, 25
**scale** [10] - 7:7; 8:17; 25:25; 28:2; 57:7, 10; 62:11, 13; 67:19; 97:25
**scarce** [1] - 29:23
**scared** [2] - 129:4
**scenarios** [1] - 90:13
**schedule** [8] - 21:15; 105:5; 106:5; 107:24; 160:12, 14; 198:9
**scheduled** [3] - 4:10; 70:24; 159:19
**scheduling** [2] - 159:18; 160:3
**scheme** [1] - 167:3
**Schertler** [1] - 73:3
**Schmitt** [1] - 15:19
**school** [8] - 99:6; 113:21; 117:24; 131:3; 145:5, 10; 155:13
**scope** [3] - 23:3; 27:7; 36:24
**Scott** [5] - 2:4; 33:2; 200:11, 13, 15
**scottlyn01@aol.com** [1] - 2:7
**scratch** [2] - 170:12; 171:9
**screen** [1] - 21:12

**sealed** [1] - 22:1

**search** [2] - 5:12; 89:6

**seat** [2] - 15:11; 111:20

**seated** [5] - 43:13; 44:5; 106:16, 24; 162:11

**seclude** [1] - 130:3

**second** [13] - 12:9, 17; 32:10; 48:20; 51:14; 81:21; 88:10; 134:1; 147:5; 149:8; 187:5; 188:25; 189:11

**secret** [2] - 59:8; 64:4

**Section** [3] - 7:1; 9:9; 173:3

**secure** [2] - 51:1, 10

**security** [8] - 36:12; 65:10; 93:10, 12, 22; 190:3; 199:25

**see** [20] - 13:15; 43:17; 46:20; 47:5; 96:15; 98:16; 110:15; 114:20; 115:19, 21, 23; 116:25; 124:16; 129:5; 132:6; 139:2; 164:3, 23; 175:15; 195:4

**seek** [1] - 183:24

**seem** [1] - 78:12

**segment** [1] - 79:18

**segregate** [2] - 56:17; 79:23

**segregation** [10] - 52:1; 76:22; 77:2, 10, 13; 144:3, 6, 9

**select** [1] - 198:17

**self** [3] - 115:5; 125:5; 155:19

**self-evident** [1] - 125:5

**selfishly** [1] - 184:18

**sell** [2] - 103:7; 141:12

**selling** [4] - 138:8; 147:11; 150:19; 155:12

**Senate** [2] - 182:8

**send** [3] - 12:12; 133:19; 175:17

**sends** [1] - 181:2

**senior** [1] - 46:4

**sense** [8] - 56:19; 77:6; 113:14; 116:20; 179:5; 191:22; 193:6; 195:16

**sent** [4] - 13:7; 81:14, 16; 140:4

**sentence** [92] - 4:3, 5, 7, 9; 7:13-16, 22; 8:3; 9:14, 20, 23, 25; 11:17; 12:3; 14:1; 17:6, 22; 20:18, 20, 23; 22:19; 25:4, 10; 26:4; 27:7, 9, 14; 31:2; 32:6; 34:19; 36:4, 22; 41:12, 14; 42:9; 71:11; 73:25; 75:11; 77:10, 24; 84:9; 90:24; 91:4; 102:6-8; 104:6; 107:13; 163:8, 13; 164:7, 19-20; 166:9; 167:15, 20; 168:11; 169:14, 24; 170:22; 173:4, 11; 174:12, 14; 176:3; 177:2, 10-11, 21; 180:2, 12; 181:1; 183:11; 185:25; 186:1, 4, 11; 187:20; 188:12, 16; 189:7, 9; 191:11, 15

**sentenced** [9] - 7:10; 25:13; 35:23; 55:23; 140:5; 167:17; 170:12; 186:4

**sentences** [5] - 6:5, 8; 7:3; 83:9; 93:15

**Sentencing** [9] - 4:21; 15:16; 104:3; 176:20; 177:4, 6, 10, 19; 180:2

**sentencing** [18] - 16:12; 18:8; 49:9, 11, 14, 19; 57:4; 72:25; 152:21, 25; 171:8; 172:25; 182:18; 183:10; 187:15; 188:5

