**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.

RAYFUL EDMOND, III,

                Defendant.

Crim. Action No. 89-162 (EGS)

<u>**MEMORANDUM OPINION**</u>

**I.   Introduction**

    In 1990, Defendant Rayful Edmond, III ("Mr. Edmond") was
sentenced to life in prison after a jury convicted him on
various charges stemming from his leading role in a large-scale
cocaine distribution operation in the District of Columbia.
*United States v. Edmond*, 52 F.3d 1080, 1087 (D.C. Cir. 1995)
(per curiam). Nearly thirty years later, the government moved to
reduce Mr. Edmond's sentence pursuant to Federal Rule of
Criminal Procedure 35(b)(2)(C), which expressly authorizes a
district court, on the government's motion, to reduce a
defendant's sentence if, after sentencing, the defendant
provided substantial assistance in investigating or prosecuting
another person. During the Rule 35(b) motion hearing, the Court
heard sworn testimony from a number of witnesses, including the
Assistant United States Attorney ("AUSA") who prosecuted this
case and testified that Mr. Edmond's more than thirty years in

prison and his decades-long cooperation have made him a changed man. *See generally* Mot. Hr'g Tr. (Oct. 16, 2019), ECF No. 273.[1]

What troubles the Court deeply, however, is that Mr. Edmond stands convicted of having run "the largest cocaine distribution operation in the history of the nation's capital." *Edmond*, 52 F.3d at 1091. Although there are no statutorily defined victims in this case, it is beyond dispute that Mr. Edmond's involvement in the criminal enterprise damaged this community deeply and resulted in the destruction of the lives of many individuals. *See* Joint Status Report, ECF No. 264 at 1; *see also* Gov't's Resp., ECF No. 224 at 2. To obtain the views of the community regarding the potential for a reduction in Mr. Edmond's sentence, the Court appointed the Attorney General of the District of Columbia (the "Attorney General") as amicus curiae. With a sample size of more than five hundred residents, a key conclusion from the data collected by the Attorney General is clear: "the community is starkly divided as to whether the Court should reduce Mr. Edmond's sentence." Br. of D.C. Att'y Gen. as Amicus Curiae ("Amicus Br."), ECF No. 246 at 4.

The parties agree that a sentence reduction is warranted. The parties, however, disagree on the amount by which the Court

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

should reduce Mr. Edmond's sentence. The government recommends
Mr. Edmond's mandatory life sentence be reduced to forty-years'
imprisonment based on its assessment of his substantial
assistance and the gravity of his crimes. Gov't's Resentencing
Recommendation, ECF No. 249 at 1. Seeking a greater sentence
reduction, Mr. Edmond recommends that his sentence be reduced to
a sentence of fifteen years' incarceration, citing his
substantial assistance and the need to avoid unwarranted
sentencing disparities. *E.g.*, Def.'s Proposed Findings of Facts
& Conclusions of Law ("Def.'s Post-Hr'g Br."), ECF No. 300 at
18; Joint Status Report, ECF No. 264 at 2.

In deciding the Rule 35(b) motion, the parties agree that
the Court should employ a two-part inquiry, and the Court may
consider the factors set forth in 18 U.S.C. § 3553(a). *See,
e.g.*, Gov't's Mot. to Reduce Sentence ("Gov't's Mot."), ECF No.
215 at 6-7; Def.'s Resp., ECF No. 228 at 2; Gov't's Post-Hr'g
Br., ECF No. 298 at 3. Under the Rule 35(b) two-step analysis,
the Court must first find that Mr. Edmond has provided
substantial assistance, and then decide the extent to which
Mr. Edmond's sentence should be reduced. Contrary to the
government's position, however, nothing in the text of Rule
35(b) limits the Court's discretion to award a reduction by an
amount greater than the government's recommendation. *See* Fed. R.
Crim. P. 35(b). The Court deems it appropriate to consider the

Section 3553(a) factors to guide the Court's exercise of discretion to reduce Mr. Edmond's sentence by an amount greater than the government's recommendation.

In resolving the government's Motion to Reduce Sentence, the Court takes into consideration the unparalleled magnitude of Mr. Edmond's crimes—indeed the Court has not seen other instances of drug dealing of this magnitude—and balances that against the unparalleled magnitude of Mr. Edmond's cooperation. Upon careful consideration of the motion, the parties' submissions, the applicable law, the entire record herein, and for the reasons explained below, the Court concludes that: (1) Mr. Edmond's previously-imposed term of life imprisonment is reduced to twenty years; and (2) a life term of supervised release is warranted. Therefore, the Court **GRANTS** the government's motion.

## II.  Background

### A. Factual and Procedural Background

Between 1985 and 1989, Mr. Edmond led a large-scale cocaine distribution conspiracy. *Edmond*, 52 F.3d at 1091. Mr. Edmond's operation generated millions of dollars from the wholesale and retail distribution of cocaine and crack cocaine. Presentence Report ("PSR") (Aug. 27, 1990), ECF No. 230 at 6 ¶ 5. According to the government, Mr. Edmond and his associates were "unscrupulous in their pursuit of cold cash," and their

4

collection of valuable items included: "[e]pensive cars, thousand dollar shirts, gold medallions worth $60,000, diamond encrusted Rolex watches, swimming pools, hundreds of tennis shoes, and wads of $100 bills[.]" Gov't's Mem. in Aid of Sentencing, ECF No. 253 at 4. In April 1989, Mr. Edmond was arrested on various criminal charges. *Edmond*, 52 F.3d at 1083. Mr. Edmond was committed without bond on April 15, 1989. PSR, ECF No. 230 at 1.

### 1. Mr. Edmond's Conviction

On December 6, 1989, a jury found Mr. Edmond guilty of the following crimes: (1) engaging in a continuing criminal enterprise ("CCE"), in violation of 21 U.S.C. §§ 848(b), 853 ("Count One"); (2) conspiracy to distribute and possess with intent to distribute more than 5 kilograms of cocaine and more than 50 grams of cocaine base, in violation of 21 U.S.C. § 846 ("Count Two"); (3) unlawfully employing a person under 18 years of age, in violation of 21 U.S.C. § 845(b) (recodified at 21 U.S.C. § 861) ("Count Five"); (4) interstate travel in aid of racketeering, in violation of 18 U.S.C. § 1952(a) ("Count Eleven"); and (5) unlawful use of a communications facility, in violation of 21 U.S.C. § 843(b) ("Counts Fourteen, Fifteen, Sixteen, and Eighteen"). *E.g.*, *Edmond*, 52 F.3d at 1087; Crim. Docket, ECF No. 1 at 9.

To calculate the sentencing range under the United States

Sentencing Commission's ("Sentencing Commission") 1989 Guidelines Manual, Mr. Edmond's conviction for Count One was excluded from the calculations because that crime carries a mandatory life sentence. *E.g.*, PSR, ECF No. 230 at 14 ¶ 28; Probation Mem., ECF No. 265 at 2 n.1. Mr. Edmond's convictions for Counts Two, Five, Eleven, Fourteen, Fifteen, Sixteen, and Eighteen were grouped together pursuant to U.S.S.G. § 3D1.2(d). PSR, ECF No. 230 at 14 ¶ 28. The base offense level was 36 because the "offenses involv[ed] the distribution of more than 50 kilograms of cocaine" under U.S.S.G. § 2D1.1(a)(3). *Id.*; *see also* Sentencing Hr'g Tr. (Sept. 17, 1990), ECF No. 255 at 53 (finding that the conspiracy involved "more than 50 kilograms of cocaine and more than 500 grams of cocaine base").

Mr. Edmond's base offense level was then increased by six levels. *See* PSR, ECF No. 230 at 14 ¶¶ 30-31, 15 ¶¶ 32-34; *see also* Sentencing Hr'g Tr., ECF No. 255 at 53-56. First, two levels were added for the possession of a dangerous weapon during the commission of the offense under U.S.S.G. § 2D1.1(b)(1). *Id.* at 14 ¶ 30; *see also* Sentencing Hr'g Tr., ECF No. 255 at 53 (finding that "one or more of [Mr. Edmond's] co-conspirators knowingly possessed a firearm during the course of the conspiracy of which [Mr. Edmond stood] convicted and that such possession was reasonably foreseeable to [Mr. Edmond]"). Next, four levels were added as a role adjustment under U.S.S.G.

6

§ 3B1.1(a) because "[Mr. Edmond] was the leader of an organization involving more than five participants." PSR, ECF No. 230 at 14 ¶ 31; *see also* Sentencing Hr'g Tr., ECF No. 255 at 55-56. Although the PSR added two levels for an obstruction of justice adjustment under U.S.S.G. § 3C1.1, the sentencing judge ultimately rejected that adjustment. *See* PSR, ECF No. 230 at 15 ¶ 33; *see also* Sentencing Hr'g Tr., ECF No. 255 at 56. As a result, the adjusted offense level was 42. Def.'s Am. Sentencing Mem., ECF No. 260 at 8.

### 2. Mr. Edmond's Sentence

Judge Charles R. Richey sentenced Mr. Edmond on February 13, 1990, and entered the Judgment and Commitment on February 16, 1990. Judgment & Commitment ("J & C") (Feb. 16, 1990), ECF No. 250 at 1. Judge Richey sentenced Mr. Edmond to life imprisonment on Counts One, Two, and Five; sixty months on Count Eleven; and forty-eight months on Counts Fourteen, Fifteen, Sixteen, and Eighteen. *Id.* at 2. Judge Richey ordered the sentences to run concurrently. *Id.* Judge Richey imposed the following terms of supervised release: (1) eight years on Count Five; (2) four years on Count Two; and (3) three years on Counts Eleven, Fourteen, Fifteen, Sixteen, and Eighteen, to run concurrently. *Id.* at 3. Judge Richey ordered Mr. Edmond to pay a special assessment of $400. *Id.*

On July 30, 1990, the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit"), on its own motion, vacated the sentences of Mr. Edmond and his co-defendants, and remanded the cases for resentencing. *E.g.*, *United States v. Edmond*, No. 90-3049 (D.C. Cir. July 30, 1990) (per curiam) (unpublished); App., No. 15-3063 (D.C. Cir. Mar. 10, 2016), Doc. 1603360 at 113-14; Gov't's Consolidated Br., *United States v. Jones*, Nos. 15-3063, 15-3064, 2016 WL 3213186, at *4 (D.C. Cir. June 10, 2016); PSR, ECF No. 230 at 3; Crim. Docket, ECF No. 1-1 at 23. Following the directive of the D.C. Circuit, Mr. Edmond "was brought before [Judge Richey] for resentencing on September 17, 1990[.]" Order, ECF No. 219 at 1.

On that day, Judge Richey sentenced Mr. Edmond to the following concurrent terms of imprisonment: (1) mandatory life without parole on Count One; (2) life without parole on Counts Two and Five; (3) sixty months on Count Eleven; and (4) forty-eight months on Counts Fourteen, Fifteen, Sixteen, and Eighteen. *E.g.*, J & C (Sept. 19, 1990), ECF No. 217 at 2. Judge Richey imposed the following terms of supervised release: (1) eight years on Count Five; (2) four years on Count Two; and (3) three years on Counts Eleven, Fourteen, Fifteen, Sixteen, and Eighteen, to run concurrently. *Id.* at 3. Judge Richey ordered Mr. Edmond to pay a special assessment of $400. *Id.* Judge Richey made clear that the September 19, 1990 Judgment and Commitment

"represents the final and only sentence of [Mr. Edmond]" in this case. Order, ECF No. 219 at 1.

On April 28, 1995, the D.C. Circuit vacated Mr. Edmond's conviction for Count Two pursuant to the parties' agreement. *Edmond*, 52 F.3d at 1108, 1113. Mr. Edmond's conviction for Count One—the conviction for engaging in a CCE under 21 U.S.C. § 848(b)—was based, in part, upon a finding that he engaged in a conspiracy under 21 U.S.C. § 846 (Count Two). *Id.* at 1107-08. The government agreed that it was impermissible for Mr. Edmond to be subjected to cumulative penalties for violations of Section 846 and Section 848. *Id.* at 1108. Mr. Edmond's convictions for the other counts remained the same. *See id.* at 1113.