**separate** [4] - 41:19; 42:1; 115:14; 178:11

**separately** [1] - 107:23

**September** [3] - 6:4; 15:15, 23

**serious** [1] - 82:2

**seriously** [2] - 192:24; 193:1

**serve** [7] - 3:18; 8:6; 11:6; 15:6; 128:17, 20; 163:6

**served** [12] - 3:20; 4:7; 14:16; 20:18; 32:7; 46:1; 96:17; 125:10; 133:24

**serves** [1] - 13:6

**service** [5] - 120:15; 121:15; 125:25; 200:2

**Service** [2] - 4:23; 107:10

**serving** [9] - 26:7; 32:8; 73:24; 75:11; 77:10, 24; 83:9; 84:9; 93:15

**SESSION** [2] - 3:1; 107:2

**set** [16] - 9:9; 11:11, 14; 26:2; 28:16; 43:8; 82:14; 92:20; 103:2; 160:12; 168:1; 169:19, 22; 172:6; 195:10; 199:1

**sets** [1] - 40:12

**settings** [1] - 82:19

**seven** [2] - 20:11; 137:20

**several** [14] - 16:4; 20:2; 26:2; 27:21; 28:14, 20; 37:3; 38:5; 39:3; 139:4; 150:4; 167:18; 172:5; 179:6

**severe** [1] - 182:15

**severed** [1] - 6:17

**severely** [1] - 181:20

**sex** [1] - 35:24

**shank** [2] - 76:10; 82:18

**share** [3] - 11:25; 96:7; 133:18

**shared** [2] - 95:18; 131:25

**shed** [1] - 114:1

**sheer** [1] - 179:8

**Shelby** [1] - 172:20

**shift** [1] - 75:1

**shifting** [1] - 75:1

**shooting** [2] - 40:3; 114:13

**shootings** [1] - 121:4

**short** [3] - 105:23, 25; 160:17

**shorthand** [1] - 2:8

**shot** [3] - 104:5; 113:22; 118:1

**show** [6] - 37:6; 57:9; 86:4; 114:24; 157:3

**showed** [3] - 87:3; 115:1; 134:21

**showing** [1] - 137:15

**shown** [1] - 37:20

**shows** [2] - 103:14; 184:1

**shut** [1] - 135:7

**sic** [1] - 152:15

**sic]** [1] - 69:9

**sick** [1] - 138:12

**side** [6] - 14:13; 56:22; 116:19; 152:11

**sidebar** [3] - 22:11; 33:10; 70:4

**Sidebar** [3] - 24:25; 35:4; 70:13

**sides** [3] - 115:14; 195:2; 198:3

**sigh** [1] - 64:21

**significance** [1] - 87:18

**significant** [13] - 3:23; 6:19; 7:12; 9:16; 10:1; 13:17; 21:23; 27:21; 42:12; 110:13; 167:20; 199:15

**significantly** [3] - 34:21; 147:24; 183:7

**similar** [1] - 186:15

**Simple** [13] - 113:3, 9, 17; 114:14; 116:1; 120:3, 6; 121:24; 145:22, 25; 176:13; 181:19

**simple** [4] - 12:1; 93:2; 165:14

**simply** [9] - 12:11; 35:9; 47:11; 58:4, 6; 109:17; 113:14; 121:5; 192:5

**sincere** [3] - 4:18; 53:18; 110:12

**sincerity** [1] - 132:1

**single** [8] - 37:24; 39:13; 54:2; 72:19; 149:3; 151:14, 16; 178:7

**SIS** [1] - 76:24

**sister** [1] - 81:25

**sit** [3] - 115:17; 136:13; 145:6

**sitting** [5] - 115:14, 18; 126:16; 128:20; 155:22

**situation** [7] - 30:3; 51:2; 122:24; 136:21; 140:11; 154:5; 187:9

**situations** [6] - 29:6, 8-9; 30:11, 14; 135:8

**six** [8] - 20:8; 51:5, 19; 77:12, 19; 112:17; 117:17; 144:5

**skill** [1] - 103:1

**Skype** [1] - 128:1

**sleep** [1] - 109:18

**slightly** [1] - 30:2

**slumped** [1] - 50:17

**small** [2] - 20:19; 46:16

**smaller** [1] - 170:8

**smart** [1] - 103:3

**smile** [1] - 166:21

**Smitty** [2] - 91:8, 16

**snitch** [1] - 175:14

**snitched** [1] - 183:20

**snitching** [2] - 175:14, 21

**so-called** [1] - 29:2

**so..** [2] - 167:5; 196:11

**Soares** [10] - 2:2; 5:2; 16:19; 19:15; 33:8; 35:5; 162:22; 185:9; 188:10; 199:22

**social** [3] - 13:5; 81:1; 119:17

**society** [4] - 94:7; 133:9; 146:16; 176:2

**sold** [1] - 86:22

**solitary** [2] - 52:1; 77:12

**solve** [2] - 29:24; 102:1

**solving** [1] - 168:7

**someone** [30] - 32:16; 34:10; 57:4, 13; 73:24; 93:18; 99:5, 24; 110:13; 118:1; 124:10; 177:7, 21, 25; 180:3, 13-14; 181:1, 25; 182:1, 3-5; 183:13; 188:25; 189:11; 190:6; 196:11, 15; 197:4

**sometimes** [12] - 57:5; 68:17; 149:1; 151:17; 152:5; 167:24; 169:3; 179:10; 184:19

**somewhat** [1] - 25:20

**somewhere** [6] - 51:22; 65:8; 76:21; 130:3; 137:10; 145:19

**son** [1] - 79:12

**sons** [1] - 156:16

**soon** [3] - 20:21; 23:22; 164:11

**sooner** [2] - 54:6, 13

**sorry** [19] - 3:16; 18:4; 33:23; 44:15, 19; 50:3; 51:18, 23; 57:25; 58:15; 108:10; 134:19; 154:4; 171:25; 172:20; 183:19; 193:7; 194:3

**sort** [10] - 65:6; 67:11; 70:23; 71:5; 132:2; 140:19; 144:25; 145:9, 11; 149:21

**sound** [1] - 55:5

**sounding** [1] - 121:5

**sounds** [1] - 173:18

**source** [1] - 86:22

**sources** [2] - 28:20; 89:3

**south** [1] - 74:14

**South** [1] - 1:23

**Southeast** [1] - 119:9

**southwest** [1] - 84:2

**speaker** [2] - 121:18; 164:3

**speakers** [1] - 115:25

**speaking** [7] - 13:22; 122:5; 131:8, 12; 145:17; 178:18; 181:19

**special** [4] - 5:7; 6:9; 45:25; 46:5

**specific** [8] - 35:7; 38:8; 41:13; 42:21; 53:6; 169:20; 187:1, 14

**specifically** [15] - 12:5; 26:24; 40:2, 7; 41:24; 50:23; 58:2; 70:23; 71:14; 105:3; 112:5; 125:15; 132:13; 174:25; 182:22