According to the PSR, Mr. Edmond had three pending counts of first-degree murder while armed and one count of using and carrying a firearm in connection with a drug trafficking offense. PSR, ECF No. 230 at 15 ¶ 41. Judge Richey severed those offenses from the conspiracy and drug-related charges. *Edmond*, 52 F.3d at 1084. The government did not adduce evidence of any violent crimes at the 1989 trial. *See* Gov't's Resp., ECF No. 224 at 4. On January 3, 1991, Judge Richey entered an Order dismissing without prejudice Count Twenty-One of the indictment charging Mr. Edmond with homicide. Order (Jan. 3, 1992), Crim. Docket, ECF No. 1-1 at 76. The parties agree that those charges

were dismissed and never pursued against Mr. Edmond. *See, e.g.*, Gov't's Resp., ECF No. 224 at 4 n.2; Gov't's Mot., ECF No. 215 at 2 n.1; Joint Status Report, ECF No. 264 at 2. To date, Mr. Edmond has served nearly thirty-two years in prison.

### 3. Mr. Edmond's Conviction and Sentence in the Middle District of Pennsylvania

While serving his sentence at the United States Penitentiary in Lewisburg, Pennsylvania ("USP Lewisburg"), Mr. Edmond was charged in a criminal information in the United States District Court for the Middle District of Pennsylvania following a two-year wiretap investigation. *See generally* Information (filed Aug. 6, 1996), ECF No. 291 at 1-8; *see also* Mot. Hr'g Tr., ECF No. 273 at 46.[2] From 1992 to 1994, Mr. Edmond used his prison privileges (*i.e.* telephone, visitation, and mailing) at USP Lewisburg to broker drug deals between his associates in the District of Columbia metropolitan area and his fellow inmates with connections to individuals at cocaine production facilities in Colombia, South America. Plea Hr'g Tr. (Aug. 8, 1996), ECF No. 295 at 6-7.

On August 8, 1996, Mr. Edmond pled guilty to conspiracy to

---

[2] The Court takes judicial notice of the proceedings and court records in *United States v. Rayful Edmond III*, Crim. Action No. 96-203 (M.D. Pa.). *See Luke v. United State*s, No. 13-5169, 2014 WL 211305, at *1 (D.C. Cir. Jan. 13, 2014). The Clerk of Court docketed certain records from Mr. Edmond's Middle District of Pennsylvania case in this case. *See generally* Docket for Crim. Action No. 89-162.

possess with the intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846, in the Middle District of Pennsylvania. Plea Agreement (filed Aug. 6, 1996), ECF No. 292 at 1-19. Eleven months later, on July 23, 1997, Judge Malcolm Muir of the Middle District of Pennsylvania sentenced Mr. Edmond to thirty years of imprisonment, to be followed by a ten-year term of supervised release. *E.g.*, J & C (M.D. Pa. July 24, 1997), ECF No. 241-1 at 2-3; Sentencing Hr'g Tr. (M.D. Pa. July 23, 1997), ECF No. 296 at 41-42. Judge Muir ordered and signed a forfeiture decree in the amount of $200,000. J & C, ECF No. 241-1 at 3.

Because Judge Muir did not order Mr. Edmond's sentence to run concurrently with his previously-imposed sentence in this Court, Mr. Edmond's sentence in the Middle District of Pennsylvania runs consecutively to his sentence in this case. *See* J & C (M.D. Pa. July 24, 1997), ECF No. 241-1 at 2; *see also* 18 U.S.C. § 3584(a) ("Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently."). The parties agree that Mr. Edmond will begin serving his sentence in the Middle District of Pennsylvania upon the completion of his sentence in this case. *See* Gov't's Mot., ECF No. 215 at 8 n.5; *see also* Def.'s Am. Sentencing Mem., ECF No. 260 at 10 n.8.

11

### 4. Mr. Edmond's Cooperation

In 1994, law enforcement officials approached Mr. Edmond about cooperating with the government, and he orally agreed to do so. Mot. Hr'g Tr., ECF No. 273 at 46-47, 58, 64, 70, 74; *see also* Gov't's Decl., ECF No. 264-1 at 3 ("From 1990-94, [Mr. Edmond] assisted with at least 20 cold cases."). Mr. Edmond executed a written agreement to cooperate in early 1995. Gov't's Mot. for Sentencing Reduction, *United States v. Constance D. Perry* ("*Perry*"), Crim. Action No. 89-162-24, ECF No. 293 at 5 ¶ 10. Mr. Edmond agreed to offer substantial assistance while incarcerated at USP Lewisburg, a maximum-security institution, with inmates who were "among the most dangerous recidivists in the nation." *Id.* ("Had other inmates learned of [Mr.] Edmond's cooperation, he would have been killed."). And "[d]espite imminent danger, [Mr.] Edmond agreed to cooperate." *Id.*

Pursuant to the terms of the plea agreement in the Middle District of Pennsylvania case, the government agreed to file a Rule 35(b) motion on behalf of Mr. Edmond's mother and co-defendant—Constance D. Perry ("Ms. Perry")—in exchange for his substantial assistance. *See, e.g.*, Plea Agreement, ECF No. 292 at 5-6 ¶ 10. Mr. Edmond acknowledged that his substantial assistance would not result in the filing of a Rule 35(b) motion on his behalf. *Id.* at 7 ¶ 11. In other words, Mr. Edmond's cooperation solely benefited Ms. Perry as the third-party

beneficiary of the plea agreement, and Ms. Perry would receive a sentence reduction based on Mr. Edmond's substantial assistance as prescribed in the government's Rule 35(b) motion in Ms. Perry's case. *Id.*

### a. Mr. Edmond's Substantial Assistance as the Basis for the Rule 35(b) Motion in Ms. Perry's Case

In moving for a sentence reduction for Ms. Perry on October 1, 1997, the government set forth the extent, nature, and value of Mr. Edmond's substantial assistance. *See generally* Gov't's Mot. for Sentencing Reduction, *United States v. Constance D. Perry*, Crim. Action No. 89-162-24, ECF No. 293 at 5 ¶ 9 ("Since July 20, 1994, [Mr. Edmond] has rendered substantial assistance to the Government in the prosecution and investigation of others.").[3] The government explained that Mr. Edmond's cooperation could be divided into four categories. *Id.* at 5 ¶ 10, 5 ¶¶ 10-11, 6-7 ¶ 12, 7 ¶ 13, 7-8 ¶ 14, 8 ¶ 15.

---

[3] In 1990, Judge Richey sentenced Ms. Perry to 293 months of imprisonment following her conviction for conspiracy to distribute cocaine. Gov't's Notice to Def. of Intent to File Mot. for Sentencing Reduction, ECF No. 286 at 1 ¶ 1. On July 2, 1996, Judge Richey resentenced Ms. Perry to 170 months of imprisonment in accordance with a decision from the D.C. Circuit, which "did not reflect any reduction based upon the cooperation of [Mr. Edmond], but was based solely upon [the D.C. Circuit's] requirement to conduct a resentencing hearing." *Id.* at 3 ¶ 7. On June 2, 1998, Judge John Garrett Penn, having been reassigned the case, reduced Ms. Perry's previously-imposed sentence to time-served. *E.g.*, Resentencing Hr'g Tr. (June 2, 1998), ECF No. 285 at 17; Revised J & C (June 29, 1998), ECF No. 294 at 1-2.

First, "[Mr.] Edmond agreed to work with the Government in a covert drug investigation commencing [in August 1994]." *Id.* at 5 ¶ 10. Next, Mr. Edmond testified as a government witness in two criminal trials in the Middle District of Pennsylvania: (1) in the first trial, his testimony contributed to at least two of his fellow inmates (Freddie Aguilera and Nelson Garcia) being convicted and sentenced to life in prison for agreeing to ship cocaine from Colombia to Mr. Edmond's associates in the District, *id.* at 5-6 ¶ 11; and (2) in the second trial, his testimony over the course of eight days led to the convictions of two individuals (Michael A. Jackson and James Marshall Corbin), *id.* at 6 ¶ 12.

Third, "[Mr.] Edmond participated in the reverse undercover sting of DC drug dealers who had been the recipients of cocaine shipped at his behest to them in 1992 from the Trujillo-Blanco Colombian cartel family." *Id.* at 7 ¶ 13. In August 1996, Mr. Edmond invited those targets to purchase cocaine from a shipment that would be delivered to the District, and the undercover operation led to "the seizure of $190,000 in drug proceeds." *Id.* In April 1997, Judge Thomas F. Hogan accepted Mr. Edmond's testimony that resolved a dispute regarding the 1992 drug conduct of two conspirators, and his testimony was corroborated by wiretap evidence. *Id.* In the end, the undercover operation led to the convictions of eight defendants: (1) Rodney

Murphy; (2) Jimmy Robinson; (3) Lecount Jackson; (4) Adolph
Jackson; (5) Darrell Coles; (6) Marcus Haynes; (7) Johnny
Cherry; and (8) Christopher Johnson. *Id.*

Finally, Mr. Edmond provided the Field Office of the
Federal Bureau of Investigation ("FBI") in Philadelphia,
Pennsylvania, with information regarding two homicides that were
committed at USP Lewisburg in 1994, and Mr. Edmond was expected
to testify as a government witness at the trials for both
homicides. *Id.* at 7-8 ¶ 14. Also, the government indicated that
Mr. Edmond was willing to provide testimony in the fall of 1997,
with the approval of the Deputy Attorney General of the United
States, to "various Congressional oversight committees that
[were] investigating issues involving drug trafficking and
prison reform." *Id.* at 8 ¶ 15.

The government summarized Mr. Edmond's cooperation as
follows:

> [Mr.] Edmond's assistance to law enforcement
> has proven to be very substantial and has
> directly led to numerous convictions of major
> national and international drug traffickers.
> In addition, [Mr.] Edmond has provided law
> enforcement with information that may help the
> Bureau of Prisons reconsider policies
> regarding privileges granted to maximum
> security inmates that are inconsistent with
> the Bureau of Prison's mission to incapacitate
> certain inmates. Finally, [Mr.] Edmond's
> cooperation and the attendant publicity may
> have helped rectify serious social problems in
> D.C. by demoralizing other drug dealers. His
> cooperation has also helped to dispel his

> legendary image among the drug culture and now
> serves to discourage others from imitating his
> conduct as a drug king-pin.

*Id.* at 8-9 ¶ 16.

### b. Mr. Edmond's Substantial Assistance as the Basis for the Rule 35(b) Motion in this Case

After Ms. Perry's sentence reduction, Mr. Edmond continued to cooperate with the government, and "[i]t is that cooperation that serves as the basis for this motion." Gov't's Mot., ECF No. 215 at 3; *see also* Def.'s Am. Sentencing Mem., ECF No. 260 at 4 ("Mr. Edmond's cooperation formally ended in approximately 2014."). Mr. Edmond "provided general background information from 1999 to 2015." Gov't's Decl., ECF No. 264-1 at 3.

The government divides Mr. Edmond's cooperation from 1998 through the fall of 2014 into the following four categories:

> [i] providing testimony for the government at
> criminal trials, [ii] providing background
> information to the government to assist with
> ongoing narcotics trafficking investigations,
> [iii] providing background information
> pertaining to the investigations of cold case
> homicides, and [iv] providing information to
> the government to assist in instituting prison
> reforms intended to curtail inmates' ability
> to conduct criminal activities.

Gov't's Mot., ECF No. 215 at 3-4.

### i. Testimony at Criminal Trials

In 2002, Mr. Edmond testified as a government witness for approximately four days in the trial of six defendants in *United States v. Kevin L. Gray, et al.*, Crim. Action No. 00-157, before

16

Judge Royce C. Lamberth. *Id.* at 4. Prior to his arrest in 1989,
Mr. Edmond had conducted drug transactions with many of the
defendants in that case. *Id.* As noted by the government, "[t]he
Gray racketeering drug enterprise covered criminal activity
spanning more than a decade and was perhaps the most violent
drug trafficking group ever prosecuted in this district." *Id.*;
*see also* Mot. Hr'g Tr., ECF No. 273 at 61 (Barbara Watkins:
"Kevin Gray and his crew were responsible for over 30 homicides
in the D.C. area."). Mr. Edmond's testimony led to the
convictions of all six defendants for "RICO conspiracy and
related charges in connection with multiple first-degree murders
and drug offenses." Letter from Amy Jeffress (Dec. 27, 2019),
ECF No. 301 at 1.