**specifics** [1] - 52:22

**speculate** [1] - 166:14

**spend** [1] - 131:4

**spending** [1] - 103:2

**spends** [1] - 124:9

**spent** [1] - 94:14

**spirit** [3] - 117:7; 129:23; 135:14

**spirited** [1] - 133:8

**spiritual** [1] - 132:2

**spite** [3] - 109:21; 117:8; 132:5

**spoken** [2] - 153:21; 197:7

**spokesman** [1] - 129:8

**spot** [1] - 190:12

**spur** [1] - 159:13

**squad** [5] - 46:2; 56:15; 66:20, 23; 67:3

**stab** [1] - 139:23

**stabbed** [2] - 139:7; 190:13

**staff** [7] - 5:8; 43:14; 44:21; 45:1; 160:17; 161:9; 162:9

**stage** [1] - 96:9

**stakes** [2] - 192:23; 193:4

**stand** [10] - 47:25; 61:11, 14; 62:25; 106:14; 149:24; 150:2; 157:6; 198:8

**stand-up** [1] - 47:25

**stands** [4] - 8:10; 88:9; 98:21; 106:17

**start** [11] - 17:9; 30:19; 43:5; 45:3;

53:17; 66:11; 70:22; 76:8; 106:19; 141:11; 164:10

**started** [19] - 17:10; 20:21; 43:4; 48:4, 14; 50:8, 18, 24; 63:22; 66:12; 74:6; 80:6; 81:18; 121:15; 137:15, 18; 138:2; 178:17

**starting** [7] - 32:15; 42:24; 80:11; 170:12; 173:15; 177:20; 199:4

**state** [6] - 14:2; 27:16; 119:5, 7; 130:17; 167:13

**State's** [1] - 169:5

**statement** [3] - 36:16; 107:9; 128:11

**Statement** [1] - 107:10

**statements** [1] - 76:4

**states** [1] - 35:9

**STATES** [3] - 1:1, 3, 11

**States** [23] - 1:13; 3:4, 8; 4:21, 23, 25; 5:1; 6:2; 7:6, 24; 23:16; 39:6; 49:18; 72:13; 107:5; 124:7; 162:20; 182:8; 183:4, 7; 190:2

**statistical** [3] - 99:24; 100:2, 4

**statistically** [1] - 10:1

**statistics** [4] - 38:8; 99:23; 190:16

**stature** [1] - 40:23

**status** [2] - 65:4; 195:12

**statute** [9] - 17:7; 18:16; 35:9, 13; 36:6; 186:8, 16; 188:12, 14

**statutorily** [1] - 8:21

**statutorily-defined** [1] - 8:21

**statutory** [1] - 18:20

**stay** [8] - 44:8; 77:11; 106:12; 125:23; 176:6, 12, 17; 190:23

**stayed** [2] - 144:15, 18

**staying** [1] - 44:17

**steadily** [1] - 61:22

**Steadman** [5] - 130:11, 18-19; 147:7; 184:4

**STEADMAN** [3] - 130:12, 15; 201:12

**Step** [2] - 165:25; 186:8

**step** [5] - 25:19; 69:23; 85:13; 124:19; 173:7

**steps** [1] - 104:14

**Steve** [8] - 45:9; 60:20; 73:20; 74:1, 6, 25; 142:13; 151:21

**Steven** [1] - 37:18

**STEVEN** [5] - 45:10, 18; 109:1; 201:4, 8

**stick** [2] - 106:4; 135:11

**stiff** [1] - 57:9

**still** [42] - 14:17; 58:13; 69:11, 13; 81:14; 83:9; 88:5; 98:16; 99:19; 108:20; 110:11; 122:16, 25; 123:6, 15, 19; 127:17; 130:2; 132:5; 135:9; 152:5; 154:12; 156:13; 174:9; 175:11; 178:20; 183:23, 25; 186:10, 17; 187:1; 188:12, 15, 20-21; 189:4, 6, 13; 198:22