In 2003, Mr. Edmond testified as a government witness in a
trial concerning drug trafficking in the Western District of
North Carolina. Gov't's Mot., ECF No. 215 at 4. In addition,
Mr. Edmond "was prepared to testify in a second case in this
district, but the case was resolved via a guilty plea, in part
due to the defendant's cooperation." *Id.*

> ### ii. Background Information for Ongoing Narcotics Trafficking Investigations

Mr. Edmond "has supplied background and associational
information that has been used in drug trafficking
investigations; in particular, his information has been used in

numerous wiretap investigations." *Id.* (noting that Mr. Edmond's "information was not the sole basis for the wiretaps in any of these investigations"). The government asserts that "[b]ased, in part, on [Mr. Edmond's] assistance in this regard, over 100 drug dealers were arrested, prosecuted, and convicted." *Id.* The government avers that the information from Mr. Edmond and others was "used to obtain wiretaps in narcotics investigations" in twelve different matters. Gov't's Decl., ECF No. 264-1 at 1.

In the first matter, the wiretap led to thirty-nine indictments involving sixty-five defendants. *Id.* at 2. The wiretap in the second matter led to five indictments involving fourteen defendants. *Id.* In the third matter, the wiretap led to one indictment involving twenty-two defendants. *Id.* The wiretap in the fourth matter led to one indictment involving fourteen defendants. *Id.* In the fifth matter, the wiretap led to three indictments involving twenty-seven defendants. *Id.* The wiretap in the sixth matter led to fifteen indictments involving twenty-nine defendants. *Id.* In the seventh matter, the wiretap led to four indictments involving thirty-six defendants. *Id.* The wiretap in the eighth matter led to five indictments involving five defendants. *Id.* In the ninth matter, the wiretap led to sixteen indictments involving fifty-eight defendants. *Id.* The wiretap in the tenth matter led to ten indictments involving thirty defendants. *Id.* In the eleventh matter, the wiretap led

to two indictments involving twelve defendants. *Id*. Finally, the wiretap in the twelfth matter led to ten indictments involving twenty-eight defendants. *Id*.

### iii. Information Concerning Cold Case Homicides

Mr. Edmond "has provided information to local law enforcement investigating cold case homicides," including "a significant amount of information concerning relevant relationships." Gov't's Mot., ECF No. 215 at 5. Mr. Edmond "participated in monthly telephone calls with AUSA John Dominguez, who relayed questions from law enforcement, which allowed them to collect information about relationships between the decedents and suspects not otherwise known to the investigators." Gov't's Decl., ECF No. 264-1 at 2. Mr. Edmond "has often been able to provide information to investigators regarding friendships, rivalries, or feuds, among decedents and suspects." Gov't's Mot., ECF No. 215 at 5.

Mr. Edmond's information assisted law enforcement with "focus[ing] [its] attention on others once learning that a suspect had a motive to commit murder even when those murders occurred after the defendant has been incarcerated." Gov't's Decl., ECF No. 264-1 at 2. The government notes that "none of [Mr. Edmond's] information about cold cases led directly to arrests," but "the information helped homicide detectives focus

limited resources by relating historical information about which drug dealer was allied with whom and which dealer was arguing with another dealer." *Id*. at 2-3. Mr. Edmond's information contributed to the "local cold case squad . . . solving old homicides in the District of Columbia." *Id*. at 2.

### iv. Information for Instituting Prison Reforms

Following Mr. Edmond's drug trafficking operation at USP Lewisburg, the Office of the Inspector General ("IG") of the United States Department of Justice ("DOJ") opened an investigation into the telephone and visitation privileges at federal prisons. Gov't's Mot., ECF No. 215 at 5. Mr. Edmond "spent hours explaining to IG officials how he and other inmates had exploited their prison telephone privileges for criminal purposes." *Id*. In response to the information provided by Mr. Edmond and others, the Bureau of Prisons ("BOP") "completely revamped the inmate telephone system, eliminating inmates' ability to make three way/conference calls and long distance calls." *Id*. Additionally, BOP and law enforcement officials began vetting the calls by inmates and restricting their access to pre-approved telephone numbers. *Id*.

In April 2000, an IG official testified before the Subcommittee on Criminal Justice Oversight of the United States Senate Judiciary Committee concerning the "Use of Prison

Telephones by Federal Inmates to Commit Crime." Statement of Glenn A. Fine, U.S. Dep't of Justice (Apr. 6, 2000), https://oig.justice.gov/node/729. According to this testimony, IG officials interviewed Mr. Edmond "about his experience using prison telephones to commit crimes" and "[Mr.] Edmond said that he had little concern about conducting drug deals using prison telephones because he knew that most calls were not being monitored." *Id*. Based on the interviews with Mr. Edmond and others, the IG officials recognized that "the problem [was] significant," and they recommended that "BOP take steps to curb prison telephone abuse." *Id*. The IG's review reached a number of conclusions, including that the "inmate call monitoring system [was] ineffective," and it "highlighted the serious nature of inmate abuse of prison telephones, including murders and drug deals arranged using BOP telephones." *Id*.

### B. The Government's Rule 35(b) Motion

On August 22, 2018, Mr. Edmond filed a motion to compel the government to file a motion to reduce his sentence. *See generally* Def.'s Sealed Mot. to Compel, ECF No. 202; *see generally* Def.'s Resp., ECF No. 268.[4] Months later, on February 15, 2019, the government filed the instant motion pursuant to

---

[4] The case was randomly reassigned to the Court on August 28, 2018 due to the death of Judge John Garrett Penn. Min. Entry of Aug. 28, 2018.

Rule 35(b)(2)(C) based on Mr. Edmond's substantial assistance. Gov't's Mot., ECF No. 215 at 1. Thereafter, Mr. Edmond filed his response. *See* Def.'s Sealed Resp., ECF No. 220-2 at 1-3; *see also* Def.'s Redacted Resp., ECF No. 221 at 1-3.

On May 21, 2019, the Court held a status hearing, and the parties agreed that the Court should adopt the two-step inquiry to evaluate the government's Rule 35(b) motion. Status Hr'g Tr. (May 21, 2019), ECF No. 236 at 6-7, 44-45. The Court appointed the Attorney General as amicus curiae on May 24, 2019,[5] and directed amicus curiae to file a brief regarding the views of the community as to whether to reduce Mr. Edmond's sentence. Min. Orders of May 24, 2019.[6] The Attorney General filed the amicus brief on August 30, 2019, *see* Amicus Br., ECF No. 246 at 4; and neither party responded to the amicus brief, *see generally* Docket for Crim. Action No. 89-162.

The government filed its sentencing recommendation on September 6, 2019, *see* Gov't's Resentencing Recommendation, ECF

---

[5] The Court expresses its sincere appreciation to the Attorney General and the Office of the Attorney General.

[6] The Court ordered briefing on how it "may obtain the views of victims, family members of victims, and members of the community, including whether the Attorney General for the District of Columbia could appropriately represent the views of the members of the community." Min. Order of Mar. 6, 2019. The parties agree that there were no statutorily defined victims in this case. *See* Gov't's Resp. to Court's Minute Order, ECF No. 224 at 2, 9-11; *see also* Def.'s Resp. to Court's Minute Order, ECF No. 228 at 1.

No. 249 at 1; Mr. Edmond then filed his sentencing memorandum on October 2, 2019, *see* Def.'s Am. Sentencing Mem., ECF No. 260 at 9-10; and the government filed its response on October 9, 2019, *see generally* Gov't's Resp., ECF No. 263.

On October 16, 2019, the Court held a motion hearing, at which Mr. Edmond, the lead prosecutor, former law enforcement officials, and community leaders testified. Min. Entry of Oct. 16, 2019. The Court heard sworn testimony from the following eight witnesses called by Mr. Edmond: (1) AUSA John Dominguez ("Mr. Dominguez"); (2) Barbara Watkins ("Ms. Watkins"); (3) Steven Benjamin ("Mr. Benjamin"); (4) Rick Watkins ("Mr. Watkins"); (5) Tyrone Parker ("Mr. Parker"); (6) Rev. Willie Wilson ("Rev. Wilson"); (7) Rev. Thson Rowe ("Rev. Rowe"); and (8) Bishop Patrina Steadman ("Bishop Steadman"). *Id.* As explained below, the Court credits the testimony of each witness. The government declined to cross examine Mr. Edmond and the other witnesses. *See generally* Mot. Hr'g Tr., ECF No. 273.

On December 9, 2019, the government filed a post-hearing brief and proposed findings of fact. *See generally* Gov't's Post-Hr'g Br., ECF No. 298; *see generally* Gov't's Proposed Findings of Fact, ECF No. 299. Mr. Edmond filed his post-hearing submission on January 10, 2020. *See generally* Def.'s Post-Hr'g Br., ECF No. 300.

The briefing is now complete, and the motion is ripe and ready for the Court's adjudication.

### III.   Legal Standard

"Federal courts are forbidden, as a general matter, to 'modify a term of imprisonment once it has been imposed,' 18 U.S.C. § 3582(c); but the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is Rule 35 of the Federal Rules of Criminal Procedure. 18 U.S.C. § 3582(c)(1)(B) ("[T]he court may modify an imposed term of imprisonment to the extent otherwise expressly permitted . . . by Rule 35[.]"). "Rule 35 delineates a limited set of circumstances in which a sentence may be corrected or reduced," and "it authorizes a reduction for substantial assistance on the Government's motion, Rule 35(b)." *Dillon v. United States*, 560 U.S. 817, 828 (2010).

Rule 35(b)(2)(C) provides that "[u]pon the government's motion made more than one year after sentencing, the court may reduce a sentence if the defendant's substantial assistance involved . . . information the usefulness of which could not reasonably have been anticipated by the defendant until more than one year after sentencing and which was promptly provided to the government after its usefulness was reasonably apparent to the defendant." "In evaluating whether the defendant has provided substantial assistance, the court may consider the

defendant's presentence assistance." Fed. R. Crim. P. 35(b)(3). And "the court may reduce the sentence to a level below the minimum sentence established by statute." Fed. R. Crim. P. 35(b)(4).

The decision to grant or deny a Rule 35(b) motion is within the district court's discretion. *E.g.*, *United States v. Pollard*, 865 F.2d 1330, 1988 WL 145115, at *1 (D.C. Cir. 1988); *United States v. Hooton*, 693 F.2d 857, 859 (9th Cir. 1982) ("A Rule 35 motion is essentially a plea for leniency and is addressed to the sound discretion of the district court."). "[I]n deciding a Rule 35(b) motion, a district court makes two inquiries. First, it must determine whether the defendant in fact provided substantial assistance. Second, if so, it must then determine what, if any, reduction in sentence is warranted." *United States v. Katsman*, 905 F.3d 672, 674 (2d Cir. 2018) (citing *United States v. Tadio*, 663 F.3d 1042, 1047-48 (9th Cir. 2011), *cert. denied*, 566 U.S. 1029 (2012); *United States v. Park*, 533 F. Supp. 2d 474, 476 (S.D.N.Y. 2008)).

## IV.  Analysis

The main dispute in this case is the amount by which the Court should reduce Mr. Edmond's sentence. The parties agree on three threshold matters that are critical to the Court's Rule 35(b) analysis. First, Mr. Edmond has provided substantial assistance to the government. *See* Gov't's Mot., ECF No. 215 at

3-7; *see also* Def.'s Am. Sentencing Mem., ECF No. 260 at 1-4.

Second, Mr. Edmond is eligible for a discretionary sentence

reduction under Rule 35(b)(2)(C). *See* Gov't's Mot., ECF No. 215

at 1, 7; *see also* Def.'s Am. Sentencing Mem., ECF No. 260 at 1,

9-10. Third, the Court may consider the factors set forth in 18

U.S.C. § 3553(a) to reduce Mr. Edmond's sentence. *See* Gov't's

Mot., ECF No. 215 at 6; *see also* Def.'s Resp., ECF No. 228 at 2.