**sting** [1] - 137:17

**stingy** [1] - 193:5

**stop** [22] - 40:9; 42:21; 48:20; 50:8; 51:13; 69:7; 81:21; 82:5; 83:20; 88:10;

113:24; 120:18; 121:19; 143:22, 24; 175:20; 176:15

**stopped** [3] - 40:11; 42:22; 175:13

**stopping** [2] - 48:23; 113:20

**stories** [2] - 14:21; 126:11

**story** [3] - 64:1, 8

**straight** [2] - 140:4; 189:6

**straightforward** [1] - 48:6

**strategically** [1] - 105:1

**street** [6] - 12:10; 65:15; 98:22; 154:17; 158:5

**Street** [4] - 1:15, 20, 23; 12:17

**streets** [6] - 31:13; 129:19; 130:2; 138:24; 145:5; 158:9

**strike** [1] - 8:9

**strings** [1] - 144:19

**strong** [1] - 76:9

**stronger** [1] - 89:3

**strongly** [2] - 9:3; 107:12

**struggling** [1] - 18:7

**stuck** [1] - 75:21

**study** [1] - 126:17

**stuff** [4] - 75:12; 90:15; 147:19; 155:14

**stunned** [1] - 48:15

**subject** [2] - 79:16; 182:5

**subjects** [3] - 53:19; 55:11; 56:15, 19

**submission** [6] - 161:21; 185:7; 191:18; 192:19

**submissions** [3] - 161:11; 165:3; 198:6

**submit** [6] - 10:25; 16:10; 159:9; 161:5, 21; 191:12

**submitted** [8] - 9:20; 15:15; 16:14; 18:19; 26:21; 105:14; 107:23

**subpoena** [1] - 133:19

**subpoenaed** [2] - 37:5; 60:7

**subsequent** [2] - 21:15; 27:4

**substance** [1] - 178:9

**substantial** [19] - 25:14; 53:24; 91:3, 22; 95:10; 102:17, 19; 115:12; 154:10, 13; 167:16, 19; 168:10; 169:5, 15; 174:13; 186:22; 187:2

**success** [1] - 89:7

**successful** [2] - 5:12; 112:8

**suddenly** [1] - 59:5

**suffer** [1] - 83:13

**suggest** [4] - 160:25; 161:3, 5; 198:2

**suggestion** [1] - 159:14

**Suite** [1] - 1:23

**Sullivan** [2] - 61:7; 113:7

**SULLIVAN** [1] - 1:11

**Sullivan's** [1] - 62:10

**sum** [1] - 29:21

**summarize** [2] - 16:24; 27:17

**summarizes** [1] - 10:25

**summary** [3] - 11:2; 13:14, 20

**summer** [1] - 11:18

**Sunday** [4] - 80:16; 120:16; 121:14; 143:17

**Superior** [1] - 3:20
**superlative** [1] - 98:20
**superlatives** [1] - 98:12
**superseded** [1] - 166:9
**supervised** [8] - 6:10; 7:12; 16:11; 18:18, 20; 32:9, 19; 33:25
**supervision** [5] - 32:24; 33:9; 35:6; 154:21
**supervisor** [1] - 46:5
**supervisors** [2] - 103:24; 164:24
**supplement** [2] - 165:2; 192:7
**supplemental** [1] - 16:11
**supplied** [1] - 61:4
**supplier** [1] - 87:6
**supply** [1] - 75:25
**support** [5] - 13:19; 76:9; 112:11; 114:20; 136:22
**supported** [3] - 9:24; 14:1; 100:10
**suppose** [2] - 160:16
**Supreme** [2] - 129:2; 180:8
**surf** [1] - 132:21
**surgery** [2] - 118:5; 126:15
**surprise** [3] - 50:10; 159:25; 161:1
**surprised** [3] - 14:5; 160:24; 198:20
**surprises** [2] - 160:11
**surprising** [1] - 48:13
**surprisingly** [1] - 47:9
**surrendered** [1] - 100:13
**survey** [3] - 117:22; 176:1
**susceptible** [1] - 40:21
**suspect** [4] - 23:16; 105:23; 113:7; 193:20
**suspects** [3] - 29:20; 67:11
**sway** [1] - 176:14
**SWORN** [9] - 45:10; 59:25; 63:1; 71:23; 111:19; 118:21; 124:23; 130:12; 136:1
**system** [12] - 10:22; 11:9; 14:15; 30:9; 40:13; 58:9; 94:1, 16, 25; 112:11; 121:18
**systems** [1] - 58:4

# T

**table** [3] - 12:18; 23:18; 188:24
**tables** [1] - 186:23
**Tadio** [1] - 173:6
**takedown** [1] - 73:23
**talks** [3] - 134:5; 137:21; 187:15
**tap** [1] - 28:15
**tapes** [1] - 68:15
**target** [3] - 87:21; 89:21; 98:13
**targeting** [1] - 168:25
**targets** [3] - 82:13; 98:15; 168:25
**Task** [1] - 88:9
**tax** [1] - 58:5
**team** [9] - 11:21; 55:6; 72:24; 73:19; 74:4; 84:3; 85:5; 92:21
**technical** [1] - 3:17

**techniques** [1] - 47:15
**teleconferencing** [1] - 117:8
**telephone** [6] - 12:9; 23:15; 67:1; 74:7; 94:1, 11; 128:1; 131:8
**telephones** [3] - 28:15; 30:10; 92:11
**television** [2] - 13:5; 197:10
**Temple** [5] - 114:15, 17; 119:8; 120:7; 125:7
**ten** [14] - 18:24; 35:9, 11, 13-14; 91:19; 98:13; 162:9; 184:13; 185:9; 191:9; 193:9, 21, 24
**ten-day** [1] - 193:21
**tentative** [1] - 195:10
**tenure** [1] - 68:8
**term** [10] - 7:11; 18:25; 35:7, 12, 23; 36:5; 86:23; 154:10; 186:25
**terms** [7] - 6:10; 7:18; 16:11; 56:21; 87:9; 104:6
**Terrace** [1] - 113:3
**terrible** [3] - 98:24; 99:10
**Testament** [2] - 129:8
**testified** [14] - 27:25; 29:9; 38:18; 39:1; 71:1; 80:9; 98:21; 141:16; 150:14, 18; 152:21, 25; 153:3; 179:16
**testify** [28] - 21:6; 27:20; 28:3, 5, 22; 30:18; 39:3; 40:18; 68:6, 22; 70:24; 86:2, 5-6, 10; 90:15; 91:17, 20, 23-24; 136:5; 137:1; 150:14; 151:6; 152:20; 179:17
**testifying** [7] - 23:4; 133:22; 149:16; 150:6, 13; 168:8; 182:8
**testimony** [35] - 24:7; 28:4, 7; 37:3; 40:5, 14; 43:16; 45:3; 56:24; 61:12; 70:19; 72:17; 84:19, 24; 85:11, 20; 103:9; 104:24; 116:24; 119:23; 150:5, 16; 160:9, 24; 161:24; 167:10; 168:5, 17; 171:1; 178:15; 179:19
**Thanksgiving** [7] - 80:12; 81:6; 83:18, 20-21, 24; 194:14
**that'd** [1] - 156:25
**theme** [1] - 123:9
**themselves** [3] - 42:19; 71:2; 126:1
**theoretically** [1] - 189:4
**theory** [1] - 23:1
**thereafter** [1] - 11:14
**thereby** [1] - 36:21
**therefore** [1] - 17:4
**thereof** [2] - 74:17; 180:4
**thereupon** [1] - 106:18
**Thereupon** [2] - 106:25; 162:17
**they've** [1] - 107:14
**thinking** [12] - 18:6; 20:21; 110:24; 111:2; 138:2, 6-7; 141:8; 161:8; 185:3
**thinks** [2] - 159:10; 170:17
**third** [10] - 12:13, 18; 29:1; 32:21, 25; 33:1; 78:23; 134:1; 136:12
**thorough** [1] - 38:22
**thoughtful** [2] - 13:16; 14:23
**thoughts** [2] - 191:8; 198:21
**thousand** [1] - 16:5