The parties, however, disagree on the extent of

Mr. Edmond's sentence reduction at the second step of the Rule

35(b) analysis. The government recommends a forty-year prison

term, and Mr. Edmond recommends a fifteen-year prison term. *See*

Gov't's Resentencing Recommendation, ECF No. 249 at 1; *see also*

Joint Status Report, ECF No. 264 at 2. Mr. Edmond asserts that

the government's recommendation is a starting point for the

Court's analysis, and he argues that it is within the Court's

discretion to reduce his sentence by an appropriate amount when

considering his substantial assistance and the Section 3553(a)

factors. Def.'s Post-Hr'g Br., ECF No. 300 at 9. The government,

however, contends that "this Court may consider those factors

only to grant a smaller reduction than requested by the

government, not to increase the reduction beyond the amount

justified by the defendant's assistance alone." Gov't's Post-

Hr'g Br., ECF No. 298 at 3. In the government's view, "the scope

and purpose of this Rule 35 proceeding is exceedingly narrow."

*Id.* at 4.

Before analyzing the parties' arguments, the Court first finds that Mr. Edmond has provided substantial assistance. The Court then considers the factors set forth in 18 U.S.C. § 3553(a) to determine the extent of the reduction, concluding that the Court may reduce Mr. Edmond's sentence by an amount greater than what the government has recommended in this case.

### A. Mr. Edmond Has Provided Substantial Assistance

The Court begins the two-step analysis with "determin[ing] whether [Mr. Edmond] has offered substantial assistance sufficient to trigger [the Court's] authority to reduce [his] sentence." *Tadio*, 663 F.3d at 1047. At the first step of the analysis, "the district court does not consider the facts of the defendant's crime, the defendant's personal characteristics, or any other § 3553(a) factors." *Tadio*, 663 F.3d at 1048. "Rule 35(b) departures address only postsentencing cooperation with the Government, not postsentencing rehabilitation generally, and thus a defendant with nothing to offer the Government can gain no benefit from Rule 35(b)." *Pepper v. United States*, 562 U.S. 476, 502 n.15 (2011). For the reasons explained below, the Court finds that Mr. Edmond has provided substantial assistance to the government.

Mr. Edmond's cooperation from 1998 to 2014 serves as the basis of the government's Rule 35(b) motion. *See* Gov't's Mot.,

ECF No. 215 at 1, 3. The government maintains that Mr. Edmond "has provided substantial assistance in the investigation and prosecution of others, and this assistance was provided more than one year after his sentencing in this matter." *Id.* at 1. And the government asserts that Mr. Edmond's "cooperation has been both deep and wide." *Id.* at 7.

According to the government, "Mr. Edmond was ready, willing and able to testify in several significant drug trafficking cases in the District of Columbia and in a Federal District in North Carolina." Mot. Hr'g Tr., ECF No. 273 at 27. Mr. Dominguez, one of the lead prosecutors in the *Edmond* case, explained that "the practice of the U.S. Attorney's Office, when it comes to providing assessment for substantial assistance to law enforcement, is that a witness" must "testify or [be] willing to testify." *Id.* at 91. For example, Mr. Edmond was willing to testify as a government witness in a drug trafficking case against Bill Willis and "Dump Truck Smitty." *Id.* Although Bill Willis pled guilty, Mr. Dominguez explained that Mr. Edmond is "not deprived of an opportunity to get a benefit for being willing to cooperate just because somebody decides to plead guilty." *Id.* at 91-92.

Mr. Dominguez worked closely with Mr. Edmond as he cooperated with the government over the years, and he testified that the "value [of Mr. Edmond] as a cooperator was tremendous."

*Id.* at 101-102. When asked to rank Mr. Edmond's cooperation, Mr. Dominguez testified that: (1) it was "off the chart"; (2) "[it was] extraordinary"; and (3) no other cooperation compares to Mr. Edmond's cooperation during his tenure as an AUSA for thirty-five years and as the head of the Organized Crime Drug Enforcement Task Force program in the U.S. Attorney's Office. *Id.* at 98.

Mr. Benjamin and Mr. Watkins both testified that Mr. Edmond's assistance to the government was useful, truthful, and exceptional. Mr. Benjamin, a former FBI Special Agent, testified that Mr. Edmond's cooperation was "[e]xceptional in every way" based on his experience of working on several drug cases and with hundreds of cooperators during his career. *Id.* at 55. On a scale of one to ten, Mr. Benjamin rated Mr. Edmond's cooperation at eleven. *Id.* at 57. Similarly, Mr. Watkins, a retired police officer, testified that Mr. Edmond "went above and beyond what any normal cooperator would do." *Id.* at 68.

As outlined above, the government divides Mr. Edmond's cooperation into four categories. Gov't's Mot., ECF No. 215 at 3-4. With regard to the first category, Mr. Edmond testified in two criminal trials. Gov't's Proposed Findings of Fact, ECF No. 299 at 2-3 ¶¶ 6-7. The usefulness of Mr. Edmond's testimony as a government witness is undisputed here. *See id.*; *see also* Def.'s Post-Hr'g Br., ECF No. 300 at 4-5.

A former prosecutor—who was "responsible for preparing [Mr. Edmond] and sponsoring his testimony at trial" in the *Gray* case—stated that: (1) "Mr. Edmond was fully cooperative"; (2) "[the prosecution] found his testimony credible"; and (3) "he was an important witness at trial." Letter from Amy Jeffress (Dec. 27, 2019), ECF No. 301 at 1. At the time that Mr. Edmond was cooperating with the government regarding the *Gray* case, Ms. Watkins, a former police officer, was detailed to the FBI and was working undercover. Mot. Hr'g Tr., ECF No. 273 at 60. Ms. Watkins testified that "Mr. Edmond supplied information regarding the Kevin Gray case and a few other cases," and she "was with the prosecutor that went to interview [Mr. Edmond]." *Id.* at 61.

Ms. Watkins further testified that Mr. Edmond "gave extensive testimony which resulted in the convictions" in the *Gray* case, and Mr. Edmond participated in a debrief session with the government about the *Gray* case where law enforcement "could [not] keep up with how fast he was giving us the information, so we were trying to write, and he [was] steadily pouring out the information." *Id.* at 61. Mr. Edmond "was very, very upfront and informative." *Id.* Ms. Watkins recalled that Mr. Edmond provided information to her on at least four to five different cases. *Id.* at 62. When asked to rate Mr. Edmond's cooperation on a scale of one to ten, Ms. Watkins testified that Mr. Edmond "was very

productive. On a scale of 1 to 10, 11." *Id.*

As to the criminal trial in the Western District of North Carolina, Mr. Dominguez described Mr. Edmond's willingness to testify as a government witness. *Id.* at 86. Mr. Edmond confirmed that he, in fact, provided testimony during the trial in North Carolina about the defendant who sold drugs and purchased drugs from Mr. Edmond. *Id.* at 150. The government acknowledged that Mr. Edmond testified on behalf of the government in that drug trafficking trial. Gov't's Proposed Findings of Fact, ECF No. 299 at 3 ¶ 7.

With respect to the second category, it is beyond dispute that Mr. Edmond provided background information to law enforcement concerning narcotics trafficking investigations. *See id.* at 3-4 ¶¶ 9-10; *see also* Def.'s Post-Hr'g Br., ECF No. 300 at 4. Mr. Dominguez testified that Mr. Edmond provided useful information as a confidential informant during the investigation of Phyllis Webster ("Ms. Webster"). Mot. Hr'g Tr., ECF No. 273 at 86-87. Previously, Mr. Edmond had sold a kilogram of cocaine to Ms. Webster. *Id.* at 86. Mr. Dominguez further testified that Mr. Edmond's information assisted the government in 1999 in "building a wiretap investigation against [Ms. Webster] and her supplier." *Id.* at 87.

Mr. Dominguez testified that Mr. Edmond assisted law enforcement with interpreting "thousands and thousands" of hours

of wiretaps. *Id.* at 80. The usefulness of Mr. Edmond's information is evident because the government obtained wiretaps in narcotics investigations based on information provided by Mr. Edmond and others. Mr. Edmond's information, along with the information from others, led to 111 indictments and 340 convictions. Gov't's Proposed Findings of Fact, ECF No. 299 at 3-4 ¶ 10.

As to the third category, it is undisputed that Mr. Edmond "provided information to the local cold case squad to assist in solving old homicides in the District of Columbia," and he "participated in monthly telephone calls with the assigned AUSA, who relayed questions from law enforcement, which allowed them to collect information about relationships between the decedents and suspects not otherwise known to the investigators." *Id.* at 4 ¶ 11; *see also* Def.'s Post-Hr'g Br., ECF No. 300 at 6. Mr. Edmond testified that he provided information to law enforcement about cold case homicides, stating that law enforcement "had about 3,000 cold cases, and they wanted to close them." Mot. Hr'g Tr., ECF No. 273 at 148. Mr. Watkins testified that Mr. Edmond's information about the cold case homicides was "very helpful." *Id.* at 67. According to the government, Mr. Edmond's information, including historical information, was helpful to homicide detectives with limited resources. Gov't's Proposed Findings of Fact, ECF No. 299 at 4 ¶ 11.

Finally, Mr. Edmond's assistance to the IG resulted in a complete reevaluation of BOP's inmate telephone system. *Id.* at 5 ¶ 12. As outlined above, Ms. Perry received the benefit of Mr. Edmond's substantial assistance as to her sentence reduction under Rule 35(b), which included the government's indication that Mr. Edmond was willing to provide testimony to Congress about issues related to drug trafficking and prison reform. *See* Gov't's Mot. for Sentencing Reduction, *Perry*, Crim. Action No. 89-162-24, ECF No. 293 at 7-8 ¶ 14. While a Congressional committee heard testimony in 2000 from an IG official about Mr. Edmond's involvement in using prison telephones to commit crimes, the Court distinguishes Mr. Edmond's willingness to potentially testify before Congress in the fall of 1997 as relevant to Ms. Perry's case from his cooperation with respect to the IG's review of BOP's inmate telephone system in this case.

Prior to the IG's review of the telephone system, Mr. Benjamin testified that "Mr. Edmond was simply one of many [who] were on the phones at [USP] Lewisburg conducting anything from tax fraud to major drug deals." Mot. Hr'g Tr., ECF No. 273 at 58. "And [the inmates] would simply make a collect call, have their person outside [of the prison] forward them to Colombia or wherever, and arrange a drug deal." *Id.* After the issue with the telephone system became public, Mr. Dominguez testified that DOJ

sought to implement changes to the telephone privileges of inmates and investigate the issue. *Id.* at 92-94. Mr. Dominguez coordinated the appointments and interviews between Mr. Edmond and the IG's office. *Id.* at 92.

Mr. Benjamin testified that Mr. Edmond's cooperation assisted DOJ and BOP with "fixing the problem with the phone systems." *Id.* at 58. Mr. Dominguez explained that Mr. Edmond's "information was a great force for change," *id.* at 93; and Mr. Edmond "help[ed] [BOP] accomplish their mission of incapacitating people who have been removed from society for crimes," *id.* at 94. Specifically, "[Mr.] Edmond was candid about how easy it was for [him] and other inmates to abuse the privileges to make criminal phone calls on these phones to, as [Mr.] Edmond says, make collect phone calls to Colombia to order up kilo[grams of cocaine] to be delivered to people in D.C. or Baltimore." *Id.* Mr. Dominguez further testified that IG officials "spent a lot of time interviewing [Mr.] Edmond about the vulnerabilities of the phone system." *Id.* As a result, the IG's office issued a report, and BOP implemented certain changes, including: (1) "inmates are not allowed to make collect phone calls"; (2) inmates are prohibited from making three-way calls; and (3) inmates "can only call certain people on approved phone calling lists." *Id.*

The Court credits the government's evaluation of
Mr. Edmond's substantial assistance, and the testimony of the
prosecutor and former law enforcement officials who, during the
motion hearing, attested to Mr. Edmond's extensive cooperation.
The Court observes that certain witnesses—Mr. Edmond,
Mr. Parker, and Rev. Wilson—testified about Mr. Edmond's
assistance in negotiating a "truce" between two gangs in 1997,
which contributed to a decline in violence in the Simple City
Benning Terrace. *See* Mot. Hr'g Tr., ECF No. 273 at 113-17, 120-
22, 145-47; *see also* Def.'s Post-Hr'g Br., ECF No. 300 at 6. The
government, however, did not present any information regarding
Mr. Edmond's involvement with brokering the truce. Although the
Court credits the testimony of these witnesses, the Court defers
to the government's assessment of Mr. Edmond's substantial
assistance.