**thousands** [2] - 80:21
**threat** [1] - 84:11
**three** [38] - 3:19; 6:11, 14; 12:13; 18:24; 19:4; 20:10; 29:9; 30:17; 36:4, 25; 46:3; 53:6, 14; 55:10; 80:18; 85:24; 89:2; 94:4; 108:18; 112:14; 113:12, 22; 125:19; 130:1; 132:15; 135:10; 143:8, 12-13; 149:1; 168:5; 182:3, 10; 185:20
**three-way** [1] - 94:4
**three-year** [1] - 36:4
**threw** [1] - 142:19
**thrive** [2] - 30:11; 157:4
**throughout** [3] - 44:17; 48:8; 49:24
**throw** [1] - 150:2
**Thson** [2] - 124:22; 125:4
**THSON** [3] - 124:23; 125:1; 201:11
**Tiffani** [1] - 108:7
**tight** [1] - 160:12
**timeframe** [4] - 42:16; 53:3, 13; 184:11
**Title** [1] - 186:14
**title** [2] - 119:3; 125:5
**to..** [1] - 33:12
**today** [54] - 4:11; 17:22; 18:7; 19:2; 30:1; 31:17; 37:6, 20; 43:7, 10; 49:21; 56:24; 63:15; 71:9, 11; 104:9, 15; 117:2, 4-5, 14; 132:18; 133:20; 136:2, 22; 153:15; 157:6; 159:7; 160:9, 19, 24; 161:10, 23-24; 167:18; 168:3; 169:2, 10, 18; 170:4, 13, 21; 184:6; 186:5; 187:12; 191:11; 193:17
**today's** [5] - 21:10; 63:12; 79:20; 117:20; 194:6
**together** [16] - 51:6; 66:17; 85:4; 93:25; 115:17; 119:25; 121:22; 127:16; 128:3; 131:3; 134:4; 146:15; 152:7, 12
**tomorrow** [3] - 43:6, 8, 10
**took** [20] - 5:11; 13:17; 46:3; 51:5, 19; 61:11, 14; 63:21; 64:21; 67:8; 74:10; 75:19, 21; 76:1; 114:15; 137:10; 143:7, 16; 191:3
**tools** [1] - 116:16
**top** [8] - 33:23; 101:10-13, 20-21; 163:20
**topic** [1] - 174:7
**total** [5] - 13:12; 17:16; 20:12; 85:25; 193:24
**totally** [1] - 115:24
**tough** [3] - 102:17, 23; 155:7
**towards** [2] - 41:25; 158:25
**town** [1] - 99:9
**track** [1] - 190:15
**trade** [1] - 26:13
**trafficked** [1] - 12:21
**traffickers** [2] - 28:16; 90:8
**trafficking** [15] - 6:16; 26:1, 10, 23; 27:3, 21; 28:2; 74:20; 87:2, 4; 89:22; 90:17; 91:14; 98:14; 102:3
**training** [2] - 121:22; 123:24
**transcribing** [1] - 56:5
**TRANSCRIPT** [1] - 1:10