After carefully considering the government's factual
proffers, the parties' submissions, and the sworn testimony of
the witnesses, the Court finds that Mr. Edmond has provided
substantial assistance within the meaning of Rule 35(b)(2)(C).

### B. Mr. Edmond Is Entitled to a Discretionary Sentence Reduction by an Amount Greater than the Government's Recommendation

The Court turns to the second step of the Rule 35(b)
analysis. *See Tadio*, 663 F.3d at 1048 ("If a defendant has
provided substantial assistance, the court proceeds to the

second step and determines the extent to which the defendant's sentence should be reduced."). "At this step, the non-assistance factors of § 3553(a) properly guide a district court's exercise of its discretion in determining the extent of the reduction." *Id.*

The Court first evaluates the scope of its discretion to consider the Section 3553(a) factors to reduce Mr. Edmond's sentence, and then addresses the extent of the sentence reduction.

### 1. The Court's Discretion to Reduce Mr. Edmond's Sentence Under Rule 35(b)

The parties agree that the Court may exercise its discretion to consider the Section 3553(a) factors and reduce Mr. Edmond's sentence. *See* Gov't's Post-Hr'g Br., ECF No. 298 at 3; *see also* Def.'s Post-Hr'g Br., ECF No. 300 at 9.[7] Indeed, the D.C. Circuit has made clear that "[i]t is well established that a Rule 35 motion . . . is addressed to the trial judge's discretion." *Pollard*, 1988 WL 145115, at *1. The remaining question is whether the Court may exercise its discretion to

---

[7] The Court agrees with the majority view that a district court may consider the Section 3553(a) factors when ruling on a Rule 35(b) motion. *See, e.g.*, *United States v. Doe*, 932 F.3d 279, 284 (5th Cir. 2019) ("[N]othing in [Rule 35(b)] precludes consideration of those factors."), *cert. denied*, 140 S. Ct. 899 (2020); *but see United States v. Grant*, 636 F.3d 803, 816 (6th Cir. 2011) (concluding that "the § 3553(a) factors have no role in Rule 35(b) proceedings").

reduce a defendant's sentence by an amount greater than the government's recommended sentence.

In moving for a sentence reduction under Rule 35(b), the government asserted that "[w]hether to reduce a sentence pursuant to Rule 35 and the amount of any reduction is within the discretion of the Court." Gov't's Mot., ECF No. 215 at 6. The government maintained that the Court "may consider the full range of statutory sentencing factors under 18 U.S.C. § 3553, irrespective of the direction in which those factors cut." *Id*. Initially, the government took the position in this case that "[t]he Court may use those § 3553 factors to reduce the sentence by an amount greater than, less than, or the same as what the defendant's assistance, considered alone, would warrant." *Id*. The government explained that "the amount of reduction should always be determined in reference to the starting point and by considering the § 3553 factors in combination with the amount of assistance rendered by the defendant." *Id*. (citing *Tadio*, 663 F.3d at 1055; *United States v. Manella*, 86 F.3d 201, 205 (11th Cir. 1996) (per curiam)).

Recognizing that the D.C. Circuit has not addressed this issue, the government's position reflected the same position taken by the government in *United States v. Tadio*, 663 F.3d 1042 (9th Cir. 2011). *See Id*. at 6, 7 n.3. In *Tadio*, the government argued that "a district court cannot rule in a vacuum, absent

critical factors, and that Rule 35(b) does not prohibit the consideration of [the] § 3553(a) factors in deciding to what extent a defendant's sentence should be reduced for substantial assistance." *Tadio*, 663 F.3d at 1046 (internal quotation marks omitted). The government contended that "the district court did not err in considering the non-assistance factors when it decided whether to grant a sentence reduction greater than what [the defendant's] assistance, considered alone, warranted." *Id.* at 1044.

The United States Court of Appeals for the Ninth Circuit ("Ninth Circuit") agreed with the government and affirmed the district court's consideration of the Section 3553(a) non-assistance factors in determining the amount of the defendant's sentence reduction under Rule 35(b). *Id.* at 1055. The Ninth Circuit explained:

> [A] Rule 35(b) proceeding is a resentencing in which the starting point is the original sentence, and in which the amount of assistance rendered by the defendant is the triggering factor for any reduction. The district court may properly consider the § 3553(a) factors in determining the amount of reduction and it may use those non-assistance factors to reduce the sentence by an amount greater than, less than, or the same as what the defendant's assistance, considered alone, would warrant. But the amount of reduction should always be determined in reference to the starting point and by considering the non-assistance factors in combination with the amount of assistance rendered by the defendant.

*Id.*

The government changed its position in this case, however. *Compare* Status Hr'g Tr., ECF No. 236 at 45 ("[The government] would ask the Court to consider the [Section 3553(a)] factors only if the Court was going to impose less of a reduction than the government asked for.") *and* Gov't's Resp., ECF No. 224 at 7, *with* Gov't's Mot., ECF No. 215 at 6. To support its position, the government relies on persuasive authority for the proposition that "this Court may consider [the Section 3553(a)] factors only to grant a smaller reduction than requested by the government, not to increase the reduction beyond the amount justified by the defendant's assistance alone." Gov't's Post-Hr'g Br., ECF No. 298 at 3 (citing cases). The parties agree that the D.C. Circuit has not weighed in on this issue. *See id.* at 4 n.2; *see also* Def.'s Resp., ECF No. 228 at 2 n.1.

Federal appellate courts disagree "on the proper role played by non-assistance factors in determining the extent of a sentence reduction once a defendant has satisfied the substantial assistance criterion of Rule 35(b)." *Tadio*, 663 F.3d at 1047 (collecting cases). Some courts have held that a district court may only consider the Section 3553(a) factors to reduce a sentence by less than the amount that a defendant would be entitled to based solely on the defendant's assistance. *E.g.,*

*United States v. Mora*, 703 F. App'x 836, 843 (11th Cir. 2017)
("While a court may deny or limit the size of a sentence
reduction based on its consideration of factors other than the
defendant's substantial assistance, it may only award a
reduction on the basis of the defendant's substantial
assistance."); *United States v. Webster*, 666 F.3d 1023, 1026
(7th Cir. 2012) ("[A] district court hearing a Rule 35(b) motion
may not use the § 3553(a) factors to further reduce the
defendant's sentence once the value of his assistance has been
assessed."); *United States v. Rublee*, 655 F.3d 835, 839 (8th
Cir. 2011) ("If the court decides to grant the Rule 35(b)
motion, its decision to limit the § 3553(e) reduction, as
opposed to extending it further downward, need not be based only
on factors related to the assistance provided.").

Other courts have held that a district court may consider
the Section 3553(a) factors to award a sentence reduction under
Rule 35(b) that is greater than, less than, or the same as the
reduction that the defendant's assistance would warrant. *E.g.*,
*Katsman*, 905 F.3d at 675 ("Section 3553(a) does not limit the
consideration of those factors to the original sentencing
decision, nor does it prohibit courts from considering them
during a resentencing proceeding."); *United States v. Davis*, 679
F.3d 190, 196-97 (4th Cir. 2012) (holding that a "district court
can consider other sentencing factors, besides the defendant's

substantial assistance, when deciding the extent of a reduction to the defendant's sentence after granting a Rule 35(b) motion"); *Tadio*, 663 F.3d at 1043 ("The sentence imposed must be related to the degree of assistance rendered, but a district court may consider non-assistance factors in awarding a reduction, whether that reduction is greater than, less than, or equal to the reduction that a defendant's assistance, considered alone, would warrant."). The Court is persuaded by the courts that have held that a district court may consider the Section 3553(a) factors in deciding the extent of a Rule 35(b) reduction, including whether to award a greater reduction than is warranted by the defendant's assistance alone.

A district court does not possess unfettered discretion in the context of a Rule 35(b) motion. *See Tadio*, 663 F.3d at 1055 ("We caution that a resentencing under Rule 35(b) is not the equivalent of a *de novo* sentencing."). That being said, the Court has the discretion to reduce Mr. Edmond's sentence, and the Court's authority to do so has been triggered by Mr. Edmond's substantial assistance. *See id*. at 1047, 1055. And the Court's consideration of the Section 3553(a) factors to reduce Mr. Edmond's sentence by an amount greater than the government's recommended reduction does not "convert [this] Rule 35(b) proceeding into a full resentencing." Gov't's Post-Hr'g Br., ECF No. 298 at 3. The government's position—that "this

41

Court may consider [the Section 3553(a)] factors only to grant a smaller reduction than requested by the government," Gov't's Post-Hr'g Br., ECF No. 298 at 3; and "it may do so only to ensure that the government's recommended assistance-based reduction is not unreasonably generous," *id*. at 5—reads limitations into Rule 35(b) that do not exist. The text of Rule 35(b) does not support the government's position. *See Katsman*, 905 F.3d at 675.

Rule 35(b) provides that "[u]pon the government's motion made more than one year after sentencing, the court *may* reduce a sentence if the defendant's substantial assistance involved . . . information the usefulness of which could not reasonably have been anticipated by the defendant until more than one year after sentencing and which was promptly provided to the government after its usefulness was reasonably apparent to the defendant." Fed. R. Crim. P. 35(b)(2)(C) (emphasis added). Nothing in the text of Rule 35(b) prohibits the Court's consideration of the Section 3553(a) factors in determining the extent of a sentence reduction. *See Katsman*, 905 F.3d at 675 ("The use of 'may' in Rule 35 implies discretion, and discretion can best be exercised by considering the various sentencing factors."). "Indeed, to read Rule 35(b) as requiring the court to resentence a defendant, considering only substantial assistance in isolation from other factors, 'leaves too little discretion for the court

42

to exercise' in determining whether a reduced sentence is warranted or prudent under the circumstances." *Id.* (quoting *Manella*, 86 F.3d at 204-05).

As Mr. Edmond points out, "the extent of any reduction granted is within the court's discretion," and "the Court should consider [the] government's recommendation as a starting point for its analysis." Def.'s Post-Hr'g Br., ECF No. 300 at 9. Furthermore, the Court is not bound by the government's recommendation. *See United States v. Grant*, 493 F.3d 464, 467 (5th Cir. 2007) ("[O]nce the government moves for a reduction in sentence, the sentencing court is not bound by the government's recommendation on whether or how much to depart but must exercise its independent discretion."); *see also United States v. Washington*, 293 F. Supp. 2d 930, 932-33 (E.D. Wis. 2003) (concluding that a reduction greater than the government's recommended reduction was warranted).

In the government's own words, district courts "are of course not bound to follow [the government's] recommendation just because [the government] sponsored [a Rule 35(b)] motion." *United States v. Jonathan L. Franklin*, Crim. Action No. 04-128-01 (RMC), Resentencing Hr'g Rough Tr. (D.D.C. Apr. 13, 2012) at 8. In *Franklin*, the government asserted that "[o]nce [the government] sponsor[s] the [Rule 35(b)] motion and [the district court] grant[s] the motion finding good cause for [a

substantial assistance departure, [then the district court has] the discretion to impose" a sentence reduction. *Id*. The court agreed, granted the Rule 35(b) motion, rejected the government's recommendation of 420 months of imprisonment, and reduced the defendant's life sentences to thirty years. *Id.* at 1, 47; *see also Franklin*, Crim. Action No. 04-128-01 (RMC), Am. J & C, (D.D.C. May 8, 2012), ECF No. 1195 at 4.

*     *     *

In sum, Rule 35(b) vests the Court with the discretion to reduce a sentence by an amount it deems appropriate under the circumstances after it finds that the defendant has provided substantial assistance and taking into account the degree of assistance rendered by the defendant. Because the Court must exercise its independent discretion to determine the extent of the sentence reduction under Rule 35(b), it will consider the Section 3553(a) non-assistance factors to guide its exercise of discretion in reducing Mr. Edmond's sentence.