transcript [8] - 2:8; 49:16; 159:4; 192:22; 193:15, 23, 25; 200:11
transcription [1] - 2:8
transcripts [1] - 107:18
transform [1] - 117:7
transition [1] - 112:18
trap [1] - 155:4
trapped [1] - 75:22
travel [1] - 5:22
treated [1] - 65:17
tremendous [3] - 80:24; 102:1; 103:23
trial [27] - 6:19; 26:1; 27:24; 28:4, 23; 38:18, 20; 39:1; 73:5; 84:18, 20; 85:7; 86:1, 9; 104:22; 149:15, 18; 150:19; 152:20; 179:17; 186:6; 189:2, 11; 199:4
trials [1] - 179:18
trick [1] - 163:12
tricky [2] - 195:12; 196:5
tried [4] - 12:1; 103:9; 139:16; 143:23
trouble [1] - 145:10
truce [4] - 40:2; 113:2; 145:24; 176:13
Truck [2] - 91:8, 16
true [6] - 69:1; 71:8; 129:21; 147:9; 167:23
truly [1] - 168:2
truth [2] - 103:11
truthful [2] - 104:24; 181:10
truthfulness [2] - 67:22
truths [1] - 115:9
try [19] - 30:14; 43:7; 52:17; 57:20; 58:13; 76:13; 77:4; 103:13; 104:1; 112:8; 113:24; 128:4; 139:15; 140:10; 154:8; 167:4; 175:20; 191:20; 198:13
trying [26] - 9:3; 42:2; 48:16; 53:23, 25; 54:17; 59:5, 8; 61:21; 75:2; 78:16; 80:21; 82:3; 95:5; 99:7; 125:23; 126:17; 149:5; 159:12; 162:24; 177:14; 184:18; 190:23; 194:17; 195:25
turn [6] - 23:11; 93:3; 148:9; 149:14; 150:7; 183:22
turnaround [1] - 193:15
turned [4] - 76:22; 77:2; 86:13; 131:11
twice [4] - 84:13, 15; 100:3; 149:2
twin [1] - 156:13
two [38] - 5:17; 12:22; 16:5; 17:9, 12, 14; 19:2; 28:2; 31:14; 35:19, 21; 40:2, 12; 46:19; 47:24; 52:25; 53:6, 14; 55:10; 80:19; 102:8; 106:7; 113:12, 21; 135:13; 156:13; 168:5, 21; 171:16, 21, 23; 173:7; 179:25; 180:25; 193:25
two-level [1] - 17:14
two-minute [1] - 106:7
two-plus [2] - 179:25; 180:25
two-step [1] - 173:7
type [8] - 57:10; 65:7; 133:12; 155:12; 179:23; 184:1; 190:19; 193:8
types [5] - 30:14; 55:9; 56:12; 179:24; 181:25
Tyrone [3] - 111:16; 119:24; 146:1
TYRONE [3] - 111:19, 21; 201:9

Tyson [1] - 125:7

# U

U.S [32] - 1:13, 18-19; 2:5; 5:4; 7:1, 17; 8:3; 9:9; 15:16; 16:8; 52:4; 70:15; 72:9; 73:20; 75:4; 77:6; 84:1; 85:2; 86:7; 91:21; 96:19; 98:8; 103:25; 109:10, 14; 110:6, 9; 117:21
U.S.C [1] - 188:15
ultimate [1] - 71:9
ultimately [3] - 17:3; 38:5; 59:9
um-hmm [3] - 128:10; 130:9; 134:16
un-useful [2] - 85:18, 21
unable [1] - 43:6
unanimity [1] - 171:20
uncomfortable [2] - 72:2, 8
uncorroborated [1] - 88:24
under [34] - 4:16; 5:21; 7:1; 9:9; 16:12; 17:6, 20; 19:3, 5; 21:2, 11; 25:3; 34:20; 46:17; 47:3; 52:3; 53:21; 63:20; 96:2; 104:3; 108:20; 125:24; 136:4; 164:11; 173:4; 188:12, 23-24; 189:8
undercover [5] - 47:14; 60:23; 84:2; 137:16
understood [4] - 72:12; 76:18; 92:3
undisclosed [7] - 40:16; 116:11; 122:4; 126:4; 127:25; 175:10, 17
unduly [1] - 199:6
unfortunately [1] - 165:21
unintended [1] - 100:11
Union [4] - 114:15, 17; 119:8; 120:7
unique [3] - 39:8; 116:22; 175:21
uniquely [1] - 14:12
unit [2] - 67:14; 88:8
UNITED [3] - 1:1, 3, 11
United [25] - 1:13; 3:4, 8; 4:21, 23, 25; 5:1; 6:2; 7:6, 24; 23:15; 39:6; 49:18; 72:13; 107:5; 124:7; 125:8; 162:20; 169:5; 182:8; 183:4, 7; 190:2
universal [1] - 169:23
Universal [1] - 171:19
universally [1] - 177:3
unjust [1] - 177:23
unlawful [1] - 5:23
unlawfully [1] - 5:20
unless [8] - 7:19; 31:16; 106:5; 170:23; 174:15; 188:6; 191:23; 195:25
unlike [1] - 121:3
unpack [1] - 51:16
unprecedented [1] - 167:22
unquote [1] - 126:20
untrue [1] - 96:24
untruthful [1] - 54:16
unusual [4] - 75:9; 103:1, 8
unwarranted [4] - 182:18; 183:9; 187:15; 188:5
up [90] - 17:16; 29:21; 30:13; 35:12; 37:6, 20, 24; 38:3; 40:4; 44:10, 18;

47:25; 48:17; 53:19; 56:7; 57:9; 59:5; 61:20; 68:8; 73:24; 77:5; 78:7, 12; 80:10, 15-16; 81:4, 12, 15; 82:14; 86:4, 9; 91:20; 92:20; 93:6; 94:20; 96:19; 97:10; 102:2; 104:3; 105:18; 109:24; 110:10; 114:24; 115:1; 116:6; 118:3; 126:13, 19; 127:15; 129:1, 18; 131:3, 5, 10; 135:11; 136:14; 140:5; 141:20, 23; 142:14, 24; 145:19; 146:17, 25; 148:18, 21, 24; 151:18; 154:8, 15; 155:3, 9, 12; 156:15, 17; 157:6, 13; 160:20; 161:24; 163:21; 168:1; 169:18; 183:17; 190:17; 191:16; 194:15
upfront [1] - 61:23
upset [1] - 93:7
upwards [1] - 124:9
urges [1] - 107:13
useful [2] - 67:10, 12; 69:11, 13; 85:17, 21-22; 87:7, 9; 178:20
uses [2] - 128:22; 184:13
USP [18] - 73:22; 74:10, 20; 75:22; 76:2, 5, 12, 19; 78:13; 81:11, 15; 92:16, 22; 190:1, 14-15, 19
utility [4] - 53:15; 72:18; 85:16; 105:2
utilize [1] - 117:6
utilized [2] - 116:16; 117:9