### 2. Consideration of the Section 3553(a) Factors to Determine the Extent of the Reduction and the Term of Supervised Release

In fashioning an appropriate sentence, a district court considers the following seven factors:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and

44

> to provide just punishment for the offense;(B)
> to afford adequate deterrence to criminal
> conduct;(C) to protect the public from further
> crimes of the defendant; and (D) to provide
> the defendant with needed educational or
> vocational training, medical care, or other
> correctional treatment in the most effective
> manner;(3) the kinds of sentences
> available;(4) the kinds of sentence and the
> sentencing range established for—(A) the
> applicable category of offense committed by
> the applicable category of defendant as set
> forth in the guidelines . . . (5) any pertinent
> policy statement . . .(6) the need to avoid
> unwarranted sentence disparities among
> defendants with similar records who have been
> found guilty of similar conduct; and (7) the
> need to provide restitution to any victims of
> the offense.

18 U.S.C. § 3553(a). "A district court, however, need not

consider every § 3553(a) factor in every case." *United States v.*

*Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017) (citation and internal

quotation marks omitted).

Section 3553(a) calls for "an individualized assessment

based on the facts presented." *Gall v. United States*, 552 U.S.

38, 50 (2007). That section requires the Court to "impose a

sentence sufficient, but not greater than necessary, to comply

with the purposes" of sentencing. 18 U.S.C. § 3553(a).

Consideration of the Section 3553(a) factors to determine the

extent of a sentence reduction is prudent because "[i]n some

instances, . . . a defendant's individual circumstances will

have changed, or information that sheds new light on the nature

of the offense will have emerged, since the date of sentencing."

*Tadio*, 663 F.3d at 1053.

"Rule 35(b) authorizes a district court to reduce any aspect of a defendant's sentence, including supervised release terms and orders of restitution not mandated by statute." *United States v. Spallone*, 399 F.3d 415, 424 (2d Cir. 2005). Supervised release "serves an entirely different purpose than the sentence imposed under § 3553(a)," *Pepper*, 562 U.S. at 502 n.15; and it "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 54 (2000). A district court may "extend a term of supervised release if less than the maximum authorized term was previously imposed, and may modify, reduce, or enlarge the conditions of supervised release, at any time prior to the expiration or termination of the term of supervised release." 18 U.S.C. § 3583(e)(2). In doing so, the Court must consider the factors set forth in Section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7). 18 U.S.C. § 3583(e).[8]

For the reasons explained below, the Section 3553(a) factors weigh in favor of reducing Mr. Edmond's sentence and imposing a life term of supervised release.

---

[8] Mr. Edmond has no restitution obligation because there are no statutorily defined victims, rendering inapplicable the seventh factor under Section 3553(a)(7). *See* J & C, ECF No. 217 at 1-4.

a. **Nature and Circumstances of the Offenses and the History and Characteristics of the Defendant**

i. **Nature and Circumstances of the Offenses**

As to the nature and circumstances of the offenses, the starting point is the original sentence, and Mr. Edmond's sentence of mandatory life imprisonment reflects the nature and circumstances of his crimes. *See* 18 U.S.C. § 3553(a)(1); *see also Tadio*, 663 at 1055. Mr. Edmond's offenses—violations of 21 U.S.C. §§ 843(b), 848(b), 853, 861 and 18 U.S.C. § 1952(a)—are very serious. *See Edmond*, 52 F.3d at 1087. Mr. Edmond acknowledges that his criminal conduct resulted in "devastation and destruction." Def.'s Post-Hr'g Br., ECF No. 300 at 4. As the government correctly points out, Mr. Edmond "stands convicted of having run one of our city's largest and most destructive narcotics distribution operations," and "after having been convicted of that, he went on to run a large scale narcotics distribution operation from prison." Gov't's Mot., ECF No. 215 at 7-8.

Based on the views of the community gathered by the Attorney General, "Mr. Edmond had a profound and personal impact on the lives of District residents, and community members in all eight wards were grateful to the Court for hearing their voices." Amicus Br., ECF No. 246 at 9. Some residents of the

District recounted the harms caused by Mr. Edmond's crimes,
including drug addiction, death, the spread of the crack
epidemic, and "its lingering impact on the District." *Id.* at 16.
Other residents, however, attributed the crack epidemic to
"racially motivated policies of the federal government and that
Mr. Edmond was a victim of those policies." *Id.* While some
residents opposed Mr. Edmond's release from custody, *id.* at 12-
13; others believed that he "has already served enough time for
his crimes" and that "a life sentence for drug offenses was
excessive[,]" *id.* at 14. And some residents cited a host of
reasons for why thirty years in prison is "sufficient
punishment," including the financial cost to taxpayers and that
individuals change after a number of years. *Id.* at 15. While
there are no statutorily defined victims in this case, it is
appropriate for the Court to take into consideration the impact
Mr. Edmond's criminal conduct had on the community. Here, the
government explicitly asks the Court to take into account the
harm Mr. Edmonds inflicted upon the community. Mot. Hr'g Tr.,
ECF No. 273 at 31.

Mr. Edmond concedes the seriousness of his underlying
criminal conduct, and he expresses remorse for his actions. *See
id.* at 138 ("I just knew [selling drugs] was wrong . . . I just
felt sick about it, you know, because I was hurting people. I
had already hurt my family . . . "); *id.* at 154 ("I'm very

remorseful . . I'm sorry for everybody that I hurt . . . "). As previously stated, the Court found Mr. Edmond's testimony to be credible, and the government declined to cross examine him. Mr. Edmond admittedly devastated the community, but he has served more than thirty years in prison for his crimes in this case. *See* Gov't's Mot., ECF No. 215 at 7. Furthermore, the government emphasizes that there is no "direct evidence of Mr. Edmond being implicated in the acts of violence" related to the criminal enterprise. Mot. Hr'g Tr., ECF No. 273 at 49-50. In fact, "at the 1989 trial the government did not adduce evidence of any violent crimes." Gov't's Resp., ECF No. 224 at 4.

### ii. Mr. Edmond's History and Characteristics

Mr. Edmond's history and characteristics favor a sentence reduction and an extended period of supervision. Mr. Edmond is a native of the District, and he was primarily raised by his mother. PSR, ECF No. 230 at 17 ¶ 49. His parents never married, and his father spent the majority of his time outside of the household. *Id*. According to Mr. Edmond, he was born into a life of crime because some individuals in his neighborhood, including his own family members, sold drugs when he was a child. Mot. Hr'g Tr., ECF No. 273 at 155. Nonetheless, Mr. Edmond takes full responsibility for his actions. *Id*.

Mr. Edmond graduated from high school, and he is the father

of two children. PSR, ECF No. 230 at 17 ¶ 50, 18 ¶ 53.
Mr. Edmond has two granddaughters. Mot. Hr'g Tr., ECF No. 273 at
156. Mr. Edmond has many supportive family members, friends, and
religious leaders. *See, e.g.*, *id*. at 119, 122, 125-27, 130-35;
Letter from Rachelle Edmond-Millington (Nov. 8, 2019), ECF No.
287 at 1-2; Letter from Elpiniki N. Koudellou (Nov. 7, 2019),
ECF No. 288 at 1-2. Although some of Mr. Edmond's family members
were co-defendants, none of them have been re-arrested or
reincarcerated. Mot. Hr'g Tr., ECF No. 273 at 157. Mr. Edmond's
family members are homeowners and business owners who have
defied the statistical odds of recidivism. *Id*. at 99-100, 157.

Mr. Edmond was twenty-four years old when he was
incarcerated for his crimes in this case. *See* Gov't's Mot., ECF
No. 215 at 7. The Court gives considerable weight to the fact
that Mr. Edmond had no prior criminal history before this case.
*See* Def.'s Post-Hr'g Br., ECF No. 300 at 11; *see also* PSR, ECF
No. 230 at 15 ¶¶ 37-38. Mr. Edmond, however, continued to engage
in criminal activity at USP Lewisburg following his sentence in
this case. Placing in context this criminal conduct, Mr. Watkins
testified that Mr. Edmond's further crimes while in prison
reflected "pressure[] to maintain his status, as any of the high
profile prisoners are in the penitentiary." Mot. Hr'g Tr., ECF
No. 273 at 65. Mr. Watkins explained that Mr. Edmond "had to
maintain whatever [he] came in there from the street for. If

not, [he] went to the lower order, the lower rung of the ladder amongst all the prisoners and [would be] treated completely differently, so [he was] pretty much forced into maintaining the same posture [he] had before [he] came to prison." *Id.* Despite such pressure, Mr. Edmond seized on the opportunity to "get out of the game" through cooperation. *Id.*

### iii. Mr. Edmond's Cooperation and Character

The Court may also consider Mr. Edmond's cooperation with the government under Section 3553(a)(1). *See United States v. Kaufman*, 791 F.3d 86, 90 (D.C. Cir. 2015). "No matter how horrible an offender's crimes, how unlikely his prospect of rehabilitation, how dangerous he might be, an informer deserves a reward for the benefit conferred on society by his assistance in investigating and prosecuting wrongdoers." *United States v. Torres Teyer*, No. 01 CR. 21 (GEL), 2006 WL 3511885, at *8 (S.D.N.Y. Dec. 6, 2006). To reward Mr. Edmond for his cooperation, the government moved to reduce his sentence in this case.

The Court takes into account Mr. Edmond's decades-long cooperation because it indicates that his "character is less incorrigible than it may have otherwise appeared, and that the need for protection of the public—a critical goal of sentencing under § 3553(a)(2)(C)—is to some extent reduced." *Id.* at *9. It

is undisputed that Mr. Edmond "voluntarily began assisting the government without having a written agreement in place." Def.'s Post-Hr'g Br., ECF No. 300 at 16. In 1994, Mr. Edmond began cooperating with law enforcement, and he entered into a formal cooperation agreement the next year. Gov't's Mot. for Sentencing Reduction, *Perry*, Crim. Action No. 89-162-24, ECF No. 293 at 5 ¶ 10. The Court credits Mr. Edmond's sworn testimony that his cooperation reflects his stated desire to right his wrongs. *See* Mot. Hr'g Tr., ECF No. 273 at 154. With respect to his decision to cooperate with the government, Mr. Edmond explained: "I was looking for a way out, and I figured if I start cooperating with the government, that would give me a way, I wouldn't have to sell drugs again." *Id.* at 141. As such, Mr. Edmond's decision demonstrates his efforts to cut ties with the criminal world. *See id.* at 141-42.

The Court also considers the degree of Mr. Edmond's cooperation. Having already determined that Mr. Edmond provided substantial assistance, the Court finds that the degree of his substantial assistance is very high. The uncontroverted testimony of Mr. Dominguez, Ms. Watkins, Mr. Benjamin, and Mr. Watkins indicates that the degree of Mr. Edmond's cooperation was exceptionally high. As previously stated, Mr. Dominguez testified that Mr. Edmond's cooperation: (1) was "off the chart"; (2) "[it was] extraordinary"; and (3) no other

cooperation compares to Mr. Edmond's cooperation during his career as a federal prosecutor. Mot. Hr'g Tr., ECF No. 273 at 98. Ms. Watkins testified that Mr. Edmond's cooperation "was very productive. On a scale of 1 to 10, 11." *Id.* at 62. Mr. Benjamin testified that Mr. Edmond's cooperation was "[e]xceptional in every way" based on his experience of working on several drug cases and with hundreds of cooperators during his career. *Id.* at 55. On a scale of one to ten, Mr. Benjamin rated Mr. Edmond's cooperation at eleven. *Id.* at 57. Mr. Watkins testified that Mr. Edmond "went above and beyond what any normal cooperator would do." *Id.* at 68.