# V

vacated [3] - 6:25; 17:3; 18:2
valuable [3] - 90:19; 117:9; 121:1
value [5] - 27:6; 90:10; 95:10; 101:5, 25
valve [2] - 189:5, 14
varied [1] - 13:9
variety [1] - 177:23
various [1] - 96:11
vary [1] - 43:11
Velda [1] - 79:5
verified [1] - 78:4
versus [4] - 3:4; 6:2; 107:5; 162:20
via [8] - 23:15; 66:17; 79:23; 128:1; 131:8, 13; 197:9, 13
vicarious [1] - 84:7
victim [2] - 14:14
victims [1] - 8:21
video [2] - 21:18; 133:1
videos [2] - 122:15
Vietnam [2] - 99:5
view [4] - 18:12; 22:19; 88:15; 171:10
viewed [3] - 14:11, 14; 121:6
views [19] - 8:7, 24; 9:3, 7, 19; 10:7, 19; 11:16, 20, 25; 12:14, 24; 13:13, 18-19; 14:19, 21; 15:5; 161:14
violation [6] - 5:17, 20-22, 24; 7:6
violence [22] - 29:14; 48:8; 49:24; 50:1; 93:18; 99:10; 112:2, 5; 113:11, 17, 20; 115:10; 116:1, 3; 120:1; 121:19; 122:2, 11; 123:10; 139:2; 176:16

**violent** [7] - 6:19; 27:24; 73:2; 76:11; 113:4; 190:5, 15
**Virginia** [1] - 102:9
**virtue** [3] - 113:4; 116:18; 162:1
**vis-à-vis** [3] - 56:17; 178:12; 187:12
**visit** [4] - 129:13; 134:24; 150:4; 174:3
**visitation** [3] - 92:6; 93:1, 21
**visited** [1] - 31:11
**visiting** [1] - 146:10
**visitors** [1] - 129:13
**voice** [7] - 10:15, 22; 12:14; 115:24; 128:24; 136:14
**voiced** [1] - 13:13
**volume** [2] - 81:9
**volumes** [1] - 90:7
**volunteered** [1] - 57:22; 68:14
**vulnerabilities** [2] - 94:15, 25

# W

**wait** [2] - 198:12; 200:4
**walk** [4] - 44:18; 129:22; 130:2; 135:6
**walked** [2] - 159:24; 183:17
**walking** [2] - 44:10; 106:4
**Wallace** [4] - 2:4; 200:11, 13, 15
**walls** [1] - 78:13
**wants** [2] - 50:13; 111:4
**War** [2] - 99:5
**war** [4] - 112:7; 113:11, 15
**ward** [1] - 12:5
**Ward** [3] - 12:18, 20; 107:10
**warden** [3] - 145:4; 147:15
**warn** [2] - 46:23, 25
**warrant** [2] - 89:6; 173:13
**warring** [1] - 120:6
**Warring** [1] - 176:13
**was..** [1] - 81:3
**Washington** [14] - 1:8, 16, 21; 2:6; 27:25; 46:1; 109:15; 113:23; 119:9; 120:24; 121:2; 123:21; 149:19
**waste** [1] - 98:24
**Watch** [1] - 107:10
**watch** [1] - 124:19
**watching** [2] - 181:4
**WATKINS** [6] - 59:25; 60:3; 63:1, 4; 201:5
**Watkins** [16] - 37:19; 47:16; 53:5; 59:24; 60:21; 62:19, 25; 76:16; 148:15; 151:24; 152:2; 179:2
**wavered** [3] - 53:19; 68:18
**Wayne** [1] - 101:24
**ways** [3] - 52:20; 155:17
**weapon** [1] - 17:11
**Website** [1] - 11:24
**Webster** [8] - 86:11, 15, 24; 87:8, 23; 151:11; 173:5
**week** [14] - 28:1, 16; 39:1; 53:6, 14; 55:10; 66:6; 112:17; 117:17; 120:24; 125:20; 132:15; 179:6, 11