Apart from his formal cooperation with the government, Mr. Edmond, Mr. Parker, and Rev. Wilson testified about certain gang activity in 1997. Mot. Hr'g Tr., ECF No. 273 at 113-17, 120-22, 145-47. To his credit, "Mr. Edmond worked with the Alliance of Concerned Men to intervene in and put an end to an ongoing war between two youth gangs." Def.'s Post-Hr'g Br., ECF No. 300 at 6. While incarcerated, Mr. Edmond joined a meeting via telephone with the members of the rival gangs, and his "words had a clear impact as the violence decreased after the meeting." *Id.* In addition, Mr. Edmond spoke to at-risk youth on a monthly basis, and he described to them the horrors of prison life in hopes of steering them away from prison. Mot. Hr'g Tr., ECF No. 273 at 145. Mr. Edmond testified that he intends to

continue assisting the government and helping the community upon his release. *See id.* at 154.

Bishop Steadman and Mr. Edmond "grew up together" and since Mr. Edmond's arrest in 1989, they maintained their personal relationship through letters and telephone conversations. *Id.* at 131. Bishop Steadman testified that Mr. Edmond is not the same person he was in 1989 because he is now a person of faith with a sincere heart. *Id.* at 131-33. Bishop Steadman has facilitated an opportunity for Mr. Edmond to speak to her congregation, especially young people at her church. *Id.* at 132-33. In Bishop Steadman's view, Mr. Edmond's experience will have a positive impact on the nation, and it will deter others from taking a similar path. *Id.* at 133.

Weighing the nature and circumstances of the offenses, Mr. Edmond's history and characteristics, and his cooperation and character, the Court finds that requiring Mr. Edmond to serve a longer period of incarceration than the time he has already served is not necessary. The Court also finds that a life term of supervised release is warranted. Certain statutory provisions, including 21 U.S.C. §§ 841(b), 861, authorize the imposition of life terms of supervised release.

**b. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment for the Offense, Afford Adequate Deterrence to Criminal Conduct, Protect the Public from Further Crimes of the Defendant, and Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

The second and third factors also weigh in favor of reducing Mr. Edmond's sentence as well as imposing a life term of supervised release. *See* 18 U.S.C. § 3553(a)(2), (3). The government contends—and Mr. Edmond does not dispute—that the Court should consider the gravity of his crimes. *See* Gov't's Mot., ECF No. 215 at 7; *see also* Def.'s Post-Hr'g Br., ECF No. 300 at 9. Indeed, Judge Richey imposed the sentence to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense[s]." 18 U.S.C. § 3553(a)(2)(A). The parties do not argue that serving more than thirty years in prison has no deterrent effect. A longer period of incarceration for Mr. Edmond is not necessary to deter criminal conduct.

Nor would requiring Mr. Edmond to serve life in prison reflect the need for "educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). Mr. Edmond earned a high school diploma in 1982, and he attended college for a

brief period. PSR, ECF No. 230 at 18 ¶ 53. While incarcerated,
Mr. Edmond has taken educational and vocational courses in a
variety of subjects, including European Civilization and
religious studies, and he has completed a drug education
program. *See* Gov't's Sealed Submission, ECF No. 247-1 at 2-3, 6.
Mr. Edmond's courses, including family budgeting and wellness,
and his work assignments demonstrate that he has taken advantage
of opportunities aimed at assisting him in the re-entry into the
community. *See id.* at 2, 6. The progress report from BOP states
that Mr. Edmond "is considered fully employable upon release."
Gov't's Sealed Submission, ECF No. 247-1 at 4.

Next, the Court considers Mr. Edmond's disciplinary reports
under Section 3553(a)(2)(B)-(C). *See* 18 U.S.C. § 3553(a)(2)(B)-
(C) ("The court, in determining the particular sentence to be
imposed, shall consider . . . the need for the sentence imposed
to afford adequate deterrence to criminal conduct [and] to
protect the public from further crimes of the defendant.").
Mr. Edmond's disciplinary record includes a number of
infractions over the years. *See* Gov't's Sealed Submission, ECF
No. 247-1 at 3-4, 7-15, 18, 23-26, 28-36, 40-52, 54-58.
Nonetheless, the government has not presented—and the Court is
not aware of—any recent disciplinary infractions in Mr. Edmond's
record. The most recent progress report shows that Mr. Edmond
incurred infractions in 1991, 1993, 1999, and 2007. *Id.* at 3-4.

And the report states that "Mr. Edmond has not been a management problem" and "[o]verall, his adjustment has been considered satisfactory." *Id.* at 2.

Mr. Edmond's disciplinary record is not spotless, but it underscores the need for the extension of the previously-imposed terms of supervised release. Neither party, however, points to Mr. Edmond's disciplinary infractions as an impediment to his sentence reduction. On balance, the Court cannot find that a longer period of incarceration for Mr. Edmond is necessary to deter criminal conduct or protect the public from future crimes.

### c. The Applicable Sentencing Guidelines Range

Using the applicable Sentencing Guidelines in effect at the time of sentencing, the Probation Officer calculated a final offense level of 42 and a Criminal History Category of I. Letter from Glenn R. Schmitt, U.S. Sentencing Comm'n (Sept. 27, 2019), ECF No. 262 at 1 [hereinafter "Sentencing Comm'n Letter"]. Mr. Edmond's CCE conviction carried a mandatory life sentence. *Id.* at 2. Before application of U.S.S.G. § 5G1.1, Mr. Edmond's guidelines range was 360 months (*i.e.* thirty years) to life. *Id.* at 1. Because Mr. Edmond faced a minimum penalty of life imprisonment, the Guidelines range was life to life. *Id.* (citing U.S.S.G. § 5G1.1).

Using the Sentencing Guidelines in the Sentencing Commission's 2018 Guidelines Manual for purposes of this Rule

35(b) proceeding, the Probation Officer determined that the applicable guideline for Counts Five, Fourteen, Fifteen, Sixteen, and Eighteen was U.S.S.G. § 2D1.1, and the applicable guideline for Count Eleven was U.S.S.G. § 2E1.2. Probation Mem., ECF No. 265 at 2. The Probation Officer excluded Count One—the CCE conviction—because 21 U.S.C. § 848(b) requires a mandatory life sentence. *Id*. The Probation Officer grouped together Counts Five, Eleven, Fourteen, Fifteen, Sixteen, and Eighteen under U.S.S.G. § 3D1.2(d). *Id*. The Probation Officer calculated a base offense level of 34.

The Probation Officer applied a two-level increase under U.S.S.G. § 2D1.1(b)(1) because a firearm or dangerous weapon was possessed during the commission of the offenses, and a four-level increase under U.S.S.G. § 3B1.1(a) for Mr. Edmond's role as the leader of an organization involving more than five participants. Probation Mem., ECF No. 265 at 2-3. The Probation Officer calculated a total offense level of 40. *Id*. at 3. Mr. Edmond's total offense level, combined with Criminal History Category I, resulted in a sentencing range of 292 to 365 months (*i.e.* 24.3 to 30.4 years) before the application of U.S.S.G. § 5G1.1. Sentencing Comm'n Letter, ECF No. 262 at 2. "Regardless of the foregoing, though, engaging in a [CCE] in violation of 21 U.S.C. § 848(b) is punishable by a mandatory life sentence." *United States v. Millan*, No. 91-CR-685 (LAP), 2020 WL 1674058,

at *3 (S.D.N.Y. Apr. 6, 2020).

Mr. Edmond objects to the two-level increase under U.S.S.G. § 2D1.1(b)(1) for possession of a firearm or dangerous weapon on two grounds: (1) he "has no such convictions"; and (2) "[i]t is well settled that any fact which increases the mandatory minimum is considered an 'element' of the crime and must be submitted to the jury." Def.'s Post-Hr'g Br., ECF No. 300 at 15 n.3 (citing *United States v. Alleyne*, 570 U.S. 99 (2013)). Mr. Edmond's reliance on *Alleyne* is misplaced. In *Alleyne*, the Supreme Court held that "any fact that . . . increases the mandatory minimum is an element that must be submitted to the jury." 570 U.S. at 103 (internal quotation marks omitted). The Supreme Court explained that "[a]ny fact that, by law, increases the penalty for a crime is an element that must be submitted to the jury and found beyond a reasonable doubt." *Id*. Nothing of the kind is present here.

The application of the two-level increase under U.S.S.G. § 2D1.1(b)(1) does not increase Mr. Edmond's penalty beyond the statutory minimum or maximum, as Mr. Edmond already faces a mandatory life sentence for his CCE conviction under 21 U.S.C. § 848(b). As the D.C. Circuit has explained, "*Alleyne* . . . dealt with an increase to the statutory range—not increases to a defendant's range under the Sentencing Guidelines[.]" *United States v. Bell*, 795 F.3d 88, 104 (D.C. Cir. 2015). At bottom,

the issue of whether the two-level increase is applicable here does not change the fact that the starting point is Mr. Edmond's mandatory life sentence. *Cf. Millan*, 2020 WL 1674058, at *3.

The Court rejects Mr. Edmond's argument that his mandatory life sentence for his conviction under 21 U.S.C. § 848(b) should not be considered as a starting point and U.S.S.G. § 5C1.2 (the "Safety Valve") abrogated his mandatory minimum sentence for two reasons. *See* Mot. Hr'g Tr., ECF No. 273 at 188-89. First, the original sentence is the starting point in the Rule 35(b) context. *Tadio*, 663 F.3d at 1055. The government correctly notes that "[t]he mandatory life sentence that was imposed on [Mr. Edmond] is the proper benchmark from which the Court should measure any sentence reduction – not an irrelevant Guidelines range." Gov't's Resp. to Def.'s Am. Sentencing Mem., ECF No. 263 at 3 n.3. And Mr. Edmond appears to concede this point. *See* Joint Status Report, ECF No. 264 at 2 (Mr. Edmond's Position: "[T]he focal point of Mr. Edmond's original sentence was the mandatory life provision under § 848 ([CCE]).").

Next, the government argues—and Mr. Edmond does not dispute—that the "Safety Valve" under U.S.S.G. § 5C1.2 does not apply here because of Mr. Edmond's CCE conviction. Gov't's Post-Hr'g Br., ECF No. 298 at 6; *see generally* Def.'s Post-Hr'g Br., ECF No. 300. To be eligible for the Safety Valve under Section 5C1.2 of the Guidelines, a court must find, *inter alia*, that the

defendant "was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848." U.S.S.G. § 5C1.2(a)(4). Here, the Court cannot find that Mr. Edmond is eligible for the Safety Valve under U.S.S.G. § 5C1.2 because of Mr. Edmond's CCE conviction.

Although Mr. Edmond faces a mandatory life sentence under 21 U.S.C. § 848(b), Mr. Edmond argues—and the government does not dispute—that Rule 35(b) allows the Court to reduce his sentence below the mandatory sentence. *See* Def.'s Am. Sentencing Mem., ECF No. 260 at 4 (citing Fed. R. Crim. P. 35(b)(4)); *see also* Gov't's Resp. to Def.'s Am. Sentencing Mem., ECF No. 263 at 1-3.

### d. The Need to Avoid Unwarranted Sentencing Disparities

As to the sixth factor, the Court considers "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). A reduction in Mr. Edmond's sentence is consistent with Section 3553(a)(6)'s requirement of treating similarly situated defendants alike. *See id.* Mr. Edmond argues that a reduction greater than the government's recommendation is justified after considering the sentences of other cooperating

defendants. Def.'s Am. Sentencing Mem., ECF No. 260 at 5-7. To support his position, Mr. Edmond relies on cases in which defendants—specifically, Salvatore Gravano ("Mr. Gravano") and Alberto Martinez ("Mr. Martinez")—offered substantial assistance and the government recommended prison sentences of less than forty years. *Id.* at 5-7.

The government contends that its recommendation in this case would not create an unwarranted sentencing disparity. Gov't's Resp. to Def.'s Am. Sentencing Mem., ECF No. 263 at 2. The government advances two primary arguments. First, "[t]he D.C. Circuit . . . has recognized that sentence reductions for cooperation do not create unwarranted disparities." *Id.* (citing *United States v. Hemphill*, 514 F.3d 1350, 1364 (D.C. Cir. 2008); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007)). Next, the government contends that "it is neither feasible nor productive to attempt to compare [Mr. Edmond's] cooperation to that of others in different times and places" because "cooperation by its very nature is fact specific." *Id.* at 3.