**weekend** [1] - 194:14
**weekly** [1] - 125:19
**weeks** [3] - 121:21; 193:25; 199:5
**weigh** [1] - 102:19
**weird** [2] - 55:5
**welcome** [2] - 103:22; 108:12
**what'd** [1] - 82:16
**whatever's** [1] - 159:11
**whereas** [1] - 14:13
**whole** [2] - 104:9; 142:19
**why'd** [1] - 146:22
**wide** [2] - 31:7; 138:25
**widely** [1] - 13:7
**widespread** [1] - 14:20
**widow** [2] - 79:6
**widow's** [1] - 79:12
**William** [2] - 47:16; 60:21
**Williamsport** [2] - 74:12, 14
**WILLIE** [3] - 118:21; 119:1; 201:10
**Willie** [2] - 119:8; 128:14
**willing** [19] - 27:20; 28:5; 30:18; 51:4, 9; 55:7; 78:19; 86:3, 5-6, 10; 91:17, 24-25; 106:12; 127:22; 154:20; 157:10
**willingness** [1] - 110:19
**Willis** [5] - 91:7, 16; 150:21, 24
**Wilson** [8] - 118:19; 119:3, 8; 124:16; 126:10; 127:15; 128:14; 145:23
**WILSON** [3] - 118:21; 119:1; 201:10
**win** [1] - 127:16
**wiretap** [16] - 28:20; 30:20; 46:18; 80:22; 86:21; 87:5, 10-11, 15-17; 89:6, 20, 22; 90:15; 98:17
**wiretaps** [3] - 47:13; 88:2; 168:7
**wish** [1] - 192:7
**withdrawal** [1] - 93:1
**WITNESS** [106] - 45:10, 12, 14; 48:21; 50:4; 54:15, 21, 24; 55:1, 3; 56:19; 57:1, 16, 18, 23, 25; 59:15, 21, 25; 60:2; 62:24; 63:1, 3, 25; 68:1, 24; 69:22; 71:23; 72:1, 5; 78:10; 79:25; 87:20; 88:21, 23; 89:14, 17, 20, 25; 93:11, 14; 95:2, 5, 8, 21, 23; 96:3, 5; 97:10, 13, 16, 19, 22; 98:4, 7; 100:20, 24; 101:2, 5, 7, 9, 11, 13, 18, 21; 102:8, 14, 16; 103:21; 105:20; 108:22, 24; 110:20; 111:14, 17, 19; 117:13, 15, 18, 21; 118:21, 23, 25; 123:11, 16; 124:11, 18, 20, 23, 25; 128:7, 10, 13; 129:14, 16, 18; 130:9, 12, 14; 134:12, 14, 16, 18; 135:1, 3, 5
**witness** [17] - 29:7; 38:23; 45:7; 48:23; 72:20; 86:8, 19; 87:24; 90:19; 91:23; 98:21; 105:3; 111:11; 123:4; 134:8; 142:19; 187:24
**Witness** [5] - 33:15, 21, 25; 34:5; 136:15
**witnessed** [2] - 190:12
**witnesses** [24] - 4:12; 19:24; 20:7; 22:1, 3, 6, 23; 23:2; 37:8, 12, 18; 41:17; 42:16; 43:5; 72:15; 105:22; 106:6;

108:14; 158:17, 19, 21; 160:8; 181:12
**word** [3] - 18:4; 52:15; 114:13
**words** [7] - 50:18; 71:8; 141:8; 175:20; 182:2; 183:24; 196:14
**workout** [1] - 140:9
**works** [2] - 98:18; 154:18
**world** [7] - 48:1; 50:14; 78:12, 24; 82:2; 119:14; 124:9
**worlds** [1] - 161:10
**worry** [1] - 142:23
**worth** [1] - 104:6
**wow** [1] - 98:23
**wrap** [1] - 38:3
**wrapping** [1] - 78:10
**wrestled** [1] - 8:23
**write** [9] - 12:11; 21:20, 23; 61:22; 71:13; 95:15; 96:24; 148:21; 159:5
**writing** [1] - 198:16
**written** [2] - 46:20; 90:23; 107:17
**wrongs** [4] - 53:23, 25; 154:8; 155:3
**wrote** [7] - 39:14; 71:7; 129:8; 131:14; 182:20

# Y

**y'all** [3] - 146:13, 16
**Y'all** [3] - 126:17; 143:15; 146:14
**year** [14] - 4:10; 9:21; 16:8, 13; 18:25; 19:5; 36:4; 42:15; 64:11; 96:14; 124:10; 167:17; 198:14
**years** [99] - 4:6, 8; 5:21; 6:11; 7:11; 18:23-25; 19:2, 4; 20:20, 24; 25:5; 27:9; 32:7; 35:9, 11, 13-14, 17, 19, 21-22; 38:5; 41:12; 46:2, 19; 47:24; 52:25; 54:22; 55:24; 65:13; 68:2; 88:12, 14; 90:3; 91:19; 98:8, 13-14; 100:13; 101:17; 102:4, 10-11; 103:20, 25; 119:11; 122:20, 25; 124:4; 125:11; 130:23; 134:10; 147:4; 156:12, 25; 157:21; 158:9; 163:2; 168:12, 18, 20; 169:15; 170:22; 174:13; 176:23; 177:11, 13, 16, 21; 178:3, 5; 179:10, 12; 180:12, 16; 182:11, 14; 183:12, 14, 21; 185:23; 186:25; 187:2; 189:6
**York** [2] - 46:6; 188:1
**young** [38] - 40:6, 9, 12, 17, 25; 114:13, 22-23; 117:17; 120:12, 14, 18, 24; 121:6, 9, 17; 122:1, 5, 16; 125:22; 126:1, 5, 9, 12, 17, 20, 24-25; 128:4; 133:3, 13; 134:5, 24; 135:10; 146:24; 176:9, 15; 177:14
**yourself** [4] - 130:4; 139:16, 18; 140:1
**yourselves** [1] - 3:6
**youth** [21] - 14:19; 40:20; 112:2, 5, 15; 113:9; 119:16, 19, 21; 122:23; 125:13, 16, 18; 132:10, 12, 17; 145:2, 17; 148:4
**yup** [1] - 156:18

## Z

**zone** [1] - 113:15