The Court is not persuaded by the government's arguments. First, the government's reliance on *Hemphill* and *Bras* is misplaced because both cases are readily distinguishable from this case. In *Hemphill*, the D.C. Circuit agreed with the district court that the disparity was reasonable between the defendant's ten-year sentence and his co-conspirator's five-year

sentence because the co-conspirator "pled guilty and testified against her co-conspirators." 514 F.3d at 1364. In *Bras*, the D.C. Circuit rejected the defendant's argument that there was a disparity between his thirty-seven month sentence and his co-conspirators' probation sentences because: (1) his co-conspirators were not comparators; and (2) the co-conspirators "provided substantial assistance in the investigation of the scheme, while [the defendant] did not." 483 F.3d at 114.

Unlike the defendants in *Hemphill* and *Bras*, Mr. Edmond does not attempt to compare his sentence to his co-defendants. *See* Def.'s Am. Sentencing Mem., ECF No. 260 at 5-7. Contrary to the government's contention, Mr. Edmond does not ask the Court to compare his cooperation with that of another defendant. *See id*. Rather, Mr. Edmond argues that Mr. Gravano and Mr. Martinez are similarly situated defendants. *Id*.

Mr. Edmond points out that Mr. Gravano was sentenced to five years of imprisonment based on the government's recommendation after he admitted to several crimes, including nineteen murders. *Id*. at 6. And "[u]pon information and belief," Mr. Edmond asserts that "the government recommended a thirty-five year sentence for [Mr.] Martinez, the leader of a drug enterprise that admitted to killing ten people." *Id*. at 7. Mr. Edmond notes that Najibullah Zazi ("Mr. Zazi"), a convicted terrorist, received a ten-year sentence based on the

government's recommendation. *Id.* at 7 n.5. Mr. Edmond, however, fails to provide the Court with the records or details of the alleged comparators, such as their Sentencing Guidelines ranges. Without such information, the Court cannot discern whether Mr. Gravano, Mr. Martinez, and Mr. Zazi are appropriate comparators within the meaning of Section 3553(a)(6).

Mindful of its obligation under Section 3553(a)(6) to avoid unwarranted sentencing disparities among similarly situated defendants, the Court requested that the Sentencing Commission examine cases similar to Mr. Edmond's case for purposes of this Rule 35(b) proceeding. *See generally* Min. Order of Oct. 7, 2019. The Sentencing Commission's analysis was threefold. First, the Sentencing Commission "examined cases with identical guideline factors as that which applied in Mr. Edmond's case (but using the current guidelines manual) to determine the sentence imposed in similar cases over the last ten years." Sentencing Comm'n Letter, ECF No. 262 at 1. Next, the Sentencing Commission "examined offenders convicted under each of the five statutes [applicable to Mr. Edmond] within the last ten years where the guideline range in effect was life to life to determine the sentenced imposed." *Id.* Finally, the Sentencing Commission "reviewed cases where a Rule 35(b) motion was granted in the last five years and where the offender was initially convicted under one of the five statutes [applicable

to Mr. Edmond] and where the guideline range in effect at the original sentencing was life to life." *Id*. at 2.[9]

The Sentencing Commission's September 2019 results, in pertinent part, are as follows:

> For 21 U.S.C. § 848, 110 cases with at least a CCE conviction and a guideline minimum of life imprisonment were reported to the Commission in the past ten years. The defendants in twenty-eight of those cases received a departure for substantial assistance under U.S.S.G. § 5K1.1. **The average sentence imposed was 181 months (or fifteen years),** with sentences ranging from one day to 360 months (or thirty years). In the past five years, six Rule 35(b) cases were reported to the Commission. **The average sentence imposed in those Rule 35(b) cases was 185 months (fifteen years and four months),** with sentences ranging from 72 months to 396 months (*i.e.* six years to thirty years and two months).

*Id*.

Having carefully considered the foregoing results, a reduction of Mr. Edmond's sentence greater than the government's

---

[9] Neither party objected to the Sentencing Commission's analysis with respect to the applicable Guidelines and statutes. *See* Joint Status Report, ECF No. 264 at 1-2. The Court disregards the Sentencing Commission's analysis of 21 U.S.C. § 846 (Count Two) because the D.C. Circuit vacated that conviction. *See Edmond*, 52 F.3d at 1108, 1113. The Court agrees with Mr. Edmond that the Sentencing Commission's statement—that "Mr. Edmonds [sic] was held responsible for several murders," Sentencing Comm'n Letter, ECF No. 262 at 2—is unsupported by the record. *See* Joint Status Report, ECF No. 264 at 2 ("[T]here can be no genuine dispute as to the lack of Mr. Edmond's involvement in murder."). Accordingly, the murder guideline under U.S.S.G. § 2A1.1 is inapplicable here.

recommendation is needed to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). On average, Mr. Edmond's sentence for the CCE conviction is out of step with the sentences for CCE convictions and sentence reductions in Rule 35(b) cases with CCE convictions. *See* Sentencing Comm'n Letter, ECF No. 262 at 2.

\*     \*     \*

As the Court articulated during the October 16, 2019 motion hearing, the task of rendering a decision in this case is extraordinarily difficult and challenging. Mot. Hr'g Tr., ECF No. 273 at 3-4. In determining an appropriate sentence reduction, the Court must balance the applicable Section 3553(a) factors, which includes considering the nature and degree of Mr. Edmond's substantial assistance. And the Court must balance the gravity of Mr. Edmond's crimes.

On the one hand, Mr. Edmond's crimes were exceptionally grave. As the government points out, Mr. Edmond "conducted the largest, most destructive drug organization that this city's ever seen." *Id.* at 31. Mr. Edmond acknowledges that his criminal conduct resulted in "devastation and destruction" in this community. Def.'s Post-Hr'g Br., ECF No. 300 at 4. More than 500 residents of the District of Columbia responded to the Attorney General's solicitation for comment on the government's motion to

reduce Mr. Edmond's sentence, which is a testament to the lasting impact his criminal conduct has had on this community. *See* Amicus Br., ECF No. 246 at 4. The Court is well aware of the lasting negative impact Mr. Edmond's criminal conduct has had on this community. The Court recognizes the pain and suffering of the individuals affected by his criminal conduct.

On the other hand, Mr. Edmond has spent thirty-one years in prison since the imposition of his sentence, and he has been incarcerated for nearly thirty-two years since his initial arrest. While incarcerated, Mr. Edmond cooperated with the government. The government affirms that Mr. Edmond's cooperation "was important and wide and deep." Mot. Hr'g Tr., ECF No. 273 at 31. Indeed, the Court has found that Mr. Edmond provided substantial assistance to the government and that the degree of his assistance was exceptionally high. In addition to Mr. Edmond's expressed remorse for his actions, Mr. Edmond's decision to cooperate—and his lengthy period of cooperation—is an expression of genuine remorse. Mr. Edmond clearly provided above-average cooperation. Furthermore, his cooperation demonstrates that the need to protect the public from future crimes has lessened. The Sentencing Commission's data indicates that the average sentencing reduction for a defendant convicted of a CCE offense is fifteen years. Based on the Court's detailed analysis of the applicable Section 3553(a) factors, as set forth

67

above, Mr. Edmond's individual circumstances have changed since the date of sentencing. *See Tadio*, 663 F.3d at 1053. The Court is persuaded that it is appropriate to reduce Mr. Edmond's life sentence.

After balancing the relevant Section 3553(a) factors, the Court in its discretion finds that it is appropriate under the facts and circumstances to reduce Mr. Edmond's sentence and that a sentence of twenty years of imprisonment is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). The Court also finds that a life term of supervised release is necessary to fulfill the postsentencing rehabilitation goals of supervised release. *See Pepper*, 562 U.S. at 502 n.15; *see also Johnson*, 529 U.S. at 59.

### 3. Remaining Considerations

Finally, Mr. Edmond urges "the Court to consider the fact that he has been confined under conditions that are significantly more restrictive than other inmates." Mot. Hr'g Tr., ECF No. 273 at 34. Mr. Edmond notes that inmates with similar restrictions face certain hardships due to restrictive security measures. Def.'s Notice of Obj., ECF No. 270 at 1 n.1. Citing information provided to the United States Senate's Permanent Subcommittee on Investigations of the Committee on Governmental Affairs, Mr. Edmond points out that "a 'protected witness sentenced inmate, in terms of hardship of sentence,

serves 3 days in equivalent for every 1 day of the general population prisoner.'" *Id.* (quoting Def.'s Ex. 1, ECF No. 270-1 at 3). The BOP Director testified before the Subcommittee and confirmed that "imprisoned protected witnesses frequently have a tougher time in prison than do inmates who **ARE NOT COOPERATING WITH THE AUTHORITIES**." Def.'s Ex. 1, ECF No. 270-1 at 3. The government does not deny that Mr. Edmond's conditions of confinement have been more restrictive than other inmates. Mot. Hr'g Tr., ECF No. 273 at 187.

To recap, Mr. Edmond initially agreed to cooperate with law enforcement in 1994. Mot. Hr'g Tr., ECF No. 273 at 46-47, 58, 64, 70, 74. It is undisputed that Mr. Edmond's cooperation put his life and the lives of his family members at great risk because: (1) his roommate was the "third largest cocaine producing person in the world," *id.* at 78; (2) his roommate's mother was the "Black [W]idow," *id.* at 79; and (3) his fellow inmates were Colombian drug dealers and leaders of the Medellín Cartel, *id.* at 78, 82. After he decided to cooperate with the government, Mr. Edmond's movement was significantly more restricted than other inmates. *Id.* at 147-148. Those restrictions limited Mr. Edmond's ability to communicate with his family and the at-risk youth at the church. *Id.* at 148. Mr. Edmond's conditions of confinement were restricted up until approximately 2018. *Id.*

Mr. Edmond does not cite any authority that permits the Court to take into consideration that his conditions were significantly more restrictive than other inmates in the context of a Rule 35(b) motion. In a different context, a sentencing judge may consider a deportable non-U.S. citizen's conditions of confinement. *See, e.g.*, *United States v. Smith*, 27 F.3d 649, 650 (D.C. Cir. 1994) (holding that district courts may "depart below the range indicated by the Sentencing Guidelines where the defendant, solely because he is a deportable alien, faces the prospect of objectively more severe prison conditions than he would otherwise"). Although the Court is sympathetic to the restrictive nature of Mr. Edmond's conditions of confinement during his cooperation over the years and his request for the Court to consider those conditions, Mr. Edmond fails to cite authority to support his request.

The government argues that it would be inappropriate for the Court to consider Mr. Edmond's conditions, but the government does not rely on case law in support of its position. *See* Mot. Hr'g Tr., ECF No. 273 at 187. The government contends that Mr. Edmond himself is to blame for the more restrictive conditions of confinement based on his decision to cooperate with the government. *Id.* The government asserts:

> With respect to Mr. Edmond's time in prison
> being more difficult, we're not quibbling with
> the defense, but we [sic] just asking the

70

> Court to consider, that's the product of what
> -- the situation Mr. Edmond was in,
> Mr. Edmond's cooperation, so it's not really
> appropriate to say his time was more difficult
> than others, when that was all a product of
> his actions, his choices, and how he got here
> today vis-à-vis cooperating.

*Id.*

The government's position is perplexing given that it is at odds with the rationales for cooperation. Cooperation benefits society at large by furthering law enforcement's efforts to investigate and prosecute criminals, and it encourages others to do the same. *See Torres Teyer*, 2006 WL 3511885, at *8. The government received the benefit of Mr. Edmond's decades-long cooperation. There is no dispute that the details of his cooperation placed his life in jeopardy. But the government's position ignores the grave risk to Mr. Edmond's life and the lives of his family members associated with his weighty decision to cooperate with the government. Although the Court does not consider the post-sentencing conditions of confinement, the Court did consider Mr. Edmond's cooperation when evaluating the first factor under Section 3553(a)(1).

## V.   Conclusion

For the reasons set forth above, the Court **GRANTS** the government's Motion to Reduce Sentence pursuant to Rule 35(b)(2)(C). Mr. Edmond's previously imposed sentence of imprisonment is reduced to twenty years of imprisonment, and his

previously imposed terms of supervised release are extended to a

life term of supervised release. An appropriate Order

accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:**      **Emmet G. Sullivan**
          **United States District Judge**
          **February 23, 2021**